## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MOHAMED KHAIRULLAH, *et al.*

        *Plaintiffs,*

    v.

MERRICK GARLAND, Attorney General of the United States, in his Official Capacity, *et al.*

        *Defendants.*

Civil Action No: 3:23-cv-30095-MGM

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER, OR IN THE ALTERNATIVE, TO DISMISS FOR FAILURE TO STATE A CLAIM

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................2

I.     Statutory and Regulatory Background ............................................................................2

       A.     The Terrorist Screening Dataset and its Subcomponent Lists ........................3

       B.     Use of the TSDS and its Subcomponent Lists................................................5

       C.     Redress Procedures ........................................................................................5

II.    Plaintiffs' Allegations ...................................................................................................6

STANDARD OF REVIEW ......................................................................................................9

ARGUMENT ...........................................................................................................................9

I.     The Court Should Transfer This Case to the U.S. District Court for the District of
      Columbia Pursuant to 28 U.S.C. § 1404 or 28 U.S.C. § 1406(a) .................................9

II.    The Complaint Fails to State a Procedural Due Process Claim (Count I) ...............................11

       A.     Travel Delays Like Those Alleged Are Not Cognizable Deprivations of a Liberty
              Interest for Procedural Due Process Purposes. ...............................................12

       B.     Plaintiffs Have Not Stated a Claim for Any Alleged Injury to Their Reputations
              Under the "Stigma-Plus" Standard. ...............................................................16

       C.     Plaintiff Mirzay Has Now Received Citizenship, and Purported Delays in
              Processing for Immigration Benefits Are Not Cognizable Deprivations In Any
              Event. ..............................................................................................................20

       D.     Plaintiffs' Other Miscellaneous Theories of Deprivations Don't Work Either. .........21

       E.     Even if There Were a Cognizable Deprivation, the Procedures Satisfy Due
              Process ............................................................................................................22

       F.     TSA's Final Orders Are Subject to Exclusive Review in a U.S. Court of Appeals.....25

III.   The Substantive Due Process Claim (Count 2) Is Meritless. .......................................26

IV.   Plaintiffs' Equal Protection Claims (Count III) Fail. ...................................................30

V.    Plaintiffs Lack Standing to Pursue Injunctive and Declaratory Relief with Respect to their
      Fourth Amendment (Counts IV and VI) and Fifth Amendment Self-Incrimination (Count
      V) Electronic Device Claims. .......................................................................................32

VI.    Plaintiffs' Fourth Amendment Claims (Counts IV and VI) Fail.................................34

    A.    Electronic Devices.........................................................................................35

    B.    Lengths of Inspections and Questioning. .....................................................39

VII.    Plaintiffs' Fifth Amendment Self-Incrimination Claim Fails.................................44

    A.    The Fifth Amendment Right Against Self-Incrimination Is a Testimonial
        Protection, not a Prohibition on Government Information-Gathering......................44

    B.    Plaintiffs Fail to Allege Their Devices Contained Incriminating Information. ...........46

    C.    In the Alternative, the Appropriate Remedy Is Simply Exclusion of Any Evidence
        in Subsequent Criminal Proceedings. .....................................................47

    D.    Biometric Passwords Are Not "Testimonial." ................................................48

VIII.    Plaintiffs Fail to State a Claim Under the Religious Freedom Restoration Act (RFRA)..........50

IX.    Plaintiffs APA Claims (Counts VIII and IX) Are Co-extensive with Their Constitutional
    Claims and Fail for the Same Reasons .....................................................53

X.    Congress Has Plainly Authorized Defendants to Protect Aviation and National Security,
    Including by Screening Air Travelers. .....................................................54

XI.    Plaintiffs Fail to Allege Any Harms at All Traceable to Several Defendants, Justifying
    Their Dismissal.........................................................................................56

CONCLUSION.....................................................................................................57

# INTRODUCTION

As the Fourth Circuit recently observed, the Terrorist Screening Dataset ("TSDS"), the federal Government's consolidated watchlist of known or suspected terrorists, is a critical national security tool. *See Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021) ("[The TSDS] lies at the very heart of our country's effort to identify those who would inflict upon the public irretrievable loss and irreparable mass harms."). Multiple courts have rejected efforts by plaintiffs to call aspects of the Government's terrorist watchlisting efforts into question. *See, e.g.*, *Elhady*, 993 F.3d 208; *Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019); *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017); *Ghedi v. Mayorkas*, 16 F.4th 456, 466–67 (5th Cir. 2021); *Busic v. Transp. Sec. Admin*, 62 F.4th 547, 550 (D.C. Cir. 2023).

Undaunted by this weight of authority, Plaintiffs—twelve individuals who allege they were formerly or are currently included in the TSDS—bring to a new court the same claims for prospective equitable relief that have elsewhere failed. As an initial matter, the Court need not engage with the merits of this case at all. Instead, the Court should transfer this case pursuant to 28 U.S.C. § 1404 (or 28 U.S.C. § 1406(a)) to the U.S. District Court for the District of Columbia, which is a manifestly more appropriate judicial forum. Plaintiffs' forum selection appears tethered to only one Plaintiff among twelve, and only one other Plaintiff appears to reside in the First Circuit. Meanwhile, all the defendant agencies reside in or near the District of Columbia, as does counsel for Plaintiffs.

In the event this Court does not transfer this action, it should dismiss it for failure to state a claim upon which relief can be granted. The declaratory and injunctive relief Plaintiffs demand is sweeping and their claims are insufficient as a matter of law. Among other things, Plaintiffs seek a declaratory judgment that "the federal terrorist watchlisting system" is unconstitutional, *see* Compl., Prayer for Relief, ¶ 1, notwithstanding recent decisions rejecting nearly identical claims. *See, e.g.*, *Elhady*, 993 F.3d at 213 ("The delays and burdens experienced by plaintiffs at the border and in airports, although regrettable, do not mandate a complete overhaul of the [TSDS]. Nor are plaintiffs' alleged

reputational injuries more persuasive."). Plaintiffs demand a sweeping injunction that would contradict decades of Supreme Court precedent by, *inter alia*, "enjoining the Defendants from searching electronic devices at the border absent a warrant supported by probable cause." Compl., Prayer for Relief ¶ 3(e). Equally unsupportable is Plaintiffs' request that this Court require the Government to share sensitive national security information (protected from disclosure by statute and regulation) by providing the "reasons and bases for [Plaintiffs' alleged] placement on the federal terrorist watchlist," *id.* ¶ 3(a), when Courts have uniformly upheld the Government's non-disclosure policy in light of the weighty national security concerns involved.

Notwithstanding that many of the agency defendants in this case were specifically created by Congress in the aftermath of the September 11th attacks to work together to protect American aviation and national security from terrorist threats—and despite the clear grant of statutory authority to the Federal Bureau of Investigation ("FBI") and Transportation Security Administration ("TSA") to "assess current and potential threats to the domestic air transportation system," and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system," 49 U.S.C. § 44904(a)—Plaintiffs insist that authority for the enterprise is lacking and ask this court to "enjoin[] Defendants from maintaining, administering, using, or otherwise taking action related to the federal watchlisting system until" Congress passes additional legislation, Compl., Prayer for Relief, ¶ 3. Not only is this sweeping relief unwarranted, but none of Plaintiffs' claims, most of which have been rejected time and again, pass muster under Rule 12. Finally, to the extent any claims survive, Defendants against whom no allegations of injury are brought should be dismissed from this suit.

## BACKGROUND

### I.    <u>Statutory and Regulatory Background</u>

Several different components of the Federal Government work together to secure the United States and its borders and aviation system from terrorist threats. Within the Department of Homeland Security ("DHS"), TSA is responsible for securing all modes of transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for day-to-day federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3). TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* § 44903(b). The FBI investigates and analyzes intelligence relating to both domestic and international terrorist activities. *See* 28 U.S.C. § 533; 28 C.F.R. § 0.85(l). The FBI also administers the Terrorist Screening Center ("TSC"), a multi-agency Executive organization established by Presidential Directive in 2003 and tasked with, *inter alia*, "consolidat[ing] the Government's approach to terrorism screening and provid[ing] for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive ("HSPD") 6 (Sept. 16, 2003) [https://perma.cc/BFP2-MBWQ].

## A. **The Terrorist Screening Dataset and its Subcomponent Lists**

As part of its duties, TSC maintains the Terrorist Screening Dataset ("TSDS"),[1] which is "the federal government's consolidated watchlist of known or suspected terrorists." *Elhady v. Kable*, 993 F.3d 208, 213 (4th Cir. 2021). Inclusion in the TSDS results from a multi-step assessment, based on analysis of available intelligence and investigative information about an individual. Exhibit A, "Overview of the U.S. Government's Watchlisting Process and Procedures as of September 2020"

---

[1] Until recently, the TSDS was known as the Terrorist Screening Database or the "TSDB," and the terms are used interchangeably in this memorandum, the accompanying exhibit, and case law.

("Watchlisting Overview"), at 3.[2]  The FBI receives, reviews, and forwards to TSC "nominations" of individuals with a nexus to domestic terrorism for inclusion in the TSDS.  *Id.*  The National Counterterrorism Center, a component of the Office of the Director of National Intelligence, does the same for nominations of individuals with a nexus to international terrorism.  *Id.*  TSC then determines whether those nominations will be accepted.  *Id.*  For a nomination to be accepted, it must include enough identifying information to allow screeners to determine whether the individual matches a record in the TSDS, and enough information to satisfy a reasonable suspicion that the individual is a known or suspected terrorist.  *Id.*

The "reasonable suspicion" standard for inclusion in the TSDS has been met when, based on the totality of the circumstances, there is reasonable suspicion that a person is engaged, has been engaged, or intends to engage in conduct constituting, in preparation for, or in aid or in furtherance of terrorism and/or terrorist activities.  *Id.* at 4.  In making this determination, "[a] nominator must rely upon articulable intelligence or information," "taken together with rational inferences drawn from [that intelligence or information]."  *Id.*  Mere guesses, hunches, or the reporting of suspicious activity alone are not sufficient to establish reasonable suspicion.  *Id.*  Nor can inclusion in the TSDS be based solely on an individual's race, ethnicity, or religious affiliation, nor solely on beliefs or activities protected by the First Amendment.  *Id.*

The TSDS contains subsets of data, known as the No Fly List, the Selectee List, and the Expanded Selectee List.  Inclusion on any of these lists requires satisfaction of additional criteria

---

[2] The Watchlisting Overview document, which was released by the U.S. Government following an inter-agency review process, provides an official, authorized description of watchlisting policies and procedures.  The Court may properly take judicial notice of this public government document in evaluating the motion to dismiss. *See, e.g., Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 12 (1st Cir. 2004) ("the jurisprudence of Rule 12(b)(6) permits courts to consider matters that are susceptible to judicial notice."); *Ross v. Deutsche Bank Nat. Tr. Co.*, 933 F. Supp. 2d 225, 229 (D. Mass. 2013) ("In reviewing a motion to dismiss under Rule 12(b)(6), a district court may consider . . . matters subject to judicial notice, such as public records.")

distinct from, and over and above, that required for designation as a known or suspected terrorist and inclusion in the TSDS generally. *Id.*

### B.  Use of the TSDS and its Subcomponent Lists

One of the primary uses of the TSDS and its subsets is to ensure aviation security.  For example, TSA uses TSDS information to "identify [travelers] who may be a threat to civil aviation or national security," 49 U.S.C. § 114(h)(3)(A), and to "prevent [those] individual[s] from boarding an aircraft, or take other appropriate action with respect to that individual," *id.* § 114(h)(3)(B); *id.* § 114(h)(1).  The federal government also utilizes TSDS information for other purposes, including assisting state, local, and tribal governments with law enforcement and corrections.

The FBI, pursuant to statutory authority and through its Criminal Justice Information Services Division, shares TSDS information with state, local, and tribal governments, pursuant to authorization agreements, and subject to audit. *See* 28 U.S.C. § 534(a).  Pursuant to TSA regulation, Sensitive Security Information ("SSI")—including No Fly, Selectee, and Expanded Selectee list information—may be shared with law enforcement partners, including state, local, and tribal governments.  *See* 49 C.F.R. § 1520.11(b) (identifying "[p]ersons with a need to know" SSI information, including "[s]tate, local or tribal government employees" if access is necessary for performance of their official duties); § 1520.7(j) (identifying persons who have access to SSI pursuant to § 1520.11(b)).

### C.  Redress Procedures

Congress directed TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* § 44903(j)(2)(G)(i) (instructing TSA Administrator to "establish a timely and fair process for individuals identified as a threat under [the passenger screening system] to appeal to the Transportation Security Administration the

determination and correct any erroneous information."); *see also id.* § 44926(a) (granting similar authority to DHS Secretary).  Pursuant to these authorities, TSA has promulgated regulations creating a redress process, known as the DHS Traveler Redress Inquiry Program (DHS TRIP), 49 C.F.R. §§ 1560.201–1560.207, under which travelers may initiate redress process by submitting a redress inquiry form.  *Id.* § 1560.205(b).

If the traveler's information is a match or near match to an individual listed in the TSDS, "TSA, in coordination with the TSC and other appropriate Federal law enforcement or intelligence agencies, if necessary, will review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response."  *Id.* § 1560.205(d).  At the end of its review, DHS TRIP responds with a determination letter, the contents of which vary based on the circumstances, but which generally advise the traveler of any corrections that may have been made as a result of DHS TRIP's review.  *See generally Elhady*, 993 F.3d at 215 (describing redress process for individuals experiencing travel-related difficulties).

