## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MOHAMED KHAIRULLAH;
MICHAEL MIGLIORE;
NIDAL EL-TAKACH;                        Case No.  3:23-cv-30095-MGM
AHMAD MIRZAY;
NAVEED BUTT;
MONEEB ELHADY;                          **FIRST AMENDED COMPLAINT FOR**
ABDULRAHMAN CHERRI;                     **INJUNCTIVE RELIEF,**
TAWHIDULLAH AMINI;                      **DECLARATORY RELIEF,**
NUSRATILLA ABDUKHAMIDOV;                **AND DAMAGES**
TALHA MOHAMED;
ADAM QASHOU;
IHAB RASHAD;
MUAD MAYA;                              **JURY TRIAL DEMANDED**
HAZEM IBRAHIM; and
KHALIL ALWOHOUSH,

      Plaintiffs,


      v.

**MERRICK GARLAND**, Attorney General of
the United States, United States Department of
Justice, in his official capacity only;

**CHRISTOPHER WRAY**, Director of the
Federal Bureau of Investigation, in his official
capacity only;

**MICHAEL GLASHEEN**, Director of the
Terrorism Screening Center, in his official
capacity only;

**KIMBERLY CHEATLE**, Director of the United
States Secret Service, in her official capacity only;

**MATTHEW OLSEN**, Assistant Attorney
General, National Security Division, United
States Department of Justice, in his official
capacity only;

**SUSAN DAVIES**, Acting Assistant Attorney
General, Office of Legal Policy, United States

1

Department of Justice, in her official capacity
only;

**PETER WINN**, Acting Chief Privacy and Civil
Liberties Officer, Office of Privacy and Civil
Liberties, United States Department of Justice, in
his official capacity only;

**AVRIL HAINES**, Director of National
Intelligence, Office of the Director of National
Intelligence, in her official capacity only;

**CHRISTINE ABIZAID**, Director of the
National Counterterrorism Center, Office of the
Director of National Intelligence, in her official
capacity only;

**ALEJANDRO MAYORKAS**, Secretary of
Homeland Security, United States Department of
Homeland Security, in his official capacity only;

**TROY MILLER**, Acting Commissioner, United
States Customs and Border Protection, in his
official capacity only;

**DAVID PEKOSKE**, Administrator,
Transportation Security Administration, in his
official capacity only;

**UR JADDOU**, Director, United States
Citizenship and Immigration Services, in
her official capacity only;

**PATRICK LECHLEITNER**, Acting
Director, United States Immigration and
Customs Enforcement, in his official
capacity only;

**SHOBA WADHIA**, Officer, Office for
Civil Rights and Civil Liberties, United
States Department of Homeland Security,
in her official capacity only;

**KENNETH WAINSTEIN**, Under
Secretary, Office of Intelligence and
Analysis, United States Department of

Homeland Security, in his official capacity
only;

**JOHNATHAN MEYER**, General
Counsel, United States Department of
Homeland Security, in his official capacity
only;

**KELLI ANN BURRIESCI**, Deputy
Under Secretary, Office of Strategy,
Policy, and Plans, United States
Department of Homeland Security, in her
official capacity only;

**MASON CLUTTER**, Chief Privacy
Officer, Privacy Office, United States
Department of Homeland Security, in her
official capacity only;

**SHONNIE LYON**, Director, Office of
Biometric Identity Management, United
States Department of Homeland Security,
in her official capacity only;

**ANTONY BLINKEN**, Secretary of State,
United States Department of State, in his
official capacity only;

**HILLARY BATIER JOHNSON**, Deputy
Coordinator for Homeland Security,
Screening, and Designations, Bureau of
Counterterrorism, United States
Department of State, in her official
capacity only;

**LLOYD AUSTIN**, Secretary of Defense,
United States Department of Defense, in
his official capacity only;

**PAUL NAKASONE**, Commander,
United States Cyber Command; Director,
National Security Agency; Chief, Central
Security Service, United States
Department of Defense, in his official
capacity only;

**SCOTT BERRIER**, Director, Defense
Intelligence Agency, in his official
capacity only;

**PETE BUTTIGIEG**, Secretary of
Transportation, United States Department
of Transportation, in his official capacity
only;

**HIMAMAULI DAS**, Acting Director,
Financial Crimes Enforcement Network,
United States Department of Treasury, in
his official capacity only;

**ANDREA GACKI**, Director, Office of
Foreign Assets Control, United States
Department of Treasury, in her official
capacity only;

**WILLIAM BURNS**, Director, Central
Intelligence Agency, in his official
capacity only;

> Defendants.

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES

### JURY TRIAL DEMANDED

Plaintiffs **Mohamed Khairullah**, **Michael Migliore**, **Nidal El-Takach**, **Ahmad Mirzay**, **Naveed Butt**, **Moneeb Elhady**, **Abdulrahman Cherri**, **Tawhidullah Amini**, **Nusratilla Abdukhamidov**, **Talha Mohamed**, **Adam Qashou**, and **Ihab Rashad**, by and through their attorneys CAIR Legal Defense Fund ("CAIR"), CAIR-Massachusetts ("CAIR-MA"), CAIR-New Jersey ("CAIR-NJ"), and CAIR-Michigan ("CAIR-MI") state as follows:

**Introduction**

1.       Plaintiffs are law-abiding Muslim American citizens, lawful permanent residents, and asylees. They work hard, pay their taxes, pursue their education, and care for their families. They have never been indicted, charged, or convicted of any terrorism-related offense. And yet, without any notice or explanation, the federal government extrajudicially sentenced them to lifetime second-class citizenship.

2.       Like thousands of other innocent Americans—and over one and a half million people around the world, almost all of them Muslim—Plaintiffs have been placed in the Terrorist Screening Dataset ("TSDS"), known colloquially as the "federal terrorist watchlist." That placement designates them as worthy of permanent suspicion and imposes sweeping consequences that alter nearly every aspect of Plaintiffs' lives. As a result of being watchlisted, Plaintiffs have suffered a wide range of harms, including being publicly humiliated, surveilled, and harassed when they travel; prevented from attending weddings, funerals, graduations, and other milestone events; separated from their children; denied jobs, security clearances, U.S. citizenship, visas, gun licenses, and other government benefits; and even effectively exiled from the United States.

3.       Plaintiffs were placed on the federal terrorist watchlist by Defendants' interagency watchlisting system, which evaluates individuals for inclusion under a vague, rubberstamp-at-best standard that is satisfied nearly 100% of the time. Plaintiffs were not notified of their nomination to or inclusion in the watchlist. They have no idea why the government considers them worthy of permanent suspicion, have no opportunity to dispute the government's decision or confront the supposedly derogatory information on which their placement is based, and are baffled by Defendants' apparent determination that they are "known or suspected terrorists."

4.      Plaintiffs suffer life-altering consequences from their watchlist status because Defendants widely distribute the watchlist and make it known that listed individuals should be treated as dangerous threats. Defendants send the watchlist to federal agencies, over 18,000 state and local law enforcement agencies, over 500 private entities, and dozens of foreign countries, all of which then take actions to harm and stigmatize listed individuals, including Plaintiffs, as well as listed individuals' friends, family, and other associates.

5.      The stigma and harm of watchlisting placement lasts a lifetime, even if Defendants eventually decide that an individual does not meet the vague, all-inclusive standard for placement and choose to remove an individual from the watchlist. Several agencies retain records of *past* watchlist status and continue to use that historic status to deny formerly-listed individuals, including Plaintiff Mohamed Khairullah, government benefits like security clearances, employment, access to government buildings, and other licenses and permissions for the rest of their lives.

6.      In other words, once an individual is placed on the federal terrorist watchlist, they are branded as a second-class citizen for life, even if the government eventually realizes that the individual should not have been placed on the list in the first place.

7.      Plaintiff Mohamed Khairullah, for example, was placed on the federal terrorist watchlist in 2019. After suffering years of enhanced screening, unreasonable delays, electronic device searches, and interrogations while traveling, Mr. Khairullah was taken off the watchlist—but Defendants continued to retain the records of his past status and use that past status to harm him. As a result, the U.S. Secret Service barred him from entering the White House and attending an Eid al-Fitr celebration earlier this year.

8.      Defendants placed Plaintiffs, and over a million and a half other individuals, on the federal terrorist watchlist even though they know that the watchlist's inclusion

standards are so permissive, pliable, and discriminatory that they bear a vanishingly small connection to actual terrorist activities, rendering the watchlist completely ineffective at protecting national security.

9.     Rather than an effective tool for protecting the United States, the watchlist operates as a *de facto* Muslim registry. Over 98% of the names on leaked portions of the watchlist from 2019 are identifiably Muslim—and that did not happen by accident. Defendants intentionally use impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the watchlist against Muslims. Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, attending mosques and Islamic events, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, Muslim-sounding names, the frequency of Muslim prayer, adherence to Islamic religious practices, Islamic religious study, the transfer of money to individuals residing in Muslim-majority countries, affiliations with Muslim organizations, and associations with Muslims in the United States or abroad to be suspicious, and routinely nominate Muslims to the watchlist on the basis of those characteristics and activities.

10.     The federal government uses guilt-by-association presumptions to place family members, friends, traveling companions, and associates of listed persons under intense surveillance and on the watchlist. Many Americans, including children, end up targeted by the watchlisting system based on who their mother or father is, what mosque their family attends, how they exercise their constitutional rights, where they travel, with whom they associate, or on the basis of their perceived religious beliefs.

11.     Leaked government documents, as well as public governmental reports, reveal that the federal government's terrorist watchlisting system is discriminatory, standardless, and devoid of adequate procedures.

12.     Defendants create, maintain, administer, and use the watchlisting system without congressional approval and oversight, targeting Plaintiffs and thousands of other American Muslims in the shadowy corners of federal agency power.

13.     Each of the Plaintiffs' injuries are directly attributable to Defendants' compilation, implementation, and dissemination of the federal terrorist watchlisting system.

## Plaintiffs

14.     Mohamed Khairullah is a U.S. citizen and a Muslim residing in New Jersey. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

15.     Michael Migliore is a U.S. citizen and a Muslim residing in Saudi Arabia. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

16.     Nidal El-Takach is a U.S. citizen and a Muslim residing in Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

17.     Naveed Butt is a U.S. citizen and a Muslim residing in Virginia. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

18.     Moneeb Elhady is a U.S. citizen and a Muslim residing in Michigan. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

19.     Abdulrahman Cherri is a U.S. citizen and a Muslim residing in Germany. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

20.     Tawhidullah Amini is a U.S. lawful permanent resident and a Muslim residing in Missouri. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

21.     Nusratilla Abdukhamidov is a U.S. lawful permanent resident and a Muslim residing in Tennessee. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

22.     Ahmad Mirzay is a U.S. lawful permanent resident and a Muslim residing in Massachusetts. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

23.     Talha Mohamed is an asylee and a Muslim residing in New Mexico. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

24.     Adam Qashou is a U.S. citizen and a Muslim residing in Alabama. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

25.     Ihab Rashad is a U.S. citizen and a Muslim residing in New Hampshire. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

26.     Plaintiff Muad Maya is a U.S. citizen residing in Kentucky. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

27.     Plaintiff Hazem Ibrahim is a U.S. citizen residing in Alabama. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

28.     Plaintiff Khalil Alwohoush is a U.S. citizen residing in Kentucky. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

## Defendants

### *Defendant Merrick Garland*

29.     Defendant Merrick Garland is the United States Attorney General of the U.S. Department of Justice ("DOJ").

30.     DOJ and/or its agency subcomponents, especially the Federal Bureau of Investigation and the Terrorist Screening Center, play central roles in administering, maintaining, and distributing the Terrorism Screening Dataset ("TSDS").

31.     DOJ is also a regular agency attendee of the Watchlisting Advisory Council ("WLAC"), an interagency advisory group comprised of a subset of the Defendants. The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures, which are formally adopted by Defendants when they are approved by the National Security Council ("NSC").

32.     Upon information and belief, DOJ and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terrorist watchlist.

33.     DOJ and/or its agency subcomponents also participate in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

34.     Additionally, DOJ uses the TSDS to screen persons that are applying for security clearances or employment at DOJ and/or its agency subcomponents to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOJ and/or its agency subcomponents or elsewhere.

35.     DOJ also uses historical watchlist status as a basis to deny former Listees security clearances, employment or appointment with DOJ or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

36.     Defendant Garland is being sued in his official capacity only.

***Defendant Christopher Wray***

37.     Defendant Christopher Wray is the Director of the Federal Bureau of Investigation ("FBI").

38.     FBI administers the Terrorist Screening Center ("TSC"), which develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

39.     FBI is also a regular agency attendee of the WLAC, an interagency advisory group comprised of a subset of the Defendants. The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures.

40.     Upon information and belief, FBI nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

41.     FBI is responsible for initially reviewing all nominations to the TSDS except those with a "nexus to international terrorism," which are initially reviewed by the National Counterterrorism Center ("NCTC").

42.     Upon information and belief, FBI acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) subjecting them to investigation, surveillance, interrogation, and arrest; and (2) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, acceptance or retention in the armed forces, and employment with the federal government or elsewhere.

43.     FBI also administers the National Crime Information Center ("NCIC"), a nationwide, computerized database that enables information-sharing among law enforcement agencies.

44.     FBI uses the NCIC to disseminate the "known or suspected terrorists" stigmatizing label attached to Plaintiffs and other similarly situated individuals to over 18,000 federal, state, local, and tribal law enforcement agencies, as well as other federal, state, local, and tribal authorities, including pretrial service and pretrial release agencies, probation and parole offices, prosecuting attorney offices, courts and magistrate offices, correctional institutions, custodial facilities in medical or psychiatric institutions, medical examiner's offices, and others.

45.     FBI also uses the NCIC to disseminate the "known or suspected terrorists" stigmatizing label attached to Plaintiffs and other similarly situated individuals to foreign governments and hundreds of private entities, including airlines, gun sellers, financial institutions, hospitals, the captains of sea-faring vessels, and others.

46.     Additionally, FBI participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

47.     FBI uses the TSDS to screen persons that are applying for security clearances or employment at FBI to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with FBI or elsewhere.

48.     FBI uses historical watchlist status to inform decisions about who to investigate, surveil, and otherwise target for law-enforcement activity. FBI also uses historical watchlist status as a basis to deny former Listees security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

49.     Defendant Wray is being sued in his official capacity only.

***Defendant Michael Glasheen***

50.     Defendant Michael Glasheen is the Director of the Terrorism Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI").

51.     TSC is a Co-Chair of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

52.     TSC also develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

53.     Upon information and belief, TSC reviewed the nominations of all of the Plaintiffs and approved them for inclusion in the TSDS.

54.     TSC has the sole authority to place an individual on the TSDS. Moreover, upon information and belief, TSC nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

55.     TSC and/or its subcomponents, including the TSC Redress Office, also participate in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

56.     TSC facilitates the FBI's distribution of the TSDS to tens of thousands of domestic and foreign entities by exporting TSDS information, including biographic information, biometric data, and watchlist status information, to the FBI and other agencies and entities.

57.     Additionally, TSC uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with TSC to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with TSC or elsewhere.

58.     Defendant Glasheen is being sued in his official capacity only.

***Defendant Kimberly Cheatle***

59.     Defendant Kimberly Cheatle is the Director of the United States Secret Service ("USSS"), a component of the Department of Homeland Security ("DHS").

60.     Upon information and belief, USSS uses the TSDS to screen individuals that are seeking admission to federal buildings, including the White House, as well as individuals who are applying for security clearances or employment at USSS to deny them security

clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with USSS or elsewhere.

61.    USSS also uses historical watchlist status as a basis to deny former Listees security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

62.    For example, upon information and belief, USSS barred Plaintiff Mohamed Khairullah from entering the White House to attend an Eid al-Fitr celebration to which he had been invited in his capacity as New Jersey's longest-serving Muslim mayor. Upon information and belief, Mr. Khairullah was denied entry because the Secret Service realized that he had been placed on the watchlist in or around 2019—even though Defendants removed him from the watchlist in or around 2022.

63.    Defendant Cheatle is sued in her official capacity only.

**Defendant Matthew Olsen**

64.    Defendant Matthew Olsen is the Assistant Attorney General for National Security of the National Security Division ("NSD") of the U.S. Department of Justice ("DOJ").

65.    NSD is a regular attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

66.    Upon information and belief, NSD develops policies for frontline screening agencies—including but not limited to the FBI, TSA, CBP, USCIS, and Department of State—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports;

(2) burdening their travel at land border crossings and other ports of entry; (3) denying them participation in programs that allow for expedited screening at ports of entry; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

67.     Additionally, NSD uses the TSDS to screen persons that are applying for security clearances or employment at NSD to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with NSD or elsewhere.

68.     Defendant Olsen is being used in his official capacity only.

***Defendant Susan Davies***

69.     Defendant Susan Davies is the Acting Assistant Attorney General for the Office of Legal Policy ("OLP") of the U.S. Department of Justice ("DOJ").

70.     OLP is a regular attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

71.     Upon information and belief, OLP develops policies for frontline screening agencies—including but not limited to the FBI, TSA, CBP, USCIS, and Department of State— regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them participation in programs that allow for expedited screening at ports of entry; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances,

access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

72.     Additionally, OLP uses the TSDS to screen persons that are applying for security clearances or employment at OLP to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OLP or elsewhere.

73.     Defendant Davies is being used in her official capacity only.

**Defendant Peter Winn**

74.     Defendant Peter Winn is the Acting Chief Privacy and Civil Liberties Officer of the Office of Privacy and Civil Liberties ("OPCL") of the U.S. Department of Justice ("DOJ").

75.     OLP is a regular attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

76.     Upon information and belief, OPCL develops policies for frontline screening agencies—including but not limited to the FBI, TSA, CBP, USCIS, and Department of State—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them participation in programs that allow for expedited screening at ports of entry; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

77.    Additionally, OPCL uses the TSDS to screen persons that are applying for security clearances or employment at OPCL to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OPCL or elsewhere.

78.    Defendant Winn is being used in his official capacity only.

***Defendant Avril Haines***

79.    Defendant Avril Haines is the Director of National Intelligence.

80.    The Office of the Director of National Intelligence ("ODNI") assists the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS.

81.    ODNI is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

82.    Upon information and belief, ODNI and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

83.    ODNI and/or its agency subcomponents also use the TSDS to screen persons against it that are applying for security clearances or for employment to work with ODNI to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with ODNI or elsewhere.

84.    Defendant Haines is sued in her official capacity only.

***Defendant Christine Abizaid***

85.     Defendant Christine Abizaid is the Director of the National Counterterrorism Center ("NCTC") of the ODNI.

86.     NCTC is a Co-Chair of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

87.     Upon information and belief, NCTC nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

88.     NCTC is also responsible for initially reviewing all nominations to the TSDS with a "nexus to international terrorism."

89.     NCTC compiles and maintains the Terrorist Identities Datamart Environment ("TIDE") and, in doing so, receives regular updates from the TSC regarding the TSDS status of individuals listed in TIDE. The stigmatizing "known or suspected terrorists" label attached to Plaintiffs and other similarly situated individuals is reflected in their listings in TIDE.

90.     NCTC uses the TSDS and TIDE to screen individuals, including Plaintiffs and other similarly situated individuals, in order to recommend that other federal agencies deny them government benefits and impose consequences upon them, including but not limited to denying or revoking refugee status, immigrant statuses, visas, visa waiver program benefits, and asylum applications.

91.     NCTC also distributes TIDE, including the stigmatizing "known or suspected terrorists" label attached to Plaintiffs and similarly situated individuals, to federal agencies and other entities.

92.     Additionally, NCTC uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with NCTC to deny them security

clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with NCTC or elsewhere.

93.    Defendant Abizaid is sued in her official capacity only.

**Defendant Alejandro Mayorkas**

94.    Defendant Alejandro Mayorkas is the Secretary of the U.S. Department of Homeland Security ("DHS").

95.    DHS and/or its agency subcomponents assist the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

96.    DHS and/or its agency subcomponents, including U.S. Customs and Border Protection ("CBP"); Transportation Security Administration ("TSA"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); and various DHS headquarters offices, including the Office for Civil Rights & Civil Liberties ("CRCL"); the Office of Intelligence & Analysis ("OIA"); the Office of the General Counsel ("OGC"); the Office of Strategy, Policy, and Plans ("DHS Policy"); and the Privacy Office are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

97.    Upon information and belief, DHS and/or its agency subcomponents nominated some or all of the Watchlisted Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

98.    Upon information and belief, DHS and/or its agency subcomponents are some of the most active and frequent frontline users of the TSDS. They use the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to

deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

99.     Additionally, DHS oversees and administers the DHS Traveler Redress Inquiry Program ("DHS TRIP"), the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

100.    DHS and/or its agency subcomponents also administer the DHS Automated Biometric Identification System (IDENT), a system of biometric records and biographic information, including TSDS records and the stigmatizing "known or suspected terrorist" label attached to Plaintiffs and similarly situated individuals, that is shared with federal, state, local, tribal, foreign, and international governmental agencies.

101.    Additionally, DHS and/or its agency subcomponents use the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS and/or its agency subcomponents to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS and/or its agency subcomponents or elsewhere.

102.    Defendant Mayorkas is sued in his official capacity only.

***Defendant Troy Miller***

103.    Defendant Troy Miller is the Acting Commissioner of U.S. Customs and Border Protection ("CBP") of the U.S. Department of Homeland Security ("DHS").

104.    CBP is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

105.    Upon information and belief, CBP nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

106.    Upon information and belief, CBP acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

107.    CBP also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

108.    Additionally, CBP uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CBP to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CBP or elsewhere.

109.    CBP also retains historical watchlist information in its TECS system, even after an individual has been removed from the TSDS. CBP uses that historical watchlist

information to inform decisions to harm former Listees in a range of ways, including to: (1) deny them entry into the United States; (2) subject them to invasive searches and interrogations at ports of entry; and (3) to deny them other benefits and licenses, including access to programs like Global Entry that provide privileged access to ports of entry.

110.    Defendant Miller is sued in his official capacity only.

***Defendant David Pekoske***

111.    Defendant David Pekoske is the Administrator of the Transportation Security Administration ("TSA") of the U.S. Department of Homeland Security ("DHS").

112.    Upon information and belief, TSA nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

113.    Upon information and belief, TSA acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) impeding their air travel at airports; (2) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; and (3) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

114.    TSA also implements the "Quiet Skies" program and its international counterpart "Silent Partner." The Quiet Skies program cross-references the TSDS as part of a systems of targeting rules that identifies and then flags for investigation and surveillance "unknown or partially known terrorists" on flights originating from the United States. Silent Partner does the same for flights originating from foreign destinations. The resulting scrutiny

23

results in individuals being treated like TSDS Listees and may result in nomination to the TSDS.

115.    Upon information and belief, the nominations of some or all of the Plaintiffs to the TSDS resulted from Quiet Skies and/or Silent Partner identification, investigation, and surveillance.

116.    TSA also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

117.    Additionally, TSA uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with TSA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with TSA or elsewhere.

118.    Defendant Pekoske is sued in official capacity only.

***Defendant Ur Jaddou***

119.    Defendant Ur Jaddou is the Director of the U.S. Citizenship and Immigration Services ("USCIS") of the U.S. Department of Homeland Security ("DHS").

120.    USCIS is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

121.    Upon information and belief, USCIS nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

122.    Upon information and belief, USCIS acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American

citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) indefinitely delaying or denying their immigration benefits and (2) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

123. Upon information and belief, USCIS imposes years-long administrative delays and denials of U.S. citizenship upon watchlisted individuals as the result of their watchlist status, including for Plaintiffs Nusratilla Abdukhamidov, Tawhidullah Amini, and Ahmad Mirzay.

124. USCIS also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

125. Additionally, USCIS uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with USCIS to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with USCIS or elsewhere.

126. USCIS also uses historical watchlist status to deny former Listees government benefits, including favorable outcomes of refugee, immigrant, visa, visa waiver program, and asylum processes.

127. Defendant Jaddou is sued in her official capacity only.

***Defendant Patrick Lechleitner***

128. Defendant Patrick Lechleitner is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE") of the U.S. Department of Homeland Security ("DHS").

129.     Upon information and belief, ICE nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

130.     Upon information and belief, ICE acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) indefinitely delaying or denying their immigration benefits; (2) subjecting them to investigation, surveillance, interrogation, and arrest; and (3) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

131.     ICE also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

132.     Additionally, ICE uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with ICE to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with ICE or elsewhere.

133.     Defendant Lechleitner is sued in official capacity only.

***Defendant Shoba Wadhia***

134.     Defendant Shoba Wadhia is the Officer of the Office for Civil Rights and Civil Liberties ("CRCL") of the U.S. Department of Homeland Security ("DHS").

135.     CRCL is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

136.     Upon information and belief, CRCL develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

137.     CRCL also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CRCL to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CRCL or elsewhere.

138.     Defendant Wadhia is sued in his official capacity only.

**Defendant Kenneth Wainstein**

139.     Defendant Kenneth Wainstein is Under Secretary of the Office of Intelligence and Analysis ("OIA") of the U.S. Department of Homeland Security ("DHS").

140.     OIA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

141.    Upon information and belief, OIA develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the DHS and/or its agency subcomponents or elsewhere.

142.    Upon information and belief, OIA nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

143.    Additionally, OIA uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with OIA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OIA or elsewhere.

144.    Defendant Wainstein is sued in his official capacity only.

***Defendant Johnathan Meyer***

145.    Defendant Johnathan Meyer is General Counsel ("GC") of the U.S. Department of Homeland Security ("DHS").

146.    GC is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

147.    Upon information and belief, GC develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying them immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

148.    GC also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with GC to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the GC or elsewhere.

149.    Defendant Meyer is sued in his official capacity only.

*Defendant Kelli Ann Burriesci*

150.    Defendant Kelli Ann Burriesci is Deputy Under Secretary of the Office of Strategy, Policy, and Plans ("DHS Policy") of the U.S. Department of Homeland Security ("DHS").

151.    DHS Policy is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and

procedures, and coordinates DHS's policy positions on the Watchlisting Guidance and other TSDS-related policies for WLAC meetings.

152.   Upon information and belief, DHS Policy develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

153.   DHS Policy also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS Policy to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS Policy or elsewhere.

154.   Defendant Burriesci is sued in her official capacity only.

***Defendant Mason Clutter***

155.   Defendant Mason Clutter is the Chief Privacy Office of the Privacy Office ("DHS Privacy") of the U.S. Department of Homeland Security ("DHS").

156.   DHS Privacy is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

157.    Upon information and belief, DHS Privacy develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

158.    DHS Privacy also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS Privacy to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS Privacy or elsewhere.

159.    Defendant Clutter is sued in her official capacity only.

**_Defendant Shonnie Lyon_**

160.    Defendant Shonnie Lyon is the Director of the Office of Biometric Identity Management ("OBIM") of the U.S. Department of Homeland Security ("DHS").

161.    OBIM administers the DHS Automated Biometric Identification System (IDENT), a system of biometric records and biographic information, which includes TSDS records and the stigmatizing "known or suspected terrorist" label attached to Plaintiffs and

similarly situated individuals, that is shared with federal, state, local, tribal, foreign, and international governmental agencies.

162.    Upon information and belief, OBIM nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

163.    OBIM also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with OBIM to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OBIM or elsewhere.

164.    Defendant Lyon is sued in her official capacity only.

***Defendant Antony Blinken***

165.    Defendant Antony Blinken is the Secretary of State at the Department of State ("DOS").

166.    DOS and/or its agency subcomponents assist the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS.

167.    DOS and/or its agency subcomponents, including but not limited to the Bureaus of Counterterrorism; Consular Affairs; Democracy, Human Rights and Labor; Diplomatic Security; and the Office of the Legal Adviser, are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

168.    Upon information and belief, DOS and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

169.    Upon information and belief, DOS acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to indefinitely delaying or denying visas and visa waivers.

170.    For example, the Department of State has denied visas to Plaintiff Talha Mohamed's mother and also revoked a visa for one of his friends. Upon information and belief, that denial and revocation occurred because Mr. Mohamed is on the federal terrorist watchlist.

171.    DOS also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DOS to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOS or elsewhere.

172.    DOS and/or its agency subcomponents also participate in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

173.    DOS also uses historic watchlist status to deny former Listees government benefits, including favorable outcomes of refugee, immigrant, visa, visa waiver program, and asylum processes.

174.    Defendant Blinken is sued in his official capacity only.

***Defendant Hillary Batjer Johnson***

175.    Defendant Hillary Batjer Johnson is the Deputy Coordinator for Homeland Security, Screening, and Designations of the Bureau of Counterterrorism ("DOSCT") of the U.S. Department of State ("DOS").

176.    DOSCT is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

177.    Upon information and belief, DOSCT develops policies for frontline screening agencies regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government and elsewhere.

178.    Upon information and belief, DOSCT nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

179.    DOSCT also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DOSCT to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOSCT or elsewhere.

180.    Defendant Johnson is sued in her official capacity only.

***Defendant Lloyd Austin***

181.    Defendant Lloyd Austin is the Secretary of Defense at the U.S. Department of Defense ("DOD").

182.   DOD and/or its agency subcomponents, including but not limited to the National Security Agency ("NSA") and the Defense Intelligence Agency ("DIA"), are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

183.   Upon information and belief, DOD and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

184.   Upon information and belief, DOD and/or its agency subcomponents act as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to military bases and other DOD facilities.

185.   DOD and/or its agency subcomponents also use the TSDS to screen persons against it that are applying for security clearances or for employment to work with DOD to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOD or elsewhere.

186.   Defendant Austin is sued in his official capacity only.

***Defendant Paul Nakasone***

187.   Defendant Paul Nakasone is Commander of the U.S. Cyber Command, Director of the National Security Agency ("NSA"), and Chief of the Central Security Service of the U.S. Department of Defense ("DOD").

188.    NSA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

189.    Upon information and belief, NSA develops policies for frontline screening agencies regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government and elsewhere.

190.    Upon information and belief, NSA nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

191.    NSA also acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to military bases and NSA facilities, information, systems, and personnel.

192.    NSA also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with NSA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with NSA or elsewhere.

193. Defendant Nakasone is sued in his official capacity only.

***Defendant Scott Berrier***

194. Defendant Scott Berrier is the Director of the Defense Intelligence Agency ("DIA") of the U.S. Department of Defense ("DOD").

195. DIA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures, where it is usually represented by the Defense Combating Terrorism Center ("DCTC").

196. Upon information and belief, DIA nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

197. DIA also acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to military bases and access to DIA facilities, information, systems, and personnel.

198. DIA also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DIA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DIA or elsewhere.

199. Defendant Berrier is sued in his official capacity only.

***Defendant Pete Buttigieg***

200. Defendant Pete Buttigieg is Secretary of the U.S. Department of Treasury ("DOT").

201.    DOT and/or its agency subcomponents are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

202.    Upon information and belief, DOT and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

203.    Upon information and belief, DOT and/or its agency subcomponents oversee the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Plaintiffs and other similarly situated individuals to financial institutions, leading those financial institutions to impose consequences upon them, including but not limited to closing their bank accounts without notice and blocking them from conducting wire transfers.