DHS TRIP provides additional procedures for U.S. persons (*i.e.*, citizens and lawful permanent residents) who purchase tickets, are denied boarding on flights due to watchlist status, and file redress petitions alleging that they were improperly denied boarding.  *See generally Latif v. Lynch*, No 3:10-cv-00750, 2016 WL 1239925, at *5 (D. Or. Mar. 28, 2016) (describing process, the information disclosed, and the resulting order issued by the TSA Administrator).  Upon submitting proper redress petitions, such individuals are informed if they are on the No Fly List.  If so, they are offered an opportunity to be provided with the criterion and a summary of the factual basis for the No Fly List determination, to the extent possible consistent with national security and law enforcement interests.  *See id.*  The traveler then has an opportunity to respond to this information before the TSA Administrator issues a final determination as to the traveler's status on the No Fly List.  *See id.*

## II.     Plaintiffs' Allegations

The Complaint brings claims for relief on behalf of twelve individual plaintiffs, who allege varied and sometimes overlapping theories of harm.  Plaintiff Mohamed Khairullah is a U.S. citizen and resident of New Jersey who alleges he was formerly included in the TSDS, but was removed sometime between 2021 and 2023.  Compl. ¶¶ 14, 59, 461. Plaintiff Michael Migliore is a U.S. citizen who alleges he is on the No Fly List, and that he took a cruise ship to travel from the United States to Europe in 2011, and then to Saudi Arabia, where he now resides. *Id.* ¶¶ 15, 478, 497.  The remaining ten plaintiffs all allege that they are currently included in the TSDS.  Plaintiffs Nidal El-Takach and Moneeb Elhady are U.S. citizens residing in Michigan. *Id.* ¶¶ 16, 18.  Plaintiff Naveed Butt is a U.S. citizen residing in Virginia.  *Id.* ¶ 17.  Plaintiff Abdulrahman Cherri is a U.S. citizen currently pursuing studies (and residing in) Germany.  *Id.* ¶¶ 19, 762.  Cherri already has a pending lawsuit raising similar claims, and seeking virtually identical relief, in the U.S. District Court for the Eastern District of Michigan.  *See Cherri v. Mueller*, 2:12-cv-11656-DPH-RSW (E.D. Mich. Apr. 13, 2012).  Plaintiff Tawhidullah Amini is a lawful permanent resident currently residing in Missouri.  Compl. ¶ 20. Plaintiff Nusratilla Abdukhamidov is a citizen of Uzbekistan, ¶ 849, and a U.S. lawful permanent resident residing in Tennessee.  *Id.* ¶ 21.  Plaintiff Ahmad Mirzay resides in West Springfield, Massachusetts. *See, e.g.,* Compl. ¶ 22; *see also* Exhibit B, Declaration of Jay R. Weselmann ¶ 7.  Plaintiff Mirzay alleges that he is a "lawful permanent resident," but in fact he received his naturalization certification and became a U. S. citizen on September 26, 2023.  Weselmann Decl. ¶ 7.  Plaintiff Talha Mohamed is an asylee currently residing in New Mexico.  Compl. ¶ 23.  Plaintiff Adam Qashou is a U.S. citizen and Alabama resident.  *Id.* ¶ 24.  Plaintiff Ihab Rashad is a U.S. citizen who resides in New Hampshire.  *Id.* ¶ 25.  Among his allegations, Rashad claims to have experienced travel difficulties while flying out of Logan Airport in Boston from 2007–2015, *see* Compl. ¶¶ 961–62, but allegedly has not flown out of the airport since that time period.

With some variation, Plaintiffs collectively allege the following categories of harm arising from alleged watchlist status:

- Enhanced security screenings and delays at airports: virtually all Plaintiffs appear to allege some volume of these encounters, to include delays of a few hours and in some cases missed flights. These allegations are discussed *infra* Section II.A.

- Stigma from their purported watchlist status: Virtually all Plaintiffs also make this allegation to some degree.  *See infra* Section II.B.

- Delays in the processing of their applications for citizenship and other benefits: Plaintiffs Amini, Abdukhamidov, and Mirzay (although Plaintiff Mirzay's naturalization ceremony was scheduled for a few days after the Complaint was filed, and he has now become a citizen—facts he has not shared with the Court).  Discussion of these alleged harms are included *infra* Section II.C.

- Electronic device searches and seizures:  Eight Plaintiffs bring claims that Defendants searched their electronic devices in contravention of the Fourth Amendment.  *See infra* Section VI.A.

- Inspections and questioning at borders:  Nine Plaintiffs contend that the length of questioning they experience at border crossings constitutes lengthy and unjustified detention.  *See infra* Section VI.B.

- Self-Incrimination:  Six Plaintiffs assert that compelled provision of passwords and biometric information to open electronic devices violates their Fifth Amendment right against self-incrimination.  *See infra* Section VII.

- Plaintiffs Khairullah and Butt allege their applications for Global Entry were denied, ¶ 283, and Plaintiff Rashad alleges he was denied TSA PreCheck, *id*.  *See infra* Section II.D.

- Plaintiff Mirzay alleges that his application for a firearms license was denied by the West Springfield, MA, Police Department.  That claim is addressed *infra* Section II.D.

- Plaintiffs Butt and Amini have alleged that they have been unable to secure necessary security clearances for particular government employment. Compl. ¶ 1044(d), (f).  Additionally, Plaintiff Migliore alleges that he "is unable to change jobs because of his placement on the No Fly List and has lost work opportunities as a result."  *Id.* ¶ 1044(b).  *See infra* Section II.D.

- Plaintiffs Abdukhamidov, Elhady, and Qashou allege that they have had accounts at financial institutions or money transfer companies closed by virtue of their alleged watchlist status. *See, e.g.*, Compl. ¶ 210.  These allegations are addressed *infra* Section II.B.

All Plaintiffs, except Khairullah and Qashou, allege they have submitted DHS TRIP applications and received at least one final determination letter, with the exception of Mirzay, who allegedly had not received a response from DHS TRIP at the time of the filing of the complaint. *Id.* ¶¶ 512–13 (Migliore (first inquiry)); ¶ 514 (Migliore (second inquiry, no response received as of date of Complaint)); ¶¶ 614–15 (El-Takach (first inquiry)); ¶ 616–17 (El-Takach (second inquiry)); ¶ 647 (Mirzay); ¶¶ 683–84 (Butt); ¶¶ 754–55 (Elhady); ¶¶ 806–07 (Cherri); ¶¶ 836–37 (Amini); ¶¶ 893–894 (Abdukhamidov); ¶¶ 916–17 (Mohamed); ¶¶ 1020–21 (Rashad, received final determination letter).

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court will ordinarily accept as true all well-pleaded facts in the complaint and draw reasonable inferences in favor of the plaintiff. *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

I.   **The Court Should Transfer This Case to the U.S. District Court for the District of Columbia Pursuant to 28 U.S.C. § 1404 or 28 U.S.C. § 1406(a).**

As an initial matter, the Court need not address the merits of Plaintiffs' claims because, under 28 U.S.C. § 1404 (or 28 U.S.C. § 1406(a)), the Court should transfer this case to the U.S. District Court for the District of Columbia, which is a more appropriate judicial forum given the allegations and parties in the case. *See* 28 U.S.C. § 1404(a) ("in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought"); 28 U.S.C. § 1406(a) ("The district court of a district in which is filed a case laying venue in the wrong division

or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.").

Here, a significant percentage of the Defendant agencies are headquartered in Washington, D.C., including the Department of Justice, the FBI, U.S. Customs and Border Protection ("CBP"), and others. Additionally, the National Headquarters for Plaintiff's Counsel, the Council on American-Islamic Relations ("CAIR")—including the office address for four attorneys who signed the Complaint—is also in Washington, D.C. The Complaint broadly challenges an overlapping series of government policies and brings claims on behalf of twelve different Plaintiffs scattered across a number of states, all but one of whom (Plaintiff Mirzay) reside outside of Massachusetts.[3] And even as to Plaintiff Mirzay, there appear to be no factual allegations in the Complaint regarding travel-related difficulties in Massachusetts, as all of his alleged TSDS-related travel encounters occurred at John F. Kennedy International Airport in New York. *See, e.g.,* Compl. ¶¶ 632, 639. Indeed, the only Plaintiff with travel-related allegations in Massachusetts—Plaintiff Rashad, a New Hampshire resident—allegedly last experienced difficulties while flying out of Logan Airport in 2015, *see* Compl. ¶ 971, which is beyond the six-year statute of limitations period in any event. *See* 28 U.S.C. § 2401(a) ("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues").

The Government therefore submits that a transfer to the U.S. District Court for the District of Columbia would serve the interests of justice and would permit the parties to litigate this case in a district with a more obvious connection to the underlying facts, claims, and issues in the case. *See, e.g., King v. Deming,* No. CV 19-30018-MGM, 2019 WL 13251003, at *2 (D. Mass. Apr. 24, 2019) ("Under

---

[3] Khairullah resides in New Jersey. Compl. ¶ 14. Migliore resides in Saudi Arabia. *Id.* ¶ 15. El-Takach and Elhady reside in Michigan. *Id.* ¶¶ 16, 18. Butt resides in Virginia. *Id.* ¶ 17. Cherri resides in Germany. *Id.* ¶ 19. Amini resides in Missouri. *Id.* ¶ 20. Abdukhamidov resides in Tennessee. *Id.* ¶ 21. Mohamed resides in New Mexico. *Id.* ¶ 23. Qashou resides in Alabama. *Id.* ¶ 24. Rashad resides in New Hampshire. *Id.* ¶ 25.

§ 1404(a), a district court may transfer any civil action to any other district where it may have been brought '[f]or the convenience of parties and witnesses, in the interest of justice.' ") (quoting *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000)).  The Government notes in this regard that the D.C. Circuit is not among the many courts that have already rejected parallel watchlisting claims to those brought here. *See, e.g.*, *Elhady*, 993 F.3d 208; *Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019); *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017); *Ghedi v. Mayorkas*, 16 F.4th 456, 466–67 (5th Cir. 2021).  Thus, transfer to that Court does not doom Plaintiffs' claims as a matter of *stare decisis*, at least when it comes to prior assessments of parallel claims based on similar facts.

## II.    The Complaint Fails to State a Procedural Due Process Claim (Count I).

In the event the Court does not transfer this action, it should dismiss each claim.  To begin, Plaintiffs allege that Defendants are violating the Procedural Due Process Clause of the Fifth Amendment, both facially and as-applied, "by placing and maintaining Plaintiffs and other similarly[]situated Americans, lawful permanent residents, and foreign citizens in the Terrorist Screening Dataset, as well as its subsets like the No Fly List and Selectee List, without any meaningful process," Compl. ¶¶ 1031, 1045.  To succeed on a facial challenge, a plaintiff "must establish that no set of circumstances exists under which the [statute] would be valid."  *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022) (citation omitted), *cert denied*, 144 S. Ct. 72 (mem.).  The First Circuit has been "mindful that facial challenges 'are disfavored' because they 'often rest on speculation,' 'run contrary to the fundamental principle of judicial restraint,' and 'threaten to short circuit the democratic process.'"  *Id.* (citation omitted); *see also Elhady*, 993 F. 3d at 217 (rejecting facial challenge in context of identical claims and citing same concerns that facial challenges, *inter alia*, "threaten to short circuit the democratic process.") (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)).  When considering facial challenges, courts note that "programs can withstand such facial attacks whenever they are capable of constitutional applications."  *Id.* (citing *Salerno*, 481

U.S. at 745).  The programs described here are clearly capable of constitutional application.  *See id.* at 208.  Plaintiffs' facial challenges should be dismissed at the outset.

The as-applied claims fare no better.  To demonstrate a denial of due process, Plaintiffs must show (1) a cognizable liberty interest; (2) the deprivation of that interest by government action; and (3) that the procedures employed were constitutionally inadequate.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  In evaluating the constitutional adequacy of procedures, the Court should consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest," including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.  *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997) (*quoting Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  The due process inquiry and mandated procedures must be directed at the "generality of cases, not the rare exceptions."  *Mathews*, 424 U.S. at 344.  Here, Plaintiffs' allegations of purported liberty interests (and accompanying deprivations) generally fall into four categories: their "liberty interests in travel," Compl. ¶ 1038; their "liberty interests in . . . their reputations," *id.*; alleged delays in the processing times for citizenship applications and assorted immigration benefits, *see id.* ¶ 1044(c), (f), (g); and a miscellaneous category that ranges from purported harms like the denial of an application for Global Entry or TSA Pre-Check to the denial of a firearms license by state authorities to the alleged denial of a security clearance for government employment.  *See, e.g., id.* ¶ 1044(a), (c), (d), (j).  None of these theories work.

### A.  Travel Delays Like Those Alleged Are Not Cognizable Deprivations of a Liberty Interest for Procedural Due Process Purposes.

Four unanimous circuit court panels—of the Fourth Circuit, Fifth Circuit, Sixth Circuit, and Tenth Circuit—have recognized that travel delays resulting from purported status on a terrorist

watchlist are not cognizable deprivations of liberty for procedural due process purposes.  *See Elhady*, 993 F.3d 208; *Abdi*, 942 F.3d 1019; *Beydoun*, 871 F.3d 459; *Ghedi*, 16 F.4th at 466–67; *see also Proctor v. DHS*, 777 F. App'x 235, 236 (9th Cir. 2019) ("enhanced security screening does not implicate a protected liberty interest").

In *Elhady*, the Fourth Circuit held that even repeated and occasionally intrusive instances of enhanced screening resulting from purported TSDS status did not amount to a deprivation of a liberty interest.  993 F.3d 208.  Although certain plaintiffs had purportedly experienced "extreme encounters with law enforcement," while others had shown "only *de minimis* delays in international and domestic travel," *id.* at 225, "the due process inquiry and mandated procedures must be directed at the 'generality of cases, not the rare exceptions.'"  *Id.* at 217 (quoting *Mathews*, 424 U.S. at 344); *see also id.* at 225.  Accordingly, the Fourth Circuit concluded that:

> [P]laintiffs do not possess a protected liberty interest in being free from screening and delays at the border.  No plaintiff alleges he was unable to cross an international border.  The plaintiffs complain of extra delays ranging from a few minutes to twelve hours, with most being on the shorter end of that spectrum.  Such delays are not atypical for travelers, particularly at busy ports of entry at land borders.  Given the government's broad power to control movement across the nation's borders, the burdens experienced by plaintiffs are not infringements of "liberty" within the meaning of the Due Process Clause.

*Id.* at 224.  Further, "[e]nhanced screening is a relatively common experience for frequent airport travelers because the TSA will often randomly select people for this screening.  Further, most passengers chosen for enhanced screening are not in the TSDB."  *Id.* at 214.

Similarly, in *Beydoun*, the Sixth Circuit addressed a due process challenge brought by two individuals who alleged they were included on the Selectee List.  871 F.3d 459.  Similar to the allegations in the present case, the plaintiffs in *Beydoun* alleged that they "missed 'countless flights' after being subjected to lengthy secondary screenings," *id.* at 467, citing "delays ranging from ten minutes to one hour in duration" and contended that they "had been deterred from flying on one occasion," *id.* at 467–68.  The court affirmed the dismissal of both plaintiffs' claims, holding that "Plaintiffs did

13

not allege that any protected interest was violated by the[ir] being on the Selectee List." *Id.* at 468. The court reasoned that "Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane," but "these burdens do not amount to a constitutional violation" because "Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane." *Id.* Accordingly, there was no deprivation.

In *Abdi*, the Tenth Circuit also held that travel delays as a result of purported status in the TSDS did not amount to a deprivation of a liberty interest. 942 F.3d at 1030–31. It reasoned that "placement on the Selectee List affects only one mode of transportation throughout the country," and "places no restrictions on [plaintiff's] ability to drive, bus, or otherwise commute interstate." Even an alleged two-day delay was permissible, because it was commensurate with delays in other cases. *Id.* Ultimately, because "the excessive security Abdi experiences is not unlike that of many air travelers," he had not shown a deprivation of his right to travel. *Id.* at 1031.