204.    DOT and/or its agency subcomponents also use the TSDS to screen persons against it that are applying for security clearances or for employment to work with  to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOT and/or its agency subcomponents or elsewhere.

205.    Defendant Buttigieg is sued in his official capacity only.

*Defendant Himamauli Das*

206.    Defendant Himamauli Das is the Acting Director of the Financial Crimes Enforcement Network ("FinCEN") of the Office of Terrorism and Financial Intelligence of the U.S. Department of Treasury ("DOT").

207.    FinCEN is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

208.    FinCEN also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with FinCEN to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with FinCEN or elsewhere.

209.    Defendant Das is sued in his official capacity only.

**Defendant Andrea Gacki**

210.    Defendant Andrea Gacki is the Director of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury ("DOT").

211.    Upon information and belief, OFAC nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

212.    Upon information and belief, OFAC oversees the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Plaintiffs and other similarly situated individuals to financial institutions, leading those financial institutions to impose consequences upon them, including but not limited to closing their bank accounts without notice and blocking them from conducting wire transfers.

213.    For example, Bank of America shut down Plaintiff Nusratilla Abdukhamidov's bank account; Plaintiff Moneeb Elhady had accounts with MoneyGram and CashApp abruptly closed; and Plaintiff Adam Qashou's bank accounts at Wells Fargo and Chase Bank were closed without explanation.

214.    Upon information and belief, Plaintiffs suffered those closures because OFAC and other Defendants distributed the stigmatizing label of "known or suspected terrorists" attached to Plaintiffs and other watchlisted individuals to financial institutions, including

Bank of America, Wells Fargo, Chase Bank, MoneyGram, and CashApp, causing those institutions to close their accounts.

215.    OFAC also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with OFAC to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OFAC or elsewhere.

216.    Defendant Gacki is sued in her official capacity only.

*Defendant William Burns*

217.    Defendant William Burns is the Director of the Central Intelligence Agency ("CIA").

218.    CIA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

219.    Upon information and belief, CIA nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

220.    Upon information and belief, CIA acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to CIA facilities.

221.    CIA also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CIA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CIA or elsewhere.

222.    Defendant Burns is sued in his official capacity only.

## Jurisdiction and Venue

223.    This Court has federal question jurisdiction over Plaintiffs' claims of violation of the U.S. Constitution and federal statutes pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702, the U.S. Constitution, and federal common law.

224.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and by the general, legal, and equitable powers of this Court.

225.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are officers or employees of the United States sued in their official capacity; at least one of the Plaintiffs resides in Massachusetts; Defendants regularly conduct business in Massachusetts; a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within Massachusetts, including the dissemination of the federal terrorist watchlist and the stigmatizing label of "known or suspected terrorist" attached to each of the Plaintiffs to Massachusetts state and local law enforcement officers, Massachusetts courts, and other governmental and private entities within Massachusetts; and because the action involves no real property.

## Factual Background

226.    In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Dataset ("TSDS" or "federal terrorist watchlist"). TSC's consolidated watchlist is the federal government's master repository for suspected international and domestic terrorist records and is used for watchlist-related screening.

227.    Defendants play different and overlapping roles in administering, maintaining, disseminating, and using the federal terrorist watchlist to harm and stigmatize Plaintiffs and other similarly-situated individuals as "known or suspected terrorists."

228.    The sections below describe the vague, rubberstamp-at-best processes by which individuals are added to the federal terrorist watchlist without any notice or opportunity to be heard; the life-changing consequences of being added to the federal terrorist watchlist and being deemed a "known or suspected terrorist"; Defendants' deliberate and sustained use of the watchlisting system to target Muslims; and the inefficacy of the federal terrorist watchlist to accomplish Defendants' stated goals.

## Government Agencies Place Individuals on the
## Federal Terrorist Watchlist Using Ill-Defined and Nonsensical Standards.

### The Vague Standards for Inclusion in the TSDS and its Subclassifications

229.    Anyone listed in the TSDS is a "TSDS Listee" subjected to various forms of heightened scrutiny, adverse treatment, stigmatic harms, and other consequences imposed upon them by federal, state, local, and foreign governments and private entities. Those consequences differ depending on the particular entity that encounters a watchlisted individual and what subclassifications are attached to the individual's TSDS record.

230.    The Government publicly states that, to be included in the TSDS, an individual must be reasonably suspected of being a known or suspected terrorist. More specifically, a government nominator "must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or

intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."[1]

231.    That standard does not evince even an internal logic. By its own description, the government places American citizens and other individuals on the federal terrorist watchlist based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities. These standards fall far below the typical "reasonable suspicion" and "probable cause" standards required for criminal investigation.

232.    The reasonable suspicion standard's "totality of the circumstances" analysis may include assessment of an individual's race, ethnicity, country of origin, sex, age, religion, religious practices, Muslim-sounding names, languages spoken, family associations, travel history, social media history, and other activities protected by the First Amendment, Fifth Amendment, Fourteenth Amendment, and other provisions of the U.S. Constitution.[2]

233.    One set of TSDS subclassifications is used primarily by the TSA, DHS, and TSC in relation to air travel. This air-travel-focused set of classifications includes the No Fly List, the Selectee List, and the Expanded Selectee List.

234.    Persons nominated and added to the TSDS under the "reasonable suspicion" nominating standard are placed on the Expanded Selectee List by default, provided their records contain a minimum amount of name and birth date identifying information.

---

[1] January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures, *Elhady v. Piehota*, 1:16-cv-00375-AJT-JFA, Dkt. 196-16 at 4 (E.D. Va. Apr. 27, 2018), https://www.aclu.org/sites/default/files/field_document/ex._7_elhady_-_overview_of_watchlisting_system_-_4-27-18_cover.pdf (last accessed September 16, 2023).
[2] *See* 2013 Watchlisting Guidance at 11, 34-35, 44-45, https://www.aclu.org/wp-content/uploads/legal-documents/March%202013%20Watchlist%20Guidance.pdf (stating that nominations may not be made "solely" on the basis of constitutionally-protected traits and activities) (last accessed September 16, 2023).

235.    TSDS Listees may also be placed on the heightened Selectee List if their records contain additional derogatory information. According to the 2013 Watchlisting Guidance promulgated by the Watchlisting Advisory Council, TSDS Listees may be designated as Selectees if the government suspects them of association or affiliation with a foreign or domestic terrorist organization, or other association with terrorist activities.[3]

236.    TSDS Listees subclassified on either the Expanded Selectee List or the Selectee List are systematically subjected to extra screening at airports by airline employees, airport employees, TSA officers, and other screeners. They often find "SSSS" printed on their boarding passes. "SSSS" indicates a passenger's watchlist status as a "known or suspected terrorist" to airline employees, airport employees, TSA officers, and screeners.

237.    The designation of known or suspected terrorists with the marking "SSSS" has become commonplace in the Muslim community. Especially after witnessing the treatment an individual with "SSSS" on their boarding pass receives when traveling, many Muslims—including Plaintiffs as well as their family members, friends, and associates—recognize and understand "SSSS" markings on tickets to mean that the government has designated the ticketholder to be a known or suspected terrorist.

238.    Likewise, airline representatives, other airline personnel, TSA officers, and other airport employees recognize the "SSSS" designation and marking as meaning that an individual is a known or suspected terrorist.

239.    Upon information and belief, almost all of the Plaintiffs are on the Selectee List. Specifically, the following Plaintiffs are on the Selectee List: Mr. El-Takach; Mr. Mirzay; Mr.

---

[3] *Id.* at 54.

Elhady; Mr. Cherri; Mr. Amini; Mr. Abdukhamidov; Mr. Mohamed; Mr. Qashou; Mr.

Rashad; Mr. Maya; and Mr. Alwohoush.

240.    TSDS Listees may also be placed on the No Fly List if the government

determines that they pose:

(1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including an act of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1) ) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; *or*,

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.[4]

241.    Persons on the No Fly List are prevented from boarding flights that fly into, out

of, or through United States airspace.

242.    Upon information and belief, Plaintiff Michael Migliore is on the No Fly List.

243.    In practice, as one federal judge observed in *Mohamed v. Holder*, 995 F. Supp.

2d 520 (E.D. Va. 2014), "[a] showing of past or ongoing unlawful conduct does not seem to

be required … [T]he Court has little, if any, ability to articulate what information is viewed

by TSC as sufficiently 'derogatory' beyond the labels it has provided to the Court. In sum, the

No Fly List assumes that there are some American citizens who are simply too dangerous to

be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and

---

[4] January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures, *supra* n.1, at 4.

restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct." *Id.* at 532.

244.    As the *Mohamed* court went on to explain, "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward committing war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public" and that "[t]he process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct." *Id.* at 529, 531.

245.    Other screening agencies, including CBP, screen TSDS Listees but do not regularly use the No Fly List, Selectee List, and Expanded Selectee classifications to inform their screening. CBP, for example, incorporates information from the federal terrorist watchlist into its TECS platform, which it uses to screen individuals when they attempt to cross the U.S. border, clear customs, or otherwise encounter CBP officers. When TSDS Listees are screened against the TECS platform, the system automatically refers them to secondary inspection and otherwise flags them as potential terrorists in alerts sent to officers.

246.    Upon information and belief, the following Plaintiffs have been subjected to detention, interrogation, and searches by CBP officers as the result of their watchlist status being reflected in the TECS platform: Mr. Khairullah, Mr. Amini, Mr. Butt, Mr. Cherri, Mr. El-Takach, Mr. Elhady, Mr. Mirzay, Mr. Qashou, Mr. Rashad; Mr. Maya, and Mr. Alwohoush.

247.    The TECS platform does not include the No Fly List, Selectee List, and Expanded Selectee classifications. Instead, the TECS platform annotates the records of TSDS Listees with other subclassifications, including describing them as "Armed and Dangerous."

248.    Pursuant to official CBP policy adopted in January 2018 (CBP Directive No. 3340-049A), CBP conducts secondary inspections of TSDS Listees, including advanced electronics searches of any electronics carried by TSDS Listees.[5] "An advanced search is any search in which an [o]fficer connects external equipment through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy, and analyze its contents."[6] According to official CBP policy, "the presence of an individual on a government operated and government vetted terrorist watch list" alone provides adequate grounds for CBP officers to search, copy, and store the contents of laptops, tablets, smartphones, and other electronic devices without requesting or obtaining consent.[7]

249.    Upon information and belief, the following Plaintiffs have been subjected to electronics device searches by CBP officers as the result of their watchlist status: Mr. Khairullah, Mr. El-Takach, Mr. Mirzay, Mr. Elhady, Mr. Cherri, Mr. Amini, Mr. Qashou, Mr. Rashad, Mr. Maya, and Mr. Alwohoush.

250.    Another set of TSDS subclassifications is used by DHS and other federal, state, and local law enforcement officers to determine operational responses to TSDS Listees. The TSC distributes the "Known or Suspected Terrorist" (or "KST") files associated with TSDS Listees to the NCIC for further dissemination to more than 18,000 law enforcement agencies and 100,000 law enforcement officers. The KST files are then marked with particular "Handling Codes" set by the TSC. Five TSC handling codes are published in the NCIC

---

[5] CBP Directive 3340-0490, *Border Search of Electronic Devices* at 5.1.4 (Jan. 4, 2018), https://www.cbp.gov/sites/default/files/assets/documents/2018-Jan/CBP-Directive-3340-049A-Border-Search-of-Electronic-Media-Compliant.pdf (last accessed September 16, 2023).
[6] *Id.*
[7] *Id.*

Operating Manual: Known or Suspected Terrorist (KST) File, as well as other federal, state, and local law enforcement guidebooks:

> **Handling Code 1**: This individual is associated with terrorism and is the subject of an arrest warrant.
>
> **Handling Code 2**: This individual is of investigative interest to law enforcement regarding association with terrorism and there may be a detainer available from the Department of Homeland Security for this individual.
>
> **Handling Code 3**: This individual may be on a terrorist watchlist.
>
> **Handling Code 4**: This individual may be considered a person who may be of national security interest.
>
> **Handling Code 5**: This individual may be on the national security threat watchlist or of interest for ties to transnational organized crime.[8]

251.    In 2005, according to an analysis conducted by the DOJ's Office of the Inspector General, less than 1% of all TSDS Listees were designated under either Handling Code 1 or 2. In other words, less than 1% of all TSDS Listees had either an outstanding arrest warrant or were under active investigation for terrorism. The overwhelming majority of records—more than 96%—were designated under Handling Codes 3 or 4 as maybe having possible ties to terrorism.[9] Upon information and belief, these ratios continue to approximate the Handling Code subdivisions of TSDS Listees in 2023.

252.    Defendants also place some individuals in the TSDS who do not meet the reasonable suspicion standard. These "exceptions to the reasonable suspicion standard" are

---

[8] NCIC Operating Manual: Known or Suspected Terrorist (KST) File at 5.2, https://isp.illinois.gov/LawEnforcement/GetFile/7767b6bb-5b8e-4e96-a94f-0610626bff1b (last accessed September 16, 2023); NCIC Technical and Operational Update (TOU) 19-1 at 2-6 (Nov. 25, 2019), https://isp.idaho.gov/bci/wp-content/uploads/sites/3/2019/12/TOU_19-1_replacement.pdf (last accessed September 16, 2023).

[9] U.S. Department of Justice Office of the Inspector General, *Review of the Terrorist Screening Center*, Audit Report 05-27 at viii (June 2005), https://oig.justice.gov/reports/FBI/a0527/final.pdf (last accessed September 16, 2023).

based on guilt by association. Individuals who are not U.S. citizens or legal permanent residents may be nominated and approved for inclusion in the TSDS if they are the spouses or children of a TSDS Listee, otherwise have a personal relationship with a TSDS Listee, or meet other as-yet-unknown criteria that falls short of even the vague reasonable suspicion standard.

***The Indiscriminate Process by which Nominations are Submitted and Rubberstamped for Inclusion in the TSDS***

253.    The Terrorist Screening Center ("TSC"), a division of the FBI that maintains and controls the TSDS database, is responsible for determining whether an individual meets the "reasonable suspicion" standard for inclusion on the federal terrorist watchlist. In practice, the TSC answers that question in the affirmative almost 100% of the time.

254.    All executive agencies have the authority to nominate individuals for inclusion in the TSDS. Nominations undergo two rounds of review.

255.    The first round of review is conducted by the FBI, which performs the initial review of most nominations, and the NCTC, which initially reviews nominations "of identities with a nexus to international terrorism." During that first round, FBI and NCTC presume that the nomination validly meets the "reasonable suspicion" criteria. That presumption can be overcome only if the FBI or NCTC has specific and credible information that the reasonable suspicion standard is not met. Upon information and belief, under this rubberstamp standard of review, the FBI and NCTC approve over 99% of nominations.

256.    The second and final round of review is performed by the TSC. Though the TSC does not formally apply a presumption in favor of acceptance, in practice, its review is also a rubberstamp. TSC accepts nearly 100% of nominations to the TSDS.

257.    NCTC and FBI also work with TSC to provide the underlying identifying and derogatory information for listees. Specifically, the TSDS receives information from NCTC's "TIDE" database, which contains identifying and derogatory information about known or suspected international terrorists; TSC's Terrorist Review and Examinations Unit ("TREX"), which provides the identities of known or suspected terrorists without a known link to international terrorism; and FBI's Sentinel system, which contains identifying and derogatory information for known or suspected terrorists without international links.

258.    As the result of the information-sharing between nominating agencies, the FBI, NCTC, and TSC, TSDS records include a wide range of sensitive identifying information, including an individual's name, date of birth, place of birth, "unique identifying numbers" like Social Security Numbers and their foreign equivalents, passport information, countries of origin, nationality, physical identifiers, known locations, photographs or renderings, fingerprints, "other biometric data," employment information, and license plate numbers.

259.    When determining whether an individual meets the reasonable suspicion standard, the standard for No Fly List inclusion, and other benchmarks for heightened TSDS classifications, Defendants consider constitutionally-protected traits like race, religion, ethnicity, national origin, and sex, as well as an individual's speech, political and social affiliations, family relationships, and other constitutionally-protected activity.[10]

260.    Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, attending mosques and Islamic events, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, Muslim-sounding names, the frequency of Muslim prayer, adherence to Islamic religious practices, Islamic religious study, the transfer

---

[10] *See* 2013 Watchlisting Guidance, *supra* n.2, at 11, 34-35, 44-45 (stating that nominations may not be made "solely" on the basis of constitutionally-protected traits and activities).

of money to individuals residing in Muslim-majority countries, affiliations with Muslim organizations, and associations with Muslims in the United States or abroad to be "derogatory information" supporting a finding of reasonable suspicion.

261.    Upon information and belief, Plaintiffs were each nominated to and approved for inclusion in the watchlist as the result of constitutionally-protected traits and activities, including but not limited to origin from Muslim-majority countries, travel to Muslim-majority countries, attending mosques and Islamic events, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, Muslim-sounding names, the frequency of Muslim prayer, adherence to Islamic religious practices, Islamic religious study, the transfer of money to individuals residing in Muslim-majority countries, affiliations with Muslim organizations, and associations with Muslims in the United States or abroad.

262.    An individual need not be investigated for, indicted for, or convicted of a terrorism-related criminal charge to be nominated for inclusion in the TSDS or for the TSC to approve that nomination. Even if an American citizen is acquitted of terrorism charges or terrorism charges are otherwise dismissed, the government retains for itself the authority to continue to include them on the watchlist.

263.    Defendants place individuals on the federal terrorist watchlist without any information regarding the intended target of the listed individuals' purported terrorist activities.

264.    Defendants place individuals on the Selectee List without any information suggesting that they pose a threat to aviation.

265.    Defendants place individuals on the No Fly List without any information suggesting that they pose a threat to aviation.

266.    Defendants designate TSDS Listees as "Armed and Dangerous" without any information suggesting that they may possess a weapon.

267.    Defendants also use imprecise and overinclusive automated algorithms to determine whether to nominate an individual for inclusion in the TSDS. Airline passengers who are not listed in the TSDS occasionally receive boarding passes stamped with "SSSS." These designations are commonly the product of TSA's and CBP's secretive and automated "risk-based targeting rules." These targeting rules examine passengers' itineraries, travel histories, travelling companions, associations with TSDS Listees, and numerous other undisclosed factors to flag passengers as "unknown or partially known terrorists." Upon information and belief, the secretive and undisclosed factors include a "totality of the circumstances" analysis related to passengers' race, ethnicity, national origin, sex, and religion.

268.    TSA's Quiet Skies program assembles the results of these "risk-based targeting rules" onto a separate TSA watchlist known as the "Quiet Skies Selectee List," and then subjects listed passengers to intense investigation and scrutiny. Within the Quiet Skies program, Federal Air Marshalls and plainclothes TSA officers collect detailed behavioral and surveillance information on Quiet Skies Selectees, including passengers' bathroom usage, wardrobe changes, meals, conversations, whether they sleep on their flights, and reactions when they realize that they are being followed. Based on their observations and investigations, TSA may nominate Quiet Skies Selectees to the TSDS.

269.    TSA's Silent Partner program is similar in form and function to Quiet Skies. The only significant difference is that Silent Partner applies to flights originating from outside the United States, while Quiet Skies applies only to flights originating in the United States (regardless of whether it is a domestic or international flight).

270. TSA's Quiet Skies and Silent Partner programs and/or TSA's other rules-based programs target family members and traveling companions of TSDS Listees, including Plaintiffs, because of their relationships. These family members are traveling companions are themselves then treated as known or suspected terrorists.

271. TSA shares its Quiet Skies and Silent Partner list information with foreign carriers and governments to assist those carriers and governments in identifying targets for enhanced screening and interrogation.

272. TSA has stated that it has "curtailed" the Quiet Skies program, but TSA has not claimed that it has ended the program and has not provided a full description of how the program has been "curtailed." It is also unclear whether and to what degree Silent Partner has been similarly "curtailed."

273. CBP employs risk-based targeting rules similar to those used by TSA. CBP uses those rules at ports of entry to single out individuals for secondary inspection, detention, investigation, and deportation. Upon information and belief, CBP also maintains separate "unknown or partially known" terrorist watchlists in parallel to the TSDS and uses them to label and treat as terrorists individuals presenting themselves at land borders. Upon information and belief, CBP uses the results of high-risk targeting rules and the resulting inspections and investigations as factual predicates for nominating individuals to the TSDS.

274. Upon information and belief, the nominations of some or all of the Plaintiffs to the TSDS resulted from risk-based targeting rules leading to their identification, investigation, and surveillance.

275. Upon information and belief, once a nomination is accepted and a Listee is added to the TSDS, TSC does not regularly review whether the Listee continues to meet the reasonable suspicion standard for inclusion. Once an individual has been placed on the federal

terrorist watchlist, the individual remains on the list unless the nominating agency determines that the individual should be removed and contacts NCTC and TSC with a written justification for removal. NCTC then decides whether the individual should be removed from TIDE and TSC decides whether the individual should be removed from the TSDS.

276.    Even in the rare instance that an individual is removed from the federal terrorist watchlist, Defendants retain records of the individual's status as a prior Listee and continue to use those records to stigmatize and harm the individual, including by (1) burdening their travel at land border crossings and other ports of entry; (2) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (3) indefinitely delaying or denying their immigration benefits; and (4) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

277.    Defendants' retention and use of TSDS status after an individual has been removed from the federal terrorist watchlist means that, once an individual has been placed in the TSDS, he is forever treated as a second-class citizen.

278.    For example, in May 2023, the U.S. Secret Service barred Plaintiff Mohamed Khairullah from entering the White House to attend an Eid al-Fitr celebration to which he had been invited in his capacity as New Jersey's longest-serving Muslim mayor. Upon information and belief, Mr. Khairullah was denied entry because the Secret Service realized that he had been placed on the watchlist in or around 2019—even though Defendants removed him from the watchlist in or around 2022.

279.    Under these practices and standards, the number of records in the consolidated watchlist has swelled. Over 1.85 million new names have been added to the watchlist since

2008. Almost every name nominated to the TSDS is accepted. In 2019, for example, TSC accepted 96.9 percent of all nominations made. A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watchlist.[11]

280.    Under these practices and standards, the watchlist's rate of growth has increased over time. In 2009, there were 54,999 new additions to the watchlist. In 2019, there were 238,935 new additions.

281.    Defendants' own internal audits of the watchlist system point to serious flaws in its administration. For example, a March 2008 DOJ Office of the Inspector General found significant problems with the nomination and removal process.[12] Rather than address those problems, Defendants' approach since 2008 has been to double down on vague and poorly-administered nomination and redress processes, exponentially increasing the watchlist's size and adverse consequences.

### Listed Individuals Suffer Life-Changing Harms as the Result of Defendants' Use and Dissemination of the Terrorist Watchlist.

282.    Once an individual has been placed on the federal terrorist watchlist, Defendants turn their life upside-down. The harmful and stigmatizing consequences of TSDS placement are wide-ranging because Defendants, most importantly the FBI and TSC, disseminate watchlist information to federal agencies, state and local governments, more than

---

[11] *See* United States Government Accountability Office Report to Congressional Requesters, *Terrorist Watchlist Screening: Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110 at 22, (October 2007), https://www.gao.gov/assets/gao-08-110.pdf (last accessed September 16, 2023).

[12] United States Department of Justice, Office of the Inspector General, *Audit of the Department of Justice Terrorist Watchlist Nomination Process*, Audit Report 08-16 (March 2008), https://oig.justice.gov/reports/plus/a0816/index.htm (last accessed September 16, 2023).

60 foreign countries (including all Visa Waiver Program countries), and at least 577 private entities across the United States.

***The Federal Government Uses the Terrorist Watchlist to Harm and Stigmatize Listed Individuals, Including Plaintiffs.***

283.    Defendants disseminate the federal terrorist watchlist, including records associated with the Plaintiffs, to federal government agencies with the purpose and hope that those entities will impose consequences on listed individuals, including the Plaintiffs.

284.    While the TSC maintains and controls the dataset of suspected terrorists, within the federal government, it is frontline agencies like the TSA, CBP, and other law-enforcement entities that screen individuals against the watchlist. These agencies and other law-enforcement entities cross-reference the names and identities of individuals they encounter, including Plaintiffs, against the TSDS to determine whether they are on the TSDS or a potential match to a record in the TSDS. For example, TSA uses applicable records to screen airline passengers and CBP uses applicable records to screen travelers seeking entry into the United States at land borders, seaports, airports, and other ports of entry.

285.    Federal agencies also routinely cross-reference the TSDS in connection with applications for or audits of a wide range of government benefits. Federal agencies reference the TSDS in connection with and as a basis to delay or deny them: (1) security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere; (2) approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (3) access to a wide variety of government licenses and credentials used in both public and private employment, including pilot licenses, licenses required to commercially transport hazardous materials, and security credentials needed for critical infrastructure

projects like power plants; (4) access to federal government buildings; and (5) immigration benefits.

286.    For example, Mr. Khairullah was denied access to a White House event to which he had been invited and had his application for Global Entry denied; Mr. Mirzay had several U.S. citizenship applications denied, and his applications for full permanent residency and U.S. citizenship remain stuck in indefinite administrative processing; Mr. Butt has lost several jobs as the result of his indefinitely-pending security clearances and has also been denied Global Entry; Mr. Amini lost the opportunity to work as an interpreter and serve the United States in the U.S. Army and U.S. Army Reserves, and his U.S. citizenship application has been stuck in indefinite administrative processing since 2019; Mr. Abdukhamidov's application for US citizenship has been stalled in indefinite administrative processing since 2016; Mr. Mohamed's mother and friend had their visa application and visa revoked; and Mr. Rashad has been denied TSA Pre-Check®.

***State and Local Governments Use the Terrorist Watchlist to Harm and Stigmatize Listed Individuals, Including Watchlisted Plaintiffs.***

287.    Defendants also disseminate the federal terrorist watchlist, including records associated with Plaintiffs, to over 18,000 state and local government agencies, including law enforcement agencies, pretrial service and pretrial release agencies, probation and parole offices, prosecuting attorney offices, courts and magistrate offices, correctional institutions, custodial facilities in medical or psychiatric institutions, medical examiner's offices, offices of inspectors general, arson investigation units, state crime information centers, child protection agencies, and others, with the purpose and hope that those entities will impose consequences on Plaintiffs.

288.   That dissemination occurs via the National Crime Information Center ("NCIC"), an FBI-administered database of information to which these state and local governmental entities have access. State and local police officers are able to query the names of persons, including the Plaintiffs, against the TSDS as disseminated through the NCIC.

289.   Disseminating the federal terrorist watchlist to state and local police officers transforms everyday police interactions like traffic stops, house visits, and field interviews into dangerous high-risk situations because Defendants effectively direct state and local officers to treat thousands of Americans, including Plaintiffs, as dangerous and potentially violent "known or suspected terrorists" even though they have never been indicted, charged, or convicted of a crime.

290.   For example, many federal, state, and local authorities use automated license plate readers ("ALPRs" or "cameras"), which are high-speed, computer-controlled camera systems that may be mounted in stationary locations—like on street poles, streetlights, or highway overpasses—or attached to police cars. ALPRs automatically capture all license plate numbers that come into view, along with the location, date, and time that the license plate passed in front of the APLR. That data is then uploaded to a central server and cross-checked against the NCIC.

291.   Whenever a watchlisted individual drives their car past an ALPR, the system informs law enforcement officers in the area that the registered owner of the vehicle is on the federal terrorist watchlist.

292.   Even though the FBI instructs federal, state, and local law enforcement authorities with access to the NCIC not to initiate a traffic stop or other encounter with a listed individual based only on their watchlist status, officers frequently harass and surveil listees anyway. *See, e.g.*, *Long v. Gourley*, 5:23-cv-00080-JD, Dkt. 29 (W.D. Ok. Mar. 20, 2023).

293.    For example, Mr. Abdukhamidov was frequently pulled over by New York City Police Department officers before 2015 and 2018. Upon information and belief, those stops occurred because the officers were notified of Mr. Abdukhamidov's status as a "known or suspected terrorist."

294.    State and local government entities can also use the false and stigmatizing label of "known or suspected terrorist" to deny government benefits, like state-issued licenses and permits, to listed individuals, including Plaintiffs. For example, New Jersey passed a law in 2013 that banned persons on the federal terrorist watchlist from owning guns. Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terrorist watchlist, including Plaintiffs, from being able to buy a gun in the state of Connecticut. Accordingly, Plaintiffs and similarly situated individuals are unable to purchase guns in states that ban persons on the federal terrorist watchlist from owning guns.

295.    For example, in 2020, Mr. Mirzay's application for a Massachusetts firearm license was denied by the West Springfield, Massachusetts Police Department because he "has recently been on the terrorist watchlist" and his brother "is currently on the terrorist watch list."

296.    There are frequent federal proposals to ban all TSDS Listees from purchasing guns, though none has yet been formally adopted. Nonetheless, upon information and belief, Defendants disseminate the TSDS (through the NCIC or otherwise) throughout the gun market. Private, state, and local entities that sell guns and issue gun permits screen individuals' names against the TSDS. Gun permits and sales have been denied based on Plaintiffs' and similarly-situated individuals' status as TSDS Listees. In 2016, the GAO

reported that TSDS Listees are, as a matter of course, subjected to gun-purchase delays, and 212 TSDS Listees have been banned from purchasing guns altogether.[13]

297.    Being on the federal terrorist watchlist can also result in the false and stigmatizing label of "known or suspected terrorist" being listed on the publicly-available criminal records of Plaintiffs and similarly-situated individuals.

***Foreign Governments Use the Terrorist Watchlist to Harm and Stigmatize Listed Individuals, Including Plaintiffs.***

298.    Defendants also disseminate the federal terrorist watchlist, including records associated with Plaintiffs, to foreign governments with the purpose and hope that those foreign governments will constrain and monitor Plaintiffs' movement. For example, some countries detain individuals listed on the federal terrorist watchlist who enter their borders, question those individuals at the behest of U.S. officials, or altogether prevent those individuals from entering those countries.

299.    Because the federal government disseminates the federal terrorist watchlist to foreign governments, listed persons, including Plaintiffs and similarly-situated American citizens, are often not allowed to enter other nations. In other words, the United States provides the names of listed individuals, including thousands of its own citizens and permanent residents—without any notice to listed individuals or opportunity for listed individuals to refute the underlying derogatory information on which their placement is based—to foreign governments and describes them as "known or suspected terrorists."

---

[13] Letter from the United States Government Accountability Office to Senator Dianne Feinstein (March 7, 2016), https://www.feinstein.senate.gov/public/_cache/files/f/5/f53c4195-430d-4d8d-acde-1ec53e97d0fa/8B0B32645FB7DD74C275F4E0A9B06F96.gao-nics-watchlist-2016-update.pdf (last accessed September 16, 2023).