The Fifth Circuit in *Ghedi* held similarly. There, the plaintiff failed to plausibly allege "that he has been deprived of his right to travel internationally by the extra security measures he has experienced." *Ghedi*, 16 F.4th at 467.

Multiple lower courts are in accord. *See, e.g., Kovac v. Wray*, 363 F. Supp. 3d 721, 752 (N.D. Tex. 2019) ("the Screening List Plaintiffs have failed to state a claim that their inclusion in the Screening List caused them to suffer a deprivation of a liberty interest based on their right to travel, as that term is historically understood."); *Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249, at *6-7 (E.D. Mich. Mar. 8, 2017). Indeed, any passenger may be required to undergo enhanced screening or inspection for reasons unrelated to watchlists. *See Scherfen v. U.S. Dep't of Homeland Sec.*, No. 3:CV-08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watchlists."); *see also*

Secure Flight Program, 73 Fed. Reg. 64,018, 64,025 (Oct. 28, 2008) ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening.")

Even in the context of interstate travel, courts have held that travel delays ranging from a few hours up to a full day do not unconstitutionally burden the right to travel. *See, e.g., City of Houston v. FAA*, 679 F.2d 1184, 1186-99 (5th Cir. 1982) (upholding regulation limiting use of airport so that certain passengers must use connecting flights or land at a more distant airport); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 51 (2d Cir. 2007) (upholding law banning certain ferry travel to an island thereby making interstate travel "longer and more expensive"); *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 141 (2d Cir. 2010) (holding that a delay of "a little over one day . . . was a minor restriction" that did not deny the right to travel").

In this case, Plaintiffs' claims of travel delays and missed flights similarly are insufficient to state a procedural due process claim. *See* Compl. ¶ 1039(e) (Plaintiff Cherri alleges that he is "consistently detained for hours at a time,"); *id.* ¶ 407 ("Defendants took approximately 3 hours to provide the required clearance" to Plaintiff Khairullah); *id.* ¶ 568 (Plaintiff El-Takach alleging a total of a six-hour delay); *id.* ¶ 936 ("While detained by these officers, Mr. Qashou missed his connecting flight to Atlanta"). Indeed, numerous *Elhady* plaintiffs experienced multi-hour delays and missed flights very similar to those in Plaintiffs' Complaint. *See* 993 F.3d at 216 nn. 1-2 (compiling Plaintiffs' asserted delays, many of which were repeated, and several hours in length, and included missed flights). Similarly, the *Beydoun* plaintiffs alleged that they "missed 'countless flights' after being subjected to lengthy secondary screenings." *Beydoun*, 871 F.3d at 467.

Finally, with respect to alleged delays at land border crossings, the Supreme Court has held that "delays of one to two hours at international borders are to be expected," *United States v. Flores-Montano*, 541 U.S. 149, 155 n.3 (2004), and other courts of appeals have found detentions at the border

15

of four to six hours to be constitutional, *Tabbaa v. Chertoff*, 509 F.3d 89, 100–01 (2d Cir. 2007), "[I]nconvenience" for the traveler, including delays at the border, does not amount to a constitutional "denial of the right to travel." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007). Furthermore, Plaintiffs retain the right to travel by alternative forms of transportation—including by car, bus, or train—and as such there is no infringement on any constitutional right to travel. *Cf. Azubuko v. Registrar of Motor Vehicles*, 95 F.3d 1146 (1st Cir. 1996) (table) (per curiam) (noting that a law "does not impede the right to travel [where] it limits only one method of transportation").

### B. Plaintiffs Have Not Stated a Claim for Any Alleged Injury to Their Reputations Under the "Stigma-Plus" Standard.

Because "injury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process Clause]," *Siegert v. Gilley*, 500 U.S. 226, 233 (1991), the Supreme Court has formulated a heightened standard, known as the "stigma-plus" test, to determine whether alleged reputational harm infringes a liberty interest. *See Paul v. Davis*, 424 U.S. 693, 711 (1976). Under this test, plaintiffs alleging reputational harm must demonstrate: (1) they suffered a stigma from governmental action; plus (2) they experienced an alteration or extinguishment of "a right or status previously recognized by state law." *Id.*; *see also URI Student Senate v. Town Of Narragansett*, 631 F.3d 1, 9 (1st Cir. 2011) (stating the general rule that "when a person alleges that she has suffered stigmatization at the hands of a government actor, she must show an adverse effect on some interest 'more tangible' than reputational harm" and noting that "[t]he 'plus' part of this formulation is not an empty formality.") Moreover, for a stigmatic injury to be cognizable, it must be "publicly disclosed" and a plaintiff must have suffered a "tangible loss" as a result of that public disclosure. *Hannemann v. S. Door Cnty Sch. Dist.*, 673 F.3d 746, 753 (7th Cir. 2012). Absent public disclosure by the party against whom relief is sought, courts are "disinclined to exceed the established limits of constitutional claims of reputation injury." *Hawkins v. R.I. Lottery Comm'n*, 238 F.3d 112, 116 (1st Cir. 2001).

*First*, Plaintiffs have not alleged facts showing public stigmatization.  *See Elhady*, 993 F.3d at 226 (rejecting stigma-plus claims for individuals claiming to be in the TSDS); *Abdi*, 942 F.3d 1032–33 (similar); *Beydoun v. Lynch,* Case No. 14-cv-13812, 2016 WL 3753561, at *5 (E.D. Mich. July 14, 2016) (similar).  Plaintiffs makes no allegation of a disclosure of any purported status on a terrorist watchlist to the public at large—at most, they allege that TSDS status is shared with "federal, state, local, tribal, foreign, and international governmental agencies," Compl. ¶ 97, or with financial institutions,[4] *see, e.g.,* Compl. ¶ 948, or that particular airport encounters were witnessed by "other passengers," *e.g.,* Compl. ¶¶ 450, 481, 588.  As to the presence of other passengers during certain incidents, Plaintiffs allege that these incidents "play out in public, amplifying the shame and stigma that listed individuals, including Plaintiffs, endure," Compl. ¶ 1043, but Plaintiffs provide no reason to believe that any other passengers (let alone the general public) believed that Plaintiffs were being searched because of watchlist status.

As a factual matter, individuals may experience enhanced screening or inspection for reasons unrelated to any watchlist status, including at random.  *See Scherfen*, 2010 WL 456784, at *7 ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "[t]ravelers may be pulled out of line, searched, and questioned for a variety of

---

[4] With regard to Elhady, Abdukhamidov, and Qashou's allegations that Bank of America, Chase Bank, Wells Fargo, MoneyGram, and CashApp abruptly closed their accounts because Defendants "distributed the stigmatizing label of 'known or suspected terrorists'" to these financial institutions, *see* Compl. ¶ 211, Plaintiffs miss the target.  Even if Plaintiffs were included in the TSDS, that status was shared with banks, and the banks then closed accounts on that basis (speculative allegations at best), that would not constitute an adequate "plus" injury," because "the government's act of including names in the TSDS does not *mandate* that private entities deny people such privileges.  It merely makes information available to private entities, . . . and then those companies make their own choices." *Elhady*, 993 F.3d at 227.  Nowhere do Plaintiffs allege that federal officers mandated any of the alleged actions taken by financial institutions, nor that those institutions even invoked alleged watchlist status.  Such unadorned, speculative allegations do not pass muster.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

reasons, unrelated to watchlists."); Secure Flight Program, 73 Fed. Reg. at 64,025 ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[P]assengers [who are not on the Selectee List] will not always avoid enhanced screening."). Thus, several courts have correctly observed that "[s]ince every air passenger is subjected to a search, there is virtually no 'stigma attached to being subjected to search at a known, designated airport search point,'" including searches at the gate. *United States v. Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006); *United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973)); *accord United States v. Wehrli*, 637 F.2d 408, 409 (5th Cir. Unit B Feb. 1981).

Nor does disclosure to select authorized entities constitute public disclosure. As the Fourth Circuit has recognized, "disclosure [of TSDS information] to state or tribal law enforcement agencies," and disclosure "to a select number of private companies that work closely with issues related to national security," does not suffice under stigma-plus. *Elhady*, 993 F.3d at 226. Other courts have reached similar conclusions, differentiating between the proper government use of information and the improper dissemination by the Government of potentially stigmatizing information to the public. *See Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014) (alleged disclosure of No Fly List status to an airline did "not constitute dissemination of the stigmatizing information in such a way as to reach the community at large"); *Van Atta v. Def. Intel. Agency*, No. 87-1508, 1988 WL 73856, at *2–3 (D.D.C. July 6, 1988) (recognizing the "crucial distinction between official disclosure and public disclosure" in cases where "[t]he government's decision to share information with a foreign power does not open that information to public scrutiny").

The Complaint does not allege that any of Plaintiffs' TSDS status was disseminated outside of the government's normal chain of command here. Plaintiffs allege only that a Swiss hacker purportedly obtained copies of TSDS identities from an airline's internal server. *See* Compl. ¶ 349. But Plaintiffs have not provided any allegations that *the Government* bears responsibility for this

incident—indeed, they allege that a foreign hacker obtained and disseminated the information after an airline purportedly mishandled it. *See id.* And moreover, the Complaint wholly fails to allege any public dissemination of these Plaintiffs' TSDS status.

*Second*, Plaintiffs have not shown that any legal right has been "distinctly altered or extinguished" along with the alleged stigma, and therefore fail to allege a "plus" factor. *See Paul*, 424 U.S. at 711; *see also Mead v. Indep. Ass'n*, 684 F.3d 226, 233 (1st Cir. 2012) (stigma-plus plaintiff "must show an adverse effect on some interest more tangible than reputational harm . . . . [T]he reputational injury must be accompanied by a change in the injured person's status or rights under substantive state or federal law." (quoting *Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997)). Any such "change in status must be 'significant.'" *Al-Turki v. Tomsic*, 926 F.3d 610, 617 (10th Cir. 2019). Indeed, the Supreme Court created the stigma-plus test precisely to ensure that there were tangible government deprivations attached to cognizable stigmatic injury, not just extraneous consequences that flow from the reputational injury itself. *See Siegert*, 500 U.S. at 234. Where a right is not a "protectable legal status,"— such as where an administrator has discretion whether to award or deny a privilege or benefit—a plus factor is not established. *See Al-Turki*, 926 F.3d at 619 (citing *Behrens v. Regier*, 422 F.3d 1255, 1256 (11th Cir. 2005), in which state law "did not confer any adoption right of which the plaintiff was deprived" because "the decision to place a child in a prospective home is a discretionary one"). Thus, the stigma-plus test can only be satisfied if a "plaintiff shows that the injury to reputation was inflicted 'in connection with' the deprivation of a federally protected right; or plaintiff shows that the injury to reputation 'caused' the denial of a federally protected right." *Boyd v. Lake Cnty.*, No. 04-3095-PA, 2007 WL 1598086, at *5 (D. Or. June 1, 2007) (citing *Hart v. Parks*, 450 F.3d 1059, 1070 (9th Cir. 2006)).

Here, Plaintiffs identify no plausible "plus." To the extent they allege concrete harms at all, as discussed below, those alleged harms do not amount to a tangible change in legal status on the part of any Plaintiff.

### C. Plaintiff Mirzay Has Now Received Citizenship, and Purported Delays in Processing for Immigration Benefits Are Not Cognizable Deprivations In Any Event.

Several Plaintiffs allege that their purported TSDS status has caused them to experience delays in the processing of their applications for U.S. citizenship or other immigration benefits. *See, e.g.,* Compl. ¶ 1044(c) ("Mr. Mirzay had . . . his applications for full permanent residency and U.S. citizenship remain stuck in indefinite administrative processing."); *id.* ¶ 1044(f) ("Mr. Amini['s] . . . U.S. citizenship application has been stuck in administrative processing since 2019"); *id.* ¶ 1044(g) (same, as to Plaintiff Abdukhamidov, whose application for US citizenship has allegedly "been stalled in indefinite administrative processing since 2016"); *id.* ¶ 1044(h) ("Mr. Mohamed's mother and friend had their visa application and visa revoked.").[5]

As an initial matter, Plaintiff Mirzay in fact became a naturalized citizen on September 26, 2023, in Lawrence, Massachusetts. *See* Declaration of Jay R. Weselmann, ¶ 7. While his naturalization ceremony occurred after the Complaint was filed—and Plaintiffs' counsel did not file an Amended Complaint or otherwise inform the Court of this development, despite its relevance to Plaintiff Mirzay's claims—any allegations of delay in the processing of his citizenship application, assuming *arguendo* that such delay was traceable to purported TSDS status, would be moot for purposes of prospective injunctive and declaratory relief. *Cf. ACLU of Mass. v. U.S. Conf. of Cath. Bishops,* 705 F.3d 44, 52 (1st Cir. 2013) ("The doctrine of mootness enforces the mandate 'that an actual controversy must be extant at all stages of the review, not merely at the time the complaint is filed.'" (quoting *Mangual v. Rotger–Sabat,* 317 F.3d 45, 60 (1st Cir. 2003)).

---

[5] As to Plaintiff Mohamed, neither of these other individuals—his mother and friend—are named as Plaintiffs in this case, nor does Plaintiff identify any obvious authority that would permit him to assert injuries on behalf of these other individuals. Their claims, if any exist, are not before the court.

Nor can Plaintiffs Amini or Abdukhamidov rely on purported delays of the processing of their citizenship applications for purposes of identifying a plus factor.  While lawful permanent residents may have the right to apply for adjustment of status, naturalization, or other immigration benefits, they are not entitled as a legal matter to a favorable adjudication of such applications nor to adjudication on a preferred timeline, and any delay in the processing of those applications is therefore not "a change in the injured person's status or rights under substantive state or federal law" as required to state a stigma-plus claim. *See Mead*, 684 F.3d at 233; *see also Elhady*, 993 F.3d at 228 n. 5 (4th Cir. 2021) ("As for alleged delays in obtaining visas and other immigration privileges, there is no legal injury because there is no legal right to speedy grants of such privileges.").

### D. Plaintiffs' Other Miscellaneous Theories of Deprivations Don't Work Either.

Plaintiffs' other assorted theories of harm likewise fail to make out a plus element.  For example, Plaintiffs allege that they were unable to secure necessary security clearances for employment to support a "plus" allegation.  *See, e.g.,* Compl. ¶¶ 689, 842-843.  But as the First Circuit noted in *Mead*, "neither reputational harm nor the consequent impairment of future employment opportunities are constitutionally cognizable injuries," *Mead*, 684 F.3d at 235; *see also id.* at 236 ("To the extent that Mead's career opportunities have been dimmed, the damage is solely the result of harm to her reputation, not some statutory impediment or other legal obstacle to her employment.  Hence, she has no viable stigma plus claim on the basis of a burdening of employment prospects.").  Moreover, for employment interference to be cognizable under stigma-plus, a plaintiff must demonstrate that it is "virtually impossible for the employee to find new employment in his chosen field."  *Brown v. City of Mich. City*, 462 F.3d 720, 730 (7th Cir. 2006).  Plaintiffs fall far short.  Additionally, security clearances are granted at the discretion of the Government following a satisfactory background check; they are not a legal entitlement and thus would fail to constitute the necessary "change in the injured person's

status or rights under substantive state or federal law" as required to state a stigma-plus claim. *Mead,* 684 F.3d at 233; *see also Dep't of Navy v. Egan,* 484 U.S. 518, 528 (1988) ("It should be obvious that no one has a 'right' to a security clearance."). *See generally* Exec. Order No. 13764, 82 Fed. Reg. 8115 (Jan. 17, 2017) (governing Security Clearances).