300.    TSA also separately disseminates the Quiet Skies and/or Silent Partner watchlist to foreign governments and foreign airline carriers.

301.    Upon information and belief, several Plaintiffs have been harassed, searched, detained, and otherwise harmed by foreign government officials as the result of their placement on the federal terrorist watchlist. Mr. Migliore was detained, strip searched, and publicly subjected to search by an explosive-sniffing canine by Austrian government agents. British government agents also detained, searched, interrogated, and arrested Mr. Migliore. Austrian government agents patted down Mr. Qashou, swabbed him for chemicals, and searched his luggage. Turkish agents similarly conducted invasive pat downs and extensive searches of Mr. Rashad and his family.

***Private Entities Use the Terrorist Watchlist to Harm and Stigmatize Listed Individuals, Including Plaintiffs.***

302.    Defendants also disseminate the federal terrorist watchlist, including records associated with Plaintiffs, to private entities around the United States with the purpose and hope that those private entities would impose consequences on listed individuals.

303.    Private entities with access to watchlist information include banks, financial institutions, money transfer services, railroads, private colleges and universities, private correctional facilities, security services, private probation and pretrial services, airport police departments, animal-protection groups, firearms dealers, and others.

304.    Among many other harmful consequences that result from the dissemination of TSDS records to private entities, the status of Plaintiffs and similarly-situated individuals as known or suspected terrorists diminishes and imperils their ability to access and use the financial system.

305.    By providing TSDS information to banks and other financial institutions, Defendants prompt banks to close the accounts of individuals listed on the federal terrorist watchlist, including Plaintiffs. Financial institutions may also refuse to allow some watchlisted individuals, including Plaintiffs, to make wire transfers.

306.    For example, Bank of America shut down Plaintiff Nusratilla Abdukhamidov's bank account; Plaintiff Moneeb Elhady had accounts with MoneyGram and CashApp abruptly closed; and Plaintiff Adam Qashou's bank accounts at Wells Fargo and Chase Bank were closed without explanation.

307.    Upon information and belief, Plaintiffs suffered those closures because Defendants distributed the stigmatizing label of "known or suspected terrorists" attached to Plaintiffs and other watchlisted individuals to financial institutions, including Bank of America, Wells Fargo, Chase Bank, MoneyGram, and CashApp, causing those institutions to close their accounts.

***The Terrorist Watchlists' Stigmatizing Effects on Listed Individuals, Including Plaintiffs, are Meted Out Publicly.***

308.    The consequences of being placed on the federal terrorist watchlist are meted out publicly, amplifying the shame and stigma that listed individuals endure.

309.    For example, the intrusive extra screening that Listees undergo at airports, at border crossings, and elsewhere is conducted in public, often in front of family and colleagues. TSDS Listees, including Plaintiffs, have been publicly pulled out of their cars at gunpoint, singled out and escorted off planes by law enforcement officers, detained for hours at a time, and had their electronics confiscated and searched.

310.    Because travel is regularly done alongside family, friends, fellow community members, and professional contacts, an individual's watchlist status is revealed to travel

companions based on how screeners treat TSDS Listees. Moreover, TSA and CBP screening and rules-based practices often flag listees' travel companions as themselves being potential terrorists, causing them to be subjected to the same treatment as TSDS Listees and discouraging them from traveling or associating with the TSDS Listee in the future.

311.    In practice, by publicly singling them out for extra screening and stamping their boarding passes with the stigmatizing "SSSS" label, frontline screeners disclose individuals' placement on the federal terrorist watchlist to federal, state, local, and foreign authorities, as well as private employees of airports, airlines, and other transportation employees.

***Individuals Placed in the TSDS Without Reasonable Suspicion are Also Harmed by Their Placement in the TSDS.***

312.    Defendants also place individuals in the TSDS who do not meet the reasonable suspicion standard. These "exceptions to the reasonable suspicion standard" are based on guilt by association. Individuals who are not U.S. citizens or legal permanent residents may be nominated and approved for inclusion in the TSDS if they are the spouses or children of a TSDS Listee, otherwise have a personal relationship with a TSDS Listee, or meet other as-yet-unknown criteria that falls short of even the vague reasonable suspicion standard. The records of individuals listed pursuant to an exception are disseminated by Defendants to the Department of State and the Department of Homeland Security, which use them to impose consequences on and deny government benefits to Exceptions Listees including but not limited to denying or revoking refugee and asylum status, other immigrant statuses, visas, visa waiver program benefits.

313.    Likewise, Exceptions Listees can be subjected to TSA and CBP rules-based "terrorist" monitoring based only on their familial or social relationship with a TSDS Listee. This designation signals to screening agencies, officers, employers, and others that the

Exceptions Listee associates with an individual who is dangerous, violent, and poses a threat to national security.

***The Stigma and Harm of Placement on the Federal Terrorist Watchlist Continues Forever, Even if an Individual is Removed from the TSDS.***

314.    Even in the rare instance that an individual is removed from the federal terrorist watchlist, Defendants retain records of the individual's status as a prior Listee and continue to use those records to stigmatize and harm the individual for the rest of their lives. Specifically, TSC retains a copy of that individual's record and exports it to a system available to the FBI.

315.    FBI then uses historical watchlist status to inform decisions about who to investigate, surveil, and otherwise target for law-enforcement activity. FBI may also use historical watchlist status as a basis to deny former Listees security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

316.    CBP also retains historical watchlist information in its TECS system, even after an individual has been removed from the TSDS. CBP uses that historical watchlist information to inform decisions to harm former Listees in a range of ways, including to: (1) deny them entry into the United States; (2) subject them to invasive searches and interrogations at ports of entry; and (3) to deny them other benefits and licenses, including access to programs like Global Entry that provide privileged access to ports of entry.

317.    Similarly, NCTC retains historical watchlist information in its TIDE system, even after an individual has been removed from the TSDS.  That information is then used by NCTC and other Defendants, including the Department of State and DHS, to deny former

Listees government benefits, including favorable outcomes of refugee, immigrant, visa, visa waiver program, and asylum processes.

318.    All Defendants, as well as other federal government agencies and entities, also use historical watchlist status as a basis to deny former Listees security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

319.    For example, in May 2023, the U.S. Secret Service barred Plaintiff Mohamed Khairullah from entering the White House to attend an Eid al-Fitr celebration to which he had been invited in his capacity as New Jersey's longest-serving Muslim mayor. Upon information and belief, Mr. Khairullah was denied entry because the Secret Service realized that he had been placed on the watchlist in or around 2019—even though Defendants removed him from the watchlist in or around 2022.

### The DHS Traveler Redress Inquiry Program Process is Inadequate to Protect the Rights of Listed Individuals.

320.    Listed individuals, including Plaintiffs, have no clear, fair, timely, or effective mechanism by which they can challenge the TSC's decision to designate them as a potential terrorist and place them on the watchlist. Nor can individuals, including Plaintiffs, challenge their inclusion by DHS on separate but related high-risk potential-terrorist lists such as Quiet Skies, Silent Partner, and their CBP equivalents.

321.    Nominating agencies, the TSC, and the NCTC do not accept petitions for removal from the public, including Plaintiffs. Nor do they provide any information to listed individuals, including Plaintiffs, about the basis for their inclusion in the TSDS, NCTC's TIDE database, FBI's Sentinel database, or related high-risk potential-terrorist lists such as Quiet Skies, Silent Partner, and their CBP equivalents. As such, once an individual realizes

that they have been designed by Defendants as a "known or suspected terrorist," they have nowhere to turn to seek an explanation, redress, removal, or any other remedy from Defendants.

322.   The only so-called redress process available to individuals included on the terrorist watchlist is the DHS Traveler Redress Inquiry Program ("DHS TRIP"). DHS TRIP is available to only a subset of listed individuals: specifically, those who have experienced travel difficulties in the United States, like an inability to print a boarding pass, the delay or denial of boarding on an aircraft, a referral to secondary screening at a port of entry, or the denial of Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST. Those individuals may submit an inquiry to DHS TRIP.

323.   DHS TRIP is not available to listed individuals that have experienced only non-travel related harms, such as delays or denials of:  (1) security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere; (2) access to a wide variety of government licenses and credentials used in both public and private employment, including pilot licenses, licenses required to commercially transport hazardous materials, and security credentials needed for critical infrastructure projects like power plants; (3) access to federal government buildings; and (4) immigration benefits.

324.   DHS TRIP submits the redress inquiries of TSDS Listees to the TSC, which reviews the inquiries and determines whether any action should be taken. The TSC is the final arbiter and sole decisionmaker that determines whether an individual's name should be retained on or removed from the watchlist, including those of the Plaintiffs and similarly-situated individuals. The TSC has not provided any publicly available information about how it evaluates redress inquiries or makes related decisions. In 2009, the TSC testified to Congress

that, of watchlist-related DHS TRIP inquiries, "approximately 51 percent are appropriately watchlisted, 22 percent have been modified or reviewed prior to redress, 10 percent were similar names, and 15 percent were removed or downgraded due to the redress process."

325.     Even if an individual is removed from the No Fly List or Selectee List, they may remain on the Expanded Selectee List and the broader TSDS and remain subjected to terrorist-level scrutiny through the operation of the TSA's and CBP's rules-based targeted terrorist monitoring lists. And even in the rare instance that an individual is removed from the TSDS altogether, Defendants retain records of the individual's status as a prior Listee and continue to use those records to stigmatize and harm the individual for the rest of their lives.

326.     Defendants do not provide listed individuals, including Plaintiffs, with a meaningful opportunity to confront or rebut the grounds for their possible inclusion in the TSDS. Defendants provide no information to Plaintiffs and other TSDS Listees—including American citizens and lawful permanent residents—about the specific facts that the TSC considers during the redress process or the specific facts underlying an individual's nomination and placement to the watchlist. Nor do they provide any opportunity for Plaintiffs and other TSDS listees to contest or correct those facts.

327.     Once TSC makes a determination about a particular individual's status on the watchlist, it sends the result to DHS TRIP, which then responds to the individual with a cryptic standard form letter that neither confirms nor denies the existence of any terrorist watchlist records relating to the individual.

328.     In response to prior litigation, in answering DHS TRIP inquiries submitted by American citizens or lawful permanent residents who believe they may be on the No Fly List, DHS TRIP now issues letters that affirmatively state whether or not the complainant is on the No Fly List, and provides No Fly Listees with an "unclassified summary" of the reasons

for their placement on the list. In practice, these "unclassified summaries" are so brief and vague as to be entirely uninformative.

329.    DHS TRIP does not similarly disclose Selectee List, Expanded Selectee List, Quiet Skies/Silent Partner Selectee List, or historical watchlist status. Nor does DHS TRIP disclose placement on the TSDS generally, any meaningful factual basis for the individual's inclusion in the TSDS or on any of the TSDS's subclassifications, or any information about whether Defendants have resolved the specific complaint submitted.

330.    Rather, DHS TRIP responds to redress inquiries from watchlisted individuals with an uninformative boilerplate response that states, in relevant part:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

331.    The DHS TRIP process does not provide any ex parte or adversarial pre-deprivation process, even though individuals placed on the broader TSDS, Selectee List, Expanded Selectee List, No Fly List, and Quiet Skies/Silent Partner Selectee List face significant intrusions on their liberty, restrictions in their everyday life, and stigmatic harms from placements on those lists under the vague and arbitrary criteria used by Defendants.

332.    The DHS TRIP process does not provide a meaningful hearing in front of a neutral arbiter, even though individuals placed on the broader TSDS, Selectee List, Expanded Selectee List, No Fly List, and Quiet Skies/Silent Partner Selectee List face significant intrusions on their liberty, restrictions in their everyday life, and stigmatic harms from placements on those lists under the vague and arbitrary criteria used by Defendants.

333.    The DHS TRIP process does not require Defendants to consider potentially-exculpatory information in their possession, even though individuals placed on the broader

68

TSDS, Selectee List, Expanded Selectee List, No Fly List, and Quiet Skies/Silent Partner Selectee List face significant intrusions on their liberty, restrictions in their everyday life, and stigmatic harms from placements on those lists under the vague and arbitrary criteria used by Defendants.

334.   The DHS TRIP process does not consider less-restrictive ways to serve Defendants' stated goals, even though individuals placed on the broader TSDS, Selectee List, Expanded Selectee List, No Fly List, and Quiet Skies/Silent Partner Selectee List face significant intrusions on their liberty, restrictions in their everyday life, and stigmatic harms from placements on those lists under the vague and arbitrary criteria used by Defendants.

335.   Instead of offering notice and a meaningful opportunity to be heard, DHS TRIP operates as a middleman, shuttling redress inquiries to the TSC. Thus, the only so-called "process" available to individuals caught in the federal terrorist watchlisting system's web is to submit their names and identifying information to DHS TRIP—a government entity that itself has no authority to provide redress—and then hope that TSC decides to change its mind and remove them from the watchlist.

336.   Individuals are justifiably skeptical of Defendants' willingness to engage in meaningful introspection or self-correction. Infamously, in *Ibrahim v. Department of Homeland Security*, 06-CV-00545, Dkt. No. 701-1 (N.D. Cal. Feb. 6, 2014) (slip op.), Defendants vigorously contested a Muslim graduate student's challenge to her No Fly List designation and subsequent revocation of her student visa, which had left her stranded in Malaysia for nine years. Following trial, it was ultimately revealed that her placement on the No Fly List and subsequent exile from the United States resulted from an FBI agent's error. He had accidentally checked the wrong box. *Id.* at 9.

**The Federal Government's Terrorist Watchlist**

**Is No More Effective Than a List of Randomly Selected Individuals.**

337.   The federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion that they bear—at most—a vanishingly small connection to actual terrorist activities. The inclusion standards themselves violate the Plaintiffs' procedural and substantive due process rights.

338.   The federal terrorist watchlist diminishes, rather than enhances, national security because the number of innocent individuals on the list is so voluminous that placement on the list provides no meaningful information to screening agencies and the other entities to which Defendants distribute the list.

339.   Moreover, the consequences of being placed on the federal terrorist watchlist are meted out publicly, effectively revealing an individual's placement on the TSDS to any given listee who attempts to fly, cross a land border, or enter the United States through a port of entry. That plain-as-day illustration of a listee's status leaves Defendants with little ability to use watchlist placement to covertly monitor, investigate, or surveil listees who interact with screening agencies.

340.   As a result, upon information and belief, when Defendants are actively investigating, surveilling, or otherwise targeting an individual on the belief that they may be involved in terrorist activity, Defendants avoid nominating and placing that individual on the TSDS, to avoid alerting the individual that they are under scrutiny.

341.   Indeed, the TSA has conceded that it cannot identify any terrorist plots that were foiled or deterred based on either the Quiet Skies or the Silent Partner programs.

342.   Defendants' demonstrated inability to identify and watchlist persons who actually pose a threat of terrorism can be measured and described using a quantitative analysis

based on factual allegations made in this Complaint as well as publicly available information describing the current operation of the federal terrorist watchlist.

343.    The federal government has added over 1.83 million new names to the watchlist since 2008. These additions include thousands of U.S. citizens and lawful permanent residents.

344.    According to the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been fewer than 600 terrorist attacks inside the United States since 2008, perpetrated by fewer than 600 persons.

345.    Upon information and belief, in order to designate a person on the federal terrorist watchlist, the federal government must first have information about that person. Because the federal government does not possess information about every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terrorist watchlist's inclusion standards.

346.    Upon information and belief, the practices that produce this subset exclude persons who pose a threat of terrorism and include persons who do not pose a threat of terrorism.

347.    Upon further information and belief, the federal government does not screen the entire subset of people known to it. Moreover, Defendants do not make individual determinations as to whether each person about whom they have information should be placed on the federal terrorist watchlist. Rather, Defendants use automated algorithms and risk-based targeting rules to select individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists. Those automated algorithms and risk-based targeting rules

incorporate considerations of race, ethnicity, nationality, sex, and religion in selecting individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists.

348.    In order to place a person on the federal terrorist watchlist, a federal government official must make a nomination and a TSC official must accept the nomination. TSC officials accept almost 100% of nominations.

349.    Based on the facts alleged in this Complaint and the publicly-known processes of the federal terrorist watchlist, a quantitative analysis can be constructed to measure and describe the performance and efficacy of the federal terrorist watchlist.

350.    A quantitative analysis demonstrates that Defendants' watchlisting system would perform similarly if inclusion on the watchlist was done via random selection instead of the existing inclusion standards used by Defendants.

351.    A quantitative analysis therefore indicates that Defendants have no ability to watchlist persons whose placement on the watchlist would further Defendants' stated objections.

### The Defendants' Watchlist Practices Target and Disproportionately Harm American Muslims.

*Over 98% of the Names on the Federal Terrorist Watchlist are Identifiably Muslim.*

352.    In January 2023, a small airline left files named "nofly.csv" and "selectee.csv" exposed and available for download on the internet, where they were discovered by a Swiss hacker. Upon information and belief, those files—two Microsoft Excel spreadsheets—are the No Fly List and Selectee List from 2019.

353.    According to an expert statistical analysis of the 2019 No Fly List and Selectee Lists commissioned by counsel, there is a 95% chance that at least 98.3% of the records in the combined lists correspond to Muslims.

354.    The most frequently-appearing "tokens" of three or more letters in the lists are all identifiably Muslim in origin. The top ten most frequently-appearing tokens are "Muhammad," "Ali," "Abd," "Abu," "Ahmad," "Bin," "Mohammed," "Abdallah," "Ibrahim," and "Ahmed."

355.    Variations on the name "Muhammad," including "Mohammed," "Mohammad," "Mohamed," "Mahmud," and "Mahmoud," appear in at least 21.58% of the records.

356.    Almost every Plaintiff has an identifiably Muslim name, which Defendants consider to be suspicious and grounds for inclusion in the federal terrorist watchlist. Specifically, the Plaintiffs with identifiably Muslim names are: Mohamed Khairullah, Nidal El-Takach, Ahmad Mirzay, Naveed Butt, Moneeb Elhady, Abdulrahman Cherri, Tawhidullah Amini, Nusratilla Abdukhamidov, Talha Mohamed, Adam Qashou, and Ihab Rashad.

357.    Upon information and belief, Defendants nominated some or all of these Plaintiffs for inclusion in the TSDB based upon their identifiably Muslim names.

***Defendants Design and Apply the Watchlisting System to Target American Muslims.***

358.    Upon information and belief, the watchlist is overwhelmingly comprised of Muslim names because Defendants design and apply the watchlisting system to target Muslims.

359.    The federal terrorist watchlist and its inclusion standards disproportionately target and affect American Muslims. Defendants knowingly, intentionally, and purposefully use impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different to people from other faith backgrounds.

360.   Indeed, by Defendants' own description, when determining whether an individual meets the reasonable suspicion standard, the standard for No Fly List inclusion, and other benchmarks for heightened TSDS classifications, Defendants consider constitutionally-protected traits like race, religion, ethnicity, national origin, and sex, as well as an individual's Muslim-sounding names, speech, political and social affiliations, family relationships, and other constitutionally-protected activity.[14]

361.   Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed. While "locus of Terrorist Activity" is not defined by the document, upon information and belief, it includes any place where many Muslims reside.[15]

362.   Upon information and belief, Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, attending mosques and Islamic events, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, Muslim-sounding names, the frequency of Muslim prayer, adherence to Islamic religious practices, Islamic religious study, the transfer of money to individuals residing in Muslim-majority countries, affiliations with Muslim organizations, and associations with Muslims in the United States or abroad to be suspicious factors supporting inclusion in the TSDS, on the Quiet Skies/Silent Partners Selectee List(s), and on other high-risk potential-terrorist watchlists.

363.   Defendants, including the FBI, also use sophisticated geospacial technology to "identify locations of concentrated ethnic communities"—including Muslims—and

---

[14] 2013 Watchlisting Guidance, *supra* n.2, at 11, 34-35, 44-45 (stating that nominations may not be made "solely" on the basis of constitutionally-protected traits and activities) (last accessed September 16, 2023).
[15] *Id.* at 35.

specifically target law-enforcement investigations, surveillance, and other resources towards communities with significant numbers of Muslims.

364.   Muslims in those targeted communities are more likely to be nominated and approved for inclusion on the federal terrorist watchlist than other similarly-situated Americans.

365.   Moreover, because Defendants consider being a relative, friend, colleague, or fellow community member of a TSDS Listee "derogatory information" supporting placement on the watchlist, Muslim communities are subjected to rapidly-unfolding network effects once one member is watchlisted. One nomination, even if grounded in probable cause or a preexisting criminal conviction, can quickly spiral into Defendants classifying nearly every member of an extended family or community mosque as a suspected terrorist.

366.   For example, Dearborn, Michigan, a city of 96,000 people with the largest percentage of Arab-American residents in the United States, has the second-highest concentration of watchlisted individuals in the country. Dearborn is surpassed only by New York City, which has a population of nearly 8.5 million. No Muslim from Dearborn has ever committed acts of terrorism against the United States.[16]

367.   Defendants do not similarly consider non-Muslim religious identity, affiliation, association, or practices to be suspicious. For example, while travel to Muslim-majority countries makes a Muslim more likely to land on the watchlist, the same is not true of a non-Muslim. Defendants treat otherwise similarly-situated individuals differently depending on their religion.

---

[16] Jeremy Scahill and Ryan Devereaux, *Watch Commander: Barack Obama's Secret Terrorist-Tracking System, by the Numbers*, The Intercept (Aug. 5, 2014), https://theintercept.com/2014/08/05/watch-commander/ (last accessed September 16, 2023).

368.     Upon information and belief, when Defendants review lists of social networks and known associates of currently-watchlisted individuals, they routinely choose to nominate Arab or Muslim names on the stereotyped basis of race, religion, or national origin alone. Meanwhile, Defendants gloss over any apparently white, Christian, English, or Western European names that may appear on the same network lists, even though they, too, are associates of the watchlisted individual. This is true even when the only distinction between a nominated and a non-nominated person are race, religion, or national origin.

369.     In fact, almost all (if not all) legal challenges regarding designations on the federal terrorist watchlist have been filed by American Muslims.[17]

370.     A 2019 leaked copy of the No Fly and Selectee portions of the federal terrorist watchlist by CommuteAir confirms that Muslims are disproportionately on the list.

371.     Based on a study of the leaked copies of the federal terrorist watchlist performed by statistical experts, using a 95% confidence level, over 98.3% Selectee portion of the leaked copy of the watchlist and over 99.6% of the No Fly portion of the leaked copy of the watchlist are Muslim. Overall, 98.3% of the records in the combined list were identified as Muslim by the statistical experts.

---

[17] *See Rahman v. Chertoff*, No. 05-cv-3761 (N.D. Ill.); *Ibrahim v. DHS*, No. 06-cv-00545 (N.D. Cal.); *Scherfen v. DHS*, No. 3:08-cv-1554 (M.D. Pa.); *Latif v. Holder*, 3:10-cv-00750 (D. Or.); *Shearson v. Holder*, No. 1:10-cv-1492 (N.D. Ohio); *Mohamed v. Holder*, 3:10-cv-00750 (E.D. Va.); *Abdallah v. JetBlue Airways Corp.*, No. 12-cv-1050 (D.N.J.); *Mokdad v. Holder*, No. 1:11-cv-50 (E.D. Mich.); *Fikre v. FBI*, 3:13-cv-00899 (D. Or.); *Tarhuni v. Holder*, 3:13-cv-00001 (D. Or.); *Tanvir v. Tanzin*, No. 13-CV-6951 (S.D.N.Y.); *Ege v. DHS* (No. 13-1110) (D.C. Cir.); *Beydoun v. Lynch*, No. 14-cv-13812 (E.D. Mich.); *Kadura v. Lynch*, No. 14-cv-13128 (E.D. Mich.); *Long v. Lynch*, 1:15-cv-01642 (E.D. Va.); *Bazzi v. Lynch*, 16-cv-10123 (E.D. Mich.); *Elhady v. Piehota*, No. 1:16-cv-375 (E.D. Va.); *Amiri v. Kelly*, No. 17-cv-12188 (E.D. Mich.); *Abdi v. Wray*, No. 2:17-cv-622 (D. Utah); *Kovac v. Wray*, 3:18-cv-110 (N.D. Tex.); *Jardaneh v. Barr*, No. 8:18-cv-02415 (D. Md.). Many of these legal challenges were filed by groups of multiple Muslim plaintiffs.

372.    Over 20% of the names on the leaked copy of the 2019 watchlist include some variation of Muhammad or Ali. The top 50 most frequently occurring names on the watchlist are all Muslim names.

373.    As of November 2023, more than two thirds of the federal terrorism watchlist include people whose name includes one of 100 common spellings of various Muslim names. The 100 names include 10 different spellings of the name Muhammad.

374.

375.    Although most terrorist acts in the United States are committed by non-Muslims, and indeed in many cases are committed by anti-Muslim extremists, the overwhelming majority of U.S. citizens on the watchlist are Muslim. This is the result of Defendants' knowing, intentional, and purposeful use of religious, racial, and national origin criteria, including as described above.

376.    Upon information and belief, Defendants dismiss mass violence perpetrated by white Christians as "lone wolf" events unconnected to "organized" terrorism, while overreacting to comparable or less serious perpetrated by Muslims.

377.    Upon information and belief, even though they facially satisfy the same known associate watchlist criteria, close families and friends of convicted white-nationalist domestic terrorists are not routinely added to the federal terrorist watchlist, while distant families and friends of innocent Muslims often discover that their mere association with other watchlisted individuals has caused them to be labeled potential terrorists. Thus, Defendants do not treat similarly-situated groups the same, instead singling out Muslims for harsher treatment.

378.    To take just one example, on February 20, 2019, federal prosecutors indicted Lieutenant Christopher Hasson for plotting a large-scale terrorist attack. Despite significant evidence of Hasson's extremist and potential for terrorism, not only does it appear that

Hasson was not on the terrorism watchlist, but he also held a Secret-level security clearance. There is no reason to believe that any of Hasson's friends or relatives have been added to the watchlist.

379.    By intentionally and purposefully emphasizing Arab origins and Islamic faith in their investigations, surveillance, nominations, and placements on the watchlist, Defendants have used the watchlist to wreak havoc far beyond its intended purpose. Instead of serving as a targeted tool to enhance aviation and border security, the watchlist has become a bludgeon to coerce everyday American Muslims into spying on their neighbors and becoming government informants. Presence on the watchlist is deployed as an intimidation tactic and used to coercively justify the denial of American Muslims' civil rights, such as the right to have an attorney present during law enforcement questioning.

380.    For example, in 2013, a CBP officer told Mr. Rashad that he could help Mr. Rashad make his issues with travel go away as long as he provided them with some information. When Mr. Rashad said that he would only speak with his lawyer present, the CBP officer responded that only guilty individuals have lawyers.

381.    Upon information and belief, the CBP officer was attempting to use Mr. Rashad's placement on the watchlist as leverage to coerce Mr. Rashad into become a government informant.

382.    Public examples of this phenomenon abound. *See Latif v. Holder*, 28 F. Supp. 3d 1134, 1145 (D. Or. 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's names from the No-Fly List if he agreed to speak to the FBI")[18]; *Id.* at 1146 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he

---

[18] Washburn, like every other individual described in this Paragraph, is Muslim.

would receive compensation if he helped the FBI by serving as an informant"); *Id.* (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List"). *See also Fikre v. FBI*, 23 F. Supp. 3d 1268, 1278-79 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant"); *Tanvir v. Tanzin*, 894 F.3d 449, 453 (2d Cir. 2018) (multiple Muslim Plaintiffs "asked to gather information of Muslim communities and report that information to the FBI" and "[i]n some instances, the FBI's request was accompanied with severe pressure, including threats of deportation or arrest; in others, the request was accompanied by promises of financial and other assistance").

383.    To American Muslims, the watchlist is an ever-present threat of increased scrutiny and adverse consequences that descends without notice, cannot be effectively redressed, and chills their constitutionally-protected exercise of speech and religion.

**The Plaintiffs Have Been Placed on the Federal Terrorist Watchlist and Treated as "Known or Suspected Terrorists" as the Result of that Placement.**

384.    All of the Plaintiffs are challenging their designation on the federal terrorist watchlist and/or the continuing effects of a historic watchlist placement.

385.    All of the Plaintiffs are practicing Muslims.

386.    None of the Plaintiffs have ever been arrested, charged, or convicted of any type of terrorism-related offense.

387.    Upon information and belief, the nomination and designation of the Plaintiffs to the federal terrorist watchlist was made based solely upon a hunch and/or based upon their

race, ethnicity, national origin, religious affiliation, guilt by association, Muslim-sounding names, or First Amendment protected activities.

388.    Upon information and belief, because the Plaintiffs are or have been included on the federal terrorist watchlist, Defendants disseminated and are continuing to disseminate their designation as "known or suspected terrorists" or formerly-listed "known or suspected terrorists" to governmental and private partners.

389.    At no time were any of the Plaintiffs given notice of the factual basis for their placement on the federal terrorist watchlist, nor were they given a meaningful opportunity to contest their designation.

390.    Moreover, at no time were any of the Plaintiffs given notice of the deprivation of their liberty interests or violations of their constitutional rights that arose as a direct result of their placement on the federal terrorist watchlist.

391.    The experience of the Plaintiffs on the federal terrorist watchlist and, if applicable, after their removal from that list is indicative of government practice, policy, and the experiences of thousands of other Americans, particularly American Muslims, who have been deemed suspected terrorists without notice and without redress.

392.    Each of the Plaintiffs experience anxiety, shame, and humiliation as the result of being designated and treated by the government as "known or suspected terrorists" in public and, in some cases, in front of family members, colleagues, and friends.

393.    Many of the Plaintiffs have suffered monetary losses as the result of being designated and treated by the government as "known or suspected terrorists" in the form of lost business opportunities, missed flights, and other harms.

394.    Several of the Plaintiffs have experienced additional anxiety, shame, and humiliation, and in some cases the loss of important associations, because of family members,

friends, and/or colleagues also being treated as "known or suspected terrorists" simply because they travelled together.

395.    Many of the Plaintiffs have avoided and have continued to avoid traveling by air or crossing land ports of entry because of being treated as "known or suspected terrorists," and because of the anxiety, shame, and humiliation to which they are subjected each time they travel.

396.    Several of the Plaintiffs have been subjected to interrogations about their religious practices and beliefs, the answers of which, upon information and belief, are factors that were considered in their inclusion to the federal terrorist watchlist.

397.    The practice of Islam by the Plaintiffs, as well as by their family members who have been subjected to similar delays, searches, interrogations, and stigmatization as the Plaintiffs due to their relationships, have been substantially burdened by Defendants.

398.    Upon information and belief, as of the date of this filing, all of the Plaintiffs except Mr. Khairullah remain on the federal terrorist watchlist.

399.    Upon information and belief, Defendants have removed Mr. Khairullah from the federal terrorist watchlist but retain his status as a former Listee and continue to take actions against him based on that status.