With respect to Plaintiff Mirzay's effort to obtain a firearms license, *see* Compl. ¶ 648, he fails to even allege that owning a firearm (or having a license for such ownership approved) is a "a right or status previously recognized by state law." *Paul,* 424 U.S. at 711. Indeed, the Tenth Circuit in *Abdi* rejected a due process claim predicated in part on the allegation that placement on the terrorist watchlist and "the wide dissemination of [a] stigmatizing label" "could[] potentially" cause the Plaintiff to "be prevent[ed from] [p]urchasing a gun," because the Plaintiff "failed to allege that, in addition to distributing the list of 'known of suspected' terrorists on which his name appears, the government mandates that the private and public entities in receipt of the list refuse to offer service[s]," including gun sales. *See Abdi,* 942 F.3d at 1034 (citations omitted).[6] Lastly, the denial of TSA Pre-Check or Global Entry does not represent a change in legal status either. *See* Compl. ¶ 283. These are discretionary benefits, not a legal status, as to which "Congress committed to [DHS] the sole discretion to determine eligibility guidelines and evaluate applicants." *Roberts v. Napolitano,* 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011). *See Al-Turki,* 926 F.3d at 619 (discretionary benefits do not amount to a "protectible legal status"). None of these are recognized rights that have been altered or extinguished.

### E. Even if There Were a Cognizable Deprivation, the Procedures Satisfy Due Process.

Assuming for the sake of argument that the question is reached, currently existing redress processes are constitutionally adequate. "'[D]ue process' . . . is not a technical conception with a fixed

---

[6] *See also* Abdi, 942F.3d at 1034 ("Abdi alleges that the government disseminates the watchlist 'with the purpose and hope' that the entities and individuals that receive it 'will impose consequences on those individuals.' But a 'purpose and hope' is not a mandate." (citations omitted)).

content unrelated to time, place and circumstances." *Homar*, <u>520 U.S. at 930</u> (citation omitted). Instead, it is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, <u>408 U.S. 471, 481</u> (1972).

Even if Plaintiff had identified a constitutionally protected interest, that interest is quite limited. In contrast, "[t]here is obviously a compelling government interest in preventing terrorist attacks against commercial aviation." *Mohamed v. Holder*, <u>266 F. Supp. 3d 868, 880</u> (E.D. Va. 2017), *appeal dismissed sub nom. Mohamed v. Sessions*, No. 17-7235, <u>2017 WL 8289654</u> (4th Cir. Dec. 21, 2017); *see also Haig v. Agee*, <u>453 U.S. 289, 307</u> (1981) ("[N]o governmental interest is more compelling than the security of the Nation."); *Wayte v. U.S.*, <u>470 U.S. 598, 612</u> (1985) ("Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning.").

The DHS TRIP process does not permit individuals who are not U.S. Persons on the No Fly List to learn their watchlist status, and for good reason. As numerous courts have recognized, this nondisclosure serves to protect against significant national security harms. *Elhady*, <u>993 F.3d at 215</u> ("Disclosure would disrupt and potentially destroy counterterrorism investigations because terrorists could alter their behavior, avoid detection, and destroy evidence"); *see also Shearson v. Holder*, <u>865 F. Supp. 2d 850, 861</u> n.2 (N.D. Ohio 2011) (recognizing that "the TSD[S] status of a particular individual can neither be confirmed nor denied"), *aff'd*, <u>725 F.3d 588</u> (6th Cir. 2013); *Kalu v. IRS*, <u>159 F. Supp. 3d 16, 23</u> (D.D.C. 2016) ("[A]mong other adverse consequences of full or even partial disclosure [of TSDS status] is that '[r]equiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the [TSDS's] purpose[.]'" (quoting *Gordon v. FBI*, <u>388 F. Supp. 2d 1028, 1037</u> (N.D. Cal. 2005)).[7]

---

[7] *Rhodes v. FBI*, <u>316 F. Supp. 3d 173, 178</u> (D.D.C. 2018) (similar); *Morgan v. FBI*, No. A-15-CA-1255-SS, <u>2016 WL 7443397</u>, at *4 (W.D. Tex. May 24, 2016) (similar); *Wright v. FBI*, No. 3:20-CV-173-G-BN, <u>2020 WL 7345678</u>, at *8 (N.D. Tex. Nov. 13, 2020) (similar); *Platsky v. Nat'l Sec. Agency*, No. 11-

Nonetheless, in recognition of the fact that no notice is provided for such individuals, internal procedures to protect against erroneous deprivation are robust. When an individual is placed on the TSDB, that placement decision undergoes several layers of review: (1) internal review by the nominating agency to determine that an individual should be nominated for placement in the TSDS, (2) an independent determination by TSC, upon a review of the nomination material, that placement is appropriate; (3) regular TSC reviews and audits of placement, including a review at every encounter,[8] and (4) the DHS TRIP redress process, in which the traveler can draw the Government's attention to any possible errors by explaining the difficulties the traveler has encountered and submitting relevant information, and through which the Government conducts a review of available relevant information. *See supra* Bkgd. § I.C. Providing additional process would not substantially reduce the risk of error, but would undermine the Government's efforts to detect terrorists and prevent terrorist attacks. On balance, therefore, the harm to counterterrorism efforts caused by alerting individuals that they are or are not on a terrorist watchlist far outweighs the benefits of additional process for people who are merely subject to travel delays. *See Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) ("Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives."). Because Plaintiffs have received constitutionally adequate process, the procedural due process claims should be dismissed. *See generally Elhady*, 993 F.3d at 228-29 (noting that "several factors make us doubt the merits of plaintiffs' arguments under [the *Matthews v. Eldridge* framework]").

---

cv-4816-SLTRLM, 2013 WL 12121950, at *4 (E.D.N.Y. Jan. 30, 2013) (similar), *aff'd*, 547 F. App'x 81 (2d Cir. 2013); *Skurow v. DHS*, 892 F. Supp. 2d 319, 332 (D.D.C. 2012) (similar); *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006) (similar), *aff'd sub nom., Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009); *Al-Kidd v. Gonzales*, No. 05-093, 2007 WL 4391029, at *9 (D. Idaho Dec. 10, 2007) ("the public interest in [protecting information in the TSDS] weighs decidedly in favor of nondisclosure for security reasons."); *Raz v. Mueller*, 389 F. Supp. 2d 1057, 1062 (W.D. Ark. 2005) (similar). *Cf. Vazquez v. DOJ*, 887 F. Supp. 2d 114, 117-18 (D.D.C. 2012) (same, as to other FBI databases).

[8] An "encounter" is an event in which an individual is identified during a screening or inspection process or law enforcement stop to be a potential match to an individual who is in the TSDS.

## F.  TSA's Final Orders Are Subject to Exclusive Review in a U.S. Court of Appeals.

Separate from the merits of their due process claim, this Court should dismiss that claim and any claims based on TSA's risk-based rules for lack of jurisdiction under 49 U.S.C. § 46110.  Challenges to the adequacy of DHS TRIP—which include at least Counts I and VIII—must be brought in a court of appeals under 49 U.S.C. § 46110.  Section 46110 provides for exclusive jurisdiction in the courts of appeals to review any "order" issued "in whole or in part" by TSA.  49 U.S.C. § 46110(a), (c); *see also Magassa v. Mayorkas*, 52 F.4th 1156, 1159 (9th Cir. 2022) ("We also hold that the district court did not have jurisdiction to consider Magassa's challenge to the TSA's Redress Process because it falls within our exclusive jurisdiction under 49 U.S.C. § 46110"); *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015). This includes "challenges to the adequacy of the redress process."  *Mokdad*, 804 F.3d at 811.  Further, Plaintiffs' complaint makes several passing references to "rules-based targeting lists," *see, e.g.*, Prayer for Relief, Counts I, III–X.  However, the Court also lacks jurisdiction to consider any challenge to the security measures enacted by TSA in response to its congressional directives detailed above.  *See* Fed. R. Civ. P. 12(b)(1); *supra* Bkgd. § I.B–C.  A challenge to particular security measures authorized by Congress and chosen by TSA to ensure aviation security would necessarily implicate TSA orders, as it would involve TSA's statutory authority to establish screening procedures and deny boarding.  *See* 49 U.S.C. § 114(e), (h); *see Blitz*, 700 F.3d at 735–37 (challenge to application of security procedures subject to Section 46110).[9]  Thus, the Court lacks jurisdiction to consider the aspects of Plaintiff's

---

[9] The Ninth Circuit has expressly held that Section 46110 precludes the Court from reaching an APA claim that challenges TSA's "policies and procedures implementing" the Government's TSDS and its subsets because such a claim constitutes a challenge to a TSA order.  *Ibrahim v. DHS*, 538 F.3d 1250, 1256–57 (9th Cir. 2008); *see Gilmore*, 435 F.3d at 1133 (holding that a TSA Security Directive implementing the agency's airline passenger identification policy is a final order within the meaning of Section 46110); *accord Blitz*, 700 F.3d at 735–37; *Corbett v. United States*, 458 F. App'x 866, 871 (11th Cir. 2012); *Ruskai v. Pistole*, 775 F.3d 61, 65 (1st Cir. 2014); *Proctor v. DHS*, 777 F. App'x 235, 235 (9th Cir. 2019).

claims that seek to challenge TSA's choice of security measures, including TSA's alleged decision to require him to undergo additional TSA screening and the procedures available to individuals selected for enhanced screening on account of TSA's risk-based rules.

### III.    The Substantive Due Process Claim (Count 2) Is Meritless.

In Count II, the Complaint asserts a substantive due process claim as to Plaintiff Migliore, who alleges that he is on the No Fly List.  *See* Compl. ¶¶ 1046–52.  As an initial matter, this claim is likely not ripe because, as Plaintiffs concede, "in answering DHS TRIP inquiries submitted by American citizens or lawful permanent residents who believe they may be on the No Fly List, DHS TRIP now issues letters that affirmatively state whether or not the complainant is on the No Fly List, and provides No Fly Listees with an '"unclassified summary" of the reasons for their placement on the list."  Compl. ¶ 325; *see also* Watchlisting Overview at 9 ("When a U.S. citizen or Lawful Permanent Resident applying for redress is, in fact, on the No Fly List, DHS TRIP may inform the applicant of his or her status on the list.")  Here, Plaintiff Migliore filed a DHS TRIP request on July 27, 2023 (twelve years after his last alleged attempt to fly into or out of U.S. airspace, but only six weeks before this lawsuit was filed),[10] but did not await a response from DHS TRIP prior to commencing this action.

---

[10] Migliore also filed a DHS TRIP request on July 6, 2011, and received a final determination letter to that request on November 4, 2011 indicating that "it has been determined that no changes or corrections are warranted at this time." Compl. ¶¶ 512–13.  However, the procedures for DHS TRIP changed in 2015 for US persons included on the No Fly List who are denied boarding on an aircraft because of watchlist status and file a DHS TRIP redress application. *See generally Latif v. Lynch*, No. 3:10-cv-00750, 2016 WL 1239925, at *5 (D. Or. Mar. 28, 2016); *Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019) ("Under the revised procedures challenged here, an individual who has been denied boarding at an airport may apply for redress through DHS TRIP. If the complainant is on the No Fly List, DHS TRIP advises the complainant by letter that he or she is on the list and provides instructions for requesting further information."). The Complaint does not allege that Plaintiff Migliore, subsequent to the enactment of the revised redress process, sought to board an aircraft, was denied boarding, and filed a DHS TRIP application.  Plaintiffs' counsel, who was also counsel for the plaintiffs in *Latif* and *Kashem*, is undoubtedly aware of the post-*Latif* procedures, as several plaintiffs in those cases went through the revised procedures and obtained information bearing on their purported placement on the No Fly List.

If Plaintiff Migliore intends to seek relief under a theory of substantive due process based on his No Fly List status, he should be required to go through the very process that Plaintiffs' counsel admits may be illuminating as to whether a U.S. citizen is on the No Fly List prior to commencing his lawsuit. Moreover, while no statute requires exhaustion of administrative remedies in this case, exhaustion here would serve the "twin purposes of protecting administrative agency authority and promoting judicial efficiency," *McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992), that the ripeness doctrine is meant to support. *See Shearson v. Holder*, 725 F.3d 588, 594 (6th Cir. 2013) ("[W]e agree with the district court that Shearson should be required to exhaust her administrative procedures by submitting a traveler inquiry form through the Redress Program before she can proceed with this case.").

Additionally, the No Fly List substantive due process claim is also untimely because Migliore filed outside of the six-year statute of limitations. *See generally* 28 U.S.C. § 2401(a) ("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). Indeed, not only did Plaintiff obviously know about his alleged No Fly List status, but Plaintiff's counsel (who still represents him in this action) gave a statement to the *Seattle Times* twelve years before the instant Complaint was filed. *Compare* Matthew Brakat, *Oregon Man on No Fly List Finally Makes it to Italy*, Seattle Times (Sept. 13, 2011), [https://perma.cc/UH5H-YV6R] ("Gadeir Abbas, Migliore's lawyer with the Council on American-Islamic Relations, had challenged Migliore's placement on the no-fly list, saying he had been denied due process.") *with* Compl. at 185 (listing same counsel).

Even if Migliore's substantive due process claim were ripe and timely, it fails on the merits.[11] Substantive due process protects the narrow set of fundamental interests "so deeply rooted and

---

[11] Insofar as Mr. Migliore "brings this substantive due process challenge both as applied to himself and facially to the category of individuals placed on the No Fly List who have not been arrested, charged, or convicted of a terrorism-related offense," Compl. ¶ 1052, his facial challenge to the No

sacrosanct that no amount of process would justify" their deprivation. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 462 (7th Cir. 2007). Specifically, "'substantive due process' prevents the [G]overnment from engaging in conduct that 'shocks the conscience' . . . or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted). The doctrine "does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of state law. Rather, substantive due process prevents 'governmental power from being used for purposes of oppression,' or 'abuse of government power that shocks the conscience,' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests." *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st Cir. 1992). To prevail, "the plaintiff must show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006); *see also Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but that a plaintiff must also show a deprivation of a protected interest). Consequently, "conscience-shocking conduct is an indispensable element of a substantive due process challenge to executive action." *DePoutot v. Raffaelly*, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

Plaintiff's allegations fall far short of demonstrating an infringement of a fundamental right, let alone coming close to showing any Governmental conduct that "shocks the conscience." Indeed, the D.C., Second, Fifth, and Ninth Circuits have determined that a traveler does not have a constitutional right to the most convenient form of travel, such as traveling by airplane as opposed to another form of transportation, such as by boat. *See Busic v. Transp. Sec. Admin.*, No. 20-1480, 2023 WL 2053178, at *2 (D.C. Cir. Feb. 17, 2023) (no fundamental right to travel by airplane); *Town of*

---

Fly List on substantive due process grounds would fail for the same reasons identified as to the procedural due process claim.