## Mohamed Khairullah
### (Formerly Watchlisted Plaintiff)

400.    Mr. Khairullah is a U.S. citizen and Muslim of Syrian descent. He lives in Prospect Park, New Jersey, where he currently serves as mayor.

401.    Mr. Khairullah is America's longest-serving Muslim mayor and has served Prospect Park for nearly two decades, having served five full terms as mayor. He also served

two terms as a councilman for Prospect Park and served as a volunteer firefighter from 1994-2008.

402.    Upon information and belief, Mr. Khairullah was placed on the federal terrorist watchlist from approximately July 2019 until August 2022.

403.    Mr. Khairullah's name is present on the leaked "selectee.csv" spreadsheet that, upon information and belief, is a copy of the 2019 Selectee List.

404.    After approximately August 2022, after Defendants removed Mr. Khairullah from the watchlist, they continued—and continue, to this day—to retain records of his past watchlist status and use them to harm and stigmatize him.

405.    Mr. Khairullah was removed from the federal terrorist watchlist because Defendants concluded that he does not meet even the vague, rubberstamp "reasonable suspicion" standard.  However, Defendants retained records of his status as a prior Listee and continue to use those records to stigmatize and harm him. Specifically, TSC retains a copy of his record and exports it to a system available to the FBI.

406.    Upon information and belief, the FBI uses his historical watchlist status to inform decisions about who to investigate, surveil, and otherwise target for law-enforcement activity. FBI may also use his historical watchlist status as a basis to deny him security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to government facilities, and eligibility to access national security information.

407.    Upon information and belief, CBP also retains Mr. Khairullah's historical watchlist information in its TECS system, despite him being removed from the TSDS. CBP uses that historical watchlist information to inform decisions to continue to inflict harm on former Listees, including Mr. Khairullah, in a range of ways, which may include: (1) denial

of entry into the United States; (2) invasive searches and interrogations at ports of entry; and (3) denial of other benefits and licenses, such as Trusted Traveler Programs, including Global Entry, TSA Precheck®, NEXUS and FAST, that provide privileged access to ports of entry.

408.    Similarly, upon information and belief, NCTC retains his historical watchlist information in its TIDE system.  That information is then used by NCTC and other Defendants, including the Department of State and DHS, to deny former Listees, including Mr. Khairullah, government benefits, such as favorable outcomes of refugee, immigrant, visa, visa waiver program, and asylum processes.

409.    All Defendants, as well as other federal government agencies and entities, also use historical watchlist status as a basis to deny former Listees, including Mr. Khairullah, security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

410.    As a result of his placement on the federal terror watchlist, from July 2019 until August 2022, Mr. Khairullah—as well as his family, when they traveled with him—became the target of enhanced screening, unreasonable delays, electronic device searches, and interrogations when traveling.

411.    On July 3, 2019, Mr. Khairullah attempted to travel from Newark International Airport in New Jersey (EWR) to Istanbul Airport in Turkey (IST), via Barcelona Airport in Spain (BCN). He was traveling with his wife and five children.

412.    Mr. Khairullah and his family could not retrieve their boarding passes by printing them at home. Nor could they print them at the airport kiosk in Newark. Instead, they were directed to seek assistance at the airline service desk.

413.    The airline agent contacted Defendants to obtain clearance to print the Khairullahs' boarding passes. Defendants took approximately an hour and a half to provide the required clearance. As a result, Mr. Khairullah and his family had missed their flight. They were forced to rebook their tickets for the next day.

414.    The next day, on July 4, 2019, upon arriving at the airport, Mr. Khairullah and his family were again unable to print their boarding passes at the airport kiosk.

415.    The Khairullah family went to the airline desk to speak with the agent. The agent made a call to Defendants to obtain clearance to print Mr. Khairullah and his family's boarding passes. Defendants took approximately 3 hours to provide the required clearance. Before the agent gave them their boarding passes, he asked the family if they had weapons in their bags. The family stated repeatedly that they did not. When the Khairullahs received their boarding passes, all of the passes, including the boarding pass belonging to Mr. Khairullah's 14-month-old son, were stamped with "SSSS," indicating that they were designated as "known or suspected terrorists."

416.    At the security checkpoint, a TSA officer scanned the family's boarding passes, then called a supervisor over. The TSA officer asked the Khairullahs to step out of the security line and form a separate line by themselves.

417.    TSA officers then publicly subjected all members of the Khairullah family—including Mr. Khairullah's 14-month-old son, whose diapers were searched—to an extensive and lengthy screening, including an invasive pat down, a search of all of each of their carry-on bags, and a chemical swab of each of their hands and belongings.

418.    Upon arriving at the gate, the Khairullahs found CBP officers waiting for them. The officers searched the Khairullah family for a second time. They patted each of them down and thumbed through their luggage piece by piece, by hand. The officers then ordered the

family to turn on and hand over their electronics. After the officers visually examined the electronics, the Khairullahs were finally able to board their flight.

419.    On August 2, 2019, on their return trip from Istanbul Airport (IST) to John F. Kennedy International Airport in New York (JFK), the Khairullahs went to the airline service desk to check their luggage and obtain their boarding passes. Turkish airline agents told the Khairullahs that the airline would have to call Defendants to obtain clearance for their boarding. Mr. Khairullah and his family were then permitted to proceed to security with their boarding passes.

420.    Upon arrival to New York, the Khairullahs found CBP officers waiting for them at the door of the plane. The officers asked the Khairullahs to produce their passports and then escorted them through the airport to secondary inspection after falsely explaining to them they had been "randomly selected."

421.    The Khairullahs were the only passengers taken to secondary inspection by CBP officers.

422.    In secondary inspection, CBP officers interrogated Mr. Khairullah, his wife, and their children. CBP officers then instructed Mrs. Khairullah and the children to wait in a waiting room while they interrogated Mr. Khairullah separately. The officers asked him whether he associated with terrorists in Turkey.

423.    The officers also demanded that Mr. Khairullah hand over his phone. Mr. Khairullah told the officers his password, even though he was reluctant to do so, as the phone contained pictures of Mr. Khairullah's wife without hijab, and the officers viewing the photo violated her sincerely held religious belief that she must wear the hijab in front of men outside of her immediate family.

424.     CBP officers then searched Mr. Khairullah's luggage. After the search was complete, a CBP officer told Mr. Khairullah that he would be keeping his phone for inspection because Mr. Khairullah "refused to consent" to the phone search.

425.     Upon information and belief, the CBP officers downloaded all of the data from Mr. Khairullah's phone without his consent.

426.     The CBP officers also conducted a full-body pat-down of Mr. Khairullah, in which he was asked to empty his pockets and place his hands against a wall. An officer went through Mr. Khairullah's wallet and, upon information and belief, photocopied its contents, including receipts and credit cards.

427.     After three and a half hours of detention, the family was released.

428.     On December 21, 2020, Mr. Khairullah traveled from LaGuardia International Airport in New York (LGA) to Dallas Fort Worth International Airport in Texas (DFW). He was traveling alone.

429.     Mr. Khairullah was unable to retrieve his boarding pass online before arriving at the airport. Upon arriving at the airport in New York, Mr. Khairullah was unable to print his boarding pass at the airport kiosk. Instead, he was directed to seek assistance at the airline service desk.

430.     The airline agent contacted Defendants to obtain clearance to print his boarding pass. When Mr. Khairullah received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

431.     At the security checkpoint, a TSA officer called another TSA officer over to escort Mr. Khairullah to a separate security line. There, the TSA officer publicly subjected Mr. Khairullah to an extensive and lengthy screening, including an invasive pat down, a search of his carry-on bag, and a chemical swab of each his hands and belongings.

432.    At the gate, Mr. Khairullah found more TSA officers waiting for him. Mr. Khairullah was asked to step out of the boarding line, to hand over his electronics, and was searched and patted down by TSA officers once more before he was allowed to board his flight.

433.    On December 22, 2020, Mr. Khairullah traveled back to New Jersey via LaGuardia Airport (LGA) from Dallas/Fort Worth International Airport (DFW) in Texas. He was traveling alone.

434.    Mr. Khairullah could not print his boarding pass at the airport kiosk. Instead, he was directed to seek assistance at the airline service desk.

435.    The airline agent contacted Defendants to obtain clearance to print Mr. Khairullah's boarding pass. After the call, the airline agent gave Mr. Khairullah a wink and made another call to Defendants.

436.    When Mr. Khairullah received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

437.    At the security checkpoint, TSA officer publicly exclaimed "oh no!" when Mr. Khairullah stepped forward for his turn in line, after which the officer called a supervisor over the radio.

438.    Mr. Khairullah was taken by the TSA officer to a separate line by himself, where the TSA officer placed his belongings through a scanner. The TSA officer then subjected Mr. Khairullah to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings.

439.    Upon the arrival of the TSA supervisory security officer, Mr. Khairullah was subjected to another pat down, which triggered an alarm ("code 13") and the appearance of

a TSA explosive bomb canine unit. Mr. Khairullah overheard officers referring to "VIP" and "TSSC."

440.    The supervisory security officer searched through Mr. Khairullah's bag and separately frisked, squeezed, and swabbed every article in the bag.

441.    Mr. Khairullah was taken to a private room for another pat down before being permitted to proceed to his gate where, again, TSA officers were waiting. He was searched once more before boarding his flight.

442.    On December 23, 2020, Mr. Khairullah traveled from Newark International Airport in New York (EWR) to Dallas Fort Worth International Airport in Texas (DFW) to attend a family funeral. He was traveling with his wife and four of their children.

443.    Fearing travel problems similar to those they had endured in the past, Mr. Khairullah and his family arrived four hours early for their domestic flight.

444.    Mr. Khairullah could not access his or his family's boarding passes online and was unable to print their boarding passes at the airport kiosk. Instead, he was directed to seek assistance at the airline service desk.

445.    The airline agent contacted Defendants to obtain clearance to print Mr. Khairullah and his family's boarding passes. Defendants took approximately one hour to provide the required clearance.

446.    After printing the boarding passes, the airline agent did not immediately hand them to Mr. Khairullah. Rather, the agent took the family's carry-on luggage to the baggage carousel.

447.    Mr. Khairullah was then given the family's boarding passes. The boarding passes for him and his wife were stamped with "SSSS," indicating that they were designated as a "known or suspected terrorists."

448.    At the security checkpoint, TSA officers publicly subjected Mr. Khairullah and his family to an extensive and lengthy screening, including invasive pat downs and a chemical swab of their hands and belongings.

449.    On December 31, 2020, Mr. Khairullah and his family returned to Newark International Airport in New York (EWR) from Dallas/Fort Worth International Airport in Texas (DFW).

450.    Fearing travel problems similar to those they had endured in the past, Mr. Khairullah and his family arrived four hours early for their domestic flight.

451.    Mr. Khairullah could not access his or his family's boarding passes online nor was he able to print their boarding passes at the airport kiosk.

452.    Mr. Khairullah, upon arrival to the airport, sought assistance at the airline service desk.

453.    The airline agent contacted Defendants to obtain clearance to print Mr. Khairullah and his family's boarding passes. Defendants took approximately one hour to provide the required clearance.

454.    At the security checkpoint, TSA officers scanned Mr. Khairullah's license. An alarm sounded, after which a supervisory security officer arrived at the checkpoint.

455.    The supervising officer instructed Mr. Khairullah and his wife to form a line separate from the rest of the passengers waiting to be screened.

456.    The TSA officers separated Mr. Khairullah and his wife from their five children, several of whom began crying from fear. The officers instructed Mr. Khairullah and his wife to pass through the body scanner. The officers then searched each piece of the family's luggage by hand.

457.    When Mr. Khairullah and his family arrived at their gate, TSA officers, including an explosives detection handler with a canine, were waiting for them.

458.     TSA officers led the canine towards the family and it sniffed each family member for explosives, one by one, as other passengers watched and surrounded the gate to board.

459.    After Mr. Khairullah and his family's boarding passes were scanned, a TSA officer escorted them to the plane and asked them to make their hands visible for a final swabbing.

460.    The TSA officer also swabbed Mr. Khairullah's computer before permitting him to board the plane.

461.    In August 2021, Mr. Khairullah and his family drove across the United States-Canada land border into Canada and back.

462.    At the border checkpoint on their way back into the United States, CBP officers scanned the family's passports. When CBP officers scanned Mr. Khairullah's passport, strobe lights and alarms went off across every customs station.

463.    CBP officers ran towards the booth where Mr. Khairullah waited with his young children and wife, swarmed the booth, and ordered the family to step out of the car. The CBP officers then conducted an extensive search of the family's vehicle, luggage, and personal effects.

464.    CBP officers separated Mr. Khairullah from his wife and children and escorted him to a separate room. There, they interrogated him about his purpose for traveling and who he contacted while in Canada.

465.    Mr. Khairullah complied and when CBP officers asked him to produce a second form of identification, Mr. Khairullah described its location in his car.

466. Mr. Khairullah was separated from his family and held incommunicado in a separate interrogation room for over five hours. After approximately five hours, the CBP officers permitted the family to cross the border back into the United States.

467. As a result of his placement on the federal watchlist, despite having to travel for work and to visit family, Mr. Khairullah avoids traveling by airplane as much as possible.

468. As a result of his placement on the federal watchlist, Mr. Khairullah has refused to cross a land border since his last experience.

469. Upon information and belief, at some point between August 2021 and May 2023, Defendants removed Mr. Khairullah from the federal terrorist watchlist. But, upon information and belief, they retained the records of his historic watchlist status and continued to use them to harm Mr. Khairullah.

470. On May 1, 2023, Mr. Khairullah drove from New Jersey to Washington, D.C. to attend an Eid al-Fitr celebration hosted at the White House.

471. Mr. Khairullah had not only been invited as a guest to the celebration. He had also helped a Democratic Party staffer to compile a list of Muslim leaders in New Jersey to invite to the celebration.

472. When Mr. Khairullah was in his car only miles from the White House, the White House Special Events Office called Mr. Khairullah to inform him that he was not cleared for security and could no longer attend the gathering.

473. Confused and disappointed, Mr. Khairullah turned around and drove home to New Jersey.

474. Upon information and belief, when Defendants screened Mr. Khairullah to approve his entry to the White House, he was identified as someone who had previously been

included in the Terrorist Screening Dataset as a "known or suspected terrorist." As a result, he was denied entry to the White House.

475.    On April 21, 2022, Mr. Khairullah applied for Global Entry. His application was denied.

476.    Upon information and belief, Defendants denied Mr. Khairullah's application for Global Entry because he was on the federal terrorist watchlist.

477.    In the alternative, upon information and belief, Defendants denied Mr. Khairullah's application for Global Entry because he was previously placed on the federal terrorist watchlist.

478.    Although Mr. Khairullah has been removed from the federal terrorist watchlist, the effects of his listing continue to haunt him and his family.

479.    As a result of Mr. Khairullah's previous designation on the federal terrorist watchlist, his family is afraid to travel to visit family members and friends for fear of being treated like criminals and "known or suspected terrorists."

480.    Mr. Khairullah's previous watchlist status has disrupted his ability to travel with ease, discouraged him from traveling by plane, particularly with his family, and interfered with his ability to carry out his job as an elected official whose work requires constant travel and mobility.

481.    Mr. Khairullah was also publicly humiliated and stigmatized by the White House's abrupt denial of entry to the Eid al-Fitr celebration, which only reaffirmed that Defendants continue to view him as a threat.

482.    Mr. Khairullah, by virtue of his job as a mayor, is routinely invited to attend such gatherings and is likely to be disinvited and publicly humiliated and stigmatized again due to his historic watchlist status.

483.    Upon information and belief, Defendants continue to retain Mr. Khairullah's status as a previous listee.

**Michael Migliore**
**(No Fly List Plaintiff)**

484.    Mr. Migliore is a United States citizen and a Muslim who currently lives in Saudi Arabia.

485.    Upon information and belief, Mr. Migliore has been placed on the federal terrorist watchlist and No Fly List.

486.    As result of his placement on the federal terrorist watchlist and No Fly List, Mr. Migliore and his family, all U.S. citizens, have resided in Saudi Arabia since 2011 and has not been able to return to the United States.

487.    In Fall 2009, Mr. Migliore traveled from Portland International Airport in Oregon (PDX) to Venice Marco Polo Airport in Italy (VCE) to visit his mother. Mr. Migliore took public transportation with his father to get to the Portland airport. While waiting for public transportation, a man with a professional camera approached to within six feet of Mr. Migliore and took a photograph of Mr. Migliore. Upon information and belief, this individual was an FBI agent.

488.    At the airport in Portland, Mr. Migliore approached an airline agent to print out his boarding pass. When Mr. Migliore received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

489.    At the security checkpoint, Mr. Migliore placed his laptop on the conveyor belt and proceeded forward. A TSA officer then pulled Mr. Migliore aside for a secondary search. He was publicly subjected to an extensive and lengthy screening, including an invasive pat

down that involved a search of his groin area in full view of other passengers and personnel at the security checkpoint, including his father.

490.    After that humiliating experience, Mr. Migliore went to the end of the conveyor belt to retrieve his laptop but could not find it. He asked the TSA officers for his laptop but they did not provide any information about its whereabouts.

491.    Mr. Migliore complained to airport police about the disappearance of his laptop. Without being called, an FBI agent arrived and interrogated Mr. Migliore about his laptop, who it belonged to, and what was on it.

492.    A few weeks later, Mr. Migliore was informed that his laptop was located. Upon information and belief, Defendants seized Mr. Migliore's laptop and conducted a forensic search of its contents before returning it to him. Mr. Migliore received his laptop by mail.

493.    In the winter of 2010, Mr. Migliore traveled home from Venice Marco Polo Airport in Italy (VCE) to Portland International Airport in Oregon (PDX), with a connecting flight in Vienna International Airport (VIE). During his layover, he was detained at a security checkpoint at Vienna International Airport.

494.    Austrian government agents escorted Mr. Migliore to a private area, where he was interrogated, strip searched nude in front of two agents, and searched extensively.

495.    The Austrian government agents also searched Mr. Migliore's checked luggage in front of him item by item.

496.    Mr. Migliore felt violated and humiliated. He was frustrated and scared. Austrian government agents refused to provide him with any information about why he was being detained and interrogated.

497.    Austrian government agents detained Mr. Migliore for several hours and, as a result, he missed his connecting flight to the United States. At the end of the interrogation, Austrian agents told Mr. Migliore that he would be interrogated again the following day before he boarded his rescheduled flight. Mr. Migliore spent the night at the airport.

498.    The following day, when checking in for his new flight, Mr. Migliore was detained, interrogated, and extensively searched again by another pair of Austrian agents. Mr. Migliore was then escorted by uniformed agents to his gate.

499.    At the gate but before passengers started boarding, an Austrian government explosive detection handler and a canine searched Mr. Migliore's person and belongings and sniffed him for explosives. The search was conducted in public in front of approximately 200 individuals. Mr. Migliore could feel the stares of the passengers.

500.    When the canine search was over, Mr. Migliore felt humiliated and ashamed. He went to the restroom near the gate and had an emotional breakdown. Mr. Migliore did not understand why he was being treated like a potential threat and criminal in front of hundreds of people.

501.    Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Migliore to foreign governments, including the Austrian government, and, as a result, he was subjected to the treatment described above.

502.    On July 4, 2011, Mr. Migliore arrived at Portland International Airport (PDX) with his brother, father, and three friends. Mr. Migliore planned to travel to Venice, Italy, for the summer. His family and friends accompanied Mr. Migliore to the check-in counter to see him off.

503.    Mr. Migliore could not check in online or at the airport kiosk. Instead, he was directed to the ticket counter. At the ticket counter, the airline representative made several

phone calls. After approximately 15 minutes, a police officer approached Mr. Migliore, as several other officers stood further away. In front of Mr. Migliore's family and friends, the police officer informed Mr. Migliore that he was on the No Fly List and would not be allowed to fly.

504.    Mr. Migliore was shocked, ashamed, and embarrassed. Mr. Migliore did not receive any explanation for why he was on the No Fly List. Nor was he provided with any information or process on what to do to resolve the situation.

505.    Mr. Migliore was determined to go to Italy. He took an Amtrak train from Portland to New York City. From New York City, he took a cruise to the United Kingdom.

506.    As the cruise ship approached the dock at the United Kingdom, Mr. Migliore saw a speedboat approach. Two officers from UK MI5—the United Kingdom's domestic counterintelligence and security agency—came to Mr. Migliore's room, asked for his name and detained him in his room on the ship. Mr. Migliore was informed that he was being detained under the United Kingdom's Terrorism Act 2000.

507.    Mr. Migliore was afraid that he was going to be arrested and tortured.

508.    The UK MI5 officers asked him where he was going. They confiscated all of Mr. Migliore's belonging, including his cellphone, wallet, and bags. Thereafter, the UK MI5 officers escorted Mr. Migliore out of the room and searched his room. As soon as the ship reached the dock, Mr. Migliore was escorted to a car via a non-official exit and taken to a police station.

509.    After completing intake paperwork, the UK MI5 officers took a photograph of Mr. Migliore's tattoo. Mr. Migliore was informed once more that he was being detained under the Terrorism Act 2000 and that he would be arrested if he refused to answer any questions. Mr. Migliore was not allowed to call his family, but he was instructed to call a solicitor.

510.    The solicitor did not assist Mr. Migliore. Instead, Mr. Migliore was interrogated for eight hours. Mr. Migliore was questioned about his religious beliefs and practices, including the reasons he became a Muslim. UK MI5 officers argued with Mr. Migliore's religious beliefs and asked him why he didn't remain Christian as he was raised. They also asked Mr. Migliore about why he wanted to travel to Saudi Arabia and why he wanted to get married.

511.    The UK MI5 officers took the film from Mr. Migliore's disposable camera and asked him if he had any pictures of the ship he was on.

512.    At the end of the interview, Mr. Migliore was falsely accused of vandalizing the cruise ship by writing "I hate this ship" behind a painting in his private cabin that he was staying in during the cruise. He was arrested, handcuffed, and photographed.

513.    The UK MI5 officers requested Mr. Migliore's permission to conduct a DNA test. Mr. Migliore did not consent to the test, but the UK MI5 officers swabbed his mouth with a cotton swab against his will and conducted the DNA test.

514.    The UK MI5 officers also questioned other passengers from the cruise ship about their contact with Mr. Migliore.

515.    After the interrogation, the British authorities escorted Mr. Migliore to the airport. Due the lengthy detention and interrogation, Mr. Migliore missed his flight to Italy. Mr. Migliore had to rebook his flight for the next day. He did not get a reimbursement. Mr. Migliore was forced to spend the night at the airport.

516.    While at Heathrow Airport in London (LHR), undercover officers followed and surveilled Mr. Migliore everywhere he went.

517.    Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Migliore to foreign governments, including the U.K. government, and, as a result, he was subjected to the treatment described above.

518.    Because Mr. Migliore is a dual Italian and U.S. citizen, he rebooked his flight under his Italian national identification card. On this trip, Mr. Migliore was not subjected to enhanced screening.

519.    Because Mr. Migliore was unable to fly to Italy from the United States because of his placement on the No Fly List, it took Mr. Migliore approximately 12 days to get from Portland, Oregon to Venice, Italy.

520.    On July 6, 2011, Mr. Migliore filed a DHS TRIP traveler inquiry seeking relief from the treatment he received when traveling.

521.    On November 4, 2011, Mr. Migliore received a DHS TRIP final determination letter that stated: "it has been determined that no changes or corrections are warranted at this time."

522.    On July 27, 2023, Mr. Migliore once again filed a DHS TRIP traveler inquiry. At the time of filing, he has not yet received a response to the complaint.

523.    As a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, he fears for his life and has not traveled back to the United States since he traveled to Saudi Arabia in 2011. Mr. Migliore has forgone many trips to the United States to avoid the fear, stigma, and humiliation that he suffers when traveling.

524.    In 2012, Mr. Migliore married his spouse in Egypt. Mr. Migliore's mother was able to make it to the wedding, but no other family member was able to attend. As a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, Mr. Migliore could not celebrate his wedding day with his father, brother, or lifelong friends.

525.    As a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, Mr. Migliore has missed many meaningful events, including his older brother's graduation and visits with family and friends. To take one recent example, Mr. Migliore's wife's sister got married in Portland, Oregon in the summer of 2023. Neither Mr. Migliore nor his wife could attend the wedding.

526.    As a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, Mr. Migliore's nine-year-old daughter was born overseas instead of on American soil.

527.    Mr. Migliore's wife suffers from hyperemesis gravidarum during pregnancy, which causes severe nausea and vomiting.

528.    When Mr. Migliore's wife was pregnant with their second child, she traveled to the United States twice so that her mother in Portland could help care for her. Mr. Migliore wanted to return to the United States with his wife and daughter but, as a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, he could not.

529.    Mr. Migliore's second child, a boy, was born in the United States. As a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, Mr. Migliore could not be present for the birth of their son.

530.    Mr. Migliore's wife has also suffered traumatizing and stigmatizing treatment at the hands of authorities because of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List.

531.    On January 20, 2017, Mr. Migliore's wife traveled from King Fahd International Airport in Dammam, Saudi Arabia (DMM) to Seattle-Tacoma International Airport (SEA). During a layover in Amsterdam, she was approached by airport officials when

on the boarding bridge departing the plane. Officials singled her out and demanded to see her passport.

532.    When Mr. Migliore's wife arrived at the Seattle-Tacoma International Airport, CBP officers interrogated her at the passport control checkpoint. CBP officers asked her about Mr. Migliore, including where he was and what his job was. They also asked her where she was staying in the United States and when she would leave. CBP officers unpacked all her bags and took her documents, cell phone, credit cards, and passport to a back office. Upon information and belief, CBP officers made a copy of the information on her cell phone.

533.    Even though Mr. Migliore's wife was pregnant, sick from the flight, and with her four-year-old daughter, the CBP officers forced her to remain on her feet for over an hour while she was being detained. Upon information and belief, Mr. Migliore's wife was subjected to the above-described treatment because of her relationship with Mr. Migliore.

534.    In 2021, Mr. Migliore's wife traveled from Italy to Portland International Airport in Oregon (PDX) with her father-in-law. When she arrived at the passport control checkpoint in Portland, a CBP officer pulled her aside and questioned her about how long she would stay in the United States, where she was staying, what her husband was doing in Saudi Arabia, and where he worked in Saudi Arabia. Mr. Migliore's wife felt afraid and nervous. Upon information and belief, she was subjected to this questioning because of her relationship with Mr. Migliore.

535.    In July 2023, Mr. Migliore's wife traveled from Saudi Arabia to Seattle, Washington. While in Seattle visiting family, she went on a day trip to Vancouver, Canada. Mr. Migliore's wife took a Greyhound bus from Seattle to Vancouver.

536.    When crossing the border from the United States to Canada, all passengers on the bus went through a passport check. Mr. Migliore's wife was the only passenger pulled into

secondary screening by CBP officers when she presented her American passport. Officers asked her where she was "really" from, why she was traveling, why she was only going for a day trip, and what kinds of restaurants she would visit. When the first round of questioning was done, another officer asked her the same questions but in different ways.

537.   The bus waited for Mr. Migliore's wife as she was questioned and, when officers released her, she was allowed to reboard the bus and proceed to Vancouver. She was humiliated to realize that she was the last person to board the bus and that the passengers were all delayed because of her interrogation and detention. Upon information and belief, she was subjected to this questioning because of her relationship with Mr. Migliore.

538.   As a result of Mr. Migliore's placement on the federal terrorist watchlist and No Fly List, he is unable to change jobs in Saudi Arabia. Saudi Arabian laws require him to return to the United States to receive a new work sponsor in order to do so, which Mr. Migliore's placement on the No Fly List renders extremely challenging impossible. Mr. Migliore is also deterred from traveling by ship to and from the United States in light of his past experience. Mr. Migliore has lost opportunities for work as a result.

539.   Upon information and belief, Mr. Migliore remains on the federal terrorist watchlist and No Fly List.

### Nidal El-Takach
### (Watchlisted Plaintiff)

540.   Plaintiff Nidal El-Takach is a U.S. citizen and Muslim who currently lives in Michigan. Mr. El-Takach works as an engineer and is a husband and father.

541.   Upon information and belief, Mr. El-Takach has been placed on the federal terrorist watchlist.

542.    Due to his placement on the federal terrorist watchlist, Mr. El-Takach has been subject to enhanced screening, unreasonable delays, interrogations, and religious questioning while traveling by plane.

543.    On July 10, 2017, Mr. El-Takach traveled from Beirut International Airport in Lebanon (BEY) to Detroit Metro Airport in Michigan (DTW) with a layover at Frankfurt International Airport in Germany (FRA).  He was travelling with his two young children.

544.    Mr. El-Takach was not able to print his boarding pass from Frankfurt to Detroit in either Beirut or Frankfurt.

545.    Airline ticketing agents in Frankfurt needed to contact Defendants to obtain clearance to print Mr. El-Takach's boarding pass. It took approximately 40 minutes for Defendants to provide clearance to allow the ticketing agents to print Mr. El-Takach's boarding pass.

546.    When Mr. El-Takach arrived at Detroit Metro Airport, the flight crew made an announcement asking everyone to stay seated. Soon after, CBP officers boarded the plane and walked to Mr. El-Takach's seat. They asked him and his two children to come with them while the rest of the passengers stayed seated. Mr. El-Takach felt afraid for his safety and worried for his children.

547.    The officers escorted Mr. El-Takach and his children off the plane and took him to a table in a public area of the airport. Officers searched both of Mr. El-Takach's bags. Officers handed Mr. El-Takach a sheet of paper that told him he was obligated to give them his phone and its password. Mr. El-Takach handed over his phone and password to the officers.

548.    In the public area of the airport, CBP officers questioned Mr. El-Takach about his religious beliefs and practices, including whether he is Sunni or Shia Muslim, whether his

wife wears hijab, whether he attends Islamic religious ceremonies, whether he performs daily prayers, and whether he attends Friday Jumu'ah services at his local mosque.

549.    Upon information and belief, Mr. El-Takach's answers to the questions about his Islamic religious beliefs and practices were factors that contributed to his designation on the federal terrorist watchlist.

550.    In the alternative, upon information and belief, the CBP officers asked Mr. El-Takach about his Islamic religious beliefs and practices because of his placement on the federal terrorist watchlist.

551.    Mr. El-Takach's children who were traveling with him were four and eight years old. His four-year-old son was exhausted and upset.

552.    Officers then escorted Mr. El-Takach and his children into a back room for even more questioning.

553.    There, FBI agents interrogated Mr. El-Takach about whether he had any contacts with Hezbollah. Mr. El-Takach explained that he did not and that he only travels to Lebanon for two weeks out of every year.

554.    One of the FBI agents handed Mr. El-Takach a sheet of paper and asked him to write down the names of everyone he knew in Hezbollah. Mr. El-Takach felt intimidated and threatened by the FBI agents.

555.    The FBI agents questioned Mr. El-Takach for another three and a half hours while his young children waited. The experience left Mr. El-Takach feeling intimidated and afraid.