*Southold*, 477 F.3d at 54 (holding that there is no constitutional right to the most convenient form of travel); *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006) (holding that there is no "right to travel by airplane"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (holding that "travelers do not have a constitutional right to the most convenient form of travel").

Here, the allegations supporting Migliore's No Fly List substantive due process claim are woefully inadequate. He argues that he is "unable to travel to the United States absent great, practically insurmountable difficulty and has effectively been extrajudicially exiled to Saudi Arabia for over a decade." Compl. ¶ 1049. However, Plaintiff's own experience belies that very assertion: he apparently first traveled to Europe from the United States by boat, *see id.* ¶ 497 (describing Migliore's journey on a cruise ship from New York to the United Kingdom), and could presumably do so again if he wanted to return to the United States. Additionally, U.S. nationals on the No Fly List who are located outside of the United States may apply for a one-time waiver to fly back to the United States, which the United States may approve. *See, e.g., Khalid v. Garland*, No. 1:21-CV-02307 (CRC), 2023 WL 2561943, at *2 (D.D.C. Mar. 16, 2023) ("Khalid remained in Pakistan with his wife and child until March 2022, Am. Compl. ¶¶ 2–5, when he was granted a one-time waiver to return to the United States via U.S. airspace.").[12] Notably, counsel for Plaintiffs in this action was also counsel for Plaintiff in both *Khalid* and *Fikre*, which suggests that they are aware of the existence of the one-time waiver program notwithstanding the Complaint's allegations.

---

[12] *See also* Tr. of Oral Argument at 39–40, *FBI v. Fikre* (No. 22-1178) ("JUSTICE GORSUCH: I wanted to follow up actually on Justice Kagan's question. That's where I was headed earlier too. We have an American citizen here who was for years sometime, I don't remember exactly how long, forced to live abroad and fearful about coming home because he didn't know what he was being accused of . . . And we have to take that as true at this stage. MR. JOSHI: But -- but I just want to make it clear for the Court that the reason he came back in 2015 is because, even though he was on the No Fly List, is he had a one-time waiver. These are available to any American citizen who's overseas on the No Fly List. That's exactly how he came back.")

In all events, as Courts have found, the No Fly List does not violate substantive due process. Applying strict scrutiny, the District Court in *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880–81 (E.D. Va. 2017), found that "there is obviously a compelling government interest in preventing terrorist attacks against commercial aviation." *Id.* at 880.  Additionally, "[t]he No Fly List is sufficiently necessary and, under properly applied procedural protections, narrowly tailored to further the government interest." *Id.*

## IV.    Plaintiffs' Equal Protection Claims (Count III) Fail.

Plaintiffs' equal protection claims fare no better.  Again, these claims are not new, and have been rejected by numerous courts in watchlisting cases.  *See, e.g.*, *Elhady v. Piehota*, 303 F. Supp. 3d 453, 467 (E.D. Va. 2017) (dismissing similar equal protection claims), *rev'd on other grounds*, *Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021); *Kovac v. Wray*, 363 F. Supp. 3d 721, 759–60 (N.D. Tex. 2019) (finding Plaintiffs, who pled similar facts, failed to allege sufficiently plausible facts to support that the watchlist was created based on, or operates through, intentional discrimination); *Abdi v. Wray*, No. 2:17-cv-622-DB, 2018 WL 1940411, at *1 (D. Utah Apr. 23, 2018) (holding allegations of disparate impact are insufficient to establish intentional discrimination in violation of the Equal Protection Clause), *aff'd on other grounds*, 942 F.3d 1019 (10th Cir. 2019); *Shearson*, 865 F. Supp. 2d at 864–65 (finding plaintiff's generalized claims that various groups of people are on watchlists were bald accusations that did not come close to constituting what is necessary to establish an equal protection violation).  Generally, these courts found that Plaintiffs failed to allege facts "sufficient to plausibly allege the Watch List was created based on, or operates through, intentional discrimination," and that allegations only of disparate impact are insufficient.  *E.g.*, *Elhady*, 303 F. Supp. 3d at 467; *Kovac*, 363 F. Supp. 3d at 759; *Abdi*, 2018 WL 1940411, at *4; *Shearson*, 865 F. Supp. 2d at 865.  Plaintiffs' claims should meet the same fate here.

Doctrinally, to survive a motion to dismiss an equal protection claim, Plaintiffs must plausibly allege that they have been selectively treated and that such treatment resulted from "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132–33 (1st Cir. 2015); *see also Mulero-Carillo v. Roman-Hernandez*, 790 F.3d 99, 106 (1st Cir. 2015); *United States v. Blewitt*, 920 F.3d 118, 123 (1st Cir. 2019) (approach to Fifth and Fourteenth Amendment Equal Protection Claims "precisely the same").

Here, Plaintiffs undermine their claim, by acknowledging that discrimination on the basis of religion or race is, in fact, contrary to the Government's policy.  Compl. ¶ 256 n.10; ¶ 357 n.14.  As the Watchlisting Overview makes clear, the standards for inclusion in the TSDS are based on objective factors related to terrorism, not on religion or race.  Where the claimed differential treatment is based on a facially neutral law or policy, Plaintiffs must allege facts that demonstrate a disparate impact on a protected group and that such impact is "traceable to an invidious discriminatory intent." *Boston Parent Coal. For Acad. Excellence Corp. v. Sch. Comm. For the City of Boston*, 89 F.4th 46, 61 (1st Cir. 2023); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229, 239 (1976) (requiring proof of discriminatory animus even when facially neutral statute has a "racially disproportionate impact").  And, as in the other watchlisting cases, Plaintiffs fail to plead facts sufficiently plausible to allege the watchlist is based on discrimination or animus.

Plaintiffs' scattered attempts to evade this reality are unavailing.  Plaintiffs allege with specificity only a vanishingly small number of remarks that cannot be stretched to allege an equal protection violation.  *See, e.g.*, Compl. ¶ 540 (alleging CBP officers questioned El-Takach about religious beliefs and practices); *id.* ¶¶ 765, 792 (alleging CBP officers and plainclothes FBI agent questioned Cherri about, *inter alia*, his religious practices and connection to Iran and Muslim-majority countries); *id.* ¶¶ 817–18, 832 (alleging CBP officers questioned Amini regarding events in Afghanistan

and his religious beliefs and practices); *id.* ¶ 938 (alleging CBP officers asked Qashou about connections in Jordan and Palestine and political opinions). But isolated remarks by non-decisionmakers without any authority to set policy or place Plaintiffs in the TSDS are insufficient to make out an equal protection claim. *See, e.g.*, *United States v. Johnson*, 122 F. Supp. 3d 272, 350 (M.D.N.C. 2015) (noting that "oral statements of government officials have rarely been held to be express classifications" in the equal protection context, but observing further that an exception—not alleged to be applicable here—may exist "only . . . at the managerial level, when commanders and supervisors acting in accordance with the policy instruct officers to target racially defined groups" (citation omitted)); *Howard v. City of New York*, No. 12 Civ. 933 JMF, 2014 WL 84357, at *2 (S.D.N.Y. Jan. 6, 2014) (finding "a single racially motivated comment uttered by a nondecisionmaker" insufficient to state an equal protection claim), *aff'd*, 602 F. App'x 545 (2d Cir. 2015). *Cf. Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (noting well-established rule in Title VII context that "to prove discriminatory animus, the derogatory remark cannot be stray or isolated"), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003).

The Court should follow the great weight of authority and reject these claims. *See Abdi*, 2018 WL 1940411, at *4 (discussing similar claims); *Elhady*, 303 F. Supp. 3d at 466 (same); *Kovac*, 363 F. Supp. 3d at 759–60 (same); *Kadura*, 2017 WL 914249, at *9 (same).

## V.    Plaintiffs Lack Standing to Pursue Injunctive and Declaratory Relief with Respect to their Fourth Amendment (Counts IV and VI) and Fifth Amendment Self-Incrimination (Count V) Electronic Device Claims.

Plaintiffs have no standing to pursue the claims in Counts IV, V, or VI, which seek prospective relief related to searches or seizures of electronic devices. First, five of the named plaintiffs do not allege any past electronic device searches and/or seizures: Migliore, Elhady, Butt, Abdukhamidov, and Mohamed. *See* Compl. ¶ 1068. Three Plaintiffs do not allege "unconstitutionally lengthy and unjustified detentions": Migliore, Abdukhamidov, and Mohamed. *See id.* ¶ 1080. And six Plaintiffs

make no allegation that Defendants required them to unconstitutionally provide their passwords or biometric information:  Khairullah, Migliore, Elhady, Butt, Abdukhamidov, and Mohamed.  *See id.* ¶ 1073.  These deficiencies clearly disqualify these Plaintiffs from establishing standing to pursue such claims, when it is axiomatic that a constitutionally sufficient "injury in fact" must be (among other things) "concrete and particularized,"—"mean[ing] that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) ("Art[icle] III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." (citation omitted)).  As these five Plaintiffs do not allege to have "personally suffered" any injury related to search or seizure of their electronic devices, these three Plaintiffs do not allege to have "personally suffered" any injury related to unconstitutional detention, and these six Plaintiffs do not allege to have "personally suffered" any injury related to self-incrimination, they plainly lack standing to pursue any relief under Counts IV, V, and VI, respectively.  *See El Ali v. Barr*, 473 F. Supp. 3d 479, 519 (D. Md. 2020) ("Defendants again correctly note that these claims must go forward, if at all, only as to those Plaintiffs who allege an unconstitutional search or interrogation.").

Additionally, two Plaintiffs bringing claims regarding searches of electronic devices are time-barred from bringing such claims.  The allegations brought by Elhady and Rashad, *see, e.g.*, Compl. ¶¶ 707, 713, 720, 963, 995–96, fall beyond the six-year statute of limitations period.  *See* 28 U.S.C. § 2401(a) ("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues").  Elhady alleges device searches in 2009, 2012, and 2013, well outside the six-year window.  Compl. ¶¶ 705, 707, 710, 713, 716, 720.  And Rashad alleges that his devices were confiscated and the contents downloaded "[b]etween 2007 and 2015, on all trips he took," *id.* ¶¶ 962–63, as well as in May 2017, *id.* ¶ 992, 995–

96.  While the statute of limitations runs from when the right of action *first* accrues, even if the Court were to count from the last alleged event, Rashad's time ran—at latest—in May 2023.  The Complaint was filed in September 2023.  *See generally* Compl.  This leaves only five Plaintiffs—Cherri, Qashou, El-Takach, Mirzay, and Amini—with surviving allegations regarding device searches and seizures.

But even for the remaining Plaintiffs, it is well established that "past injuries alone are insufficient to establish standing" to seek declaratory or injunctive relief, as Plaintiffs do here.  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Instead, Plaintiffs "must show [they are] suffering an ongoing injury or face[] an immediate threat of injury," *id.*, that is "certainly impending.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2103); *see also, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."); *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) ("if a future injury is too speculative for Article III purposes and no [harm] is even close to impending, then there is no standing to sue" (cleaned up)).  The remaining Plaintiffs fail to satisfy these standards where no Plaintiff has made a single allegation regarding any specific plans for future international travel—the occurrence of which, of course, is a prerequisite to the occurrence of any future border search of electronic devices or individuals (which is itself a prerequisite to Plaintiffs' purported theories of "self-incrimination" or unconstitutional search and seizure of devices or individuals).  *See, e.g.*, *El Ali*, 473 F. Supp. 3d at 519 (finding plaintiffs averring Fourth and Fifth Amendment violations had standing where they "alleged *not only* historic and repeated illegal searches and seizures but particular needs or desires to travel in the future").[13]

### VI.    Plaintiffs' Fourth Amendment Claims (Counts IV and VI) Fail.

---

[13] All emphases added unless otherwise noted.

Plaintiffs present three theories of liability under the Fourth Amendment, each arising from alleged encounters with U.S. personnel at U.S. ports of entry: one concerning alleged electronic device inspections, another concerning the length of time inspections take, and a third concerning what the Government is allowed to do with information it obtains through inspections. Their theory appears to be that the Government, having allegedly included certain Plaintiffs in the TSDS, may not legally inspect their devices without heightened suspicion, nor conduct lengthy inspections at the Ports of Entry, nor subsequently use information obtained from these inspections to open lines of investigatory inquiry, further existing lines of inquiry, or retain information, "based solely on the watchlisted individuals' placement in the TSDS." *See, e.g.*, Compl. ¶¶ 1061–81.[14] Plaintiffs are wrong on all counts. *See, e.g., United States v. Flores-Montano*, <u>541 U.S. 149, 153</u> (2004) ("Congress, since the beginning of our Government, has granted the Executive Plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant . . . ."). Plaintiffs' demand for additional restrictions on the Government's exercise of this authority are baseless.

### A.  Electronic Devices.

Plaintiffs allege that, due to their alleged watchlist status, customs officers have inspected, to varying degrees, the electronic devices of some (but not all) Plaintiffs at some (but not all) encounters at U.S. Ports of Entry. But Plaintiffs' request for relief in this arena goes so far as to request that this Court contravene First Circuit precedent by prohibiting Defendants from searching electronic devices at the border without a warrant. *See* Compl. at 183, Prayer for Relief ¶ 3(e); *Alasaad v. Mayorkas*, <u>988 F.3d 8, 13</u> (1st Ci<u>r. 2021</u>) ("neither a warrant nor probable cause is required for a border search of electronic devices."). Plaintiffs' complaints are as meritless as their request for relief.

---

[14] As with other claims, Plaintiffs make no serious effort to substantiate any facial claim related to the Fourth Amendment. This brief and this section therefore focuses on Plaintiffs' as-applied claims.

Two categories of border searches of electronic devices allegedly are at issue here: those called "basic" or "manual" and those called "advanced" or "forensic."[15] *See* Compl. ¶¶ 539, 553, 559, 561–63, 565, 581, 598, 643, 707–08, 713, 720; 773, 784, 795–97, 816, 835, 935, 963, 995–96 (alleging searches); *id.* ¶¶ 479–84, 1039(e) (alleging forensic searches). CBP defines a basic search as "any non-advanced search." *Alasaad*, <u>988 F.3d at 13</u>. An advanced search is "any search in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and/or to analyze its contents." *Id.* Both types of searches allow officers to search only "information that is resident upon the device." *Id.* at 14.