556.    In July 2018, Mr. El-Takach traveled from Detroit Metro Airport in Michigan (BTW) to Beirut International Airport in Lebanon (BEY). He was traveling with his two young children.

557.   At the TSA security checkpoint, TSA officers pulled Mr. El-Takach aside into a separate line, where they went through all of bags by hand and subjected him to an invasive pat-down. The search took 45 minutes.

558.   Before Mr. El-Takach's flight was able to take off, TSA officers searched the aircraft for explosives. That search took approximately 90 minutes.

559.   Later in July 2018, Mr. El-Takach returned from Beirut International Airport in Lebanon (BEY) to Detroit Metro Airport in Michigan (DTW).

560.   When Mr. El-Takach landed at Detroit Metro Airport, the flight crew made an announcement instructing Mr. El-Takach and his seven- and nine-year-old children to exit the plane. They told the remaining passengers on the flight to stay seated.

561.   When Mr. El-Takach and his children exited the plane, they found two CBP officers waiting for them at the door. The officers searched Mr. El-Takach's belongings. The officers also handed Mr. El-Takach a sheet of paper that told him he was obligated to give them his phone and its password. Mr. El-Takach complied.

562.   The CBP officers escorted Mr. El-Takach and his children to secondary inspection for further questioning.

563.   There, CBP officers questioned Mr. El-Takach about his Islamic religious beliefs and practices, whether he attended religious ceremonies, and whether his wife wears hijab.

564.   CBP officers again questioned Mr. El-Takach about whether he had any contacts with Hezbollah. Mr. El-Takach explained that he did not and that he only travels to Lebanon for two weeks out of every year.

565.    Mr. El-Takach, who is diabetic, felt ill and exhausted. He told the CBP officers that he needed to eat, but they offered him only water. Mr. El-Takach's two young children were forced to wait as the officers interrogated Mr. El-Takach for three hours.

566.    In December 2018, Mr. El-Takach traveled from Beirut International Airport in Lebanon (BEY) to Detroit Metro Airport in Michigan (DTW). When Mr. El-Takach landed in Detroit, the airline crew made an announcement for the passengers on the flight to stay seated. The crew instructed Mr. El-Takach to exit the plane.

567.    When Mr. El-Takach exited the plane, he found two CBP officers waiting for him at the door. The officers searched Mr. El-Takach's bag. The officers also handed Mr. El-Takach a sheet of paper that told him he was obligated to give them his phone and its password. Mr. El-Takach complied.

568.    After the initial search, CBP officers escorted Mr. El-Takach to secondary inspection for further questioning.

569.    CBP officers asked Mr. El-Takach about his phone and the different apps that are on it. They asked him specifically about his work email app and the two-factor authentication app he has for his email. Mr. El-Takach told the CBP officers that his work-related information is confidential and officers should not access it.

570.    CBP officers took Mr. El-Takach's phone anyway. They asked him if Hezbollah had accessed his phone whilst he was in the Beirut airport that contained confidential, proprietary information related to his work as an engineer. Officers accused Mr. El-Takach of giving secrets to Hezbollah about his work as an engineer.

571.    Two and a half hours later, CBP officers informed Mr. El-Takach that they were confiscating his phone and would not provide him with a date by which it would be returned.

572.    Upon information and belief, CBP officers downloaded the contents of Mr. El-Takach's phone without his consent.

573.    Two plainclothes FBI agents entered the room where Mr. El-Takach was being interrogated. The FBI agents asked him about WhatsApp messages he received from an organization that helps register Arab Americans to vote.

574.    They also questioned him about Hezbollah and who he knew in the organization.

575.    After completing their interrogation of Mr. El-Takach, the two CBP officers who escorted Mr. El-Takach from the plane left. Mr. El-Takach was then interrogated by two more FBI agents who were dressed in civilian clothes, who did not identify themselves. Finally, he was interrogated by additional FBI agents.

576.    In total, the interrogations lasted more than six hours. Mr. El-Takach's family was left waiting for him at the airport and wondering where he was.

577.    Mr. El-Takach left the questioning feeling traumatized and afraid for his safety.

578.    When Mr. El-Takach was released from questioning, the CBP officers refused to return his phone, which they had confiscated.

579.    On March 23, 2022 Mr. El-Takach traveled from Detroit Metro Airport in Michigan (DTW) to Cancun International Airport in Mexico (CUN). He was traveling with his wife and children.

580.    When Mr. El-Takach attempted to print his family's boarding passes, the process took over an hour. When the family received their boarding passes, the boarding passes for Mr. El-Takach, his wife, and their 13-year-old son were stamped with "SSSS," indicating that they were designated as "known or suspected terrorists."

581.   At the TSA security checkpoint, TSA officers pulled Mr. El-Takach aside and thoroughly searched all of his luggage. They also subjected Mr. El-Takach and his son to invasive full-body pat-downs. It took Mr. El-Takach and his family over an hour to undergo the searches and pat-downs.

582.   When Mr. El-Takach and his family arrived at the gate, they found TSA officers waiting for them. The TSA officers patted the family down and searched all of their luggage in full view of other passengers.

583.   When Mr. El-Takach and his family entered the jet bridge to board the plane, TSA officers once again fully patted them down and searched their luggage in full view of other passengers.

584.   Later in March 2022, Mr. El-Takach and his family returned from Cancun International Airport (CUN) to Detroit Metro Airport (DTW) with a layover in Newark Liberty International Airport in New Jersey (EWR).

585.   When the family arrived at the airport in Cancun, they went to the airline service desk to have their boarding passes printed. The airline agent contacted Defendants to obtain clearance to print the family's boarding passes.

586.   At the security checkpoint, agents pulled Mr. El-Takach and his family aside and conducted pat downs and searches of each of their persons and luggage.

587.   At Newark, when the family deplaned, they found CBP officers waiting for them in the gate area. The CBP officers separated Mr. El-Takach from his wife and children and took them to be questioned separately.

588.   The CBP officers that were questioning his wife falsely accused Mr. El-Takach of being affiliated with Hezbollah. CBP officers separately questioned Mr. El-Takach about Hezbollah.

589.    CBP officers searched through all of Mr. El-Takach's luggage and demanded that Mr. El-Takach hand over his phone. When Mr. El-Takach explained that his phone can only be unlocked using his fingerprint, the officers became frustrated. Seeing their anger, Mr. El-Takach was afraid and unlocked his phone for the officers. The CBP officers then took a picture of the phone's serial number.

590.    CBP officers interrogated and searched Mr. El-Takach for over an hour and a half. As a result, he and his family missed their connecting flight to Detroit.

591.    At 10 pm, Mr. El-Takach went to the airline counter to rebook his family's flight. It took the airline four hours—until 2 am—to receive clearance from Defendants to rebook Mr. El-Takach and his family. Mr. El-Takach and his family were left waiting and exhausted during this process.

592.    The next morning's flight on Mr. El-Takach and his family were booked was cancelled due to the weather. Because he did not want to spend another four hours going through the clearance process again for their rebooked flight, Mr. El-Takach and his family decided to drive home from New Jersey to Michigan, an 11-hour drive.

593.    In December 2022, Mr. El-Takach traveled from Detroit Metro Airport in Michigan (DTW) to Punta Cana International Airport in the Dominican Republic (PUJ). He was traveling with his wife.

594.    It took airline agents over an hour to receive clearance from Defendants to print boarding passes for Mr. El-Takach and his wife. When they received their boarding passes, they were both stamped with "SSSS," indicating that they were designated as "known or suspected terrorists."

595.    At the security checkpoint, TSA officers pulled Mr. El-Takach aside, thoroughly searched all of his luggage, and subjected him to a full-body, invasive pat-down. The search took over an hour.

596.    When Mr. El-Takach arrived at his gate, he found TSA officers waiting for him. The officers patted him down and searched all of his luggage in full view of other passengers.

597.    When Mr. El-Takach entered the jet bridge to board the plane, TSA officers once again fully patted he and his wife down and searched their luggage in full view of other passengers.

598.    Mr. El-Takach did not receive his checked luggage until the day after he and his wife arrived in Punta Cana.

599.    On December 19, 2022 Mr. El-Takach and his wife returned from Punta Cana International Airport in the Dominican Republic (PUJ) to Detroit Metro Airport in Michigan (DTW).

600.    At the airport in Punta Cana, it took airline agents over an hour to receive clearance from Defendants allow the agents to print Mr. El-Takach's and his wife's boarding passes. When they received their boarding passes, agents manually wrote "SSSS" on each of their boarding passes, indicating that Mr. El-Takach and his wife were designated as "known or suspected terrorists."

601.    When Mr. El-Takach and his wife landed in Detroit, the flight crew instructed everyone to remain seated while Mr. El-Takach and his wife left the plane.

602.    When Mr. El-Takach and his wife exited the plane, they were met by CBP officers at the gate.

603.     CBP officers interrogated Mr. El-Takach and his wife in the middle of the airport in full view of other passengers. The CBP officers questioning his wife once again falsely accused Mr. El-Takach of being a member of Hezbollah.

604.     CBP officers interrogated Mr. El-Takach about Hezbollah. After 20 minutes had passed, Mr. El-Takach noticed two plainclothes FBI agents taking notes nearby, holding Mr. El-Takach's passports. When the CBP officers finished their interrogation, the FBI agents approached Mr. El-Takach and began their own interrogation.

605.     Mr. El-Takach asked the FBI agents for their names and badge numbers, but they only provided him with first names.

606.     FBI agents also interrogated Mr. El-Takach about Hezbollah. Mr. El-Takach reiterated that he has no connections to the group. FBI agents also pulled up the mass text message he received about helping Arab Americans register to vote, presumably because they assumed that the file attached to the message titled "Arab-Americans" was related to Hezbollah activity. The interrogation lasted two hours.

607.     Due to his placement on the federal terror watchlist, Mr. El-Takach has also been subjected to enhanced screening, unreasonable delays, and interrogations while crossing the United States-Canada border by land.

608.     On November 2, 2019, Mr. El-Takach drove to Canada from the United States and back via the Blue Water Bridge border crossing. He was traveling with a colleague for work.

609.     Mr. El-Takach did not have any electronic devices with him.

610.     At the border crossing into Canada, Canadian border officials stopped and interrogated Mr. El-Takach and his colleague.

611.    Canadian border officials asked Mr. El-Takach why he did not have his electronics with him.

612.    Canadian border officials demanded Mr. El-Takach's colleague's phone and phone password. He provided them and the officials took his phone to a separate area to conduct a search.

613.    The questioning of Mr. El-Takach and his colleague lasted three hours.

614.    Upon information and belief, Mr. El-Takach's colleague was interrogated and had his electronics searched due to his relationship with Mr. El-Takach, who is on the federal terrorist watchlist.

615.    When Mr. El-Takach and his colleague returned to cross back into the United States on that same day, CBP officers were waiting for their car.

616.    Upon information and belief, Canadian border officials had informed CBP that Mr. El-Takach and his colleague had crossed the border into Canada and that they were returning to the United States.

617.    As soon as their car pulled to the primary inspection booth, the CBP primary inspection officer at the booth instructed Mr. El-Takach's colleague to turn off the car.  CPB officers approached the car with their guns drawn and pointed at them.

618.    CBP officers shouted instructs at Mr. El-Takach to exit the car, handcuffed him, and escorted him to a back room.

619.    CBP officers left Mr. El-Takach handcuffed and waiting in that room for over an hour. Then officers escorted him to another room where his handcuffs were removed. He waited there for three more hours.

620.    Mr. El-Takach is diabetic and was growing ill waiting for the questioning. Officers offered food and drink to his colleague, but not to him.

621.    When officers finally began their interrogation, they asked Mr. El-Takach about Hezbollah and why he did not bring his phone on this trip.

622.    In 2017, Mr. El-Takach filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

623.    On July 28, 2017, Mr. El-Takach received a final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

624.    In 2019, Mr. El-Takach filed another DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

625.    On March 4, 2019, Mr. El-Takach received an identical final determination letter.

626.    Due to his placement on the federal terror watchlist, Mr. El-Takach was diagnosed with post-traumatic stress disorder (PTSD) in or around 2019.

627.    In or around 2019, Mr. El-Takach suffered from acute anxiety, depression, fear, and insomnia. He struggled to do everyday things that were once easy for him, such as driving and hiking.

628.    As the result of the treatment he received while crossing the United States-Canada border in 2019, Mr. El-Takach suffered a severe episode of PTSD that prevented him from traveling again until 2022.

629.    Mr. El-Takach was so afraid of traveling that he did not attend his mother's funeral in Lebanon in 2021.

630.    Before 2019, Mr. El-Takach attended services at his local mosque almost every Friday.

631.     From 2019 to 2022, Mr. El-Takach was so traumatized by Defendants' treatment of him—particularly the interrogations about his Islamic religious beliefs and practices—that he stopped attending services at his local mosque. Mr. El-Takach hoped that, if he did not openly practice his religion, that Defendants would stop considering him to be a suspected terrorist and remove him from the watchlist.

632.     Since Mr. El-Takach began traveling again in 2022, he will not travel with his children across the United States-Canada border by land for fear of subjecting them to detention, harassment, invasive searches, and other humiliating ordeals as the result of his placement on the federal terrorist watchlist.

633.     Throughout Mr. El-Takach's detentions and interrogations by CBP officers in secondary inspection, every fellow passenger that he has seen detained in secondary inspection has been a person of color.

634.     Mr. El-Takach has suffered financial harm as the result of his placement on the federal terrorist watchlist and the travel difficulties that his watchlist status causes.

635.     Upon information and belief, Mr. El-Takach remains on the federal terrorist watchlist.

**Ahmad Mirzay**
**(Watchlisted Plaintiff)**

636.     Mr. Mirzay is a citizen of Afghanistan and a Muslim. He has been a U.S. lawful permanent resident since 1999.

637.     Upon information and belief, Mr. Mirzay has been placed on the federal terrorist watchlist.

638.    Upon information and belief, Defendants placed Mr. Mirzay on the federal terrorist watchlist, at least in part, because Mr. Mirzay's brother is on the list. As a result of Mr. Mirzay's family ties with a listed individual, Defendants turned his life upside-down.

639.    As a result of his placement on the federal terrorist watchlist, since the summer of 2015, Mr. Mirzay has been subjected to enhanced screening, unreasonable delays, and interrogations while traveling.

640.    In the summer of 2015, Mr. Mirzay traveled with his family to attend his brother's wedding. The family flew from John F. Kennedy International Airport in New York (JFK) to Kabul International Airport in Afghanistan (KBL) with a layover at Atatürk Airport in Istanbul, Turkey (ISL).

641.    At JFK, when Mr. Mirzay received his boarding pass for his flight to Istanbul, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

642.    At the security checkpoint and in front of Mr. Mirzay's family, TSA officers publicly subjected Mr. Mirzay to an extensive and lengthy screening, including an invasive pat down and a search of all his carry-on bags. Mr. Mirzay was humiliated and felt that the TSA officers purposefully embarrassed him.

643.    After the search, TSA officers escorted Mr. Mirzay and his entire family into a back room, where they were separated. Each family member was individually interrogated by agents who identified themselves as FBI agents.

644.    Upon information and belief, the FBI agents singled out and interrogated Mr. Mirzav's family members because of their relationship with Mr. Mirzav and his status on the watchlist.

114

645.     The FBI agents interrogated Mr. Mirzay about where he was going, why he was traveling, who he would see, and where he was staying. They also questioned him about where he got the money to purchase his plane ticket. The questioning took over an hour. Mr. Mirzay felt humiliated and confused about why he was being interrogated.

646.     When Mr. Mirzay landed in Istanbul for his layover, he was stopped at the Turkish customs checkpoint by Turkish officials while they made several phone calls to Defendants to obtain clearance to allow Mr. Mirzay to proceed. After making a number of calls, the Turkish officials let him pass and continue to his flight to Kabul.

647.     Later in the summer of 2015, Mr. Mirzay returned from Kabul International Airport in Afghanistan (KBL) to John F. Kennedy Airport in New York (JFK) with a layover at Atatürk Airport in Istanbul, Turkey (ISL).

648.     When Mr. Mirzay's plane landed in New York, the flight crew announced that all passengers should have their passports ready when they deplaned.

649.     As passengers were deplaning, CBP officers boarded the aircraft and began checking the passports of the passengers.

650.     When Mr. Mirzay deplaned, there were two CBP officers waiting for him in the gate area. They escorted Mr. Mirzay in full view of other passengers to a back room for secondary questioning.

651.     In that back room, the CBP officers searched all of Mr. Mirzay's belongings. CBP officers also searched Mr. Mirzay's cell phone twice: once when with its American SIM card, and then again with its Afghan SIM card. Upon information and belief, CBP officers downloaded all of the data from both Mr. Mirzay's American SIM card and his Afghan SIM card.

652.   CBP officers interrogated Mr. Mirzay about where he traveled, who he saw while in Afghanistan, what markets he visited there, why he was in Afghanistan, and what he did there.

653.   Mr. Mirzay was detained incommunicado for five hours while CBP officers interrogated and searched him. Mr. Mirzay's family decided to drive home to Massachusetts without him and had to return to get him after he was released.

654.   As the result of the humiliating and traumatic treatment that he suffered while traveling, Mr. Mirzay is afraid to travel by plane, and has not done so since 2015. Mr. Mirzay has foregone many opportunities to visit family and friends for nearly a decade.

655.   On July 19, 2023, Mr. Mirzay filed a DHS TRIP traveler inquiry. At the time of this filing, he has received no response.

656.   In the summer of 2020, Mr. Mirzay applied for a license to carry a firearm in Massachusetts. He completed the state-mandated training course, was fingerprinted, and completed an interview with the local police chief as part of the application process.

657.    On August 19, 2020, Mr. Mirzay received a letter from the West Springfield, Massachusetts Police Department denying his application for a firearm license due to his placement on the federal terrorist watchlist. The denial letter stated that "Mr. Mirzay has recently been on the terrorist watchlist" and that his brother "is currently on the terrorist watch list."

658.   Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Mirzay and Mr. Mirzay's brother to state and local authorities, including the West Springfield Police Department, and, as a result, his application for a firearm license was denied.

659.     In the alternative, upon information and belief, Defendants had disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Mirzay and Mr. Mirzay's brother to state and local authorities, including the West Springfield Police Department, which the authorities retained even after Defendants took Mr. Mirzay off the watchlist. As a result of Mr. Mirzay's historic watchlist status, his application for a firearm license was denied.

660.     Mr. Mirzay first applied for U.S. citizenship in 2012. That application was denied in 2016, purportedly because he was late submitting required paperwork. Mr. Mirzay applied again in 2018. He received a citizenship interview in February 2019, but that application was denied in July 2019, again purportedly because he was late submitting required paperwork.

661.     Upon information and belief, USCIS rejected Mr. Mirzay's citizenship applications because he is on the federal terrorist watchlist, not because he submitted paperwork late.

662.     In the alternative, upon information and belief, USCIS rejected Mr. Mirzay's citizenship applications because he was previously placed on the federal terrorist watchlist, even though he has since been removed from the watchlist, not because he submitted paperwork late.

663.     Mr. Mirzay re-applied for citizenship for a third time in 2022. His application was left pending for a year before any he received notice of any progress from USCIS. When Mr. Mirzay was granted a citizenship interview, he had to go through multiple interviews to advance to the next stage.

664.    Ultimately, Mr. Mirzay's citizenship, though delayed, was approved, and Mirzay became a citizen on September 23, 2023, five days after the filing of the initial Complaint.

665.    N

666.    Upon information and belief, Mr. Mirzay remains on the federal terrorist watchlist.

<b>Naveed Butt<br>(Watchlisted Plaintiff)</b>

667.    Plaintiff Naveed Butt is a U.S. Citizen, Muslim, and disabled U.S. Army veteran. He has dedicated his career to serving the United States in law enforcement and counterterrorism.

668.    Mr. Butt joined the United States Army as an Infantry Soldier in April 1983 and served for thirteen years in active duty, active reserve, the Maryland National Guard, and the Virginia National Guard until he retired due to injuries in 1996.

669.    Mr. Butt served the Fairfax County Police Department in Virginia and honorably retired after 28 years of service in 2016.

670.    Mr. Butt participated significantly in the search and recovery efforts at Ground Zero after 9/11.

671.    Throughout his career in law enforcement, Mr. Butt has conducted trainings and developed policy for customs and border control procedure.

672.    Throughout his career, Mr. Butt instructed federal officers at various federal law enforcement training centers, including the FBI Academy in Quantico, Virginia.

673.    Mr. Butt served as a Resident Program Manager for the Department of State Antiterrorism Assistance Program at the U.S. Embassy in Islamabad, Pakistan for two years.

118

674.     Upon information and belief, Mr. Butt has been placed on the federal terrorist watchlist.

675.     As a result of his placement on the federal terrorist watchlist, Mr. Butt has been the target of enhanced screening, unreasonable delays, and interrogations while traveling, even when he is on assignment as a contractor with the Department of State and carrying an Official Red U.S. government passport.

676.     In September 2013, Mr. Butt returned from Algeria to Washington Dulles International Airport in Virginia (IAD). Mr. Butt was returning from a work assignment in Algeria as a Lead Instructor of Counterterrorism with the Department of State.

677.     Upon landing at Dulles and arriving at the passport control checkpoint, Mr. Butt was pulled aside by a CBP officer and taken into secondary questioning.

678.     The CBP officer questioned Mr. Butt about where he went on his travel, who he spoke with, and what he did. Mr. Butt did not have any luggage or searchable items. Mr. Butt explained that he was on official business for the U.S. government and the CBP officer recommended that he apply for Global Entry to avoid this situation in the future.

679.     Mr. Butt was distressed and confused by the treatment he received while on official business for the U.S. government and flabbergasted that he was targeted by CBP, an agency whose officers he had helped train throughout his career.

680.     After that upsetting experience, Mr. Butt applied for Global Entry and was approved.

681.     In January 2015, Mr. Butt returned from the Bahamas to Washington Dulles International Airport (IAD) in Virginia. He was returning from a work assignment in the Bahamas as a Lead Instructor of Counterterrorism with the Department of State. He traveled with two colleagues who worked with the FBI.

682.    Upon landing at Dulles and arriving at the passport control checkpoint, Mr. Butt used the Global Entry express line. Nonetheless, Mr. Butt was pulled into secondary screening. His colleagues were not. Mr. Butt was detained in a back room for an hour while CBP claimed to be verifying his information. He felt humiliated and confused as to why he was targeted in front of his colleagues.

683.    On July 18, 2015, Mr. Butt returned from Pakistan to Washington Dulles International Airport (IAD) in Virginia.  He was returning from a work assignment in Pakistan as a Resident Program Manager with the Department of State Bureau of Counterterrorism.

684.    When Mr. Butt received his declaration form upon landing at Dulles, he noticed that the form was marked with an "X."

685.    Upon landing at Dulles and arriving at the passport control checkpoint, Mr. Butt used the Global Entry express line. When he spoke with a CBP officer, the officer asked him detailed questions about his work, how he became a citizen, and for the last four digits of his social security number. The officer marked Mr. Butt's passport with a "C" and sent him to secondary questioning.

686.    Mr. Butt was escorted by CBP officers to a back room for secondary questioning. CBP officers completely unpacked Mr. Butt's luggage, interrogated him about its contents, and confiscated all of the work-related CDs in the suitcase. They also confiscated all of his paper documents and photocopied them. Upon information and belief, the CBP officers made copies of the contents of Mr. Butt's CDs.

687.    After the CBP officers searched Mr. Butt's belongings, a Homeland Security Investigations agent from DHS interrogated Mr. Butt about his travel, his work, who he met,

and why he had spent so much time abroad. Mr. Butt explained that his work for the U.S. government required him to travel.

688.    Mr. Butt was detained in secondary questioning for three hours. He left the experience feeling humiliated, angry, and upset that he had been treated a suspected terrorist while on an assignment for the U.S. government.

689.    On April 13, 2023, Mr. Butt filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

690.    . On May 25, 2023, Mr. Butt received a final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

691.    Upon information and belief, due to Mr. Butt's placement on the federal terrorist watchlist, Defendants revoked his Global Entry status.

692.    On September 22, 2015, Mr. Butt received an email from a Supervisor at the Global Entry Enrollment Center informing him that he was no longer eligible for Global Entry and his status had been revoked. In response, Mr. Butt submitted a complaint to the CBP Ombudsman and successfully regained Global Entry status.

693.    In 2019, Mr. Butt applied to renew his Global Entry status. On April 3, 2019, Mr. Butt received an email from a CBP Ombudsman stating that he was no longer eligible to be enrolled in Global Entry. Mr. Butt appealed the decision but, this time, his appeal was denied.

694.    Upon information and belief, due to Mr. Butt's placement on the federal terrorist watchlist, Defendants denied his application to renew his Global Entry status.

695.    As a result of his placement on the federal terror watchlist, Mr. Butt has had several job-related security clearance applications languish in administrative processing, leading him to lose two job opportunities.

696.    In June 2017, Mr. Butt was offered a position at the Department of State headquarters. As a condition of his employment, Mr. Butt was required to obtain a security clearance.

697.    Mr. Butt submitted a U.S. Office of Personnel Management Standard Form 86 and his fingerprints to the Department of State Diplomatic Security Service to initiate the required background check to obtain his security clearance. Mr. Butt periodically checked the status of the investigation over the course of two years, but the background check remained continuously under investigation.

698.    In 2019, after two years of his security clearance being stuck in administrative processing, the Department of State withdrew Mr. Butt's offer letter. Mr. Butt received no explanation for his security clearance failing to proceed.

699.    Upon information and belief, Mr. Butt's security clearance remained stuck in administrative processing because he is on the federal terrorist watchlist.

700.    In 2020, Mr. Butt applied to a position as a training coordinator with a private contractor for the Department of Defense and was offered the position. As a condition of his employment, Mr. Butt was required to obtain a security clearance.

701.    Mr. Butt began working at the new position in December 2020. He submitted a U.S. Office of Personnel Management Standard Form 89 and his fingerprints to the Department of State Diplomatic Security Service to initiate the required background check to obtain his security clearance. Two weeks later, Mr. Butt was notified that he obtained an interim security clearance.

702.    In February 2023, after Mr. Butt had worked in the position for over two years, his clearance was still in the interim phase and not fully processed. Mr. Butt received notice that his interim clearance had been withdrawn and was asked to resign because his clearance was still not processed.

703.    Upon information and belief, Mr. Butt's security clearance remained stuck in administrative processing because he is on the federal terrorist watchlist.

704.    Mr. Butt's current position as a contractor for the Department of State requires a security clearance. Since his security clearance application remains in adjudication for his previous job, he is not able to start a new application. As a result, Mr. Butt has not been able to obtain a current security clearance.

705.    Mr. Butt remains at risk of losing his current job for the same reason that he lost the previous two jobs: because, upon information and belief, his security clearance remains stuck in administrative processing because he is on the federal terrorist watchlist.

706.    As a wounded combat veteran, Mr. Butt is entitled to burial at Arlington National Cemetery. Due to his placement on the federal watchlist, Mr. Butt worries that he will not be permitted to be buried as a wounded combat veteran at Arlington.

707.    Upon information and belief, Mr. Butt remains on the federal terrorist watchlist.

**Moneeb Elhady**
**(Watchlisted Plaintiff)**

708.    Moneeb Elhady is a U.S. citizen of Yemeni descent.

709.    Upon information and belief, Mr. Elhady has been placed on the federal terrorist watchlist. At least some family members, including his brother Anas Elhady, have

been placed on the federal watchlist due to their association with Mr. Elhady. *See Elhady v. Piehota*, 303 F. Supp. 3d 453 (E.D. Va. 2017).

710.    As a result of his placement on the federal terrorist watchlist, since 2009, Mr. Elhady has been the target of enhanced screening, unreasonable delays, electronic device searches, and interrogations while traveling.

711.    On October 6, 2009, Mr. Elhady traveled from Sanaa International Airport in Yemen (SAH) to John F. Kennedy International Airport in New York (JFK) with a connecting flight at King Abdulaziz International Airport in Jeddah, Saudi Arabia (JED).

712.    Upon landing in New York and arriving at the passport control checkpoint, CBP officers took Mr. Elhady to a back room for secondary inspection. The CBP officers asked him where he was coming from, questions about his family, and questions about where he intended to spend money in the United States.

713.    The CBP officers then demanded that Mr. Elhady turn over his cell phone. The officers kept Mr. Elhady's phone for approximately thirty minutes before returning it.

714.    Upon information and belief, the officers downloaded the contents of Mr. Elhady's cell phone.

715.    The CBP officers also searched Mr. Elhady's luggage by hand, opening each bag and emptying the contents before closing the bags and returning them. The entire encounter with officers took between thirty minutes and an hour.

716.    In August 2012, Mr. Elhady traveled from Sanaa International Airport in Yemen (SAH) to Detroit International Airport in Michigan (DTW) with a connecting flight at Frankfurt International Airport in Germany (FRA).

717.    In Yemen, Mr. Elhady retrieved his boarding passes from an airline agent. The boarding passes were stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

718.    Upon landing in Michigan and arriving at the passport control checkpoint, CBP officers took Mr. Elhady to a back room for secondary inspection. The CBP officers asked him where he was coming from, about his family, and about where he intended to spend money in the United States. The CBP officers also asked him questions about Yemen and the civil war in Yemen.

719.    The CBP officers then demanded that Mr. Elhady hand over his cell phone. They kept Mr. Elhady's phone for approximately thirty minutes before returning it.

720.    Upon information and belief, the CBP officers downloaded the contents of Mr. Elhady's cell phone without his consent.

721.    The CBP officers also searched Mr. Elhady's luggage by hand, opening each bag and emptying the contents before closing the bags and returning them.

722.    On August 27, 2013, Mr. Elhady traveled with his brother from Sanaa International Airport in Yemen (SAH) to Detroit International Airport in Michigan (DTW) with connecting flights at Dubai International Airport in the United Arab Emirates (DXB) and Paris Charles de Gaulle Airport in France (PCG).

723.    In Yemen, Mr. Elhady retrieved his boarding passes from an airline agent. The boarding passes were stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

724.    Upon landing in Detroit, a CBP officer waited for Mr. Elhady and his brother after the passport check booth at the passport control checkpoint. The officer walked Mr. Elhady and his brother to a room where he asked them questions about the civil war in Yemen

including, specifically, where they believed the fighting in Yemen was taking place. Mr. Elhady and his brother did not know the answer to this question and answered by telling the officer that they did not know.

725.    The CBP officers also asked Mr. Elhady questions about where he was coming from, why he was in the United States, his family, and where he spends his money.

726.    The CBP officers then demanded that Mr. Elhady hand over his cell phone. The officers kept Mr. Elhady's phone for approximately thirty minutes before returning it.

727.    Upon information and belief, the officers downloaded the contents of Mr. Elhady's cell phone without his consent.

728.    The CBP officers also searched Mr. Elhady's luggage by hand, opening each bag and emptying the contents before closing the bags and returning them.