Basic searches of electronic devices at the border do not require any level of suspicion. *Id.* at 13; *see also Tabbaa*, <u>509 F.3d at 98</u> (citation omitted). As to advanced searches, per CBP policy, only reasonable suspicion is required, not probable cause or a warrant. *Alasaad*, <u>988 F.3d at 13</u>; *id.* n.3; *see also United States v. Qin*, <u>57 F.4th 343, 346</u> (1st Cir. 2023) ("We have distinguished between "routine" and "non-routine" border searches. The former type of search may be conducted not only without a warrant upon probable cause. The latter type of search, though it also may be conducted without a warrant upon probable cause, must be supported by reasonable suspicion that the search will turn up contraband or evidence of the sort just described.").

Despite these standards, Plaintiffs allege that the inspections of certain of their devices demonstrate a "policy and practice" of "routinely" searching watchlisted individuals' devices "solely based" on such status. *E.g.*, Compl. ¶ 1063–67. This allegation is puzzling, when only eight of twelve

---

[15] Courts have been known to refer to a "basic" search as a "manual" or "routine" search (based on officers manually thumbing through the device). Some courts refer to any search of electronic devices conducted using tools as a "forensic" or "non-routine" search, but that may depend on the type of tools or technology used. Generally speaking, a "forensic" or "non-routine" search may be an "advanced" search, but not every court would consider every "advanced" search a "forensic" or "non-routine" search. Moreover, the First Circuit has not defined when an electronic search may be considered a "routine" or "non-routine" search. *See generally Alasaad*, <u>988 F.3d 8</u>; *Qin*, <u>57 F.4th 343</u>.

Plaintiffs allege device searches, despite all Plaintiffs alleging current or prior watchlist status. *Id.* ¶¶ 416–17, 1068. And even those Plaintiffs alleging searches allege only a smattering of manual (*i.e.*, basic) searches of electronic devices during many years of alleged travel. As to the two Plaintiffs alleging forensic searches, *see id.* ¶¶ 479–84, 1039(e), their allegations are barebones and conclusory. Migliore asserts that "upon information and belief," a "forensic search" was conducted. *See id.* ¶ 484. As to Cherri, he contends that he is "forced to submit to forensic searches of his electronic devices when he enters the United States," *id.* ¶ 1039(e), but provides not one specific alleged fact in support of that assertion. These allegations do not meet minimum pleading standards and should be dismissed on that ground alone. Moreover, Plaintiffs Migliore and Cherri fail to allege that the Government lacked reasonable suspicion to conduct forensic searches of their devices, if such searches were conducted.

Assuming *arguendo* that Plaintiffs were in the TSDS when their devices were searched, and that CBP officers did and would conduct advanced searches of Plaintiffs' devices based only upon such TSDS status, then as pled in the Complaint, CBP officers would have reasonable suspicion to do so, since their alleged prior or current placement in the TSDS requires, at a minimum, reasonable suspicion. *See generally* Watchlisting Overview; *see also Mokdad v. Lynch*, 804 F.3d 807, 810 (6th Cir. 2015); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018). There nothing infirm about policies that permit (but do not require) an advanced search of an electronic device at a Port of Entry based "solely" on watchlist status, since that status reflects the presence of reasonable suspicion. *See, e.g.*, U.S. Customs & Border Protection, CBP Directive No. 3340-049A, Border Search of Electronic Devices at 5 (Jan. 4, 2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf [https://perma.cc/8WFM-TUU7] ("Many factors may create reasonable suspicion or constitute a national security concern; examples include the . . . presence of an individual on a government-

operated and government-vetted terrorist watch list.") ("CBP Directive").  Presence on a government watchlist would have "sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop."    *Navarette v. California*, 572 U.S. 393, 397, 399 (2014) (holding an officer had reasonable suspicion to make an investigatory stop based on an anonymous tip because the tip bore "adequate indicia of reliability") (citation omitted).  Here, a nomination to the TSDS, a heavily vetted database of terrorist identity information that involves collaboration of multiple federal government entities, undergoes a multi-step review process at the nominating agency, and then again at the TSC. *See, e.g.*, Watchlisting Overview at 3; *Nur v. Unknown CBP Officers*, No. 1:22-cv-169, 2022 WL 16747284, at *1 (E.D. Va. Nov. 7, 2022); *El Ali*, 473 F. Supp. 3d at 493.  Indeed, an entire federal sub-agency (the TSC) is dedicated to ensuring the information in the TSDS is accurate, further demonstrating the reasonableness of relying upon such information.  Watchlisting Overview at 1–2.  And even if CBP officers cannot view information underlying TSDS status at the border—just as the officer in *Navarette* could not view the information underlying the anonymous tip—TSDS status contains more "indicia of reliability" than an anonymous tip.    Thus, even if Plaintiffs were on the TSDS, and advanced searches were conducted of their devices during certain of their alleged encounters, CBP officers would have had reasonable suspicion to perform such searches.  Under binding First Circuit precedent, such searches would therefore be permissible.  *See Alasaad*, 988 F.3d at 13.

Plaintiffs additionally fall well short of alleging that Defendants "routinely" conduct reasonable-suspicion-based advanced electronic searches of watchlisted individuals' devices as a "policy and practice."  Indeed, that is not CBP policy.  *Id.*

Plaintiffs' allegations about the length of time devices may be (but are not consistently, according to their allegations) retained are largely a red herring.  Plaintiffs contend that Defendants have retained certain of their devices for various periods of time, ranging from 30 minutes, Compl. ¶ 707; to two hours, *id.* ¶ 773, and six hours, *id.* ¶ 997; to unexplained, *id.* ¶ 570, and unalleged, *id.*

¶ 643, periods of time.  But Plaintiffs spin these unremarkable allegations to then allege, with no factual support, that "Defendants routinely refuse to return the confiscated electronic devices to watchlisted individuals for weeks or months."  *Id.* ¶ 1063.  Even if they had alleged such durations of retention, they fail to grapple with the First Circuit's rulings that searches lasting as long as 22 and 60 days have been upheld as falling within the border search exception.  *See, e.g.*, *United States v. Molina-Gómez*, 781 F.3d 13, 21 (1st Cir. 2015); *United States v. Qin*, 57 F.3d 343, 351 (1st Cir. 2023).  Plaintiffs allege no detention of devices coming even close to those lengths of time.  Plaintiffs' attempt to fabricate a "policy or practice" of "confiscate[ing]" devices for months is unadorned puffery.  CBP's actual inspection policies and practices fully comport with the Constitution, and Plaintiffs' attempts to contend otherwise fall flat.

Finally, Plaintiffs attempt to call into question the Government's downstream use and retention of data.  *E.g.*, Compl. ¶¶ 1064–66.  But whether the Government can use information obtained in a particular context depends on the specific facts and circumstances.  Moreover, these questions are governed by carefully crafted policies that are tailored to the contours of the law, including the Fourth Amendment.  *See, e.g.*, CBP Directive.  Plaintiffs notably decline to seriously contend with these policies.  Instead, they seek to paint with broad-brush allegations that the Government's post-acquisition use of information obtained from individuals in the TSDS is categorically lawless.  Such a blunt allegation falls well short of establishing a legal entitlement to relief.  *E.g.*, *Iqbal*, 556 U.S. at 678.

## B.  Lengths of Inspections and Questioning.

Similarly unavailing are Plaintiffs' allegations about the length of time inspections take and the nature of the questions sometimes, and variously, asked.  Again, Plaintiffs attempt to label their myriad experiences as reflecting "official policy and practice" that watchlisted persons are subjected to "prolonged detentions when they attempt to cross the border into the United States."  Compl. ¶ 1077.

Their scattered allegations, presented by only nine of the Plaintiffs, fail to plausibly allege the existence of such a policy and practice. *Id.*

First, though, a discussion of nomenclature. Plaintiffs repeatedly invoke the labels "detention" and "seizure" when referring to encounters at the border. *E.g.*, Compl. ¶¶ 243, 419, 625, 1039, 1062, 1077, 1079–80. But they misapprehend the nature of screening, inspection, and questioning at the border. The First Circuit has held that "even though a traveler being questioned by CBP is not 'free to leave,' he is not necessarily in custody," *United States v. Molina-Gomez*, 781 F.3d 13, 22 (1st Cir. 2015) (citation omitted), and that "even secondary inspection does not per se constitute custodial interrogation," *United States v. Fernández-Ventura*, 85 F.3d 708, 711 (1st Cir. 1996). Indeed, it "is simply wrong" to conclude that a traveler is in custody at the border because they "may not simply walk away from an interrogating officer." *Fernández-Ventura*, 85 F.3d at 712. "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points." *Id.* at 711; *see also United States v. Tajeddini*, 996 F.2d 1278, 1287–88 (1st Cir. 1993) (asking "where [a traveler] was arriving from and with whom he was traveling" constitute "routine Customs questions"), *abrogated on other grounds by Roe v. Flores-Ortega*, 528 U.S. 470 (2000); *Touset*, 890 F.3d at 1235 ("the Fourth Amendment does not guarantee the right to travel without great inconvenience, even within our borders").

The Fourth Amendment commands, rather, that searches and seizures be "reasonable." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537–38 (1985). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Id.* at 537. And the Supreme Court has held that the Fourth Amendment's "balance of reasonableness is qualitatively different at the international border than at the interior. . . . [This] reflect[s] longstanding concern for the protection of the integrity of the border." *Id.* at 538. Not only

that, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Id.* at 540.

Here, Plaintiffs use the term "detention" to cover a wide range of alleged inspection encounters. While some incidents of routine screening or inspection are described as "detention," *see id.* ¶ 419 (Khairullah); ¶ 625 (El-Takach, alleging "detentions" without specificity); ¶ 764 (Cherri, alleging "hours-long detentions" in 2010); ¶ 800 (Cherri); ¶¶ 936–37 (Qashou); ¶ 1004 (Rashad), not every incident of routine questioning is so described. *Compare, e.g.*, *id.* ¶ 419 *with* ¶ 458. And certain of the plaintiffs who allege they were subjected to "prolonged detention"—namely, Mirzay, Butt, Elhady, and Amini—fail to allege specific incidents of "detention" at all. Even putting these inconsistencies to one side, the Complaint is devoid of any allegations that alleged inspections were excessively intrusive, or constituted anything other than a routine border inspection (or, in the case of allegations related to TSA, reasonable airport screening). That these alleged "seizures" lasted multiple hours (perhaps up to five, *see* Compl. ¶ 800, but the allegations are vague) does not make them non-routine or an undue burden. *See, e.g.*, *Touset*, 890 F.3d at 1235 ("the Fourth Amendment does not guarantee the right to travel without great inconvenience, even within our borders"); *Molina-Gomez*, 781 F.3d at 18; *Tabbaa*, 509 F.3d at 100 (finding alleged intrusive questioning and detentions lasting up to 4-6 hours to be routine); *United States v. Feiten*, Case No. 15-20631, 2016 WL 894452, at *3 (E.D. Mich. Mar. 9, 2016) (finding four-hour border search of electronic devices to be reasonable); *Flores-Montano*, 541 U.S. at 155 n.3 ("We think it clear that delays of one to two hours at international borders are to be expected."); *Rahman v. Chertoff*, No. 05 C 3761, 2010 WL 1335434, at *2-3 (N.D. Ill. Mar. 31, 2010) (finding over four-hour inspection of plaintiffs alleged to be on TSDB to be routine); *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 277, 282-83 (E.D.N.Y. 2013) (finding five-hour border search of electronic devices without a warrant did not violate the Fourth Amendment).

41

Plaintiffs allege that the periods of questioning they experienced created "unreasonable delays," *e.g.*, Compl. ¶¶ 954, 956, but there are any number of reasons why the "various steps at issue" in Plaintiff's searches in the "border context" could have taken several hours. *Tabbaa*, 509 F.3d at 100–01. Moreover, the Supreme Court has "consistently rejected hard-and-fast time limits" because "common sense and ordinary human experience must govern over rigid criteria." *Montoya de Hernández*, 473 U.S. at 543 (citation omitted). "Persons approaching an international border and checkpoint can reasonably expect to be stopped, questioned, and possibly searched." *United States v. Kelly*, 302 F.3d 291, 294–95 (5th Cir. 2002); *see Flores-Montano*, 541 U.S. at 155 n.3; *Denson v. United States*, 574 F.3d 1318, 1339 (11th Cir. 2009); *id.* at 1340 ("Included within the officer's discretion is an entitlement to conduct routine questioning.").

Nor does the length of questioning or topics covered transform the encounter to anything other than routine. "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points." *Fernández-Ventura*, 85 F.3d at 711. The questions Plaintiffs were allegedly asked, *see, e.g.*, Compl. ¶¶ 540, 679, 681, 706, 718–19, 736, 744, 750–51, 765, 780, 805, 817–18, 832, 854, 938, including questions about religious practices, the nature of their employment and citizenship, previous and upcoming travel, family members, acquaintances, place of birth, opinions regarding foreign affairs, what is in their luggage, and whether they carried any weapons, are no "different than the types of questions border officers typically ask prospective entrants in an effort to determine the places they have visited and the purpose of duration of their trip" that "courts have regularly held to be routine." *Tabbaa*, 509 F.3d at 98–99 (finding "intrusive questions about [plaintiffs'] activities at [an Islamic] conference, the content of the lectures they attended, and their reasons for attending" to be routine); *see also George v. Rehiel*, 738 F.3d 562, 568, 579–81 (3d Cir. 2013) (finding questioning about personal and religious beliefs, travel, education, and whether plaintiff was a member of "pro-Islamic" or "communist" groups, and personal contacts,

not to violate the Fourth Amendment).  Such questions are no less reasonable when put to these Plaintiffs.  Nor does any alleged "humiliate[ion]" or "embarrass[ment]" felt by Plaintiffs render any questioning so unreasonable as to become a Fourth Amendment violation.  *See, e.g.*, Compl. ¶¶ 913, 987.  All travelers are subject to the possibility of "[h]eightened screening at airports" and "may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watch lists." *Scherfen*, 2010 WL 456784, at *7; *see Hartwell*, 436 F.3d at 180–81 (noting no stigma attached to being searched because "every air passenger is subjected to a search at a known, designated airport search point" (citation omitted)).