729.    On October 10, 2016, Mr. Elhady traveled from Istanbul Airport in Turkey (IST) to San Francisco International Airport in California (SFO) with a connecting flight at Toronto Pearson International Airport in Canada (YYZ).

730.    In Turkey, Mr. Elhady retrieved his boarding passes from an airline agent. The boarding passes were stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

731.    Upon landing in Canada and arriving at the passport control checkpoint, CBP officers took Mr. Elhady to a back room for secondary inspection. The officers asked him where he was coming from, his family, and where he intended to spend money.

732.    The officers also searched Mr. Elhady's luggage by hand, opening each bag and emptying the contents before closing the bags and returning them.

733.    On July 12, 2017, Mr. Elhady traveled with his parents and two sisters from Prince Mohammed Bin Abdulaziz International Airport in Saudi Arabia (MED) to John F.

Kennedy International Airport in New York (JFK) with a connecting flight at Istanbul Airport in Turkey (IST).

734.   In Saudi Arabia, Mr. Elhady and his family retrieved their boarding passes from an airline agent. Mr. Elhady's and his father's boarding passes were stamped with "SSSS," indicating that they were designated as "known or suspected terrorists."

735.   Upon landing in New York and arriving at the passport control checkpoint, CBP officers took Mr. Elhady and his father to a backroom for questioning. The CBP officers asked each of them where they were coming from, why they were in the United States, about their family, and where they intended to spend money.

736.   The CBP officers also searched their luggage by hand, opening each bag and emptying the contents before closing the bags and returning them.

737.   Upon information and belief, Mr. Elhady's faither's boarding pass was stamped with "SSSS," and he was questioned and searched due to his familial relationship with Mr. Elhady.

738.   On December 30, 2017, Mr. Elhady traveled with his father from King Abdulaziz International Airport in Saudi Arabia (JED) to Chicago O'Hare International Airport in Chicago (ORD) with a connecting flight at Frankfurt International Airport in Germany (FRA).

739.   In Saudi Arabia, Mr. Elhady and his father retrieved their boarding passes from an airline agent. Mr. Elhady's and his father's boarding passes were stamped with "SSSS," indicating that they were designated as "known or suspected terrorists."

740.   On July 2, 2021, Mr. Elhady traveled from Chicago O'Hare International Airport in Chicago (ORD) to Istanbul Airport in Turkey (IST).

741.     As Mr. Elhady prepared to board his flight in Chicago, two officers in green and beige uniforms approached Mr. Elhady in plain view of other passengers and began questioning him.

742.     For fifteen minutes—at the gate—officers asked Mr. Elhady detailed questions about his family. The officers asked about an uncle of Mr. Elhady and Mr. Elhady's relationship with him. They asked questions about Mr. Elhady's brother and Mr. Elhady's wife. They asked Mr. Elhady why he was going to Turkey. When Mr. Elhady told the officers he was meeting his wife there for a vacation, the officers asked for the address of the resort Mr. Elhady and his wife were staying at.

743.     On July 10, 2021, Mr. Elhady, his wife, and their nine-month-old daughter returned from their vacation. They traveled from Istanbul Airport in Turkey (IST) to Chicago O'Hare International Airport in Chicago (ORD).

744.     In Turkey, Mr. Elhady retrieved his boarding pass from an airline agent. Mr. Elhady's boarding pass was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

745.     Upon landing in Chicago and arriving at the passport control security checkpoint, CBP officers took Mr. Elhady to the side for questioning. The officers questioned Mr. Elhady about his family and about a wedding that he did not attend.

746.     Due to his placement on the federal terrorist watchlist, Mr. Elhady has also been subject to enhanced screening, unreasonable delays, and interrogation while crossing the United States-Canada border by land.

747.     From 2010 to 2015, Mr. Elhady lived in Detroit, Michigan. During this time, Mr. Elhady crossed the border into Canada through the Detroit Windsor Tunnel almost biweekly.

748.     Nearly every time he crossed the border back into the United States, CBP officers would swarm his car with their guns drawn and shout instructions at him to exit the car. CBP officers would then escort him to secondary inspection, where he would be detained incommunicado while the officers searched the car and Mr. Elhady's person.

749.     Officers would ask Mr. Elhady to leave his phone in his car and, upon information and belief, would search the phone while they held him for questioning.

750.     Officers asked questions about Mr. Elhady's family, why he was crossing the border, and how frequently Mr. Elhady crossed the border.

751.     On average, these border stops would take between one and two hours.

752.     On at least two occasions, officers escorted Mr. Elhady to a room where they demanded he put his hands on the wall while they forcibly searched him. Each of these encounters took around three hours.

753.     On one occasion, around 2012 or 2013, the CBP officers damaged Mr. Elhady's radio while searching the car. The CBP officers instructed Mr. Elhady that he could submit a quote for repairs to be reimbursed. He was never reimbursed for the damage to his radio.

754.     On December 22, 2022, Mr. Elhady crossed United States-Canada border by land to run some errands. He returned the same day.

755.     Upon returning to the United States, at the Detroit-Windsor Tunnel, officers asked Mr. Elhady to park his vehicle. Officers had Mr. Elhady exit the vehicle and to leave his phone in the car, and they asked him to step to the side for questioning.

756.     Mr. Elhady waited for thirty minutes before two officers approached him and began asking questions. They asked where he was born, his birthday, and about his family members.

757.    Mr. Elhady waited for another forty-five minutes before two different officers approached and began asking new questions. Mr. Elhady initially refused to answer questions before eventually agreeing to answer. The CBP officers asked questions about five people Mr. Elhady knew, including his brother, other family members, and colleagues.

758.    During the questioning, the CBP officers confirmed they were also searching Mr. Elhady's phone. Mr. Elhady asked why they were searching the phone and one officer said they had a warrant to do so.

759.    After approximately two hours, the agents let Mr. Elhady go.

760.    After the December 2022 incident, Mr. Elhady filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

761.    On May 25, 2023, Mr. Elhady received a final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

762.    Due to his placement on the federal terrorist watchlist, Mr. Elhady has experienced multiple closures of financial accounts.

763.    Mr. Elhady opened a MoneyGram account to send money to distribute to orphans in Yemen.

764.    Around 2022, Mr. Elhady's MoneyGram was inexplicitly closed. When Mr. Elhady contacted MoneyGram to find out why, he was told the decision was irreversible.

765.    In 2015, Mr. Elhady was notified by CashApp that his account had been suspended. When he contacted CashApp to find out why, he was told the decision was irreversible.

766.     Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Elhady to MoneyGram and CashApp, as a result, his accounts were closed without explanation

767.     Upon information and belief, Mr. Elhady still remains on the federal terrorist watchlist.

**Abdulrahman Cherri**
**(Watchlisted Plaintiff)**

768.     Plaintiff Abdulrahman Cherri is a U.S. citizen currently residing in Germany while working on his PhD.

769.     Upon information and belief, Mr. Cherri has been placed on the federal terrorist watchlist.

770.     In 2010, when Mr. Cherri crossed the United States-Canada land border, CBP officers repeatedly subjected him to hours-long detentions and interrogations, including interrogations about his Islamic religious beliefs and practices. *See Cherri v. Mueller*, 2:12-cv-11656-DPH-RSW, Dkt. 111-2 at 20-24 (E.D. Mich. May 28, 2019).

771.     CBP officers asked Mr. Cherri about what Islamic religious leaders he follows, which Muslim-majority countries he has visited, what mosques he worships at, how often he prays, and why Mr. Cherri's girlfriend converted to Islam.

772.     Upon information and belief, Mr. Cherri's answers to the questions about his Islamic religious beliefs and practices were factors that contributed to his designation on the federal terrorist watchlist.

773.     In the alternative, upon information and belief, the CBP officers asked Mr. Cherri about his Islamic religious beliefs and practices because of his placement on the federal terrorist watchlist.

774.   As a result of his placement on the federal terrorist watchlist, Mr. Cherri has been the target of enhanced screening, unreasonable delays, electronic device searches, and interrogations while traveling.

775.   On July 27, 2022, Mr. Cherri traveled from Frankfurt International Airport in Germany (FRA) to Salt Lake City International Airport in Utah (SLC).

776.   At the airport in Frankfurt, Mr. Cherri could not retrieve his boarding pass on his cell phone. Instead, he sought assistance at the airline service desk.

777.   The airline agent contacted Defendants to obtain clearance to print Mr. Cherri's boarding pass. Before the agent gave Mr. Cherri his boarding pass, he asked him questions about his travel and whether he had any weapons.

778.   When Mr. Cherri landed in Salt Lake City and arrived at the passport control checkpoint, CBP officers took Mr. Cherri to a back room for secondary inspection. The officers asked him about his travel and if he had any weapons.

779.   The CBP officers then demanded that Mr. Cherri hand over his electronic devices and provide his password. Mr. Cherri complied. The officers kept his phone for two hours before returning it. The officers also asked to see Mr. Cherri's laptop.

780.   Upon information and belief, the officers downloaded all of the data from Mr. Cherri's phone without his consent.

781.   CBP officers also searched Mr. Cherri's luggage by hand, opening each bag and emptying the contents before closing the bags and returning them.

782.   On September 22, 2022, Mr. Cherri traveled from Fort Lauderdale–Hollywood International Airport in Florida (FLL) to Adolfo Suárez Madrid–Barajas Airport in Spain (MAD) with connecting flights at John F. Kennedy International Airport in New York (JFK) and Amsterdam Airport Schiphol in the Netherlands (AMS).

783.     When he landed in Madrid, a Spanish government agent met Mr. Cherri at the end of the tunnel as he exited the plane. The agent took Mr. Cherri's passport and asked him why he was coming to Spain. Mr. Cherri told the agent he was taking a vacation. The agent returned Mr. Cherri's passport and let him go.

784.     On December 6, 2022, Mr. Cherri traveled from Dusseldorf International Airport in Germany (DUS) to Salt Lake City International Airport in Utah (SLC) with a connecting flight at Paris Charles de Gaulle Airport in France (CDG).

785.     In Dusseldorf, Mr. Cherri could not retrieve his boarding pass on his cell phone. Instead, he sought assistance at the airline service desk.

786.     The airline agent contacted Defendants to obtain clearance to print Mr. Cherri's boarding pass. Before the agent gave Mr. Cherri his boarding pass, he asked Mr. Cherri questions about his travel and whether he had any weapons.

787.     In Paris, Mr. Cherri again could not retrieve his boarding pass on his cell phone. Instead, he sought assistance at the airline service desk.

788.     The airline agent contacted Defendants to obtain clearance to print Mr. Cherri's boarding pass. Before the airline agent gave Mr. Cherri his boarding pass, he asked Mr. Cherri questions about his travel and whether he had any weapons.

789.     Upon landing in Salt Lake City and arriving at the passport control checkpoint, Mr. Cherri was escorted by CBP officers to secondary inspection, where he was detained and questioned. The CBP officers asked Mr. Cherri questions about his travel, the address where he was staying, and what he was planning on doing in Salt Lake City.

790.     CBP officers then demanded Mr. Cherri's cell phone and the password, which Mr. Cherri provided. The CBP officers took Mr. Cherri's cell phone to another room for around two hours before returning and letting Mr. Cherri go.

791.     Upon information and belief, the officers downloaded all of the data from Mr. Cherri's phone without his consent.

792.     On March 20, 2023, Mr. Cherri traveled from Dusseldorf International Airport in Germany (DUS) to Detroit International Airport in Michigan (DTW) with a connecting flight at Amsterdam Airport Schiphol in the Netherlands (AMS).

793.     In Dusseldorf, Mr. Cherri could not retrieve his boarding pass on his cell phone. Instead, he sought assistance at the airline service desk.

794.     The airline agent contacted Defendants to obtain clearance to print Mr. Cherri's boarding pass. Before the agent gave Mr. Cherri his boarding pass, he asked Mr. Cherri questions about his travel and whether he had any weapons.

795.     In Amsterdam, Mr. Cherri again could not retrieve his boarding pass on his cell phone. Instead, he sought assistance at the airline service desk.

796.     The airline agent contacted Defendants to obtain clearance to print Mr. Cherri's boarding pass. Before the agent gave Mr. Cherri his boarding pass, he asked Mr. Cherri questions about his travel and whether he had any weapons.

797.     Upon landing in Detroit and arriving at the passport control checkpoint, a CBP officer approached Mr. Cherri and escorted him to a room. There, a plainclothes FBI agent met Mr. Cherri. Mr. Cherri asked for their names, but they would not provide them.

798.     The plainclothes FBI agent questioned Mr. Cherri for approximately an hour to ninety minutes. He asked Mr. Cherri about the reason he lived in Germany, what he was studying, whether he is in touch with anyone in Iran, who his Islamic religion teachers are, his family and his relationships, where he gives lectures on Islam, where he attends Islamic religious services.

799.    Upon information and belief, Mr. Cherri's answers to the questions about his Islamic religious beliefs and practices were factors that contributed to his designation on the federal terrorist watchlist.

800.    In the alternative, upon information and belief, the CBP officers asked Mr. Cherri about his Islamic religious beliefs and practices because of his placement on the federal terrorist watchlist.

801.    The FBI agent demanded that Mr. Cherri hand over his electronic devices. Mr. Cherri provided his cell phone and his laptop. The FBI agent then instructed Mr. Cherri to leave the room. Through the window, Mr. Cherri saw the agent leave the room with his electronic devices.

802.    Upon returning the laptop, Mr. Cherri noticed that files about Islam, which were not previously open, had been opened.

803.    A CBP officer confiscated Mr. Cherri's phone and gave him no timeframe by which the phone would be returned.

804.    Upon information and belief, CBP officers downloaded all of the data from Mr. Cherri's phone and laptop without his consent.

805.    A CBP officer also searched through Mr. Cherri's belongings, including his luggage.

806.    The entire detention—the questioning, the device searches, and luggage searches—took over five hours. Mr. Cherri, at this point, had been traveling for twenty-four hours.

807.    On May 1, 2023, Mr. Cherri traveled from Detroit Metro Airport in Michigan (DTW) to Dusseldorf International Airport in Germany (DUS) with a connecting flight at Amsterdam Airport Schiphol in the Netherlands (AMS).

808.   Aware of his past issues retrieving a boarding pass on his own, when he arrived at the airport in Detroit, Mr. Cherri went straight to the airline service desk to retrieve his boarding pass.

809.   The airline agent contacted Defendants to obtain clearance to print Mr. Cherri's boarding pass.

810.   In Amsterdam, Dutch government agents asked Mr. Cherri questions about his travels and what he was doing in Amsterdam.

811.   In Dusseldorf, German government agents stopped Mr. Cherri while he was leaving the airport to search his luggage and ask questions. They asked questions about his travels to the U.S. and what he was doing in Germany.

812.   Mr. Cherri filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

813.   On May 31, 2023, Mr. Cherri received a DHS TRIP final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

814.   Upon information and belief, Mr. Cherri remains on the federal terrorist watchlist.

### Tawhidullah Amini
### (Watchlisted Plaintiff)

815.   Plaintiff Tawhidullah Amini is a U.S. lawful permanent resident and Afghan national. He was born and raised in Afghanistan and immigrated to the United States in 2014, having received lawful permanent resident status.

816.   In pursuit of his dream of becoming a physician, he has embarked on nearly a decade of higher education. Mr. Amini graduated from community college, from Harris-

Stowe State University with his bachelor's degree, and from Ponce Science and Health University in St. Louis, Missouri with a Master of Medical Science, where he now works as a teacher's assistant.

817.    Upon information and belief, Mr. Amini has been placed on the federal terrorist watchlist.

818.    Mr. Amini's watchlist status has disrupted his citizenship application, discouraged him from traveling by plane, interfered with his ability to visit family, frustrated his attempts to send money to his parents, and affected his job prospects.

819.    As a result of his placement on the federal terrorist watchlist, since 2018, Mr. Amini has been the target of enhanced screening, unreasonable delays, and interrogations while traveling.

820.    In May 2018, Mr. Amini visited Kabul, Afghanistan to visit family. When he disembarked from his return flight from Istanbul, Turkey (IST) to Chicago O'Hare (ORD), Mr. Amini encountered approximately a dozen CBP officers waiting in the gate area.

821.    CBP officers told disembarking passengers to raise their hands if they had a green card or a new or unused U.S. passport. Following their instructions, Mr. Amini raised his hand.

822.    CBP officers escorted Mr. Amini to a room. There, two CBP officers—one male and one female—demanded that Mr. Amini provide passwords to his phone and computer. He provided the passwords. The officers also took his camera.

823.    CBP officers detained Mr. Amini incommunicado and interrogated him for approximately 4 to 5 hours before allowing him to leave. They asked him for his opinion on different groups in Afghanistan, U.S. involvement in Afghanistan, the Afghan government, and the Taliban.

824.    CBP officers also asked him questions about his faith, including what he thought about a particular medieval Muslim scholar, school of thought he adheres to, what mosque he attends, whether he prays regularly, and if he follows the Salafi sect of Islam.

825.    Upon information and belief, Mr. Amini's answers to the questions about his Islamic religious beliefs and practices were factors that contributed to his designation on the federal terrorist watchlist.

826.    In the alternative, upon information and belief, the CBP officers asked Mr. Amini about his Islamic religious beliefs and practices because of his placement on the federal terrorist watchlist.

827.    In December 2020, Mr. Amini again visited Kabul, Afghanistan to see family. He flew to Kabul from Chicago O'Hare with a connection in Dubai.

828.    Mr. Amini could not print out his boarding pass remotely. When he arrived at O'Hare, gate agents printed out his boarding pass for him. Mr. Amini noticed that the boarding pass was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

829.    At the TSA security checkpoint, TSA officers pulled Mr. Amini into a separate security line for further screening. They searched his shoes and belt and went through every item in his luggage by hand.

830.    After TSA security, Mr. Amini was followed throughout the airport by FBI agents.

831.    At the boarding gate, Mr. Amini was again thoroughly searched. A TSA explosive detection handler was also at the gate with a canine that sniffed all passengers for explosives as they boarded the plane.

832.    After passengers boarded, Mr. Amini's flight was delayed by three hours and, looking out the window of the plane onto the tarmac, he saw his checked luggage being taken back to the airport for additional screening.

833.    Before his return flight to Chicago O'Hare (ORD) from Kabul (KBL) via Dubai (DXB), Mr. Amini was again unable to print his boarding pass out remotely. The airline agent contacted Defendants to obtain clearance to print Mr. Amini's boarding pass. Mr. Amini's boarding pass was again stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

834.    When Mr. Amini arrived in Dubai for his connecting flight, Dubai government officials forced him to repeatedly pass through airport security. He was thoroughly searched twice.

835.    Mr. Amini boarded the plane to Chicago. After all passengers boarded, Mr. Amini heard his name called over the plane's loudspeakers. The flight crew told him that he was not allowed to enter the United States.

836.    Mr. Amini spoke with one of the Emirates airline managers and, eventually, the airline allowed him to fly.

837.    When Mr. Amini landed in Chicago and disembarked, he was intercepted by two CBP officers, who escorted him to secondary screening. When they reached the secondary screening area, the officers intimidated Mr. Amini, telling him: "When you're here, you have no rights."

838.    Mr. Amini was interrogated about his travels, his family, his mosque, and his religious practices.

839.   Upon information and belief, Mr. Amini's answers to the questions about his Islamic religious beliefs and practices were factors that contributed to his designation on the federal terrorist watchlist.

840.   In the alternative, upon information and belief, the CBP officers asked Mr. Amini about his Islamic religious beliefs and practices because of his placement on the federal terrorist watchlist.

841.   Mr. Amini had no electronics with him except a camera and a small flip phone. Officers demanded that Mr. Amini hand over his camera memory card. Upon information and belief, CBP officers downloaded data from Mr. Amini's camera memory card without his consent.

842.   On February 10, 2023, Mr. Amini filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

843.   On April 10, 2023, Mr. Amini received a DHS TRIP final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

844.   Mr. Amini's experiences have discouraged him from traveling. He prefers to drive rather than fly, even long distances, and he is reluctant to visit his ailing mother in Afghanistan out of fear of being barred from re-entering the United States.

845.   Before approximately 2021, Mr. Amini used Western Union and MoneyGram to send money to his family in Afghanistan for his parent's medical care. Both services have blocked him from doing so.

846.   Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Amini to Western Union and MoneyGram and, as a result, he has been blocked from transferring money to his family.

847.   In 2019, Mr. Amini received a job with a local school district. But on his first day of work, the superintendent told him that the position was no longer available.

848.   Upon information and belief, Mr. Amini lost his job because his security clearance was stalled in administrative processing as a result of his placement on the federal terrorist watchlist.

849.   In late 2019 or early 2020, Mr. Amini applied for an interpreter job with the U.S. Army. Though Mr. Amini was well-qualified for the job, he was not hired because, as officials informed him a few days after he applied, they could not process his application for a security clearance.

850.   Mr. Amini also applied to join the U.S. Army Reserves. In February 2023, he was informed that he would not be permitted to join.

851.   Upon information and belief, Mr. Amini was rejected for positions with the U.S. Army and U.S. Army Reserves because his security clearance was stalled in administrative processing as a result of his placement on the federal terrorist watchlist.

852.   In 2019, Mr. Amini applied for U.S. citizenship. His application remains under review.

853.   Upon information and belief, Mr. Amini's citizenship application remains stuck in indefinite administrative processing as a result of his placement on the federal terrorist watchlist.

854.   Upon information and belief, Mr. Amini remains on the federal terrorist watchlist.

### Nusratilla Abdukhamidov
### (Watchlisted Plaintiff)

855.   Plaintiff Nusratilla Abdukhamidov is a citizen of Uzbekistan. He has resided as a permanent resident in the United States since 2009 and currently lives in Tennessee. He is a Muslim and a truck driver who travels frequently for work.

856.   Upon information and belief, Mr. Abdukhamidov has been placed on the federal terrorist watchlist.

857.   As a result of his placement on the federal terrorist watchlist, since 2015, Mr. Abdukhamidov has been the target of enhanced screening, unreasonable delays, and interrogations while traveling.

858.   Defendants' treatment of Mr. Abdukhamidov follows the same routine every time he travels.

859.   Every time he travels, Mr. Abdukhamidov is unable to print his boarding pass at the airport kiosk. Instead, he is directed to seek assistance at the airline service desk.

860.   An airline agent contacts Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. The agent's phone call usually takes approximately 30 minutes. Before the agent gives Mr. Abdukhamidov his boarding pass, he asks him questions, like if he is flying alone and what is in his bag. When Mr. Abdukhamidov receives his boarding pass, it is stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

861.   At the security checkpoint, TSA officers publicly subject Mr. Abdukamidov to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands, shoes, and bags.

862.   On October 17, 2015, Mr. Abdukhamidov traveled from LaGuardia Airport in New York (LGA) to Tampa International Airport in Florida (TPA). He was travelling with his wife and his grandmother.

863.   Mr. Abdukhamidov, his wife, and his grandmother could not print their boarding passes at the airport kiosk. Instead, they sought assistance at the airline service desk.

864.   The airline agent contacted Defendants to obtain clearance to print the boarding passes. The agent's phone call took approximately 30 minutes. When Mr. Abdukhamidov, his wife, and his grandmother received their boarding passes, Mr. Abdukhamidov's and his grandmother's were stamped with "SSSS," indicating that they were designated as "known or suspected terrorists."

865.   When Mr. Abdukhamidov reached the TSA security checkpoint with his wife and grandmother. They were pulled aside for an additional search by TSA officers. Officers patted down Mr. Abdukhamidov across his entire body. Officers searched all his carry-on bags and searched his wife's and grandmother's bags as well. Officers swabbed Mr. Abdukhamidov's hands and his belongings before he, his wife, and his grandmother were allowed to continue to their gate.

866.   In February 2016, Mr. Abdukhamidov traveled from Philadelphia International Airport in Pennsylvania (PHL) to Tampa International Airport in Florida (TPA). He was traveling with his wife, two sisters, and grandmother.

867.   Mr. Abdukhamidov booked his ticket under a separate reservation from the rest of his party.

868.   Mr. Abdukhamidov could not print his boarding pass at the airport kiosk. Instead, he sought assistance at the airline service desk.

869.   The airline agent contacted Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. When Mr. Abdukhamidov received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

870.    At the security checkpoint, TSA officers publicly subjected Mr. Abdukamidov to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings.

871.    On November 15, 2016, Mr. Abdukhamidov traveled from San Francisco International Airport in California (SFO) to JFK Airport in New York. He was traveling with his wife and daughter.

872.    Mr. Abdukhamidov could not print his boarding pass at the airport kiosk. Instead, he sought assistance at the airline service desk.

873.    The airline agent contacted Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. When Mr. Abdukhamidov received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

874.    At the security checkpoint in front of his entire party, TSA officers publicly subjected Mr. Abdukamidov to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings. Officers also asked Mr. Abdukhamidov questions about where he was traveling to.

875.    In October 2019, Mr. Abdukhamidov traveled from O'Hare International Airport in Chicago, Illinois (ORD) to Meadows Field Airport in California (BFL), via Denver International Airport (DIA). He was traveling with his father in-law.

876.    Mr. Abdukhamidov could not print his boarding pass at the airport kiosk. Instead, he sought assistance at the airline service desk.

877.    The airline agent contacted Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. When Mr. Abdukhamidov received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

878.    At the security checkpoint in front of his entire party, TSA officers publicly subjected Mr. Abdukamidov to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings. Officers also asked Mr. Abdukhamidov questions about where he was traveling to.

879.    When Mr. Abdukhamidov and his father in-law arrived at their gate, TSA officers were in the gate area waiting for them.

880.    The officers publicly searched Mr. Abdukhamidov and his luggage in full view of his fellow passengers. They also asked Mr. Abdukhamidov about his travel.

881.    After Mr. Abdukhamidov and his father-in-law arrived in Denver, they were searched again by TSA officers. The officers pulled Mr. Abdukhamidov and his father-in-law into a stairwell as they were walking to their departure gate, searched all of their belongings, and patted them down.

882.    In September 2020, Mr. Abdukhamidov traveled from O'Hare International Airport in Illinois (ORD) to Nashville International Airport in Tennessee (BNA). He was traveling with a friend.

883.    Mr. Abdukhamidov went to an airline agent to print his boarding pass. The airline agent contacted Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. When Mr. Abdukhamidov received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

884.    At the security checkpoint, TSA officers publicly subjected Mr. Abdukamidov to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings.

885.    On their way from the security checkpoint to their gate, Mr. Abdukhamidov's friend noticed two men following them through the airport. On information and belief, these men were FBI agents.

886.    When Mr. Abdukhamidov arrived in Nashville, two TSA officers approached him and his friend at their arrival gate. The officers pulled Mr. Abdukhamidov and his friend aside and asked them about the details of their trip. The officers followed Mr. Abdukhamidov and his friend to outside the airport where Mr. Abdukhamidov's sister picked them up.

887.    The TSA officers asked to see his sister's driver's license and asked her questions.

888.    Later that night, a sheriff visited the home of Mr. Abdukhamidov's friend (where Mr. Abdukhamidov was staying) and questioned Mr. Abdukhamidov about his travels and what happened at the airport.

889.    On February 21, 2022, Mr. Abdukhamidov traveled from Nashville International Airport in Tennessee (BNA) to Washington Dulles Airport in Virginia (IAD).

890.    Mr. Abdukhamidov went to an airline agent to print his boarding pass. The airline agent contacted Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. The agent's phone call took approximately 20 minutes. The agent asked Mr. Abdukhamidov questions about where he was traveling and who he planned on seeing when he arrived. When Mr. Abdukhamidov received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

891.    At the security checkpoint, TSA officers publicly subjected Mr. Abdukamidov to an extensive and lengthy screening, including an invasive pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings.

892.   After Mr. Abdukhamidov went through security, a TSA officer approached him and told him to follow him to the gate. At the gate, there were TSA explosive detection handlers waiting with a canine.

893.   The TSA officers pulled Mr. Abdukhamidov aside when the airplane began boarding. The TSA officers told him that the canine smelled something suspicious. TSA officers questioned Mr. Abdukhamidov and searched his belongings in full view of the other passengers on the flight.

894.   A couple of weeks after the incident, Mr. Abdukhamidov was visited at his home in Tennessee by FBI agents. The FBI agents attempted to question him about the incidents at Nashville Airport.

895.   On June 8, 2023, Mr. Abdukhamidov traveled from Philadelphia International Airport in Pennsylvania (PHL) to Nashville International Airport in Tennessee (BNA).

896.   Mr. Abdukhamidov went to an airline agent to print his boarding pass. The airline agent contacted Defendants to obtain clearance to print Mr. Abdukhamidov's boarding pass. When Mr. Abdukhamidov received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

897.   At the security checkpoint, TSA officers publicly subjected Mr. Abdukamidov to an extensive and lengthy screening, including an invasive full-body pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings

898.   When Mr. Abdukhamidov reached his gate, two TSA officers patted him down in full view of the other passengers before allowing him to board his flight.

899.   On March 7, 2023, Mr. Abdukhamidov filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

900.   On May 22, 2023, Mr. Abdukhamidov received a DHS TRIP final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

901.   As a result of his placement on the federal watchlist, Mr. Abdukhamidov avoids traveling by airplane as much as possible.

902.   The harms caused by Mr. Abdukhamidov's watchlist status are not limited to his travel experiences. Mr. Abdukhamidov applied for U.S. citizenship in March 2016. After six weeks he was fingerprinted for his citizenship application. Since his fingerprinting, he has been waiting indefinitely for his citizenship with no updates from the United States Citizenship and Immigration Services.

903.   In January 2021, Mr. Abdukhamidov sent a request for an update on his case. USCIS told him that he would get a response by the end of 2021. He has not yet received that update.

904.   Upon information and belief, Mr. Abdukhamidov's application for US citizenship has been stalled in indefinite administrative processing due to his placement on the federal terrorist watchlist.

905.   Between 2015 and 2018, Mr. Abdukhamidov was frequently targeted for traffic stops by police officers while driving for his job in New York City. At some of the traffic stops, officers told him only that they needed to check his documents. During these stops, it would take officers over 30 minutes to check his documents.

906.   Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Abdukhamidov to state and local authorities, as a result, he was targeted by law enforcement while driving.

907.   In May 2018, Bank of America shut down Mr. Abdukhamidov's bank account. He received a letter from Bank of America that his account was suspended but the letter gave no reason for this suspension.

908.   Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Abdukhamidov to Bank of America, as a result, his account was closed without explanation.

909.   Upon information and belief, Mr. Abdukhamidov remains on the federal terrorist watchlist.

### Talha Mohamed
### (Watchlisted Plaintiff)

910.   Plaintiff Talha Mohamed is an Egyptian national and Muslim. He was born in Saudi Arabia, raised in Egypt, and immigrated to the United States in 2015. He is a full-time graduate student and an imam at a mosque in Albuquerque.

911.   Mr. Mohamed's previous legal name was Talha Zakaria Husseini Mohamed Elsayed. In August 2023, he changed his name to Talha Zakaria Husseini Mohamed.