Further, while Plaintiffs allege that their Fourth Amendment claim concerns "seizing and confiscating . . . electronic devices, particularly but not exclusively when they cross the border to enter the United States," Compl. ¶ 1063, they make no plausible allegation tying this to TSA.  As a result, this Count should be dismissed as to TSA on that basis alone.  However, even if properly pled, this Court would lack jurisdiction to hear such a claim.  *See* 49 U.S.C. § 46110 (providing that challenges to final TSA orders can only be brought in an appropriate court of appeals); *see also supra* Section II.F. A challenge to particular security measures authorized by Congress and chosen by TSA to ensure aviation security would necessarily implicate TSA orders, as it would involve TSA's statutory authority to establish screening procedures and deny boarding. *See* 49 U.S.C. § 114(e), (h); *see Blitz v. Napolitano*, 700 F.3d 733, 735–37 (4th Cir. 2012) (challenge to application of security procedures subject to Section 46110).  And even if this Court had jurisdiction, Plaintiffs fail to plead any facts to establish that any TSA screenings were unreasonable, as delays and questioning at airports have been found to constitute a reasonable administrative search.  *See Chandler v. Miller*, 520 U.S. 305, 323 (1997); *Corbett v. Transp. Sec. Admin.*, 767 F.3d 1171, 1179 (11th Cir. 2014) ("We . . . conclude" that "screening passengers at an airport" is "a reasonable administrative search under the Fourth Amendment.").  Accordingly, as the minimally intrusive delays and questioning Plaintiffs have allegedly experienced are tailored to advance

43

the government's overwhelming interest in ensuring air safety, and Plaintiffs have specified no other facts about their purported seizures from which this Court can assess their reasonableness, they have failed to state a plausible Fourth Amendment claim for any purpose, and certainly for purposes of obtaining injunctive or declaratory relief.  *See Ruskai v. Pistole*, 775 F.3d 61, 68 n.3 (1st Cir. 2014); *Hartwell*, 436 F.3d at 18–81; *United States v. Dalpiaz*, 494 F.2d 374, 376 (6th Cir. 1974).

## VII.    Plaintiffs' Fifth Amendment Self-Incrimination Claim Fails.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To make out their claim, Plaintiffs El-Takach, Mirzay, Cherri, Amini, Qashou, and Rashad point to alleged instances when Defendants' allegedly accessed "Plaintiffs' electronic devices and forc[ed] Plaintiffs to open those devices, including by providing passwords and by using biometric means such as facial recognition or fingerprints."  Compl. ¶¶ 1072–73.  But—among other deficiencies in this claim—the Fifth Amendment is a testimonial protection, which only ripens in a constitutional sense when the Government seeks to introduce incriminating evidence in a criminal proceeding.  Thus, the protection against self-incrimination is triggered only when an individual is (1) compelled to make a (2) testimonial communication (3) that is incriminating.  *Fisher v. United States*, 425 U.S. 391, 408 (1976); *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004) ("[t]o qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled").  Not one Plaintiff alleges they have been so compelled.  For this and multiple other reasons, Plaintiffs' Fifth Amendment claim fails.[16]

### A.    The Fifth Amendment Right Against Self-Incrimination Is a Testimonial Protection, Not a Prohibition on Government Information-Gathering.

---

[16] Plaintiffs' facial challenge is particularly inapt in this context, where a constitutional violation only occurs if an individual is compelled to make a testimonial communication *that is incriminating*—an inherently individualized issue.

*First*, the right against self-incrimination is a "fundamental trial right of criminal defendants" and, accordingly, a violation of such a right "occurs only at trial." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990).  For example, in *Chavez v. Martinez*, 538 U.S. 760 (2003), the Supreme Court rejected a plaintiff's contention that officers who questioned him coercively violated his right against self-incrimination at the time of questioning.  538 U.S. at 764–65.  The plurality opinion rejected this claim, explaining that "[w]e fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case."  *Id.* at 766.  A number of circuits have followed suit. *See, e.g.*, *United States v. Hulen*, 879 F.3d 1015, 1018–19 (9th Cir. 2018) (Fifth Amendment right against compelled self-incrimination "only applies when a compelled statement is used against a defendant in a criminal case" (citation omitted)); *Lingler v. Fechko*, 312 F.3d 237, 239 (6th Cir. 2002) ("By its terms, the Fifth Amendment does not prohibit the act of compelling a self-incriminating statement other than for use in a criminal case."); *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("[T]here can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding." (collecting cases)); *United States v. Riley*, 920 F.3d 200, 205 (4th Cir. 2019) (holding that "the Self-Incrimination Clause is violated *only* if those statements are used in a criminal trial"); *United States v. Oloyede*, 933 F.3d 302, 310 (4th Cir. 2019) (no Fifth Amendment violation where the case "the admission into evidence of data" from a phone "present[ed] no risk that . . . *coerced statements* (however defined) [would] be used against [her] at a criminal trial." (citation omitted)).[17]

---

[17] The privilege also can be asserted in noncriminal proceedings is "where the answers might incriminate [the suspect] in *future criminal proceedings*." *Chavez*, 538 U.S. at 770 (citation omitted).  But that context is not implicated here where there is no proceeding, civil or criminal, involving Plaintiffs. Plaintiffs' allegations arise only in the context of device searches.

Plaintiffs' complaints about device searches, therefore, are entirely premature, because the privilege is violated *only* when compelled statements are used against the witness in a criminal proceeding." *Riley*, 920 F.3d at 205 (citing *Chavez*, 538 U.S. at 770); *see also Verdugo-Urquidez*, 494 U.S. at 264 ("The privilege against self-incrimination guaranteed by the Fifth Amendment is a *fundamental trial right of criminal defendants.* Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." (citation omitted)).

Here, not only have Plaintiffs failed to allege the introduction of self-incriminating testimony against them at trial, but they allege the opposite:  that they "have never been indicted, charged, or convicted of a crime."  Compl. ¶ 286.

 Because Plaintiffs have alleged neither that they made any statements to CBP officers in the context of this claim, *see infra* Sections VII.B., VII.D., nor that any such statements are being used in a criminal proceeding against them, they have failed to state a claim under the Self-Incrimination Clause. *See Majid v. Cnty. of Montgomery*, Civ. A. No. TDC-20-1517, 2021 WL 4441349, at *4 (D. Md. Sept. 28, 2021) (rejecting a civil plaintiff's Fifth Amendment self-incrimination claims because he "has not alleged that any statement" he made to an officer "has been used against him in a criminal case").

## B. <u>Plaintiffs Fail to Allege Their Devices Contained Incriminating Information.</u>

*Second*, Plaintiffs have not alleged that their devices contained any incriminating material obtained by law enforcement during any one of the incidents referenced in the complaint.  *See United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir. 1990) (noting that the first question is "whether the information is incriminating in nature"); *see also United States v. Katin*, 109 F.R.D. 406, 408 (D. Mass. 1986) (a criminal defendant claiming Fifth Amendment privilege must show documents sought would "furnish a link in the chain of evidence needed to prosecute him").  Here, certain Plaintiffs have alleged only in conclusory fashion that they were forced to provide passwords and biometric information so that officers could access their electronic devices during a border search.  *See* Compl. ¶ 1072.  But

Plaintiffs have not alleged anything about the content of that information, much less that it would incriminate them in a future criminal case. Plaintiffs allege that the contents of their devices have been "copied," "searched," and "used for . . . intelligence and investigations," *see, e.g.*, Compl. ¶ 1067, but provide no detail about what their devices contain.

**C. In the Alternative, the Appropriate Remedy Is Simply Exclusion of Any Evidence in Subsequent Criminal Proceedings.**

*Third,* even if this claim were adequately pled, the appropriate remedy is not a civil injunction or declaratory relief of the type sought here, but rather exclusion of evidence in subsequent criminal proceedings. *See United States v. Materas*, 483 F.3d 27, 33–34 (1st Cir. 2007) ("[T]he exclusion of [such] statements . . . is a complete and sufficient remedy for any perceived" Fifth Amendment "violation." (quoting *United States v. Patane*, 542 U.S. 630, 642 (2004))); *Antonio v. Moore*, 174 F. App'x 131, 135 n. 2 (4th Cir. 2006) (noting that "the complete and sufficient remedy for a perceived" Fifth Amendment "violation is the exclusion of such statements at trial" (citation omitted)); *United States v. Cavin*, 553 F.2d 871, 873 (4th Cir. 1977) (the remedy for a violation of the Self-Incrimination Clause is "circumscribed" and is "suppression of his statement"); *see also Chavez*, 538 U.S. at 777 (Souter, J., concurring) ("the core of the guarantee against compelled self-incrimination is the exclusion of any such evidence.").

This clear precedent also applies to Plaintiffs' claim seeking expungement of the information that CBP agents allegedly gathered from Plaintiffs, Compl., Prayer for Relief at 183 ¶ 3(c). Expungement "is a relief confined to exceptional circumstances." *Allen v. Webster*, 742 F.2d 153, 155 (4th Cir. 1984) (citation omitted); *see also Sealed Appellant v. Sealed Appellee*, 130 F.3d 695, 701 (5th Cir. 1997) (reversing an order commanding executive branch agencies to expunge the records of a defendant's now overturned convictions); *Chastain v. Kelley*, 510 F.2d 1232, 1236 (D.C. Cir. 1975) (noting that "[e]xpungement, no less than any other equitable remedy, is one over which the trial judge exercises considerable discretion"); *United States v. Field*, 756 F.3d 911, 917 (6th Cir. 2014) (declining

to expunge arrest record where evidence was suppressed and such remedy was not necessary to "vindicate" the trial court's rulings or the suppression remedy).  Indeed, a district court considering similar Fourth Amendment claims declined to order expungement of the information gathered during an electronic device search because "[e]ven where evidence obtained in an unconstitutional manner has been suppressed, a further remedy of expungement does not follow."  *Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 172 (D. Mass. 2019) ("[E]ven where criminal proceedings followed a border search that exceeded the bounds of the Fourth Amendment and the fruits of the same were suppressed, expungement of the border agents' files would not necessarily follow.").[18]

### D. Biometric Passwords Are Not "Testimonial."

*Finally*, although the Court need not reach this issue, the provision of a biometric password—such as a fingerprint or voice or facial recognition—cannot violate the Fifth Amendment because such information is not "testimonial" in nature.  The Fifth Amendment is intended to protect an accused "from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government."  *Doe v. United States*, 487 U.S. 201, 213 (1988).  The Supreme Court has thus held that "[t]he word 'witness' in the constitutional text limits the relevant category of compelled incriminating communications to those that are 'testimonial' in character."  *United States v. Hubbell*, 530 U.S. 27, 34 (2000).  The touchstone of this analysis is whether the governmental action requires the individual to use "the contents of his own mind."  *Id.* at 43 (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)).  In contrast, a "simple physical act" does not so qualify.  *Id.* (citation omitted); *see also, e.g.*, *Matter of Search Warrant Application for [redacted text]*, 279 F. Supp. 3d 800, 803 (N.D. Ill. 2017) ("[T]he Supreme Court has distinguished between compelling a

---

[18] The District Court in *Alasaad* declined to order expungement even after finding constitutional violations—a holding later reversed by the First Circuit. *See Alasaad*, 988 F.3d at 13 (holding that advanced searches of devices at the border do not require a warrant or probable cause, that basic searches of devices are routine and that may be performed without reasonable suspicion).

communication versus compelling a person to do something that, in turn, displays a physical characteristic that might be incriminating." (citing *Hubbell*, 530 U.S. at 35)).[19]

At minimum, the provision of a biometric password—such as a fingerprint or voice or facial recognition—does not satisfy this test. As multiple courts have explained, the use of an individual's biometric features cannot, by definition, implicate any "revelation of the contents of [an individual's] mind," and thus is "far more akin to the surrender of a safe's key than its combination." *Matter of Search of [Redacted] Washington, D.C.*, 317 F. Supp. 3d 523, 535–36 (D.D.C. 2018); *see also, e.g.*, *Matter of Search Warrant Application for [redacted text]*, 279 F. Supp. 3d at 803–04 ("The application of the fingerprint to the sensor is simply the seizure of a physical characteristic, and the fingerprint by *itself* does not communicate anything."); *Minnesota v. Diamond*, 905 N.W.2d 870, 877–78 (Minn.) ("Because the compelled act merely demonstrated Diamond's physical characteristics and did not communicate assertions of fact from Diamond's mind, we hold that Diamond's act of providing a fingerprint to the police to unlock a cellphone was not a testimonial communication."), *cert. denied*, 138 S. Ct. 2003 (2018); *Virginia v. Baust*, 89 Va. Cir. 267, 2014 WL 10355635, at *4 (Va. Cir. 2014) ("The fingerprint, like a key, . . . does not require the witness to divulge anything through his mental processes."); *cf. In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345 (11th Cir. 2012) ("[T]he Fifth Amendment privilege is not triggered where the Government merely compels some physical act, *i.e.*, where the individual is not called upon to make use of the contents of his or her mind.").[20]

---

[19] *See United States v. Dionisio*, 410 U.S. 1, 7 (1973) (provision of voice exemplar not testimonial); *Gilbert v. California*, 388 U.S. 263, 266 (1967) (provision of handwriting exemplar not testimonial); *United States v. Wade*, 388 U.S. 218, 222–23 (1967) (participation in a lineup not testimonial); *Schmerber v. California*, 384 U.S. 757, 765 (1966) (furnishment of blood sample not testimonial); *Holt v. United States*, 218 U.S. 245, 252–53 (1910) (wearing particular clothing not testimonial).

[20] Although one court in the District of Massachusetts has held to the contrary, *see United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. Jan. 13, 2020) (Mem.), Defendants respectfully submit that the Court in that case focused in error on the contents of the device accessed with the biometric information, as opposed to the act of providing the biometric information, as other courts have done. *See supra*.

**VIII.**    **Plaintiffs Fail to State a Claim Under the Religious Freedom Restoration Act (RFRA).**

Plaintiffs contend that an individual's exercise of religion is substantially burdened under RFRA "when the government conducts an intrusive inquiry into a person's religious belief as a component of official governmental action," Compl. ¶ 1084, and that, based on a loose collection of factual allegations involving some plaintiffs in some instances, Defendants pursue a "policy and practice" of inquiring into religious subjects in a manner that violates RFRA.  But Plaintiffs do not explain how this alleged questioning imposes any burden on their free exercise of religion.  *See id.*; *accord Cherri*, 951 F. Supp. 2d at 934–35 (dismissing similar claims, *including those of one of the Plaintiffs in this case*, where plaintiffs "ha[d] not established that being queried about their religious practices and beliefs at the border infringes or burdens their ability to freely exercise their religion").  That omission is fatal to their RFRA claim.  And even if it were not, individualized questioning is the least restrictive means of achieving the compelling governmental interest of protecting the U.S. border.  Finally, although the claim is brought on behalf of all Plaintiffs, eight of the twelve—Khairullah, Migliore, Mirzay, Butt, Elhady, Abdukhamidov, Mohamed, and Qashou——make no allegations as to being asked any questions related to religion.  These Plaintiffs plead no concrete and particularized injury, *see supra* Section V, and cannot pursue this claim for lack of standing.