912.   He has embarked on nearly a decade of higher education. Mr. Mohamed graduated with a Master's in Islamic Studies from Islamic University of Madinah in Saudi Arabia. He is now pursuing a PhD in Education Leadership at University of Colorado-Colorado Springs in Colorado Springs, Colorado.

913.   Upon information and belief, Mr. Mohamed is on the federal terrorist watchlist.

914.   Mr. Mohamed travels weekly between Albuquerque, New Mexico and Denver, Colorado. As a result of his placement on the federal terror watchlist, since 2015, Mr.

Mohamed has been the target of interrogations, enhanced screening, and unreasonable delays while traveling.

915.    Defendants' treatment of Mr. Mohamed follows the same routine every time he travels.

916.    Every time he travels, Mr. Mohamed is unable to retrieve his boarding pass on his cell phone or at an airport kiosk. Instead, he seeks assistant at the airline service desk.

917.    An airline agent contacts Defendants to obtain clearance to print out Mr. Mohamed's boarding pass. The agent's phone call takes between ten and forty minutes. When Mohamed receives his boarding pass, it is stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

918.    At the security checkpoint, TSA officers publicly subject Mr. Mohamed to an extensive and lengthy screening, including an invasive pat-down (which includes a specific pat-down of his crotch area), a search of all of his carry-on bags, and a chemical swab of his belongings.

919.    The screenings, especially the pat-downs, cause Mr. Mohamed extreme embarrassment and distress.

920.    At his gate, Mr. Mohamed is usually met by seven to twelve TSA officers, who are waiting for him. The TSA officers often include explosive detection handlers and canines.

921.    The TSA officers then conduct another search of Mr. Mohamed's belongings and, when the explosive detection handlers and canines are present, sniff Mr. Mohamed and his belongings for explosives. Sometimes, they also subject Mr. Mohamed to another pat-down and chemical swab.

922.    On March 4, 2022, Mr. Mohamed filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

923. On August 24, 2022, Mr. Mohamed received a DHS TRIP final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

924. As a result of Mr. Mohamed's designation on the federal terrorist watchlist, his mother and a friend have suffered the denial and revocation of their visas.

925. In 2019, a friend of Mr. Mohamed's attempted to visit the United States. After he landed, federal agents searched his phone and found Mr. Mohamed's name and phone number. The friend's visa was then revoked.

926. Upon information and belief, Mr. Mohamed's friend's visa was revoked because of his association with Mr. Mohamed and Mr. Mohamed's placement on the federal terrorist watchlist.

927. Mr. Mohamed's mother applied for a V1V2 visa and, in June 2022, received an interview for that visa. Her application was later denied.

928. Upon information and belief, Mr. Mohamed's mother's visa was denied because of her association with Mr. Mohamed and Mr. Mohamed's placement on the federal terrorist watchlist.

929. Upon information and belief, Mr. Mohamed remains on the federal terrorist watchlist.

**Adam Qashou**
**(Watchlisted Plaintiff)**

930. Adam Qashou is a U.S. citizen of Palestinian descent.

931. Upon information and belief, Mr. Qashou has been placed on the federal terrorist watchlist.

932.     Upon information and belief, the "derogatory information" that Defendants relied upon when nominating and placing Mr. Qashou on the federal terrorist watchlist is the mere fact of Mr. Qashou's familial relationship with his brother, without any wrongdoing by Mr. Qashou himself. Mr. Qashou's brother has been convicted of a federal crime in which Mr. Qashou had no part.

933.     As a result of his placement on the federal terrorist watchlist, Mr. Qashou has been the target of enhanced screening, unreasonable delays, electronic device searches, and interrogations while traveling.

934.     On July 21, 2023, Mr. Qashou traveled from Queen Aliya International Airport in Jordan (AMM) to Hartsfield Jackson Atlanta International Airport in Atlanta (ATL) with connecting flights at Vienna International Airport in Austria (VIE) then Washington Dulles International Airport in Virginia (IAD).

935.     Before his flight out of Jordan, Mr. Qashou was unable to retrieve his boarding pass on his phone. A notice on the United App stated "Please how this document upon your arrival at the airport. It will be exchanged with a valid boarding pass." Mr. Qashou presented this notice to an airline agent, who gave Mr. Qashou his boarding passes. All of the boarding passes were stamped with "SSSS," indicating that Mr. Qashou was designated as a "known or suspected terrorist."

936.     While preparing to board in Austria, Mr. Qashou presented his boarding pass to airline agents. Upon seeing the boarding pass stamped with SSSS, the airline agents directed Mr. Qashou to an area away from the gate.

937.     Austrian security agents patted down Mr. Qashou and swabbed him for chemical residue. They also took Mr. Qashou's luggage and ran it through an x-ray machine, even though the luggage had previously cleared security in Amman.

938.    This encounter took twenty-five minutes. Mr. Qashou boarded his flight to IAD with minutes to spare.

939.    Upon landing in Virginia and arriving at the passport control checkpoint, a CBP officer collected Mr. Qashou's passport and instructed him that, after he collected his luggage, he should walk to a screening area. Mr. Qashou collected his luggage at baggage claim and followed the officer's directions to the screening area.

940.    At the screening area, CBP officers interrogated Mr. Qashou. They asked who he'd met while he traveled in Jordan and Palestine. They asked about where Mr. Qashou had been living and what his political leanings were. The CBP officers asked if Mr. Qashou's phone had anything "illegal" on it.

941.    CBP officers then demanded that Mr. Qashou hand over his phone and provide his password. Mr. Qashou complied. The CBP officers took Mr. Qashou's phone to another room where, upon information and belief, they downloaded all of the data from his phone.

942.    While detained by these officers, Mr. Qashou missed his connecting flight to Atlanta.

943.    After an hour of detention, officers informed Mr. Qashou that the area of the airport they were in was closing and that they needed to move to a different terminal. The officers handcuffed Mr. Qashou and transported him in a security vehicle across the airport. Still handcuffed, the officers escorted Mr. Qashou from the security vehicle to secondary inspection in view of other travelers. The CBP officers finally removed the handcuffs before they subjected him to secondary inspection.

944.    At the new secondary screening area, Mr. Qashou waited for two hours before being taken to a small room where he was interrogated by three CBP officers. The three CBP officers asked the same questions the prior CBP officers asked before—questions about who

Mr. Qashou met in Jordan and Palestine, where he was living, and what his political leanings were. After thirty minutes of questioning, Mr. Qashou was directed to a bench where he was instructed to wait.

945.    At this point, CBP officers returned Mr. Qashou's phone and luggage and told him that he needed to book a new flight. The officer told Mr. Qashou that he could explain to TSA officers that he has already been searched and questioned. Mr. Qashou was ultimately detained for over four hours.

946.    Mr. Qashou went from the secondary screening area to the ticketing counter to retrieve his boarding pass. The ticketing agent printed Mr. Qashou's boarding pass and it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

947.    Per the CBP officers' prior instructions, Mr. Qashou informed the TSA officers at the security checkpoint that he had just already been questioned and searched. The TSA officers told Mr. Qashou that their policies required them to complete an "extensive search."

948.    The officers also searched Mr. Qashou's luggage by hand, opening each bag and emptying the contents before closing the bags and returning them. The entire encounter with officers took between thirty minutes and an hour.

949.    TSA officers dedicated an entire search lane to Mr. Qashou. TSA officers patted down Mr. Qashou, swabbed him for chemical residue, and emptied and searched his bags in view of other people. This additional screening took twenty-five minutes. Mr. Qashou was finally able to board his flight to Atlanta

950.    When Mr. Qashou arrived in Atlanta, he arrived too late for a shuttle that would take him to Auburn, Alabama, where he lived. He waited for five hours until the next shuttle.

951.     Around 2019, Mr. Qashou's Wells Fargo bank account was closed without notice.

952.     Mr. Qashou then opened an account with Chase Bank. After about six months, Mr. Qashou's Chase Bank account was closed without notice.

953.     Due to these bank account closures, Mr. Qashou now maintains several bank accounts out of fear any one will be closed without notice.

954.     Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Qashou to Wells Fargo and Chase, as a result, his accounts were closed without explanation.

955.     Due to his placement on the federal terror watchlist, Mr. Qashou is wary about traveling in the future and plans to avoid flying whenever possible.

956.     Due to his placement on the federal terror watchlist, Mr. Qashou has felt degraded and humiliated.

957.     Upon information and belief, Mr. Qashou remains on the federal terrorist watchlist.

### Ihab Rashad
### (Watchlisted Plaintiff)

958.     Plaintiff Ihab Rashad is a U.S. citizen and Muslim who currently lives in New Hampshire. Mr. Rashad works as a project manager and is a husband and father.

959.     Upon information and belief, Mr. Rashad has been placed on the federal terrorist watchlist.

960.     As a result of his placement on the federal terrorist watchlist, since 2007, Mr. Rashad has been subject to enhanced screening, unreasonable delays, and interrogations while traveling.

961.    As a result of his placement on the federal terror watchlist, Mr. Rashad's family members—including his wife and children—who accompany him while travelling also become targets of enhanced screening, unreasonable delays, and interrogations due to their relation to Mr. Rashad.

962.    Between 2007 and 2015, Mr. Rashad was subject to routine enhanced screenings, unreasonable delays, and interrogations on all six international and domestic flights he took.

963.    Between 2007 and 2015, on all trips he took, Mr. Rashad received "SSSS" on his boarding pass when he received it at the airport.

964.    Between 2007 and 2015, on all trips he took, Mr. Rashad was subjected to enhanced screening when he went through the TSA security checkpoint at the airport. Every time Mr. Rashad went through security, a supervising TSA officer would pull him aside for an invasive pat down and full search of his baggage.

965.    Between 2007 and 2015, on all trips he took, if Mr. Rashad's wife entered the security checkpoint with him, she would be subject to the same invasive pat down and baggage search.

966.    Upon information and belief, Mr. Rashad's wife was subject to these additional searches due to her spousal relationship with Mr. Rashad, who is on the federal terror watchlist.

967.    Between 2007 and 2015, on all trips he took, CBP officers subjected Mr. Rashad to additional searches and questioning when he attempted to board his flight. When Mr. Rashad scanned his boarding pass at his flight gate, the scanner would light up red. When Mr. Rashad proceeded to the jet bridge, he would be stopped by CBP officers. CBP officers

would question Mr. Rashad about his travel plans and perform an additional search of his bags.

968.    Between 2007 and 2015, on all trips he took, Mr. Rashad was searched and questioned by CBP officers when he returned to the United States from international travel. Whenever Mr. Rashad passed through passport control in the United States, CBP officers would pull Mr. Rashad into secondary inspection for additional questioning about his travel and searches of his belongings. The officers would also confiscate his electronics.

969.    Upon information and belief, CBP officers downloaded the contents of Mr. Rashad's electronics without his consent during the electronic searches between 2007 and 2015.

970.    In 2011, Mr. Rashad traveled from Cairo International Airport in Egypt (CAI) to Boston Logan Airport in Massachusetts (BOS).

971.    When Mr. Rashad scanned his passport at the customs checkpoint in Boston, CBP officers escorted him to secondary inspection for the typical questioning and searches by CBP officers. After initial questioning, CBP officers brought in FBI agents to continue the questioning.

972.    An FBI agent interrogated Mr. Rashad about people he knew, including a family member. Mr. Rashad requested to speak with a lawyer, but the FBI agent refused to allow him to do so.

973.    In 2013, Mr. Rashad traveled from Cairo International Airport (CAI) to Boston Logan Airport (BOS).

974.    When Mr. Rashad scanned his passport at the passport control checkpoint in Boston, a CBP officer told him that he could help Mr. Rashad make his issues with travel go away as long as he provided them with some information. Mr. Rashad said that he would

only speak with his lawyer present. The CBP officer responded that only guilty individuals have lawyers.

975.    Upon information and belief, the CBP officer was attempting to use Mr. Rashad's placement on the watchlist as leverage to coerce Mr. Rashad into become a government informant.

976.    In 2015, before a planned trip to Cairo, Egypt, FBI agents came to Mr. Rashad's apartment. Mr. Rashad was not home, but FBI agents left business cards at his apartment with a note that said they knew he was going to Egypt and they wanted to speak with him.

977.    In 2015, while travelling from Boston Logan Airport in Massachusetts (BOS) to Cairo International Airport in Egypt (CAI), Mr. Rashad, his wife, daughter, and three-month-old twins were subject to enhanced screening, unreasonable delays, and interrogations.

978.    When they arrived in the airport in Boston, the family was unable to print their boarding passes at an electronic kiosk. Instead, they were directed to seek assistance at the airline service desk.

979.    The airline agent contacted Defendants to obtain clearance to print the boarding passes of each family member.

980.    When the family received their boarding passes, they were stamped with "SSSS," indicating that they were designated as "known or suspected" terrorists.

981.    At the security checkpoint, upon seeing the "SSSS" designation on their boarding passes, TSA officers escorted the family to an adjacent security area. Officers then publicly subjected Mr. Rashad, his wife, daughter, and three-month-old infant son to an

extensive and lengthy screening, including invasive pat downs, extensive searches of their personal belongings, and chemical swabs of their persons and belongings.

982.    Unidentified agents approached the family after TSA concluded its search and pulled Mr. Rashad and his wife aside for an additional screening. Upon information and belief, these agents were FBI agents.

983.    The FBI agents interrogated Mr. and Mrs. Rashad about why they were traveling, who they would be meeting, how often they traveled to the region, and whether they were affiliated with any organizations or people.

984.    The FBI agents further interrogated Mr. Rashad about whether he had "insider information" about the 2015 crash of a Russian plane on the Sinai Peninsula in Egypt.

985.    The FBI agents also asked whether they could conduct further "searches" of Mr. Rashad's three-month-old baby.

986.    When Mr. Rashad refused and asked to speak to a supervisor, the FBI agents dropped their request to further "search" the infant and escorted the family to board their plane. This interaction took approximately one hour.

987.    Upon information and belief, Mr. Rashad's children and wife were subjected to enhanced searches and interrogations because of their familial relationship with Mr. Rashad and his placement on the federal terrorist watchlist.

988.    During their return travel from Egypt, the family was again subjected to unreasonable delays, enhanced screening, and interrogations while traveling—this time during their layover at Istanbul Atatürk Airport in Turkey (IST).

989.    In Istanbul, Mr. Rashad and his family were unable to print their boarding passes for their connecting flight back to the U.S. Instead, they sought assistance at the airline service desk.

990.    The Turkish airline agent contacted Defendants to obtain clearance to print the family's boarding passes. When the family received their boarding passes, they were stamped with "SSSS," indicating that they were designated as "known or suspected" terrorists.

991.    At the security checkpoint, CBP officers directed the family to an adjacent area for an enhanced and lengthy screening, including invasive pat downs and extensive searches of their personal belongings.

992.    CBP officers then detained the family and notified Mr. Rashad that he and his family would not be cleared until officers got "Washington, D.C. to approve his entrance into the U.S."

993.    Defendants did not provide the required clearance for approximately another hour, delaying the entire flight from departing. As the family boarded the plane, fellow passengers stared at them with anger. Mr. Rashad felt humiliated and embarrassed because he and his family were treated like criminals.

994.    When the family landed in Boston, as the passengers deplaned, the airline asked passengers to show their passports. CBP officers were waiting in the gate area and, when they saw Mr. Rashad's name, they stopped him and escorted him to secondary inspection.

995.    There, CBP officers interrogated him, searched him, and then moved Mr. Rashad to a second location for additional interrogation. His family was told to wait in another waiting area.

996.    During the interrogation, CBP officers and FBI agents interrogated Mr. Rashad about his travel, his contacts, and his family.

997.    After approximately 30 minutes, Mr. Rashad was allowed to exit the interrogation, collect his luggage, and exit the airport with his family.

998.   In May 2017, Mr. Rashad and his family drove across the U.S.—Canada border into Vermont.

999.   At a border checkpoint between Canada and Vermont, CBP officers conducted an extensive search of the family's vehicle, luggage, and personal effects.

1000.   CBP officers also escorted Mr. Rashad to a separate room and interrogated him about his purpose for traveling and who he contacted while in Canada.

1001.   CBP officers confiscated Mr. Rashad's cell phone and forced him to unlock it so they could access his data and information. He complied because he was frightened by their repeated demands. CBP officers then left with Mr. Rashad's phone. Mr. Rashad and his family waited for approximately six hours before officers returned the phone.

1002.   Upon information and belief, the CBP officers downloaded all of the data on Mr. Rashad's phone without his consent.

1003.   After approximately six hours, the CBP officers returned Mr. Rashad's phone and permitted the family to cross the border. The CBP officers told Mr. Rashad that they finished their search of his phone a few hours prior but were waiting on "D.C to approve your entry back into the US."

1004.   In April 2019, Mr. Rashad flew from Juan Santamaria International Airport in Costa Rica (SJO) to Hartsfield-Jackson Atlanta International Airport in Georgia (ATL).

1005.   Upon arrival at the airport in Costa Rica, Mr. Rashad was unable to check in online or print his boarding pass at the airport kiosk. Instead, he sought assistance at the airline service desk.

1006.   The airline agent contacted Defendants to obtain clearance to print his boarding pass. When Mr. Rashad received his boarding pass, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

1007.  At the security checkpoint, CBP officers publicly subjected Mr. Rashad to extensive and lengthy screening, including an invasive pat down, an extensive search of all his belongings, and two different chemical swabs.

1008.  Upon arrival in Atlanta, he went to an Automated Passport Control kiosk at the passport control checkpoint. Upon scanning his passport, Mr. Rashad received an error message. When he asked for assistance, CBP officers escorted him to secondary inspection.

1009.  CBP officers searched Mr. Rashad's person and belongings. CBP officers also interrogated Mr. Rashad about his background, employment, family life, relatives living abroad, his connection to Egypt and other countries, and about his brother living in Egypt.

1010.  CBP officers told Mr. Rashad to wait and returned to the screening area an hour later. The officers told Mr. Rashad that they were unaware of any reason for his detention. An officer then walked away to make a phone call. When he returned, he told Mr. Rashad that he was free to go.

1011.  In November 2022, Mr. Rashad traveled to Saudi Arabia for umrah. On his return trip, Mr. Rashad traveled from Jeddah Airport (JED) in Saudi Arabia to Worchester, Massachusetts (ORH) via John F. Kennedy International Airport (JFK) in New York. He traveled with his mother.

1012.  When Mr. Rashad printed his boarding pass at the kiosk in Jeddah, it was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

1013.  When Mr. Rashad arrived in New York and arrived at the passport control checkpoint, CBP officers and ICE agents pulled him aside for questioning.

1014.  CBP officers questioned Mr. Rashad about his life and family in Egypt. They asked for his brothers' names and phone number. Mr. Rashad did not have his brother's phone number memorized, so they demanded he look it up in his phone. Mr. Rashad

162

complied with their request. They then questioned Mr. Rashad if he was affiliated with any political or religious groups. Mr. Rashad answered that he sat on the board of his local mosque. The officers asked Mr. Rashad if he "owned" the mosque and what his specific role was there. The officers also questioned Mr. Rashad about all social media and messaging apps that he used.

1015. After the CBP officers concluded the interrogation, Mr. Rashad had to go through security again in order to board his flight to Worcester. Mr. Rashad noticed that the scanner lit up red when he scanned his passport.

1016. On August 16, 2023, Mr. Rashad traveled from Boston Logan Airport in Massachusetts (BOS) to Cairo International Airport in Egypt (CAI). When Mr. Rashad landed in Cairo and scanned his passport at passport control, he was pulled aside by agents from the Egyptian National Security Agency.

1017. Egyptian agents told Mr. Rashad that this may be a case of mistaken identity, but if it wasn't things could get "very bad." Mr. Rashad was terrified and did not know what treatment to expect from agents.

1018. Mr. Rashad and his family waited for a couple of hours by the passport check area until Egyptian agents took him alone for questioning. Agents questioned Mr. Rashad about his life in the United States and asked Mr. Rashad why he gets stopped by U.S. officials when traveling.  The Egyptian agents told Mr. Rashad that his name had been given to them by U.S. officials for questioning. The Egyptian agents told Mr. Rashad that they had been given a specific warning about him from the United States since 2019 but did not specify further. The questioning took five hours and Mr. Rashad was not released until 4 am.

1019. Mr. Rashad was deeply afraid of what Egyptian agents might do to him because they had previously tortured one of his family members.

1020.   On September 13, 2023, Mr. Rashad traveled from Cairo International Airport in Egypt (CAI) to Boston Logan Airport in Massachusetts (BOS).

1021.   Upon scanning his U.S. passport in Cairo, Mr. Rashad was escorted by Egyptian National Security Agency agents to a back room for questioning.

1022.   Mr. Rashad was questioned about his immigration status, where he studied in the United States, and where he works in the United States. The questioning took two hours.

1023.   Mr. Rashad was left traumatized and afraid by the experience. He was bewildered as to why his name would be given to Egyptian authorities by the United States.

1024.   Upon information and belief, Defendants disseminated the stigmatizing label of "known or suspected terrorist" attached to Mr. Rashad to foreign governments, including the Egyptian government, and, as a result, he was subjected to the treatment described above.

1025.   On March 4, 2019, Mr. Rashad applied for TSA PreCheck®. His application was rejected but no reason was given. Upon information and belief, Mr. Rashad's application was rejected due to his placement on the federal terrorist watchlist.

1026.   In June 2019, Mr. Rashad filed a DHS TRIP traveler inquiry seeking relief from the treatment he receives when traveling.

1027.   In September 2019, Mr. Rashad a DHS TRIP final determination letter that stated: "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlist or reveal any law enforcement sensitive information."

1028.   As a result of this treatment and designation on the federal terror watchlist, Mr. Rashad has felt ashamed and humiliated because he has been treated as criminal and "known or suspected terrorist."

1029.   As a result of this treatment and designation on the federal terror watchlist, Mr. Rashad has struggled with anxiety and insomnia.

1030.   Mr. Rashad is afraid to travel or to visit family members due to the lengthy delays, enhanced screening, interrogations by Defendants, and the humiliation and stigma associated with the screening experiences that he endures.

1031.   Mr. Rashad has tried to avoid traveling for work because of the treatment he suffers when traveling. This has significantly impacted his ability to perform the ordinary duties and responsibilities of his employment. Mr. Rashad has lost jobs and business opportunities that entail international travel.

1032.   As a result of Mr. Rashad's designation on the federal terrorist watchlist, his family members and children that travel alongside him have also become targets of mistreatment.

1033.   As a result of Mr. Rashad's designation on the federal terrorist watchlist, his family is afraid to travel to visit family members and friends for fear of being treated like criminals and "known or suspected terrorists."

1034.   Upon information and belief, Mr. Rashad remains on the federal terrorist watchlist.

### Muad Maya
### (Watchlisted Plaintiff)

1035.   Plaintiff Muad Maya is a U.S. citizen and a Muslim of Jordanian descent. He lives in Louisville, Kentucky.

1036.   Mr. Maya is a nephrologist and has been a physician since 2000.

1037.   Upon information and belief, Mr. Maya has been placed and remains on the federal terrorist watchlist.

1038.   As a result of his placement on the federal terrorist watchlist, Mr. Maya has been denied boarding and prevented from flying to the United States.  He has also been a

target of unlawful electronic device search and seizures, lengthy and invasive secondary inspections, and interrogations.

1039.     On September 23, 2023, Mr. Maya purchased tickets to fly from Naples International Airport (NAP) in Italy to Charles-de-Gaulle Airport (CDG) in France to Hartsfield-Jackson Atlanta International Airport (ATL) in Georgia to Louisville International Airport in Kentucky.

1040.     At Naples International Airport, Mr. Maya the ticketing agent at the ticket counter was unable to check-in his luggage and issue his boarding pass without first obtaining clearance from TSC.

1041.     Without explanation, Mr. Maya was told he cannot board his flight to the U.S.

1042.     The ticketing agent issued his boarding pass from Naples, Italy to Paris, France; however, she was unable to provide him with his boarding pass from Paris, France to Atlanta, Georgia.

1043.     However, despite having already been cleared by TSC to receive his boarding pass, he was informed by the gate agent at the boarding gate that the United States has also prohibited him from boarding his flight from Paris, France to Atlanta, Georgia.

1044.     Mr. Maya was instructed to contact the U.S. Embassy for further assistance.

1045.     Mr. Maya called the U.S. Embassy only to experience fruitless assistance. A U.S. Embassy official asked Mr. Maya "what have you done?" implying Mr. Maya has committed a terror-related crime that justified his placement on the No Fly List.

1046.     Having no place to stay in France, Mr. Maya booked a new one-way ticket from Charles-de-Gaulle Airport to Queen Alia Airport in Jordan to stay with his family members.

1047.    Mr. Maya purchased a new ticket from Queen Alia Airport in Amman, Jordan to O'Hare International Airport in Chicago, Illinois to Louisville International Airport in Louisville, Kentucky.

1048.    At Queen Alia Airport, Mr. Maya received his boarding pass after receiving clearance by TSC to issue it.

1049.    Upon deplaning in O'Hare International Airport, CBP officers at the end of the jetway announced that all passengers have their passports in hand.

1050.    Mr. Maya was the second passenger to deplane.  The two CBP officers quickly identified him, took his passport, and escorted him to the secondary inspection area to be interrogated.

1051.    CBP officers interrogated him about his social media accounts, conversations he had over the phone, his travel history, and who he visited overseas.

1052.    CBP officers also inspected Mr. Maya's luggage and wallet by hand. The interrogation lasted approximately two hours.

1053.    When Mr. Maya arrived at the boarding gate for his connecting flight to Louisville, Kentucky, he found several TSA officers waiting for him to conduct another inspection in public view of other passengers.

1054.    The gate agent checking in his carry-on informed the TSA officers searching him his seat number.

1055.    The TSA officers told Mr. Maya to remove his shoes and searched through the contents of his carry-on public view of waiting passengers.

1056.    When Mr. Maya travels domestically, he is routinely required to go through a lengthy clearance process by TSC before he can obtain his boarding pass, subjected to an

invasive and lengthy search, and met at the gate by several TSA agents who search him in public view of other passengers despite having already cleared the TSA checkpoint.

1057.   For example, on February 19, 2024, Mr. Maya traveled from Louisville International Airport to Orlando International Airport (MCO) for a family vacation.

1058.   Mr. Maya arrived four hours early at the airport in anticipation of the routine treatment he is subjected to before being cleared to board his flights.

1059.   The ticketing agent informed Mr. Maya cannot obtain a boarding pass till he receives a clearance from TSA.

1060.   The airline printed boarding passes for only his wife and children. His wife and children had "SSSS" stamped on the boarding pass.

1061.   Not wanting his family to experience more emotional distress, Mr. Maya told his family to proceed without him on the trip till he obtains his boarding pass.

1062.   Mr. Maya waited hours before his boarding pass was cleared by TSC.

1063.   When he arrived at his boarding gate, several TSA agents conducted another inspection in public view of other passengers despite having already cleared the TSA checkpoint.

1064.   As a result of the TSC clearance process, the extensive searches, and unreasonable delays, he and his family missed their flights to Orlando, Florida.

1065.   TSA agents escorted him and his family escorted by TSA agents back to the ticket counter to rebook his tickets.

1066.   Mr. Maya underwent the clearance process again before he received his boarding pass, which was stamped with "SSSS," indicating that he was designated as a "known or suspected terrorist."

**Hazem Ibrahim**

**(No Fly List Plaintiff)**

1067.     Hazem Ibrahim is a naturalized U.S. citizen born in Egypt.

1068.     Upon information and belief, Mr. Ibrahim has been placed on the federal terrorist watchlist and No Fly List since November 2023.

1069.     Upon information and belief, the "derogatory information" on which Defendants relied when nominating and placing Mr. Ibrahim on the No Fly List was the mere fact that Mr. Ibrahim refused to cooperate with FBI agents when they solicited Mr. Ibrahim to become an informant.

1070.     As a result of his placement on the No Fly List, Mr. Ibrahim is unable to travel by flight anywhere in the United States nor can he travel internationally on flights departing from the United States or flying over the United States. He cannot travel to his native Egypt to visit his elderly mother who suffers from a chronic illness.

1071.     On June 7, 2023, two FBI agents, without notice, confronted Mr. Ibrahim at his home. Mr. Ibrahim voluntarily allowed the FBI agents into his home where they interrogated him for approximately ninety minutes.

1072.     The FBI agents initially suggested that a person at Mr. Ibrahim's address visited a terrorist recruiting website. Mr. Ibrahim showed the agents his phone to prove that he had not done so.

1073.     The FBI agents went on to ask Mr. Ibrahim his thoughts on a variety of political issues, including Donald Trump, the Middle East, and other current affairs. Mr. Ibrahim openly shared his views with the FBI agents.

1074.     The FBI agents asked Mr. Ibrahim which mosque he attends in Birmingham, Alabama and Mr. Ibrahim answered.

1075.    The FBI agents asked Mr. Ibrahim what websites he goes to online and Mr. Ibrahim answered.

1076.    On September 29, 2023, the same two FBI agents, without notice, confronted Mr. Ibrahim at his home again.

1077.    This time, the FBI agents asked and insisted that Mr. Ibrahim work with them. The FBI agents did not specify what the work would entail, only that it would be in the United States, and that the FBI agents would make things "monetarily worth it" for Mr. Ibrahim.

1078.    Mr. Ibrahim refused this offer but told the FBI agents that he would contact them if he encountered something out of the ordinary. The FBI agents left shortly after.

1079.    On November 12, 2023, Mr. Ibrahim attempted to fly from Birmingham, Alabama (BHM) to Cairo, Egypt (CAI). The flight would have had stops in Atlanta, Georgia and Paris, France.

1080.    Mr. Ibrahim attempted to check in directly at the Delta counter. The Delta employee repeatedly received an error message when trying to check Mr. Ibrahim in. After several attempts, the Delta employee told Mr. Ibrahim he was on "some kind of list" and referred Mr. Ibrahim to a TSA supervisor.

1081.    The TSA supervisor took Mr. Ibrahim's passport and stepped away for several minutes. When the TSA supervisor returned, he informed Mr. Ibrahim that "you won't be able to fly tonight" and advised Mr. Ibrahim to submit an inquiry on the DHS TRIP redress website.

1082.    Mr. Ibrahim followed the TSA supervisor's advice and filed a DHS TRIP Inquiry after he was refused to board the flight.

1083.     The same day, Mr. Ibrahim researched what happened to him and determined that he had likely been placed on the No Fly List. Mr. Ibrahim further learned that the FBI controls who is placed on the list.

1084.     The next morning, believing that the FBI visits and his denied travel were related, Mr. Ibrahim called one of the FBI agents that visited his home. Mr. Ibrahim informed the FBI agent that he was unable to fly. The FBI agent informed Mr. Ibrahim he would visit him in one week.

1085.     On November 20, 2023, the same two FBI agents came to Mr. Ibrahim's home. The FBI agents were more formal than before, referencing documents in a folder and asking specific questions about whether Mr. Ibrahim had lied to them in the past. Mr. Ibrahim had not lied to the FBI agents. The FBI agents attributed the questioning to "what's going on [in Gaza] right now."