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless that burden "is in furtherance of a compelling governmental interest," and "is the least restrictive means of furthering that . . . interest," *id.* at § 2000bb-1(b).  Thus, "[t]o establish a prima facie RFRA claim," a plaintiff must demonstrate that application of the government action would (1) substantially burden (2) a sincere (3) religious exercise.  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006) (describing the Government "conced[ing] the . . . prima facie case under RFRA"); *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc) ((1) "the activities

the plaintiff claims are burdened by the government action" are an "exercise of religion," and (2) that the government action at issue "substantially burden[s]" that exercise of religion (quoting 42 U.S.C. § 2000bb-1(a)); *id.* ("If the plaintiff cannot [properly allege] either element, his RFRA claim fails."). A substantial burden exists, in relevant part, "where [the government] denies [an important] benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Perrier-Bilbo v. United States*, 346 F. Supp. 3d 211, 222 (D. Mass. 2018) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981)), *aff'd*, 954 F.3d 413 (1st Cir. 2020).

Here, Plaintiffs do not contend that their religion requires, for example, that they avoid routine government questioning at the border. There is no reason why Plaintiffs should be exempt from such questioning—regardless of whether that questioning touches upon religious beliefs. *See, e.g.*, *United States v. Mubayyid*, 476 F. Supp. 2d 46, 52 (D. Mass. 2007). Plaintiffs allege neither that they have been forced to choose between their religion and receiving a governmental benefit, nor that they have been forced to act contrary to their religious beliefs due to potential civil or criminal sanctions. Instead, eleven of twelve Plaintiffs fail to allege that they have or intend to alter their religious expression or practices for any reason, and one Plaintiff—El-Takach—alleges that, for a period of time that seems to have ended, he made an independent choice to modify his religious practices. *See* Compl. ¶ 1087. Nowhere does any Plaintiff allege that Defendants coerce or otherwise mandate any behavioral modifications related to religion. And no Plaintiff alleges that their religion forbids such modifications. Plaintiffs have failed to allege a substantial burden on the free exercise of their religion.

Nevertheless, if an individual Plaintiff had successfully asserted that a government action has substantially burdened the sincere exercise of religion, the Government may nevertheless continue in its action if it demonstrates that its action (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling government interest. *Gonzales*, 546

U.S. at 424; *see also* 42 U.S.C. § 2000bb-1(b). There can be no dispute that the government has a compelling interest in protecting its borders and preventing and investigating potential acts of terrorism. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation."); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order."); *Flores-Montano*, 541 U.S. at 152; *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 980 (9th Cir. 2012) ("[T]he government's interest in national security cannot be understated."); *Tabbaa*, 509 F.3d at 103 ("It is undisputed that the government's interest in protecting the nation from terrorism constitutes a compelling state interest . . . ."). The complaint alleges that four individuals, who allege they either currently are or previously were on the TSDS, were asked questions, including about their religious beliefs, practices, and associations, at the U.S. border. *See* Compl. ¶¶ 540, 555 (El-Takach); 792 (Cherri); 818, 832 (Amini), 1008 (Rashad). But these four individuals do not allege being questioned about their religion each and every time they entered into the United States. For example, in the seven paragraphs of allegations regarding questions asked of Rashad, only one includes questions related to religion.[21]    The questions Plaintiffs report being asked under these circumstances are targeted and individualized. Such inquiries constitute the least restrictive means of investigating potential threats to national security at the U.S. border. *Accord Tabbaa*, 509 F.3d at 105–06.

---

[21] *See, e.g.*, Compl. ¶ 965–66 (Rashad experienced "questioning," including "about people he knew"); *id.* ¶ 977 (Rashad asked questions about "why [he was] traveling, who [he] would be meeting, how often [he] traveled to the region, and whether [he was] affiliated with any organizations or people"); *id.* ¶ 990 (Rashad asked questions "about his travel, his contacts, and his family"); *id.* ¶ 994 (Rashad asked "about his purpose for traveling and who he contacted while in Canada"); *id.* ¶ 1003 (Rashad asked "about his background, employment, family life, relatives living abroad, his connection to Egypt and other countries, and about his brother living in Egypt"); *id.* ¶ 1008 (Rashad asked about family members and "if he was affiliated with any political or religious groups"; when he "answered that he sat on the board of his local mosque," he was asked if he "owned" the mosque "and what his specific role was there"; he was also asked "about all social media and messaging apps that he used").

Finally, Plaintiffs' facial challenge fares no better than their other facial challenges, for the reasons described *supra*, *see, e.g.*, Section II.  The programs at issue here are clearly capable of constitutional application.  Accordingly, this Court should dismiss Plaintiffs' RFRA claim.

## IX.    Plaintiffs APA Claims (Counts VIII and IX) Are Co-extensive with Their Constitutional Claims and Fail for the Same Reasons.

Plaintiffs' APA claims are coextensive with their constitutional claims, and therefore should be dismissed for the same reasons.  Indeed, in Count VIII, Plaintiffs allege that "[f]or the same reasons described in Count I, Defendants' actions in placing Plaintiffs and similarly[]situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist," which allegedly included *inter alia* the dissemination of "the stigmatizing label [of known or suspected terrorists] . . . to governmental and private partners" without "constitutionally adequate avenue for redress," Compl. ¶ 1093, which is in effect a restatement of their Procedural Due Process claim.  Similarly, Count IX brings an APA claim with respect to the Government's alleged dissemination of TSDS information via the NCIC, which Plaintiffs claim results in the dissemination of "the false and stigmatizing label" of "known or suspected terrorist," *id.* ¶ 1095, which is itself simply a recitation of their stigma-plus procedural due process claim.

Moreover, insofar as Plaintiffs' claims seek to challenge some amorphous category of "Defendants' current practices and policies," *id.* ¶ 1092, the APA "does not provide judicial review for everything done by an administrative agency."  *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948).  Rather, the statute defines "agency action" to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004); *see also see also City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("Courts are well-suited to reviewing specific agency

decisions, such as rulemakings, orders, or denials," not "generalized grievances asking us to improve an agency's performance or operations.").

If the Court were to consider the due process claims as separate APA arbitrary-and-capricious claims, as styled in the Complaint, the scope of APA review is narrow and deferential, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As long as the agency's action being challenged— here, the process by which individuals are added or removed from the TSDS as part of the Defendants' regular operations—has a rational basis, it must be affirmed. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

Finally, to the extent that Plaintiffs wish to challenge their alleged placement on the TSDS directly, that may warrant judicial review of a record supporting any TSDS status, if it exists, not any discovery. *See Trinity Am. Corp. v. U.S. E.P.A.*, 150 F.3d 389, 401 n. 4 (4th Cir. 1998) ("Review of agency action is limited to the administrative record before the agency when it makes its decision."). Moreover, as is common in cases implicating sensitive national security information, such review may involve submission of materials for the Court's review *ex parte* and *in camera*. *See, e.g., Jifry v. FAA*, 370 F.3d 1174, 1181-82 (D.C. Cir. 2004); *Scherfen*, 2010 WL 456784, at *4, 7-8; *see also, e.g., Bassiouni v. FBI*, 436 F.3d 712, 722 n.7 (7th Cir. 2006).

## X. Congress Has Plainly Authorized Defendants to Protect Aviation and National Security, Including by Screening Air Travelers.

Although styled as another claim under the Administrative Procedure Act, Plaintiffs also invoke the major questions doctrine and argue that "Congress has never statutorily authorized the creation, maintenance, use, or dissemination of the Terrorist Screening Dataset, its subsets like the Selectee List and No Fly List, the Quiet Skies and Silent Partner systems, or any other rules-based terrorist targeting lists." Compl. ¶ 1102 (Count X). This is nonsense. Congress has charged TSA with overall responsibility for aviation security. *See* 49 U.S.C. § 114(d). Together with the FBI, TSA

must "assess current and potential threats to the domestic air transportation system," and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system." *Id.* § 44904(a). Moreover, in consultation with other federal agencies, TSA must "establish policies and procedures requiring air carriers [to] . . . prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." *Id.* § 114(h)(1)–(3).

Additionally, Congress has expressly authorized every step in the process—from authorizing the investigation of terrorist-related matters and the collection and analysis of related intelligence, *see, e.g.*, 28 U.S.C. §§ 533–34; 6 U.S.C. § 121(d)(1), (d)(12); 50 U.S.C. § 3056(d)(1); to the creation of an information-sharing apparatus to disseminate information within the federal government and to appropriate state and local officials, *see, e.g.*, Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638; to the authorization of various types of screening against the watchlist maintained by the TSC, *e.g.*, 6 U.S.C. §§ 1140, 1181(e)(2), 1162(e)(2); 46 U.S.C. § 70105(a), (d); 49 U.S.C. § 44917(c)(2); to specifically requiring TSA to use the TSC's watchlist, including the No Fly and Selectee Lists, to screen passengers and take appropriate action, 49 U.S.C. § 114(h)(1)–(3). And, finally, Congress expressly and unequivocally directed DHS to design and review policies and operating procedures for the collection, removal, and updating of data maintained in the No Fly and Selectee subsets of the TSDS, and to do so in consultation with the TSC. *See, e.g.*, *id.* § 44903(j)(2)(C)(i), (ii); *see also id.* § 44903(j)(2)(E)(iii).

Tellingly, every court to address the issue has rejected any contention to the contrary. *See, e.g.*, *Salloum v. Kable*, Case No. 19-cv-13505, 2020 WL 7480549, at *21 (E.D. Mich. Dec. 18, 2020) (rejecting argument that "Congress has not authorized the Executive Branch to utilize the federal terror watch list"); *El Ali*, 473 F. Supp.3d at 529 (similar); *Elhady*, 303 F. Supp. 3d at 467 (rejecting argument "that TSA and TSC exceeded their authority by creating the Watch List"); *Mohamed*, 266 F. Supp. 3d at 883–

84 (rejecting argument "that TSC and TSA have exceeded their authority"); *cf. Ibrahim v. DHS*, 669 F.3d 983, 988–89 (9th Cir. 2012) (noting that "the federal government has assembled a vast, multi-agency, counterterrorism bureaucracy" and citing relevant statutory authority).

It is unclear what work Plaintiffs think the major questions doctrine would do against the backdrop of all of these statutory grants of authority from Congress to Defendant agencies.  The major questions doctrine is limited to "certain extraordinary cases," *West Virginia v. EPA*, 597 U.S. 697, 722–24 (2022), such as those involving "decisions of vast economic and political significance," *id.* at 716; assertions of "extravagant statutory power over the national economy," *id.* at 724; or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted," *id.*  To the contrary, here, "following the September 11, 2001, attacks, Congress created TSA to prevent terrorist attacks and reduce the vulnerability of the United States to terrorism within the nation's transportation networks."  *Durso v. Napolitano*, 795 F. Supp. 2d 63, 65 (D.D.C. 2011) (citation omitted).

**XI.     Plaintiffs Fail to Allege Any Harms at All Traceable to Several Defendants, Justifying Their Dismissal.**

Finally, and notwithstanding the pleading deficiencies identified above for which all counts should be dismissed, Plaintiffs also attempt to sweep in a range of Defendants and agencies who make only a fleeting appearance in the Complaint and against whom there are no well-pleaded factual allegations related to any of the misconduct alleged.  It is an elementary principle of federal pleading practice that a plaintiff must plead sufficient factual content to allow a court "to draw the reasonable inference that [these Defendants are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Here, aside from introducing the Defendants, Compl. ¶¶ 26–219, and pleading their general involvement in the Watchlisting Advisory Council or the fact that that they may use the TSDS, Plaintiffs never mention these Defendants again in the Complaint, much less describes how they caused any alleged injury to any particular Plaintiff(s).  It is of course the case that "the standing inquiry turns on the

allegations in the complaint." *Haase v. Sessions*, <u>835 F.2d 902, 907</u> (D.C. Cir. 1987), and here there are no allegations whatsoever that would permit a court to conclude that an injury was traceable to these Defendants.    While it is true that "[g]eneral factual allegations of injury resulting from the defendant's conduct may suffice" for injury-in-fact at the pleading stage, *Alemu v. Dep't of For Hire Vehicles*, <u>327 F. Supp. 3d 29, 42</u> (D.D.C. 2018) (citation omitted), here there are no such allegations at all, general or specific.    That ends the issue as to these Defendants.    *See Iqbal*, <u>556 U.S. at 684-85</u> ("'It is no answer to say that a claim just shy of plausible entitlement to relief can, if groundless, be weeded out early in the discovery process.'" (quoting *Twombly*, <u>550 U.S. at 559</u>)).    *Cf. DeBrew v. Atwood*, <u>244 F. Supp. 3d 123, 131</u> (D.D.C. 2017) ("plaintiff's amended complaint supplies no more than 'a naked assertion' of the individual defendants' supposed participation in the events giving rise to the constitutional claims." (quoting *Twombly*, <u>550 U.S. at 557</u>)).    Therefore, assuming any claims survive Rule 12—and none should—dismissal is warranted at least as to Defendants Cheatle, Olsen, Davies, Winn, Haines, Abizaid, Lechleither, Wadhia, Wainstein, Meyer, Burriesci, Clutter, Lyon, Blinken, Batier Johnson, Austin, Nakasone, Berrier, Buttigieg,[22] Das, Gacki, and Burns.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss this action pursuant to <u>Federal Rules of Civil Procedure 12(b)(6)</u>.

Dated: February 20, 2024                         Respectfully submitted,

                                                 BRIAN M. BOYNTON
                                                 Principal Deputy Assistant Attorney General

---

[22] Although Secretary Buttigieg is correctly identified in the caption as the Secretary of Transportation, the text of the Complaint incorrectly identifies him as the "Secretary of the U.S. Department of Treasury," Compl. ¶ 197, and the allegations that follow seem to address the role of the Department of Treasury, not the Department of Transportation.    *See, e.g.*, *id.* ¶ 200 (describing communications with financial institutions).    Secretary Buttigieg is not the Secretary of the Treasury and should be dismissed for that reason as well.    Moreover, no allegations in the Complaint relate to the Department of Transportation or any of its subagencies.

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Alexandra J. Widas*
ALEXANDER N. ELY
ALEXANDRA J. WIDAS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Washington, DC 20005
Tel: (202) 993-5177; Fax: (202) 616-8470
alexander.n.ely@usdoj.gov
alexandra.j.widas@usdoj.gov

*Counsel for Defendants*

## NOTICE OF COMPLIANCE

Pursuant to this court's minute order of February 8, 2024, *see* <u>ECF No. 18</u>, I hereby certify that the combined pages of this brief and the separately filed, *ex parte*, *in camera* brief, do not exceed 75 pages in length.

<u>/s/ *Alexandra J. Widas*</u>

Alexandra J. Widas

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on February 20, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent e-mail notification of such filing to all CM/ECF participants.

<u>/s/ *Alexandra J. Widas*</u>

Alexandra J. Widas

*Counsel for Defendants*