1086.     Mr. Ibrahim insisted that the FBI agents were responsible for placing him on the No Fly List. He showed the FBI agents what he had researched, including an NPR article that discusses the FBI's involvement in maintaining the No Fly List. The FBI agents repeatedly denied that they were involved with placing Mr. Ibrahim on the No Fly List.

1087.     The FBI agents informed Mr. Ibrahim that they were aware of the DHS TRIP Inquiry he filed and suggested that the person responsible for processing the inquiry was on leave for a week but would get in touch with him when she returns. They further informed Mr. Ibrahim that he should contact the FBI agents when he hears from the person processing his DHS TRIP Inquiry. Mr. Ibrahim never heard from the FBI agents again.

1088.     On February 20, 2024, Mr. Ibrahim attempted to fly from Charlotte, North Carolina (CLT) to Atlanta, Georgia (ATL). When Mr. Ibrahim arrived at the airport, he was

unable to check in on his phone. He then attempted to check in at a kiosk, but the kiosk directed Mr. Ibrahim to speak to an airline representative.

1089.    At the counter, the airline representative made a phone call and, after ten minutes, told Mr. Ibrahim that he could not board his flight. The airline representative issued a refund for his boarding pass.

1090.    On February 28, 2024, Mr. Ibrahim received a letter response to his DHS TRIP Inquiry confirming his placement on the No Fly List. The letter stated, in part:

1091.    "We have conducted a review of any applicable records in consultation with other federal agencies as appropriate. It has been determined that you are on the U.S. Government's No Fly List Because you have been identified as an individual who 'may be a threat to civil aviation of national security.' 49 U.S.C. § 114(h)(3)(A)."

1092.    Due to his placement on the No Fly List, Mr. Ibrahim fears he will no longer be able to see his sick mother, who lives in Egypt, as she continues to age.

1093.    Due to his placement on the No Fly List, Mr. Ibrahim has felt degraded and humiliated.

1094.    Upon information and belief, Mr. Ibrahim remains on the federal terrorist watchlist and No Fly List.

**Khalil Alwohoush**
**(Watchlisted Plaintiff)**

1095.    Plaintiff Khalil Alwohoush is a U.S. citizen and a Muslim of Palestinian descent. He lives in Louisville, Kentucky and is a business owner.

1096.    Upon information and belief, Mr. Alwohoush has been placed and remains on the federal terrorist watchlist.

1097.     As a result of his placement on the federal terrorist watchlist, Mr. Alwohoush has been a target of unlawful electronic device search and seizures, lengthy secondary inspections, and interrogations.

1098.     For example, on February 10, 2023, Mr. Alwohoush traveled from Queen Alia Airport (QAIA) in Jordan to O'Hare International Airport (ORD) in Illinois to Louisville International Airport in Kentucky (SDF).

1099.     Upon landing at O'Hare International Airport for his connecting flight, a CBP officer approached Mr. Alwohoush at the end of the jetway and began interrogating him in front of his family.

1100.     The CBP officer then escorted Mr. Alwohoush to a room. There, another CBP officer demanded Mr. Alwohoush give them his cellphone and password to unlock it. He reluctantly disclosed the password to his cellphone.

1101.     The CBP officers obtained the password to his phone as a result of duress and coercion, whether express or implied, and as a result, Mr. Maya involuntarily gave the CBP officers his cellphone and disclosed his password.

1102.     Upon information and belief, the officers conducted a forensic search of Mr. Alwohoush's cellphone without consent.

1103.     CBP officers interrogated Mr. Alwohoush for approximately two hours before allowing him to leave.

1104.     After the two hour interrogation, Mr. Alwohoush went to the ticket counter to obtain his boarding pass for his connecting flight to Louisville International Airport.

1105.     At the ticket counter, Mr. Alwohoush was unable to print his own boarding pass. The ticket agent printed his boarding pass and it was stamped with

1106.     "SSSS," indicating that he was designated as a "known or suspected terrorist."

1107.    At the TSA security checkpoint, TSA agents escorted Mr. Alwohoush and his wife to a separate security line for secondary searching. They did a full body search and a chemical swab testing. His wife's pants were pulled forward and an agent peered into her pants violating her. The secondary searching took one hour.

1108.    At the boarding gate, several TSA agents waited for him to search him again. Only Mr. Alwohoush was thoroughly searched in front of waiting passengers by TSA agents at the boarding gate.

1109.    On July 10, 2023, Mr. Alwohoush traveled from Queen Alia Airport in Jordan to O'Hare International Airport in Illinois to Louisville International Airport in Kentucky.

1110.    Upon deplaning in O'Hare International Airport, two CBP officers at the end of the jetway announced that all passengers have their passports in hand.

1111.    The two CBP officers identified Mr. Alwohoush, took his passport, and escorted him to the secondary inspection area to be interrogated.

1112.    CBP officers interrogated Mr. Alwohoush for approximately one hour. They asked him if he donates money to any terrorist organization(s), where he donates his money to, and an outline of his recent travels.

1113.    After the interrogation, Mr. Alwohoush was directed to retrieve his luggage which underwent searching by the TSA agents. The CBP officers returned his passport and cleared him to board his connecting flight to Louisville International Airport.

1114.    On October 26, 2023, DHS  agents came to Mr. Alwohoush's residence in Kentucky. Mr. Alwohoush did not answer.

1115.    Later, a DHS agent called Mr. Alwohoush to follow up with Mr. Alwohoush after the July 2023 trip.

1116.    Mr. Alwohoush contacted his attorneys to communicate directly with the DHS agents.

1117.    The DHS agent represented the purpose of his visit as an "attempt to prevent" Mr. Alwohoush from getting stopped every time he travels internationally.

1118.    On October 16, 2023, Mr. Alwohoush filed a DHS TRIP complaint seeking relief from the treatment he receives when traveling.

1119.    On December 5, 2023, Mr. Alwohoush received a DHS TRIP final determination letter that stated: "DHS can neither confirm or deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

1120.    Mr. Alwohoush's experiences have discouraged him from traveling. It also discourages his family to travel with him.

1121.    Upon information and belief, Mr. Alwohoush remains on the federal terrorist watchlist.


## COUNT I
### VIOLATION OF THE FIFTH AMENDMENT—PROCEDURAL DUE PROCESS
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(All Plaintiffs)**

1122.    The foregoing allegations are realleged and incorporated herein.

1123.    The Fifth Amendment of the Constitution provides that a person shall not "be deprived of life, liberty, or property, without due process of law."

1124.    Defendants violate that guarantee by placing and maintaining Plaintiffs and other similarly-situated Americans, lawful permanent residents, and foreign citizens in the Terrorist Screening Dataset, as well as its subsets like the No Fly List and Selectee List, without any meaningful process.

1125.   The processes by which Defendants nominated Plaintiffs and other similarly-situated individuals to the watchlist and approved their nominations were arbitrary, unconnected to actual national security interests, reliant on algorithmic systems operated without meaningful oversight, and nothing more than rubberstamps that lacked substantive review.

1126.   Defendants provided no notice to the Plaintiffs or similarly-situated individuals of their placement. Defendants did not inform Plaintiffs or similarly-situated individuals of the derogatory information on which the Defendants relied to place them on the watchlist. Nor did Defendants provide an opportunity for Plaintiffs or similarly-situated individuals to rebut that derogatory information.

1127.   Defendants have also placed Plaintiffs' names and the names of similarly-situated individuals on TSA and CBP watchlists, including in the TECS platform and other lists generated by Quiet Skies and Silent Partner, without any meaningful process, notice of the placement or the derogatory information on which the Defendants relied to place them there, or an opportunity to rebut that derogatory information.

1128.   The DHS TRIP process provides no meaningful opportunity for listed individuals, including Plaintiffs, to challenge their inclusion in the TSDS, Selectee List, No Fly List, other subsets of the watchlist, or systems and records that reflect past watchlist status. With the exception of the limited additional information provided to individuals placed on the No Fly List, the DHS TRIP process does not disclose watchlist status, the grounds for inclusion on the watchlist, or provide listees with a meaningful opportunity to contest their watchlisting.

1129.   Moreover, even for individuals placed on the No Fly List, the DHS TRIP process often does not disclose watchlist status or provide any reasons for an individual's

nomination and placement. Upon information and belief, Mr. Migliore and Mr. Ibrahim are on the No Fly List. But they received only a boilerplate responses to their DHS TRIP travel inquiries.

1130. Defendants use the watchlist to target the Muslim community. Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, Muslim-sounding names, or First Amendment protected activities, Defendants consider and rely upon those protected traits as factors supporting placement on the federal terrorist watchlist, its subsets, and other similar watchlists. Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and other similarly situated American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists.

1131. Plaintiffs have experienced deprivations of their liberty interests in travel and their reputations as the result of Defendants' process-free placement of them on the watchlist.

1132. Plaintiffs have suffered delays, humiliation, searches, seizures, and outright denial of boarding when they attempt to travel.

     a. Due to his placement on the No Fly List, Mr. Migliore and Mr. Ibrahim are forbidden from flying into, out of, or through U.S. airspace.

     b. Mr. El-Takach stopped flying altogether for three years and was diagnosed with PTSD as the result of the humiliating, intrusive, and lengthy searches and interrogations to which he has been subject while traveling.

     c. As the result of the treatment he suffered at the hands of federal officers, Mr. Mirzay has not traveled by plane since 2015.

     d. Mr. Elhady endures searches, interrogations, and detentions whenever he returns to the United States from abroad.

e. Mr. Cherri is consistently detained for hours at a time, interrogated, and forced to submit to forensic searches of his electronic devices when he enters the United States, and also endures secondary screening before his departure flights.

f. Similarly, Mr. Amini chooses driving rather than flying whenever possible and, as the result of the treatment he suffers, has foregone visiting his ailing mother in Afghanistan out of fear of being barred from re-entering the United States.

g. Mr. Abdukhamidov, who undergoes extensive secondary screening by TSA officers whenever he travels, avoids traveling by airplane as much as possible as a result.

h. Mr. Mohamed undergoes humiliating, invasive screening—including frequent pat-downs of his groin area—on each and every of his weekly flights between New Mexico and Colorado.

i. Mr. Qashou has been subjected to pat-downs, interrogations, and lengthy detentions.

j. Mr. Rashad, who also endures invasive screening as a matter of course when he travels, is afraid to visit family members and has lost jobs and business opportunities due to his aversion to travel.

k. Mr. Alwohoush's experiences have discouraged him from traveling. It also discourages his family to travel with him.

1133. Defendants' placement of Plaintiffs on the watchlist will haunt the Plaintiffs for the rest of their lives, even if Defendants eventually remove them from the list, because Defendants also former watchlist status as a basis for denying government benefits and inflicting other harms. For example, after Mr. Khairullah was removed from the watchlist,

Defendants used his historic watchlist status deny him access to a White House event to which he had been invited in his capacity as a public figure and well-respected mayor of Prospect Park, New Jersey.

1134.   Plaintiffs and other similarly-situated individuals are also harmed by the Defendants' widespread dissemination of the Terrorist Screening Dataset and the stigmatizing "known or suspected terrorist" label attached to their names.

1135.   Defendants disseminate the watchlist, including records associated with Plaintiffs, to federal government agencies, state and local government agencies, private entities, and foreign governments, with the purpose and hope that those entities will impose consequences on listed individuals.

1136.   The consequences of watchlist placement play out in public, amplifying the shame and stigma that listed individuals, including Plaintiffs, endure.

1137.   As the result of the dissemination of the stigmatizing "known or suspected terrorist" label that Defendants have attached to them, listed individuals, including Plaintiffs, suffer the losses of government benefits, employment, and other consequences.

    a.   Mr. Khairullah was denied access to a White House event to which he had been invited and had his application for Global Entry denied.

    b.   Mr. Migliore is unable to change jobs because of his placement on the No Fly List and has lost work opportunities as a result.

    c.   Mr. Mirzay had his application for a firearm license denied, several U.S. citizenship applications denied, and his applications for full permanent residency and U.S. citizenship were delayed.

    d.   Mr. Butt has lost several jobs as the result of his indefinitely-pending security clearances and has also been denied Global Entry.

e.  Mr. Elhady has had several financial accounts closed without notice.

f.  Mr. Amini has been denied the ability to transfer money to his family, lost the opportunity to work as an interpreter and serve the United States in the U.S. Army and U.S. Army Reserves, and his U.S. citizenship application has been stuck in indefinite administrative processing since 2019.

g.  Mr. Abdukhamidov has suffered repeated bank account closures and his application for US citizenship has been stalled in indefinite administrative processing since 2016;

h.  Mr. Mohamed's mother and friend had their visa application and visa revoked.

i.  Mr. Qashou has had several bank accounts closed without explanation.

j.  Mr. Rashad has lost jobs and business opportunities that entail international travel and also been denied TSA Pre-Check®.

1138.  Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this procedural due process challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT II**
**VIOLATION OF THE FIFTH AMENDMENT—SUBSTANTIVE DUE PROCESS**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

**(No Fly List Plaintiffs)**

1139.   The foregoing allegations are realleged and incorporated herein.

1140.   The Fifth Amendment of the Constitution provides that a person shall not "be deprived of life, liberty, or property, without due process of law."

1141.   Defendants violate that guarantee by placing and maintaining Mr. Migliore and Mr. Ibrahim on the No Fly List, thereby depriving him of his fundamental right to travel.

1142.   Mr. Migliore's and Mr. Ibrahim's placements on the No Fly List completely bans them from flying into, out of, or through U.S. airspace on a commercial flight. As a result, Mr. Migliore is unable to travel to the United States absent great, practically-insurmountable difficulty and has effectively been extrajudicially exiled to Saudi Arabia for over a decade. Mr. Ibrahim fears he will no longer be able to see his sick mother, who lives in Egypt, as she continues to age.

1143.   Despite the immense burden on the fundamental rights of Mr. Migliore, Mr. Ibrahim, and other similarly-situated individuals on the No Fly List, the List does nothing to protect U.S. national security or other interests.

1144.   The watchlist—including the No Fly List—is radically under- and over-inclusive, inclusion on the watchlist and the No Fly List is governed by vaguely-articulated and arbitrarily-applied criteria, and Defendants are focused on targeting Muslims on the basis of their race, ethnicity, and religion. As a result, the watchlist and No Fly List have no meaningful connection to actual threats to aviation.

1145.   Mr. Migliore's and Mr. Ibrahim's experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly List. Mr. Migliore's and Mr. Ibrahim's experiences are representative of Defendants' current practices and policies. Accordingly, Mr. Migliore and Mr. Ibrahim bring this substantive due process challenge both

as applied to themselves and facially to the category of individuals placed on the No Fly List who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT III**
**VIOLATION OF THE FIFTH AMENDMENT—EQUAL PROTECTION**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(All Plaintiffs)**

1146.   The foregoing allegations are realleged and incorporated herein.

1147.   The Fourteenth Amendment of the Constitution, as applied to the federal government through the Fifth Amendment, provides that a person shall not be denied "the equal protection of the laws."

1148.   Defendants violate that guarantee by creating, maintaining, administering, and using the federal terrorist watchlist, its subsets, and other rules-based targeting lists to harm Plaintiffs because of their religion, race, ethnicity, national origin, and sex.

1149.   Defendants nominated and approved Plaintiffs' inclusion in the TSDS based on constitutionally-protected traits like religion, race, ethnicity, national origin, and sex.

1150.   As a matter of policy and official practice, Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, attending mosques and Islamic events, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, Muslim-sounding names, the frequency of Muslim prayer, adherence to Islamic religious practices, Islamic religious study, the transfer of money to individuals residing in Muslim-majority countries, affiliations with Muslim organizations, and associations with Muslims in

the United States or abroad to be "derogatory information" supporting a finding of reasonable suspicion.

1151.  Defendants also selectively apply and enforce watchlist and screening policies against individuals who appear to be or who are known or suspected to be Muslim or Middle Eastern. As a result, over 98% of the names listed in the TSDS are identifiably Muslim.

1152.  Moreover, the List does nothing to protect U.S. national security or other interests. The watchlist is radically under- and over-inclusive, inclusion on the watchlist is governed by vaguely-articulated and arbitrarily-applied criteria, and Defendants are focused on targeting Muslims on the basis of their race, ethnicity, and religion. As a result, the watchlist has no meaningful connection to actual threats to aviation.

1153.  Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this equal protection challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IV
### VIOLATION OF THE FOURTH AMENDMENT—ELECTRONIC DEVICES
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(Plaintiffs El-Takach; Mirzay; Elhady; Cherri; Amini; Qashou; Rashad; Maya; and Alwohoush)**

1154.  The foregoing allegations are realleged and incorporated herein.

1155.   The Fourth Amendment of the Constitution provides that a person shall not be subjected to "unreasonable searches and seizures."

1156.   Defendants violate that guarantee by seizing and confiscating, as a matter of official policy and practice, watchlisted individuals' electronic devices, particularly but not exclusively when they cross the border to enter the United States. Defendants routinely refuse to return the confiscated electronic devices to watchlisted individuals for weeks or months— if they ever return them at all.

1157.   As a matter of official policy and practice, particularly but not exclusively when watchlisted individuals cross the border, Defendants routinely download and copy the contents of watchlisted individuals' electronic devices into Defendants' systems and upload those contents to Defendants' watchlisting and intelligence databases. Defendants then review that material in a manner that constitutes a search for Fourth Amendment and other purposes.

1158.   As a matter of official policy and practice, Defendants use the contents of watchlisted individuals' electronic devices as a source of intelligence. Defendants use the contents of watchlisted individuals' electronic devices to launch investigations into the associates of watchlisted individuals, and also to nominate associates of the watchlisted individuals for rules-based terrorist monitoring and inclusion in the federal terrorist watchlist.

1159.   As a matter of official policy and practice, Defendants undertake these searches and seizures of watchlisted individuals' electronic devices based solely on the watchlisted individuals' placement in the TSDS.

1160. Defendants have confiscated Plaintiffs' electronic devices, copied their contents, and searched and used those contents for intelligence and investigations, after

initiating those searches and seizures solely because Plaintiffs were listed in the federal terrorist watchlist.

1161.  Specifically, Defendants have subjected the following Plaintiffs to unconstitutional electronic device searches and seizures: Mr. El-Takach; Mr. Mirzay; Mr. Elhady; Mr. Cherri; Mr. Amini; Mr. Qashou; Mr. Rashad, Mr. Maya, and Mr. Alwohoush.

1162.  Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this Fourth Amendment challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT V
### VIOLATION OF THE FIFTH AMENDMENT—SELF INCRIMINATION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
### (Plaintiffs El-Takach; Mirzay; Cherri; Amini; Qashou; Rashad; Maya; and Alwohoush)

1163.  The foregoing allegations are realleged and incorporated herein.

1164.  The Fifth Amendment of the Constitution provides that a person shall not be "compelled in any criminal case to be a witness against himself."

1165.  Defendants violate this guarantee by seizing Plaintiffs' electronic devices and forcing Plaintiffs to open those devices, including by providing passwords and by using biometric means such as facial recognition or fingerprints.

1166. Specifically, Defendants have subjected the following Plaintiffs to unconstitutionally compelled provision of passwords and biometric information: Mr. El-Takach; Mr. Mirzay; Mr. Cherri; Mr. Amini; Mr. Qashou; Mr. Rashad; Mr. Maya; and Mr. Alwohoush.

1167.  Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this Fifth Amendment challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### COUNT VI
### VIOLATION OF THE FOURTH AMENDMENT—DETENTION
#### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
#### (Plaintiffs Khairullah; El-Takach; Mirzay; Butt; Elhady; Cherri; Amini; Qashou; Rashad; and Alwohoush)

1168.  The foregoing allegations are realleged and incorporated herein.

1169.  The Fourth Amendment of the Constitution provides that a person shall not be subjected to "unreasonable searches and seizures."

1170.  Defendants violate this guarantee by subjecting watchlisted individuals, as a matter of official policy and practice, to prolonged detentions when they attempt to cross the border into the United States.

Case 3:23-cv-30095-MGM   Document 29   Filed 03/12/24   Page 187 of 197

1171.   Defendants do so without a warrant, probable cause, or reasonable suspicion of an ongoing crime, simply because the watchlisted individual is listed in the federal terrorist watchlist.

1172.   Even if some amount of detention at the border is constitutionally permissible, the detentions to which Plaintiffs and other watchlisted individuals are subjected are unreasonably and unconstitutionally long because Defendants lack reasonable suspicion to believe that Plaintiffs committed a border-related crime or are carrying inadmissible materials.

1173.   Specifically, Defendants have subjected the following Plaintiffs to unconstitutionally lengthy and unjustified detentions: Mr. Khairullah; Mr. El-Takach; Mr. Mirzay; Mr. Butt; Mr. Elhady; Mr. Cherri; Mr. Amini; Mr. Qashou; Mr. Rashad; and Mr. Alwohoush.

1174.   Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this Fourth Amendment challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT VII
### VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT
#### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
#### (Watchlisted Plaintiffs Amini and El-Takach)

187

1175.   The foregoing allegations are realleged and incorporated herein.

1176.   The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, provides that the federal government "shall not substantially burden a person's exercise of religion" unless that burden "is in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest."

1177.   An individual's exercise of religion is substantially burdened when the government conducts an intrusive inquiry into a person's religious belief as a component of official governmental action. Such inquiries place pressure on the person to modify or violate their beliefs and singles them out for disfavored treatment.

1178.   Defendants have policies and practices that require intrusive religious inquiry of individuals scooped up in watchlisting surveillance. Pursuant to those policies and practices, Plaintiffs have experienced recurrent inquiry into details of their religious beliefs and practices, including what mosques they attend, how frequently they pray, whether their wives wear hijab, and whether they are Sunni or Shia.

1179.   Plaintiffs' practice of Islam is substantially burdened by repeated and intrusive government inquiry into their beliefs, their religious communities, and their religious practices. Plaintiffs are subjected to this treatment due to Defendants' policies and practices that use the federal watchlisting system to target Muslim communities and rely, at least in part, on the details of Plaintiffs' adherence to the Muslim faith as factors supporting inclusion on the federal terrorist watchlist.

1180.   Indeed, Mr. El-Takach stopped attending services at his local mosque for approximately three years because he hoped that appearing less religious would lead Defendants to treat him less harshly.

1181.   Moreover, the List does nothing to protect U.S. national security or other interests. The watchlist is radically under- and over-inclusive, inclusion on the watchlist is governed by vaguely-articulated and arbitrarily-applied criteria, and Defendants are focused on targeting Muslims on the basis of their race, ethnicity, and religion. As a result, the watchlist has no meaningful connection to actual threats to aviation.

1182.   Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this equal protection challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT VIII
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706—
### PLACEMENT AND REMOVAL
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
(All Plaintiffs)

1183.   The foregoing allegations are realleged and incorporated herein.

1184.   Defendants' placements of Plaintiffs on the federal terrorist watchlist, on the Selectee List, on the No Fly List, and on other rules-based terror targeting lists, including but not limited those that use the Quiet Skies and Silent Partner Systems, and subsequent DHS TRIP and TSC determinations regarding their watchlist status, are agency actions.

189

1185.  Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this APA challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

1186.  While 49 U.S.C. § 114(h) authorizes TSA to share data with other agencies, that authority is specifically limited to "identif[ing] individuals on passenger lists who may be a threat to civil aviation or national security." By using the watchlist for purposes beyond passenger screening—for TSA employment, for permits, and licenses, all of which do not involve passenger lists of any kind—TSA does what no statute authorized it to do.

1187.  Defendants' actions in placing Plaintiffs and similarly-situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, were and are arbitrary, capricious, and abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful to 5 U.S.C. § 706.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT IX**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706—NCIC**

**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(All Plaintiffs)**

1188.   The foregoing allegations are realleged and incorporated herein.

1189.   Defendants disseminate the watchlist, including records associated with the Plaintiffs, to over 18,000 state and local government agencies via the NCIC. State and local government entities are then able to use the false and stigmatizing label of "known or suspected terrorist" to notify police officers in the field of the presence of a listed person, and also to deny government benefits to listed individuals.

1190.   For example, between 2015 and 2018, Mr. Abdukhamidov was frequently targeted for traffic stops by police officers while driving for his job in New York City. At some of the traffic stops, officers told him only that they needed to check his documents. During these stops, it would take officers over 30 minutes to check his documents.

1191.   Also, in 2020, Mr. Mirzay's application for a Massachusetts firearm license was denied by the West Springfield, Massachusetts Police Department because he "has recently been on the terrorist watchlist" and his brother "is currently on the terrorist watch list."

1192.   Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this APA challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

1193.   Defendants' actions in disseminating the federal terrorist watchlist to state and local authorities were and are arbitrary, capricious, and abuse of discretion, otherwise not in

accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful to 5 U.S.C. § 706.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT X**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706—**
**MAJOR QUESTIONS DOCTRINE**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(All Plaintiffs)**

1194.   The foregoing allegations are realleged and incorporated herein.

1195.   Plaintiffs, along with over one million other people, have been placed by Defendants on the federal terrorist watchlist. Defendants claim the power to place an unlimited number of people on that list and, as a result, subject them to extensive security screening, impose adverse immigration consequences on them, and distribute their information to thousands of law-enforcement and private entities, which then use it to affect everyday interactions like traffic stops, municipal permit processes, firearm purchases, and licensing applications.

1196.   Congress has never statutorily authorized the creation, maintenance, use, or dissemination of the Terrorist Screening Dataset, its subsets like the Selectee List and No Fly List, the Quiet Skies and Silent Partner systems, or any other rules-based terrorist targeting lists.

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT XI**

## NONDELEGATION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
### (All Plaintiffs)

1197.     The foregoing allegations are realleged and incorporated herein.

1198.     There is no intelligible principle Congress gave the FBI as to who it should list, how big the list should be, and how recipients of the list may use it.

1199.     By exercising power reserved to Congress in making legislative decisions about the federal terrorism watchlist, Defendants have exceeded the powers granted to them under Article II of the United States Constitution.

1200.     As a result, the federal terrorism watchlist is contrary to constitutional right, power, privilege, or immunity, in violation of 5 U.S.C. § 706(2)(B).

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT XII
### REDELEGATION AND SUBDELEGATION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
### (All Plaintiffs)

1201.     The foregoing allegations are realleged and incorporated herein.

1202.     To the extent that Congress provided statutory authorization for the federal terrorism watchlist, it did not provide that authority to Defendant TSC—a subentity that Congress has never authorized.

1203.     To the extent that Congress provided statutory authorization for the federal terrorism watchlist, it has never authorized the Watchlist Advisory Council—a multi-agency entity that Congress has never authorized—to make rules about the content of the watchlist.

1204.     By delegating its authority to other agencies and subagencies, Defendants and other federal agencies have taken power that, if it exists at all, has been assigned solely to them, and have redelegated that authority to other agencies and subagencies that Congress did not delegate such authority.

1205.     For instance, while 49 U.S.C.  § 44904(a) directs TSA and the FBI to "carry out the most effective method for continuous analysis of security threats to [the domestic air transportation system]," to the extent this provides a basis for the federal terrorism watchlist, TSA redelegated its co-lead role to NCTC, which oversees the watchlisting system alongside the FBI. Meanwhile, the FBI subdelegated its authority to TSC.

1206.     Defendants actions in redelegating and subdelegating whatever Congressional authority exists for the federal terrorism watchlist lacks statutory authority in violation of 5 U.S.C. § 70(2)(C).

WHEREFORE, Plaintiffs requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request:

1.     A declaratory judgment that Defendants' policies, practices, and customs related to the federal terrorist watchlisting system violate the First Amendment, Fourth Amendment, and Fifth Amendment to the United States Constitution; the Religious Freedom Restoration Act; and the Administrative Procedure Act.

2.     A declaratory judgment that Defendants' policies, practices, and customs related to the federal terrorist watchlisting system are not authorized by statute.

3.    An injunction that requires Defendants to remedy the constitutional and statutory violations identified above by taking measures including but not limited to:

    a.   providing individuals nominated for inclusion to and placed on the federal terrorist watchlist, its subsets, and other rules-based targeting lists with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist;

    b.   removing Plaintiffs from the Terrorist Screening Dataset and any other watchlist or database that burdens or prevents them from flying; entering the United States across the border; or obtaining a security clearance, access to federal buildings, TSA PreCheck®, Global Entry, or other government benefits;

    c.   permanently removing and expunging, in any and all record or system, Plaintiffs' placement in the Terrorist Screening Dataset and any other watchlist or database that burdens or prevents them from flying; entering the United States across the border; or obtaining a security clearance, access to federal buildings, TSA PreCheck®, Global Entry, or other government benefits;

    d.   reforming the watchlisting system to eliminate the discriminatory focus on Muslim identity and religious practice;

    e.   enjoining Defendants from searching electronic devices at the border absent a warrant supported by probable cause;

f.   enjoining Defendants from requiring individuals detained at the border to provide passwords or biometric information for the purposes of unlocking their electronic devices;

g.   requiring Defendants to expunge all information gathered from, or copies made of, the contents of Plaintiffs' electronic devices, and all other information gleaned from searches of those devices;

h.   enjoining Defendants from detaining individuals at the border absent a warrant supported by probable cause;

i.   enjoining Defendants from interrogating individuals about their religious beliefs and practices;

j.   ordering Defendants to timely process Plaintiffs' applications for United States citizenship and lawful permanent residency without reference to their watchlist status;

k.   ordering Defendants to timely process Plaintiffs' applications for security clearances without reference to their watchlist status;

l.   prohibiting Defendants from sharing TSDS information with through the National Crime Information Center or other means with state, local, tribal, and foreign governments, private entities, and any other institutions or individuals;

m.   enjoining Defendants from maintaining, administering, using, or otherwise taking action related to the federal watchlisting system until Congress authorizes such activity by statute;

4.   An award of money damages, pursuant to 42 U.S.C. § 2000bb-1(c);

5.   A trial by jury;

6.      An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and

7.      Such other and further relief as the Court may deem just and proper.

### Jury Demand

Plaintiffs, by and through their undersigned counsel, hereby demand a trial by jury of the causes of action described above.

/s/ Barbara J. Dougan
BARBARA J. DOUGAN (BBO 558392)
CAIR MASSACHUSETTS
800 Boylston Street
PO Box 990445
Boston, MA 02119
Phone: (202) 742-6420

LENA MASRI*
GADEIR ABBAS*
JUSTIN SADOWSKY*
HANNAH MULLEN*
CAIR LEGAL DEFENSE FUND
453 New Jersey Avenue SE
Washington, DC 20003

AYAH ZAKI*
CAIR NEW JERSEY
570 Broad Street, Suite 703
Newark, NJ 07102

AMY V. DOUKOURE*
CAIR MICHIGAN
1905 Haggerty Road, Suite #5
Canton, MI 48188

*Motion to be admitted to practice before
this Court pro hac vice forthcoming