# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **MOHAMED KHAIRULLAH**, et al.; | |
| Plaintiff, | Case No.: 3:23-cv-30095-MGM |
| v. | |
| **MERRICK GARLAND,** et al.; | Hon. Judge Mark G. Mastroianni |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

I.    The Government creates an illegal watchlist of Muslims without Congressional support and no due process ................................................................................. 2

II.   The Government uses the secret watchlist in secret ways to cause significant harm to those on it. ......................................................................................................... 4

III.  Plaintiffs suffer in various ways—some consistent, some not—from their placement. 6

    A.    Non-No Fly List Plaintiffs. ................................................................................. 6

    B.    No Fly Plaintiffs ................................................................................................. 10

ARGUMENT ............................................................................................................... 11

I.    This case should be heard in in the District of Massachusetts. .............................. 11

II.   This case belongs in District Court. ..................................................................... 14

    A.    Challenges to No Fly List placement belong in district court ............................ 14

    A.    Plaintiffs' Procedural Due Process Claim belongs in District Court. .................... 19

III.  Plaintiffs state a Procedural Due Process claim. ................................................... 22

    A.    The watchlist infringes Plaintiffs' travel-related liberty rights. ........................... 22

    B.    The watchlist violates Plaintiffs' rights in their reputation. ................................. 25

    C.    The process provided by DHS TRIP is inadequate. ........................................... 29

IV.   The Government violated Migliore's and Ibrahim's Substantive Due Process Rights. 30

    A.    The freedom of movement is a fundamental right ............................................. 31

    B.    The No Fly List interferes with Migliore's and Ibrahim's substantive rights, no matter how this Court decides to label them. ........................................................ 35

    C.    No Fly List is not narrowly tailored. ................................................................ 36

V.    A watchlist targeting Muslims and people from Muslim-majority countries violates the Equal Protection clause. ....................................................................................... 37

    A.    The watchlist targets Muslims and those from Muslim-majority countries. ........ 37

    B.    Plaintiffs need not have a smoking gun proof of discrimination. ........................ 39

VI.   CBP's watchlist border search policy violates the Fourth Amendment. ................. 42

A.    Plaintiffs—all of whom are regularly subject to the policy—have standing to challenge it. ......................................................................................... 42

B.    CBP searches phones unlawfully without reasonable suspicion of border-related criminal activity. ........................................................................................ 44

C.    CBP's hours-long detentions of people on the watchlist are not reasonably related to any permissible purpose. ....................................................................... 48

VII.    Requiring passwords or biometric information to unlock phones violates the Fifth Amendment. ................................................................................................ 51

A.    Plaintiffs Have Standing to Bring a Fifth Amendment Self-Incrimination Claim. 51

B.    Plaintiffs State a Fifth Amendment Self-Incrimination Claim ........................... 51

C.    Giving biometric testimony is still testimony. .................................................. 53

D.    Even if not otherwise testimonia, demanding biometric data requires probable cause and a warrant, or at minimum, reasonable suspicion. ....................................... 54

VIII.    Religious questioning at the border violates RFRA ........................................... 55

IX.    The watchlist is beyond the authority of the TSC, which has been given no powers by Congress. ........................................................................................................ 58

A.    Congress has not clearly authorized the watchlist. ........................................... 58

B.    To the extent this Court finds Congress has authorized the watchlist, it did so only for the actual agencies authorized. ................................................................... 61

X.    There is no textual basis for the watchlisting system's operations in violation of the nondelegation principle. ............................................................................................ 62

XI.    Plaintiffs' APA Claims Independently Survive. ................................................. 64

A.    Plaintiffs' challenge to NCIC dissemination is a classic APA claim independent of any other claims. ....................................................................................... 64

B.    Plaintiffs' APA Placement and Removal claim independently survives because the watchlist is arbitrary, capricious, and without statutory authorization. ...................... 65

XII.    All Defendants are proper. ............................................................................... 67

CONCLUSION ......................................................................................... 69

# TABLE OF AUTHORITIES

## Cases

*Abdi v. Wray*, 2018 WL 1940411 (D. Utah 2018)...................................................... 41

*Abdi v. Wray*, 942 F.3d 1019 (10th Cir. 2019) ....................................................... 25

*Abidor v. Napolitano*, 990 F. Supp. 2d 260 (E.D.N.Y. 2013)...................................... 50

*Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447 (D. Mass. 2021)...................................... 23

*Action for Bos. Cmty. Dev., Inc. v. Shalala*, 983 F. Supp. 222 (D. Mass. 1997) ..................... 62

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ......................................... 37

*Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021)..................................................... 43

*Alasaad v. Nielsen*, 419 F. Supp. 3d 142 (D. Mass. 2019) ......................................... 43

*Aptheker v. Sec'y of State*, 378 U.S. 500 (1964)....................................................... 33

*Araujo v. UGL Unicco-Unicco Operations*, 53 F. Supp. 3d 371 (D. Mass. 2014) ............... 45, 68

*Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1 (1st Cir. 2001) ........ 37

*Barton v. Clancy,* 632 F.3d 9 (1st Cir. 2011).......................................................... 56

*Bayley's Campground, Inc. v. Mills*, 985 F.3d 153 (1st Cir. 2021)..................................... 25

*Beland v. USDOT*, 2001 WL 274849 (D.N.H. Feb. 14, 2001) ...................................... 13

*Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017) .............................................. 22, 25

*Bosnic v. Wray*, No. 3:17-CV-826-J-32JBT, 2018 WL 3651382 (M.D. Fla. July 10, 2018)... 36

*Brown v. Holder*, 763 F.3d 1141 (9th Cir. 2014) ..................................................... 28

*Califano v. Aznavorian*, 439 U.S. 170 (1978) ........................................................ 33

*CFSA of America v. FDIC*, 132 F. Supp. 3d 98 (D.D.C. 2015) ...................................... 27

*Cherri v. Mueller*, 951 F. Supp. 2d 918 (E.D. Mich. 2013)...................................... 39, 43, 57

*Cody v. Ashcraft & Geral*, 223 F.3d 1 (1st Cir. 2000) ............................................... 12

*Collins v. City of Harker Heights*, 503 U.S. 125 (1992)............................................. 30

*Crandall v. State of Nevada*, 73 U.S. 35 (1867) ...................................................... 32

*DaCosta v. Gonzales*, 449 F.3d 45 (1st Cir. 2006) ................................................... 28

*Darby v. Cisneros*, 509 U.S. 137 (1993) ............................................................... 15

*Dist. Hosp. Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162 (D.D.C. 2011)........................... 66

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)............................... 30, 31, 34

*Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005) .......................................................... 33

*Dubois v. USDA*, 102 F.3d 1273 (1st Cir. 1996)................................................... 42, 44

*Eagles v. U.S. ex rel. Samuels*, 329 U.S. 304 (1946)................................................ 62

*Egbert v. Boule*, 596 U.S. 482 (2022) ................................................................. 42

*El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020).. 3, 16, 21, 23, 28, 35, 36, 40, 41, 47, 56, 61

*Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019)............................... 14, 21, 25, 29, 43

*Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021) ............................................. 14, 25, 28

*Elhady v. Unidentified CBP Agents*, 18 F.4th 880 (6th Cir. 2021)................................... 43

*Elhady*, 303 F. Supp. 3d ............................................................................ 29, 41

*Exxon Corp. v. FTC*, 588 F.2d 895 (3d Cir. 1978) ................................................... 13

*FBI v. Fikre*, 601 U.S. 234 (2024) .................................................................... 18

iv

*Fikre v. FBI*, 35 F.4th 762 (9th Cir. 2022) ................................................................... 18, 22

*Ghedi v. Mayorkas*, 16 F.4th 456 (5th Cir. 2021) ................................................................ 25

*Gonzalez Canton v. Mad Ruk Ent., Inc.*, No. CV 22-1458 (CVR), 2023 WL 4546545 (D.P.R. July 13, 2023) ...................................................................................................... 59, 65

*Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40 (1st Cir. 2012) ......................................... 39

*Greene v. McElroy*, 360 U.S. 474 (1959) ............................................................................ 27

*Haig v. Agee*, 453 U.S. 280 (1981) ............................................................................... 33, 35

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ................................. 18

*Heard v. Sheahan*, 253 F.3d 316 (7th Cir. 2001) ................................................................ 19

*Hernandez v. Cremer*, 913 F.2d 230 (5th Cir. 1990) ........................................................... 33

*Holt v. Hobbs*, 574 U.S. 352 (2015) ............................................................................. 56, 58

*Hurtado v. California*, 110 U.S. 516 (1884) ....................................................................... 24

*Hutchins by Owens v. D.C.*, 144 F.3d 798 (D.C. Cir. 1999) ................................................ 33

*Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250 (9th Cir. 2008) ..................................... 22

*Ibrahim v. DHS*, 06-00545, 2012 WL 6652362 (N.D. Cal. Dec. 20, 2012) .......................... 35

*In re Search Warrant No. 5165*, 470 F. Supp. 3d 715 (E.D. Ky. 2020) ................................. 54

*Int'l Bd. of Teamsters v. U.S.*, 431 U.S. 324 (1977) ........................................................... 40

*Jackson v. Gilday*, 24-cv-01155, Dkt. 1 (D.S.C. Mar. 6, 2024) ........................................... 56

*Jibril v. Mayorkas*, 20 F.4th 804 (D.C. Cir. 2021) ......................................................... 43, 44

*Jibril v. Wolf*, 2020 WL 2331870 (D.D.C. May 9, 2020) ..................................................... 43

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ............................................... 33

*Kadura v. Lynch*, 2017 WL 914249 (E.D. Mich. 2017) ....................................................... 41

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021) ............................... 27

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) ................................................... 14, 17, 18, 23

*Kelley v. Mayhew*, 973 F. Supp. 2d 31 (D. Me. 2013) ........................................................ 27

*Kent v. Dulles*, 357 U.S. 116 (1958) ................................................................................. 32

*Khalid v. Garland*, No. 1:21-CV-02307 (CRC), 2023 WL 2561943 (D.D.C. Mar. 16, 2023) 36

*King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2d Cir. 1971) ................................. 33

*Kirschner*, 823 F.Supp.2d 665 (E.D. Mi. 2010) ................................................................. 53

*Kovac v. Wray*, 363 F. Supp. 3d 721 (N.D. Tex. 2019) ...................................... 15, 21, 29, 41

*Kovac v. Wray*, No. 3:18-CV-00110-X, 2020 WL 6545913 (N.D. Tex. Nov. 6, 2020) ......... 66

*Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014) ........................................ 3, 14, 25, 35, 36

*Latif v. Lynch*, No. 3:10-CV-00750-BR, 2016 WL 1239925 (D. Or. Mar. 28, 2016) ....... 29, 30

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) ................................................................. 52

*Long v. Pekoske*, 38 F.4th 417 (4th Cir. 2022) .................................................................. 17

*Louise B. v. Coluatti*, 606 F.2d 392 (3d Cir. 1979) ........................................................... 29

*Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023) ...................................................................... 58

*Lutz v. City of York, Pa.*, 899 F.2d 255 (3d Cir. 1990) ....................................................... 33

*Magassa v. Mayorkas*, 52 F.4th 1156 (9th Cir. 2022) ........................................................ 21

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ....................................................................... 29

*Mead v. Indep. Ass'n*, 684 F.3d 226 (1st Cir. 2012) ...................................................... 27, 28

*Medina-Velazquez v. Hernandez-Gregorat*, 767 F.3d 103 (1st Cir. 2014) ............................. 39

v

*Midship Pipeline Co. v. FERC*, 45 F.4th 867 (5th Cir. 2022) ................................................ 60

*Minnesota Senior Fed'n v. U.S.*, 273 F.3d 805 (8th Cir. 2001) ............................................ 24

*Mitchell v. Helms*, 530 U.S. 793 (2000) .............................................................................. 56

*Mohamed v. Holder*, 2015 WL 4394958 (E.D. Va. 2015) .................................................... 34

*Mohamed v. Holder*, 266 F.Supp.3d 868 (E.D. Va. 2017) ............................. 34, 35, 36, 43, 61

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014) ............................................ 15, 45

*Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015) ............................................................ 21, 22

*Montin v. Est. of Johnson*, 636 F.3d 409 (8th Cir. 2011) ..................................................... 19

*Narragansett Indian Tribe by & Through Narragansett Indian Tribal Historic Pres. Off. v. Nason*,
   No. CV 20-576 (RC), 2020 WL 4201633 (D.D.C. July 22, 2020) ................................... 66

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) ................. 27

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir.1999) .................................... 45, 68

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1 (1st Cir. 2011) ........................................ 40

*Ohio v. Reiner*, 532 U.S. 17 (2001) .................................................................................... 51

*Paul v. Davis*, 424 U.S. 693 (1976) ............................................................................... 25, 26

*Pentlarge v. Murphy*, 541 F. Supp. 2d 421 (D. Mass. 2008) ................................................. 53

*Pope v. Williams*, 193 U.S. 621 (1904) ............................................................................... 33

*Proctor v. DHS*, 777 F. App'x 235 (9th Cir. 2019) .............................................................. 25

*Rahman v. Chertoff*, No. 05 C 3761, 2010 WL 1335434 (N.D. Ill. Mar. 31, 2010) .............. 50

Reno v. Flores, 507 U.S. 292 (1993) ................................................................................... 30

*Richards v. Thurston*, 424 F.2d 1281 (1st Cir. 1970) ...................................................... 22, 24

*Rochin v. California*, 342 U.S. 165 (1952) ........................................................................... 31

*Rogers v. Miller, No.* 16-cv3610, 2017 WL 6542459 (E.D.N.Y. Dec. 21, 2017) .................. 68

*Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995) ............................................................... 37

*Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022) ..................................................................... 58

*Salloum v. Kable*, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020) ............................ 21, 29, 61

*Salloum v. Kable*, No. 19-CV-13505, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020) ..... 21, 29

*Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013) .................................. 65

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ..................................................................... 24, 33

*Shutzer v. S. Rothschild & Co.*, 2006 WL 2691692, (D. Mass. Sept. 19, 2006) ..................... 12

*Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93 (1st Cir. 2020) .................................. 56

*Slochower v. Board of Education*, 350 U.S. 551 (1956) ......................................................... 52

*State of Kan. v. United States*, 16 F.3d 436 (D.C. Cir. 1994) ................................................ 32

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) .................................................................. 50

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ........................................................................ 36

*Tapalian v. Tusino*, 377 F.3d 1 (1st Cir. 2004) ................................................................... 37

*U.S. v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) .................................................................. 46, 47

*U.S. v. Sweeney*, 914 F.2d 1260 (9th Cir. 1990) .................................................................. 65

*Union Pacific v. Botsford*, 141 U.S. 250 (1891) ................................................................... 22

*United States v. Bongiovanni*, 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022) .................... 47

*United States v. Bongiovanni*, 2022 WL 17481884 (W.D.N.Y. Aug. 5, 2022) ...................... 47

*United States v. Braks*, 842 F.2d 509 (1st Cir. 1988) ........................................................... 46

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019) ........................................................ 46

*United States v. Cortez*, 449 U.S. 411 (1981) ..................................................................... 46

*United States v. Feiten*, No. 15-20631, 2016 WL 894452 (E.D. Mich. Mar. 9, 2016) ........... 50

*United States v. Fernández-Ventura,* 85 F.3d 708 (1st Cir. 1996) ...................................... 49

United States v. Guest, 383 U.S. 745 (1966) ...................................................................... 35

*United States v. Jimenez*, 419 F. Supp. 3d 232 (D. Mass. 2020) ......................................... 53

*United States v. Matthews*, 419 F.2d 1177 (D.C. Cir. 1969) ............................................... 32

*United States v. McGinnis*, 247 F. App'x 589 (6th Cir. 2007) ............................................. 46

*United States v. Menasche*, 210 F.2d 809 (1st Cir. 1954) ................................................... 28

*United States v. Menasche*, 348 U.S. 528 (1955) ............................................................... 28

*United States v. Molina-Gomez*, 781 F.3d 13 (1st Cir. 2015) .............................................. 49

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985)............................................ 48

*United States v. Mubayyid*, 476 F. Supp. 3d 46 (D. Mass. 2007) ........................................ 57

*United States v. Payne*, No. 22-50262, 2024 WL 1647253 (9th Cir. Apr. 17, 2024).............. 54

*United States v. Robles*, 45 F.3d 1 (1st Cir. 1995) .............................................................. 46

*United States v. Saboonchi*, 990 F. Supp. 2d 536 (D. Md. 2014).......................................... 50

*United States v. Tajeddini*, 996 F.2d 1278 (1st Cir. 1993) .................................................. 49

*United States v. Uricoechea-Casallas*, 946 F.2d 162 (1st Cir. 1991) .................................46, 47

*United States v. Wardlaw*, 576 F.2d 932 (1st Cir. 1978)...................................................... 46

*United States v. Warrant*, No. 19-MJ-71283-VKD-1, 2019 WL 4047615 (N.D. Cal. Aug. 26, 2019) ............................................................................................................................... 54

*URI Student Senate v. Narragansett*, 613 F.3d 1 (1st Cir. 2011) ........................................ 26

*Utility Air Reg. Grp. v. EPA*, 573 U.S. 302 (2014)...........................................................59, 60

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ..................... 40

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ...................................................... 30, 31, 36

*West Virginia* and *NFIB v. DOL*, 595 U.S. 109 (2022) ...................................................... 59

*West Virginia v. EPA*, 597 U.S. 697 (2022) ....................................................................59, 60

*Williams v. Fears*, 179 U.S. 270 (1900) ............................................................................ 32

*Wilwal v. Nielsen*, 346 F. Supp. 3d 1290 (D. Minn. 2018) .................................................. 43

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ............................................................. 27

*Worthy v. US*, 328 F.2d 386 (5th Cir. 1964) ...................................................................... 33

**Statutes**

§ 4012(c) of the Intelligence Reform and Terrorism Prevention Act of 2004..................... 59

28 U.S.C. § 1331 ............................................................................................................ 22

28 U.S.C. § 1391(e)....................................................................................................12, 13

28 U.S.C. § 2201 ............................................................................................................ 22

28 U.S.C. § 534 ...........................................................................................................63, 64

28 U.S.C. § 534(a)(1) ...................................................................................................... 63

29 U.S.C. § 655(c)(1) ...................................................................................................... 60

49 U.S.C. § 114(f)(3) ...................................................................................................... 59

49 U.S.C. § 114(h)(3)(A) ................................................................................................. 60

49 U.S.C. § 44901(a) ................................................................................ 21
49 U.S.C. § 44903(j)(2) ............................................................................ 21
49 U.S.C. § 44903(j)(2)(C)(ii) ................................................................. 60
49 U.S.C. § 44903(j)(2)(C)(iii)(I) ............................................................ 60
49 U.S.C. § 44903(j)(2)(G)(i) ................................................................... 60
49 U.S.C. § 44926 ............................................................. 3, 15, 17, 20, 21, 60
49 U.S.C. § 44936(a) ................................................................................ 21
49 U.S.C. § 46110 ............................................................................... 16, 19
49 U.S.C. 114(h)(1) .................................................................................. 60
5 U.S.C. § 706(2)(a) ................................................................................. 65
5 U.S.C. § 706(2)(C) ................................................................................ 61
6 U.S.C. § 111(b)(1)(B) ............................................................................ 59

## Other Authorities

CBP Directive 3340-049A (Jan. 4, 2018) .............................................. 42, 44
CBP Directive No. 3340-049A § 5.1.4 .................................................... 4
Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status Congressional Research Service* (Dec. 4, 2006) .................................................. 2, 40

## Regulations

28 C.F.R. § 20.20(a) ................................................................................. 64
49 C.F.R. § 1542.205 ................................................................................ 21
67 Fed. Reg. 8355 (2002) .......................................................................... 21
71 Fed. Reg. 30509 (2006) ........................................................................ 21

## Constitutional Provisions

U.S. Const. amend. XIV, § 1 ...................................................................... 37

## INTRODUCTION

There is nothing in our government like the federal terrorism watchlist system. It is designed to simultaneously gather reams of data from supposed enemies of the state while imposing specific consequences on its targets. But the entire thing is shrouded in secrecy. Who is on the watchlist, what actions may get you on the watchlist, what actions may take you off, even the full complement of consequences of placement are kept entirely secret from the public, from those on the list, and even from Congress.

Surely, some behemoth program with far reaching consequences—Plaintiffs have been prevented from flying, been subject to extensive searches, have been detained at the border and questioned for hours (including about their religious beliefs) despite having an absolute right to enter the country, have had their devices searched, seized, and uploaded to government computers, have been denied entrance to the White House, and have even been denied citizenship despite being green card holders—would have been authorized by Congress. Nope. Surely there would be some process where people were told why these things keep happening to them and are given a chance to clear themselves. Also nope. At least, surely, this program would affect Americans of all religions and nationalities roughly equally to the extent they engage in similar conduct. Again, nope—those on the list are almost exclusively Muslim, even though the Government acknowledges that white nationalist terrorism poses the greatest threat to our country.

The Amended Complaint is long, but worth a read. It explains what we know about the watchlist and how it is managed by dozens of different agencies and subagencies, each of them using or contributing to this secret list in different ways to cause harm to those on the list. It explains how easy it is to get on the list, even though there is no meaningful way for

1

somebody to try and get off of it. And it explains how it has turned the lives of the 15 plaintiffs in this case upside down, without a shred of any accusation that they have done anything wrong. Indeed, the only thing the plaintiffs in this list have in common with each other is a religion the Government has targeted for disfavored treatment.

## BACKGROUND

I.    **The Government creates an illegal watchlist of Muslims without Congressional support and no due process.**

The federal terrorism watchlist, previously officially called the Terrorism Screening Database and now officially called the Terrorism Screening Data Set, was created by executive order HSPD-6 in 2003. *See* Amend. Compl. ¶¶ 226. There is no specific Congressional authorization for either the watchlist or the agency that administers it, the Terrorist Screening Center, or TSC. *See* ¶¶ 1196.

Since 2008, the Government has added 1.83 million new names to the watchlist. *Id.* ¶ 343. Based on statistical analysis of a leak of a 2019 copy of a portion of the watchlist, the vast majority—approximately 98%--of those on the list are Muslim. *Id.* ¶ 371. This is by design, as the watchlist's purpose was to "counter Islamic terrorism." Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status Congressional Research Service* (Dec. 4, 2006), at 1, 19, 21, and 31-33.

Various federal agencies and even foreign governments can "nominate" citizens to the watchlist by submitting identity and derogatory information about the prospective listee to TSC. *Id.* ¶ 40, 82, 87, 97, 105, 112, 121, 129, 142, 162, 168, 178, 183, 190. TSC reviews nominations and decides whether to accept, reject, or modify them. *Id.* TSC may consider an individual's race, ethnicity, or religious affiliation as well as their beliefs and activities protected by the First Amendment, as information supporting a watchlist nomination. *Id.* ¶ 232.

TSC may also consider an individual's travel history and associates. *Id.* Ultimately, TSC accepts between 96-99% of all nominations. *Id.* ¶ 279.

The Government designates listees as "known or suspected terrorists." The Government uses the following inclusion standard to do so: "a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." *Id.* But, although terrorism is criminally defined, 18 U.S.C. § 2331, TSC's inclusion standard does not require evidence that an individual has, is, or will engage in criminal activity. Amend. Compl. ¶¶ 243-44; *see also El Ali v. Barr*, 473 F. Supp. 3d 479, 521 (D. Md. 2020) ("The TSDB cannot serve as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search.").

TSC does not notify individuals about their nominations or additions to the watchlist and will neither confirm nor deny watchlist status. *See, e.g.,* Amend. Compl. ¶¶ 299, 327, 1126-27. Listees have no opportunity to rebut the information on which their watchlist status is based. *Id.* at ¶¶ 326, 1126-27. The lone exception is for No Fly List American listees, which still provides little to no useful information about their placement. *Id.* ¶¶ 1128-1129.This limited exception was judicially required. *Latif v. Holder*, 28 F. Supp. 3d 1134, 1161–63 (D. Or. 2014).

DHS TRIP is the mechanism the Government uses to satisfy Congress's instruction to create a redress system for "individuals who believe they have been delayed or prohibited from boarding a commercial aircraft." 49 U.S.C. § 44926. DHS TRIP inquiries which relate to the watchlist are forwarded to the TSC Redress Office. Amend. Compl. ¶ 55. The TSC has the sole authority to decide whether to remove the individual from the Watchlist. *Id.* ¶ 324.

Unless annotated No Fly, the Government does not inform filers of either their initial watch-list status or the outcome of their filing. *Id.* ¶ 830.

## II. The Government uses the secret watchlist in secret ways to cause significant harm to those on it.

The Government does not disclose all of the effects of watchlist placement, but many of them are known. Some (but not all) of the known consequences are described in the Amended Complaint:

CBP uses the watchlist to screen passenger and crew manifests for airplanes, ships, and passengers traveling into the United States. Amend. Compl. ¶ 284. Once an individual reaches a U.S. port of entry, CBP alerts initial inspection officers if the individual is on a watchlist and requires secondary inspection. *Id.* ¶ 245. CBP policy also provides that listee status alone justifies an "advanced search" of their electronic devices. *Id.* ¶ 248; CBP Directive No. 3340-049A § 5.1.4. An advanced search entails the physical connection of the electronic device to CBP equipment to review, copy, and analyze the electronic device's contents. *Id.* CBP policy prohibits it from performing the advanced search of the electronic device in the listee's presence, or from informing the listee that the electronic device's information has been searched, copied, or conveyed to other agencies. *Id.* §§ 5.1.4, 5.2.4.5. The TSA considers lis-tees to be high-risk travelers who must undergo additional security screenings before boarding an aircraft. *See* Amend. Compl. ¶ 236. Listees are subject to an embarrassing and time-con-suming process where they must go to an airline agent who must obtain TSC's permission to allow the listee to board a plane before they can have their boarding pass printed. *See* Amend. Compl. ¶¶ 322, *see also id.* at ¶¶ 400-1121 (Plaintiffs' facts, which are replete with examples). TSA requires listees' boarding passes be stamped "SSSS." *Id.* ¶¶ 236-38. Once listees receive their boarding passes, they must undergo onerous screening at the airport security checkpoint.

*See generally id.* ¶¶ 400-1121. When listees fly internationally, TSA informs foreign governments to have them undergo such screening. *Id.* ¶¶ 300-01.

The Government separately makes watchlist information available to tens of thousands of public and private entities, state, local, tribal law enforcement agencies, and courts, and more than 60 foreign governments. *Id.* ¶¶ 44, 56, 100, 250, 282, 287; 28 C.F.R. § 20.3(g). Much, though not all, of this dissemination takes place through the National Crime Information Center ("NCIC"). *Id.* The NCIC transmits watchlist information, along with a handling code, to tens of thousands of public and private entities, that instruct those entities on what to do when encountering people on the watchlist. *Id.* ¶ 250.

If a foreign national is a listee, the State Department may deny their visa application and deem them inadmissible. *Id.* ¶ 169. The Government may also deem a foreign national inadmissible if a family member is a listee. *Id.* ¶ 170.

DHS's U.S. Citizenship and Immigration Services uses watchlist information to deny immigration, asylum, and naturalization applications. *Id.* ¶¶ 122-127. DHS and CBP will not allow listees to obtain Pre-Check and Global Entry status. *Id.* ¶¶ 286, 316, 322. Government agencies such as State, DHS, CBP, and FBI use the watchlist to screen employees and contractors and deny them employment, approval as a contractor, or access to a clearance. *See generally id.* ¶¶ 22-221.

The Department of the Treasury disseminates the watchlist to banks and other financial institutions in a manner designed to get them to prevent those on the watchlist from maintaining accounts or conducting wire transfers. *Id.* ¶ 203. The Office of Foreign Asset Control does the same. *Id.* ¶¶ 212-214.

### III.    Plaintiffs suffer in various ways—some consistent, some not—from their placement.

These consequences have turned Plaintiffs' lives upside down. Plaintiffs suffer the same series of events every time they fly.[1] They cannot print their boarding pass online or at a kiosk and have to wait until a gate agent phones the Government to get express permission to provide it. Amend. Compl. ¶¶ 412, 451, 544, 828, 833, 859, 978, 1005. This can take hours. *Id.* ¶¶ 415, 453, 545. Plaintiffs then go through significant and invasive secondary screening by TSA, including patdown, swabs, and dog searches. *Id.* ¶¶ 301, 417, 431, 432, 439, 440, 448, 457, 459, 499, 513, 831, 861, 865, 870, 892, 918, 920, 937, 949, 1007, 1107. Flying outside the country often involves a second series of invasive screening at the gate by CBP. *Id.* ¶¶ 418, 532, 546, 650, 677, 712, 778, 820, 939, 967, 974, 994, 1049, 1099.

Almost all Plaintiffs have traveled abroad while on the list, and when they do they are invariably detained at the border for hours, sometimes (when at land ports of entry) at gunpoint, *see, e.g.,* 617, 748. During these detentions they are questioned, and often held in a cell for hours on top of that. *E.g., id.* ¶ 571, 619, 653, 806, 945. CBP officers search and seize Plaintiffs' devices and sometimes do not return them. The Government demands Plaintiffs' passwords, or their biometric information, to unlock their phone. Sometimes, the Government questions them about their religious beliefs and practices.

### A.  Non-No Fly List Plaintiffs.

Mohamed Khairullah has been the Mayor of Prospect Park, New Jersey for nearly two decades, but that did not stop the Government from placing him on the watchlist and

---

[1] Khairullah, alone among Plaintiffs, no longer suffers most of these injuries as he has been removed from the watchlist. But his past watchlist status denied him access to the White House. Amend. Compl. ¶ 474.

forcing him to suffer the above-mentioned treatment on all of his flights during this time and the same painful (and dangerous) treatment both times he travelled abroad. *Id.* ¶ 402-83. Once he was removed from the list, Khairullah was invited to attend an Eid al-Fitr celebration at the White House in 2023. *Id.* ¶ 278. But after driving from New Jersey to DC, White House Special Events told him that the Secret Service did not clear him for security and he could not attend the event. *Id.* Khairullah was also rejected from the Global Entry program in 2022 (it is unclear whether this occurred before or after his removal from the watchlist). *Id.* ¶¶ 475-477.

When CBP interrogated Nidal El-Takach during one of his re-entries into the country, they questioned him about whether he is Shia or Sunni, whether his wife wears hijab, whether he attends Islamic religious ceremonies, whether he performs daily prayers, and whether he attends Friday Jumu'ah services at his local mosque. *Id.* ¶ 548. Other times, they falsely accused him of being sympathetic to Hezbollah and grilled him about his nonexistent connections to that organization. *Id.* ¶¶ 570, 574, 588, 603-604, 621. The FBI, joining the fray at one detention, interrogated him about helping Arab Americans register to vote. *Id.* ¶ 606. The Government's actions have caused him PTSD, anxiety, depression, fear, and insomnia. *Id.* ¶¶ 626-28. This forced El-Takach to stop travelling for three years, missing his mother's funeral. *Id.* ¶¶ 628-29.

Beyond the typical travel-related harms, The West Springfield Police Department denied Ahmad Mizray's application for a firearm license. *Id.* ¶ 657. The Department's denial letter noted his current or past placement on the watchlist as the reason why. *Id.* Mirzay's application for US citizenship—a process that normally takes months—took 11 years, with

Mirzay's citizenship ceremony taking place only after this lawsuit was originally filed. *Id.* ¶¶ 660-64.

Naveed Butt not only helped search and recovery at Ground Zero after September 11, but also trained FBI agents on counterterrorism. *Id.* ¶¶ 670-73. The Government thanked him for his service by placing him on the federal terrorism watchlist. *Id.* ¶ 674. As a result, he has not only suffered the normal travel-related injuries described above, *id.* ¶ 675, but also had his Global Entry revoked, *id.* ¶ 692, and had a number of clearance applications end up in purgatory, effectively ending his counterterrorism career. *Id.* ¶ 695.

CBP agents drew guns on Moneeb Elhady and damaged his car radio during searches at land borders. *Id.* ¶¶ 748, 753. The Government never paid him back for the damage. *Id.* ¶ 753. One CBP agent also falsely claimed he had a warrant during one of the inevitable searches of his phone at a border stop. *Id.* ¶ 758. And Elhady—like several other plaintiffs—has had several bank accounts, as well as a MoneyGram and a CashApp account, closed or suspended. *Id.* ¶¶ 764-66.

Abdulrahman Cherri has also suffered the same travel-related injuries, *e.g., id.* ¶¶ 778-81, and has also been subjected to religious questioning at the border, *id.* ¶¶ 770-72. Like with many others, CBP agents demanded his phone and laptop passwords. *Id.* ¶¶ 779, 790. Cherri's watchlist-related questioning has not been limited to the United States either. He was questioned by Dutch and German officials during foreign travel as well. *Id.* ¶¶ 810-11.

Tawhidullah Amini, like others, suffered the usual travel related injuries. *E.g., id.* ¶ 818. CBP also questioned him about his mosque and religious practices. *Id.* ¶ 825. He even had his camera confiscated. Amend. Compl. ¶ 822. As he was told by one agent during one of the encounters: "When you're here, you have no rights." *Id.* ¶ 837. On top of that, due to

his watchlist placement, he cannot use Wester Union or MoneyGram to send money to his family in Afghanistan, which they critically needed for medical care. *Id.* ¶ 845-46. He was also denied a job at a school, as an interpreter, and in the military due to his inability to get a clearance. *Id.* ¶¶ 847-851. And his citizenship application has been pending since 2019, "under review," despite the fact that he is a green card holder who qualifies for citizenship. *Id.* ¶¶ 815, 852-53.

Nusratilla Abdukhamidov—along with suffering the same travel-related harms as the other Plaintiffs, *e.g.*, *id.* ¶¶ 890-94—has had his U.S. citizenship application stuck in limbo since 2016 despite being a green card holder who qualifies for citizenship. *Id.* ¶¶ 902-04. He's also been targeted by NYPD during routine traffic stops for extensive "document" checks. *Id.* ¶ 905. And Bank of America shut down his bank account due to his watchlist placement. *Id.* ¶ 907.

Talha Mohamed, an imam, also faces the same travel-related harms as the other Plaintiffs. *Id.* ¶¶ 914-21. Further, his mother (and a friend) was denied a visa because of his placement on the watchlist. *Id.* ¶ 924.

Adam Qashau was placed on the watchlist merely because his brother was convicted of a felony for which Qashau had no involvement in. *Id.* ¶ 932. He too suffered the usual travel-related harms and had his bank accounts closed at Chase and Wells Fargo. *Id.* ¶¶ 933-54.

Ihab Rashad suffered the same travel-related injuries as others. *Id.* ¶¶ 960-69. The FBI denied him access to a lawyer during questioning at the border, *id.* ¶ 972. Additionally, a CBP Officer told him that if he helped them "with some information" they could "make his travel issues go away," but when he asked for a lawyer, was told only guilty people have lawyers.

*Id.* ¶ 974. Another time, while leaving the country, the FBI attempted to do an invasive search of Rashad's three-month-old baby. *Id.* ¶ 977-87. Another time, Rashad was detained for several hours at the border ***after*** he was interrogated and had his phone searched while agents "were waiting on D.C. to approve your entry back into the U.S." (Cleaned up.) *Id.* ¶ 1003. Rashad is a U.S. citizen, with an absolute right to enter the country. *Id.* ¶ 958. Rashad was also denied TSA PreCheck. *Id.* ¶ 1025.

Along with the travel harms suffered by all Plaintiffs, Muad Maya also was prevented by TSC from flying at all from Paris to Atlanta, *id.* ¶¶ 1043-45, even though he was not on a No Fly List at the time, *id.* at ¶ 1048. (This may have just been a mistake, but it is the kind of mistake that happens as a result of the Government's Kafkaesque watchlist bureaucracy.)

Khalil Alwohoush (like all other Plaintiffs) had normal travel-related injuries, *id.* ¶¶ 1097-1113, and (like many others, including when not listed in this background) had compelled disclosure of his cellphone password, *id.* ¶ 1101. He also had DHS agents come to his home in Kentucky in an attempt to interrogate him. *Id.* ¶¶ 1114-1117.

### B.  No Fly Plaintiffs

Two Plaintiffs—Migliore and Ibrahim—suffer an additional harm. They are part of the subset of individuals on the watchlist who are on the No Fly List. They cannot travel to, from, or over United States airspace. Amend. Compl. ¶¶ 1132, 1142.

Michael Migliore—prior to being placed on the No Fly List, though not necessarily before he was placed on the watchlist—had his laptop seized by TSA agents (who are not law enforcement agents) and returned to him later by mail. *Id.* ¶¶ 492. He was also detained and interrogated—twice on the same attempt to fly home—by Austrian agents. *Id.* ¶¶ 493-500. A few months later, attempting to go on vacation, he found out he was on the No Fly List and

could not travel to Venice for the summer. *Id.* ¶ 502-04. Undeterred, he ended up taking a transatlantic cruise to get to the UK, buying a ticket to fly on to Venice. *Id.* ¶¶ 505. Still, he was detained in the UK and interrogated by MI 5 agents, missing his flight. *Id.* ¶¶ 506-515. He was able to then fly without incident by rebooking under his Italian national identification card (indicating the issue was with his US passport). *Id.* ¶¶ 518. Mr. Migliore eventually married and settled outside the United States, unable to travel to his home country. Even now, government agents harass his wife  at airports and borders whenever she travels to the United States. *Id.* ¶¶ 530-537.

Hazem Ibrahim refused to cooperate with FBI agents when they solicited him to become a paid informant for the FBI in 2023 and was as a result placed on the No Fly List. *Id.* ¶¶ 1069-1078. During that solicitation, FBI agents asked Ibrahim about his views on Donald Trump, his mosque, the Middle East, and other common political and religious views. *Id.* ¶¶ 1070-75. As a result he was unable to take care of his sick mother in Egypt. *Id.* ¶¶ 1070. (She died shortly after the filing of the Amended Complaint, and Ibrahim was unable to go to her funeral or take care of her estate; these facts are not in the Amended Complaint but Plaintiffs can file a Supplemental Complaint to the extent it is necessary for Ibrahim's claims to go forward.)

## ARGUMENT

### I.    This case should be heard in in the District of Massachusetts.

In official capacity suits against the Federal Government, venue is proper wherever "a substantial part of the events or omissions giving rise to the claim occurred," or where a "plaintiff resides." 28 U.S.C. § 1391(e). One plaintiff is enough, as other "persons may be joined to any such action." *Id.*

11

Here, one plaintiff—Ahmad Mirzay—resides in Massachusetts. Amend. Compl. ¶ 22. Among his allegations is that the Government's actions cause him to be harassed by police in Massachusetts. *Id.* ¶ 295, 657, 1191. A second Plaintiff, Ihab Rashid, lives in New Hampshire, *id.* ¶ 25, regularly travels through Boston's Logan International Airport, *see id.* ¶ 970, 973, and has in fact been harassed and detained by the federal government there, *id.* ¶¶ 977, 1016, 1020. Both would presumably like to continue using their local airport—Rashid was denied entry into TSA Pre-Check in 2019, *id.* ¶ 1025—without harassment and subjection to secondary screening.

So, venue is proper. The "party seeking transfer of venue has a heavy burden, because 'there is a strong presumption in favor of the plaintiff's choice of forum.'" *Shutzer v. S. Roth-schild & Co.*, 2006 WL 2691692, at *5 (D. Mass. Sept. 19, 2006) (quoting *Cody v. Ashcraft & Geral*, 223 F.3d 1, 11 (1st Cir. 2000)). This is particularly true in a case like this one against the Federal Government, because plaintiffs are seeking to get the Government to stop violat-ing their rights, and the precedents would only broadly apply within the First Circuit should this case reach there and go no further.

Yet, the Government requests the Court to transfer this case to the District of Colum-bia. None of the Plaintiffs reside there and none of the Plaintiffs' harms occurred there. The sole reason the Government provides is that most (but not all) of the Defendants and lawyers in this case have offices in the D.C. area, so it would be convenient.[2]

If the Government's argument was correct, then Mirzay and Ihab, and all other plain-tiffs trying to challenge multiagency federal action—would be compelled to bring their cases

---

[2] Plaintiffs are also represented by CAIR Massachusetts, CAIR New Jersey, and CAIR Michigan, while Defendants are also represented by the District of Massachusetts U.S. Attorney's Office.

in DC notwithstanding the language of 28 U.S.C. § 1391(e). After all, what would make another case different? It cannot be the fact that Mirzay and Ihab brought their claims alongside other parties, as "requiring every plaintiff in an action against the federal government or an agent thereof to independently meet section 1391(e)'s standards would result in an unnecessary multiplicity of litigation." *Exxon Corp. v. FTC*, 588 F.2d 895, 898 (3d Cir. 1978). Maybe it's that some (but not all) of Plaintiffs' lawyers live in the DC area.[3] But that would seem to impermissibly chill plaintiffs challenging federal government action from relying on the wealth of private and public interest law firms and organizations in the D.C. area that specialize in challenging federal government action. In any event, the Government does not cite any case for the proposition that an individual challenging federal government action must do so in D.C. if the agency in question is in D.C. or if any (or even all) of their lawyers are from D.C.

Indeed, the Government does not cite any cases at all where Courts have transferred claims against the federal government to D.C. That is because the few Plaintiffs have found all involve extraordinary concerns not present here. In *Beland v. USDOT*, 2001 WL 274849 (D.N.H. Feb. 14, 2001), for instance, the Government—in a case where the alleged violation occurred exclusively in DC—would have been unable to compel the attendance of a key witness in the case unless the case was transferred to D.C. *Id.* at *3. And the Court made sure to note that "[t]he convenience of the parties, alone, does not dictate that this Court should transfer the action." *Id.* Yet that is precisely the Government's argument here—the mere

---

[3] Although four of the lawyers on the Complaint have a listed office in the DC area, the CAIR Legal Defense Fund (the office of those four lawyers) operates mostly virtual in the post-COVID world. As a result, one of the three CAIR Legal Defense Fund attorneys on the Complaint who are still involved in the case lives in Michigan and another in Illinois. A fourth, Hannah Mullen, withdrew from the case.

convenience of trying federal lawsuits against the federal government in D.C. means the Court should transfer the case here.

And even if convenience alone was sufficient grounds for transfer, the Government overstates the convenience. Paper watchlist discovery will be done exclusively via electronic means. Depositions will occur (historically, mostly virtually) where Defendants reside or work, rather than in Massachusetts. And (in a case that challenges policies and seeks no damages), historically, watchlist challenges get resolved, at the latest, on cross-motions for summary judgment. *See, e.g.,* Government's Br. at 10 (citing a number of cases related to watchlist challenges, none of which went to trial); *see also Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019) (successful watchlist challenge resolved at summary judgment), *rev'd on appeal, Elhady v. Kable*, 993 F.3d 208, 222 (4th Cir. 2021); *Latif v. Holder*, 28 F. Supp. 3d 1134, 1161–63 (D. Or. 2014) (successful challenge to No Fly List procedures resolved at summary judgment), *remedy affirmed on appeal Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019). So, the amount of travel to Massachusetts will essentially be the lawyers (who are mostly either in Massachusetts already or have national practices anyway) travelling to Massachusetts for whatever arguments this Court deems necessary, and then at most a trial. The Court should reject the Government's request.

## II.    This case belongs in District Court.

### A. Challenges to No Fly List placement belong in district court.

#### 1.    Congress has not mandated exhaustion of DHS TRIP.

Nothing in 49 U.S.C. § 44926 makes DHS TRIP the exclusive method for removing individuals from the No Fly List or otherwise requires Khalid and other listees to use it. *See* MTD at 25 ("no statute requires exhaustion of administrative remedies in this case"). And the agency rules implementing DHS TRIP follow Section 44926's lead and do not require

14

Khalid to use DHS TRIP. *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 534 (E.D. Va. 2014) ("as the defendants acknowledge, Congress has not mandated exhaustion of the DHS TRIP… and there are no regulations regarding DHS TRIP that mandate exhaustion.").

In this situation, at least as it relates to the APA claims of Migliore and Ibrahim, the two Plaintiffs on the No Fly List, District Court jurisdiction is mandatory. Under *Darby v. Cisneros*, 509 U.S. 137, 146 (1993), an "exhaustion requirement" must be "unambiguous so that aggrieved parties would know precisely what administrative steps were required before judicial review would be available." Here, the APA sets out the terms that must be met for any APA claim to be subject to an exhaustion requirement and explicitly forbids federal courts from imposing an exhaustion requirement unless those specific conditions not present here are met. *See Darby*, 509 U.S. at 146, 154 (Section § 10(c) of the APA "has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates" and where "administrative action pending that review is made inoperative"). There is neither a statute nor a rule that requires Migliore and Ibrahim to exhaust DHS TRIP. And even if there was such a requirement in a statute or an agency rule, the APA and *Darby* would forbid this Court from imposing an exhaustion requirement because the Government's decisions to list the No Fly Plaintiffs were not "inoperative" pending the conclusion of an administrative process. *Id.* at 154. On the contrary, the listing decision began ruining their lives as soon as they were made.

Even for the non-APA claims, most courts that have looked at this issue have found that DHS TRIP exhaustion is not a prerequisite to challenging various secret lists the Government maintains. *See Mohamed* 2014, 995 F. Supp. 2d at 539; *Crooker v. TSA*, 323 F. Supp. 3d 148, 157-158 (D. Mass. 2018); *Kovac v. Wray*, 363 F. Supp. 3d 721, 747 (N.D. Tex. 2019);

*El Ali v. Barr*, 473 F. Supp. 3d 479, 505-07 (D. Md. 2020). Since there is no Congressionally-mandated exhaustion requirement, the Government does not deprive district courts of jurisdiction over challenges to the No Fly List by—without Congressional authorization—-arbitrarily inserting the TSA Administrator as a rubber stamp on the final decision of the Screening Center. Migliore and Ibrahim can pursue their claims against the TSC (and the TSA more broadly)[4] without taking any action requiring a decision by the TSA Administrator at all.

### 2. Section 46110 does not divest the Court of jurisdiction to challenge the placement of individuals on the No Fly List

49 U.S.C. § 46110 requires individuals challenging the final decisions of the TSA Administrator to bring those challenges in the Court of Appeals. But the TSA Administrator neither runs the No Fly List nor has final decisionmaker authority about placing individuals on the No Fly List in the first instance. Amend. Compl. ¶¶ 253, 256, 279 324 (TSC runs watchlist and has final placement and removal authority). Nor does the TSA Administrator have any role in the supposed regular reviews of individuals on the No Fly List. *Id.* The only decision-making role the TSA Administrator plays is at the end of DHS TRIP.

Here, Plaintiffs' challenge to the No Fly List goes well beyond the mere decision not to remove them from the No Fly List. Instead, Migliore's and Ibrahim's Procedural and Due Process claims both allege that Defendants violated the Constitution by "placing and maintaining" them on the No Fly List. Amend. Compl. ¶¶ 1124, 1141.

Meanwhile, it is at best unclear whether the TSA Administrator could execute any of the relief sought in this case related to the No Fly List. Migliore and Ibrahim ask the Court to

---

[4] There is no evidence that the TSA Administrator, rather than line TSA or TSC employees, have any role in ordering airlines not to allow individuals on the No Fly List to board aircraft that will fly in United States airspace.

order their removal from the No Fly List, Amend. Compl. at p. 195 § 3b, but the TSA Administrator only has that authority as a result of the conclusion of the DHS TRIP process. The TSC, on the other hand, maintains the authority not only to remove them at any time, but also has the power to place Migliore and Ibrahim back on the No Fly List if they were removed. *See Long v. Pekoske*, 38 F.4th 417, 422 & n.3 (4th Cir. 2022) (TSC removed Long from the No Fly List in the middle of litigation—indeed, just as the TSA's brief on jurisdiction to the Fourth Circuit was due—after the TSA Administrator had recently decided against delisting Long at the end of DHS TRIP). An injunction against the TSC, rather than TSA, would thus be the only way for Migliore and Ibrahim to get meaningful relief in terms of removal.

As far as changes to the No Fly List, procedures regarding placement and review fall within the purview of the TSC, not the TSA Administrator. Even changes to DHS TRIP would be the responsibility of Defendant Mayorkas and DHS, not the TSA Administrator. *See* 49 U.S.C. § 44926(a); *see generally* § B, below.

The only Court of Appeals to find that Section 46110 now deprives the Court of hearing any sort of as-applied challenge involving the No Fly List was the Ninth Circuit in *Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019). *Kashem* held "that § 46110 grants the courts of appeals, rather than the district courts, exclusive jurisdiction over the plaintiffs' substantive due process claims" in that case. *Id.* at 391. To be clear, the substantive due process claims in that case were different than the ones here. In that case, the substantive due process claims merely challenged "the substantive decision in the final TSA order" to maintain the plaintiffs on the No Fly List." *Id.* at 391 n.16. The Complaint in *Kashem* confirms. Ex. A (Kashem Complaint).

And so, *Kashem* reflects the relative narrowness of the claims adjudicated there versus the claims here. 941 F.3d at 364 ("we decline to reach the plaintiffs' facial vagueness challenges").

As discussed above, Migliore's and Ibrahim's claims are broader. First, they go to placement and removal, rather than mere placement. As the Ninth Circuit later held in *Fikre v. FBI*, Section 46110 only applies in No Fly List cases to the extent the party is challenging "the TSA Administrator's decision refusing to remove him from the No Fly List under the DHS TRIP process." 35 F.4th 762, 774 (9th Cir. 2022), *cert granted and affirmed on other grounds*, 601 U.S. 234 (2024)). But claims can continue to proceed in the District Court to the extent plaintiffs are challenging "the Screening Center's decision to place him on the No Fly List in the first place." *Id.* Second, they challenge the Government's ability to prohibit any individual not convicted of a federal terrorism crime from flying, when not a condition of pretrial release in a criminal case. And third, like the claims in *Kashem* that the Court did assume the district court exercised proper jurisdiction over, they involved procedural due process claims as well as substantive.

### 3. For the same reason, the Government's ripeness and statute of limitations arguments against the No Fly List challenges must fail.

The Government separately argues that Migliore's No Fly List claim is untimely because he was placed on the No Fly List more than six years ago. But he has been maintained by TSC on the No Fly List ever since then.[5] Of course he still has a right to challenge the unconstitutional harm the Government is continuing to inflict upon him until this day. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n. 15 (1968); *see generally Heard v.*

---

[5] The Government claims to make "biannual reviews of all US citizens and lawful permanent residents" on the watchlist, which would necessarily include the No Fly List. *See Elhady v. Kable*, 16-cv-375, Dkt. 299 at 9 ¶ 15 (E.D. Va. Mar. 11, 2019) (Government's motion for summary judgment).

*Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001); *Montin v. Est. of Johnson*, 636 F.3d 409, 415 (8th Cir. 2011). And since—as the Government admits (at 25)—there is no exhaustion requirement under DHS TRIP, see above, the statute of limitations cannot be tied to either placement or the failure to exhaust.

Similarly, the Government's argument that Hazam's placement is not ripe because he has not exhausted the DHS TRIP process must fail. Exhaustion of the DHS TRIP process could only possibly be a prerequisite for bringing a claim challenging the denial of his No Fly List status at the end by the TSA Administrator—the exact narrow claim that would exclusively belong in the Court of Appeals. *See* §§ 1-2, above.

## A. Plaintiffs' Procedural Due Process Claim belongs in District Court.

The Government separately makes the argument that (1) Plaintiffs' Procedural Due Process and APA claims challenge the adequacy of DHS TRIP, and (2) for some reason the Government declines to explain, that means that they are challenges to final decisions of the TSA Administrator, which would render review in the Court of Appeals under 49 U.S.C. § 46110. Both parts of the Government's argument are wrong.

As mentioned above in Section A, Plaintiffs' challenge to the federal terrorism watchlist is based on TSC's placement and maintenance of Plaintiffs on the federal terrorism watchlist. While the TSA Administrator now has the authority to remove somebody from the No Fly List at the conclusion of DHS TRIP, the TSA Administrator has no authority to place or remove anyone from the broader federal terrorism watchlist. Similarly, Plaintiffs' APA claim includes "placement" as well as "subsequent DHS TRIP and TSC determinations regarding … watchlist status." Amend. Compl. ¶ 1184. And while 49 U.S.C. § 44926(a) (the DHS TRIP authorizing statute) orders the Secretary of Homeland Security, as opposed to the TSA

Administrator, to "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft," that is not the only harm caused by the watchlist.[6]  *See* Section III(B), below.

So, all DHS TRIP is in this case is, essentially, the only potential avenue for some individuals on the watchlist to indirectly challenge their placement on the watchlist. It is only available to those who are on the watchlist who suffer travel-related injury; but as the Complaint elaborates, watchlist injury goes beyond travel-related harm. *See* Amend. Compl. ¶¶ 282-319. DHS TRIP is effectively the Government's defense to the procedural claims against TSC, in the sense that the Government will point to DHS TRIP as a purportedly sufficient process for any procedural challenge to the watchlist. *See* MTD at 21-23. But a process offered by one subagency (TSA) at the behest of a its parent agency (DHS) is already a poor and convoluted substitute for the rights violations caused by a completely different (and made up) agency (TSC) that is embedded in a subagency (FBI) of an entirely different agency (DOJ).

In any event, while the TSA Administrator may have some role in DHS TRIP—that role is unclear other than that the TSA Administrator makes final decisions for DHS TRIP appeals for those on the No Fly List as it relates to No Fly List removal only—it is the "Secretary of Homeland Security" who is responsible for enacting and modifying the DHS TRIP process itself. 49 U.S.C. § 44926(a). So even to the extent Counts I and VIII challenge DHS TRIP rules and regulations directly, that is a challenge to the actions of Defendant Mayorkas, not to those of TSA Administrator, Defendant Pekoske. To the extent Counts I and VIII

---

[6] In contrast, 49 U.S.C. § 44903(j)(2) requires the TSA Administrator to have a process for appealing ***misidentification*** in "comparing passenger information … to the [watchlist]," a different problem arising from the watchlist that is irrelevant to this case.

challenge TSC's policy and procedures (or lack thereof) for placing and removing people from the watchlist, and providing avenues of redress, that is a challenge to Defendant Glasheen.

 It is also unsurprising that the Government can marshal no real caselaw in support of their position despite numerous challenges—some of which they cite elsewhere—to the federal terrorism watchlist on Due Process grounds. *E.g., Elhady*, 391 F. Supp. 3d 562, *Kovac*, 363 F. Supp. 3d; *Salloum v. Kable*, No. 19-CV-13505, 2020 WL 7480549 (E.D. Mich. Dec. 18, 2020), *El Ali*, 473 F. Supp. 3d at 521. Instead, they rely on two decisions that do not support their claim. One, *Magassa v. Mayorkas*, 52 F.4th 1156, 1165 (9th Cir. 2022), did not involve a challenge to DHS TRIP, but to the "Redress Process" for denials of a Security Identification Display Area badges, a TSA credential governed by 49 C.F.R. § 1542.205 and ran exclusively by the TSA, based on authority granted by Congress to the Administrator of the TSA. 49 U.S.C. §§ 44901(a) and 44936(a). *See* 71 Fed. Reg. 30509 (2006), 67 Fed. Reg. 8355 (2002) (implementing rules).

The other, *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015), refutes the Government's conclusion. While the Court does dismiss "without prejudice" part of the Mokdad's claim as to the 'adequacy of the redress process," it did so for failure to name the TSA as a defendant, not because of lack of jurisdiction, an issue it "decline[d] to opine on." *Id.* at 811-12. To the extent its ruling was based on whether 49 U.S.C. § 44903(j)(2) applied, *id.* at 811, it is irrelevant to this case, and to the extent its ruling suggested that the adequacy of the DHS TRIP process is the responsibility of the TSA Administrator as opposed to the DHS Secretary under 49 U.S.C. § 44926(a), its dicta is contrary to the plain language of the statute.

Yet the *Mokdad* Court still found jurisdiction over the broader due process claims, because "[t]o the extent that Mokdad brings a direct challenge to his placement by TSC on the

No Fly List, however, he is challenging a TSC order, not a TSA order." *Id.* at 812. So as Plaintiffs' Due Process claims are about the adequacy of the process for TSC placing them on the watchlist, that, too, is properly before the Court. *Cf. Fikre*, 35 F.4th at 775 ("putting Fikre's name on the No-Fly List was an order of an agency not named in section 46110, and so the district court retains jurisdiction to review that agency's order") (cleaned up) (quoting *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1255 (9th Cir. 2008)). Likewise, the Sixth Circuit later noted in *Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017), that "[t]he district court had jurisdiction over these declaratory judgment actions pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1331 inasmuch as Plaintiffs asserted claims under the Fifth Amendment challenging their placement on the" watchlist. *Id.* at 464.

## III.    Plaintiffs state a Procedural Due Process claim.

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific v. Botsford*, 141 U.S. 250, 251 (1891). To determine whether an interest is protected by the Due Process Clause, a court must court must balance the "state interest justifying the intrusion" against a claimed liberty interest. *Richards v. Thurston*, 424 F.2d 1281, 1285 (1st Cir. 1970). The balance looks to "the nature of the liberty asserted, the context in which it is asserted, and the extent to which the intrusion is confined to the legitimate public interest to be served." *Id.*

### A. The watchlist infringes Plaintiffs' travel-related liberty rights.

In performing this balancing test, the right to travel is fundamental, protected by the Due Process Clause. *Richards,* 424 F.2d at 1284. As a result, "[r]estrictions on the liberty

interest in travelling internationally can be regulated within the bounds of due process, while restrictions on interstate travel are subject to strict scrutiny." *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 459 (D. Mass. 2021).

The watchlist is a restriction on the liberty interest in travelling both domestically and internationally.

Domestically, travelling by airplane—which "in many instances … constitutes the only practical means of traveling across great distances," *Kashem*, 941 F.3d at 378; *El Ali*, 473 F. Supp. 3d at 508 (same)—becomes a nightmare. Nobody claims airports are fun. But those on the watchlist cannot print their boarding pass without first seeing a gate agent, who must obtain clearance from the government before allowing the listee to fly.   Amend. Comp. ¶¶ 267, 322; *see also id.* at ¶¶ 412, 419, 429, 488, 544, 580, 585, 594, 600, 641, 717, 723, 730, 734, 739, 744, 776, 785, 787, 793, 795, 808, etc. They must further go through invasive secondary screening and often questioning. *E.g.*, *id.* ¶¶ ¶¶ 246, 249, 562, 645, 650, 677, 688, 724, 735, 789, 881, 944, 968, 971, 1018. The process can take hours (especially if no agent picks up the phone), leading to missed flights and connections. *Id.* ¶¶ 393, 413, 497, 515, 1064. While other travelers occasionally get secondary screening at airports, and occasionally miss a connection for this reason or that, the issues listees have are not only more pronounced, but happen every time they fly. *E.g.*, *id.* ¶¶  ¶¶ 859, 916, 964, 1117. These screenings also happen in front of other travelers, in ways that are humiliating. *Id.* ¶¶ 309, 392; *see also, e.g., id.* at 499, 500, 503, 642, 682, 874, 878, 1099, 1108. The Government will be hard pressed to prove that these restrictions are the narrowest tailored means of enforcing a government interest. At minimum, they must show that the procedures attached to them comport with due process.

Internationally, placement on the watchlist subjects an individual to advanced searches of electronic devices at borders (that is, both land borders and arriving in the United States at international airports), Amend. Comp. ¶¶ 248, 309, 418, 611, 710, 779, 801 968, which otherwise would require reasonable suspicion for the federal government to perform. *See* § VI(B), below. They are detained for hours (often up to six hours). *id.* ¶¶ 309, 426, 466, 497, 510, 555, 565, 576, 606, 613, 653, 688, 752, 770, 806, 823, 945, 1018, 1022, 1052, 1103, 1132. During this time, they are subject to invasive interrogations as well, *id.* ¶¶ 316, 396, 407, 410, 422, 464, 466, 491, 494, 496, 498, 510, 532, 553, 565, 576, 590, 603, 639, 643, 645, 652, 675, 686, 710, 746, 770, 819, 823, 838, 857, 914, 933, 940, 944, 960, 972, 977, 983, 988, 995, 1000, 1009, 1015, 1050, 1071, 1097, 1099, 1111, even though, as United States citizens, they have an absolute right to enter the country. When these detentions occur at land borders (that is, when the arrival is not pre-announced with the listee coming off an airplane having already gone through security), the detention often takes place at gunpoint. *Id.* ¶¶ 309, 617, 748. To trigger an inquiry under the Due Process in this Circuit, all that is necessary is "that a personal liberty is involved." *Richards*, 424 F.2d at 1285. At that point, the court must balance the "state interest justifying the intrusion." The balance looks to "the nature of the liberty asserted, the context in which it is asserted, and the extent to which the intrusion is confined to the legitimate public interest to be served." *Id.*

The consequences from watchlist placement on travel are unreasonable. *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969); *Hurtado v. California*, 110 U.S. 516, 527 (1884). They are unusual and not applied equally to all travelers. *See Minnesota Senior Fed'n v. U.S.*, 273 F.3d 805, 810 (8th Cir. 2001) (liberty interest in travel turns on whether individuals are treated

equally); *see also Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 159 (1st Cir. 2021). The liberty interests in travel are thus protected by the Due Process Clause.

The Government, for its part, pushes nonbinding decisions from other circuits to argue that, despite all this logic, the watchlist does not so much as trigger the faintest requirements of the Due Process Clause. But most of the cases they cite do not stand for such a proposition. Some of the cases involved watchlist challenges that failed to allege the extent of their delays, or where the challenger suffered only marginal delays. *E.g., Abdi v. Wray*, 942 F.3d 1019, 1031, 1032 n.3 (10th Cir. 2019); *Beydoun*, 871 F.3d at 467. Others, simply casting these actions as mere inconveniences, were wrongly decided. *Ghedi v. Mayorkas*, 16 F.4th 456, 466 (5th Cir. 2021); *Elhady*, 993 F.3d at 222; *compare with Elhady*, 391 F. Supp. 3d. *Proctor v. DHS*, 777 F. App'x 235 (9th Cir. 2019), for what it's worth, does not even explain what delays were at issue in that pro se, unpublished appeal.

And no case has found that the outright ban on flying for those on the No Fly List does not implicate the due process clause. *E.g., Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014). At minimum, Migliore and Ibrahim's Due Process claims should go forward.

**B.  The watchlist violates Plaintiffs' rights in their reputation.**

The Constitution protects a liberty interest in the reputational interests of individuals under a test Courts refer to as the "stigma-plus" test. To bring a constitutional action for reputational injury, a plaintiff must show a (1) stigmatic statement affecting one's standing in the community," (2) dissemination, and (3) another adverse action affecting the plaintiff's interest. *Paul v. Davis*, 424 U.S. 693, 708-09 (1976). As to the first two prongs, the Government does not contest either that being labeled a terrorist is stigmatizing or that TSC disseminates

that information to other federal government agencies, as well as state and local governments and even some private parties.

That leaves the question of the other adverse action affecting the plaintiff's interest. *Paul*, 424 U.S. at 708-09. That interest must be "more tangible" than "reputational harm." *URI Student Senate v. Narragansett*, 613 F.3d 1, 9 (1st Cir. 2011). The "plus" prong requires that "the challenged governmental action adversely impacted some right or status previously enjoyed by her under substantive state or federal law." *Id.* at 10 (citing *Paul*, 424 U.S. at 710-120. The First Circuit has added an additional requirement, that the harm must "emanate from substantive state or federal law." *Id.* Both the disseminator and the disseminate may be government entities, *id.*, but the source of the change in right or status must be the disseminating defendant.

Dissemination of watchlist status qualifies.

First, TSC's watchlist dissemination to CBP, at minimum, qualifies. As the Amended Complaint alleges, TSC disseminates watchlist status declaring plaintiffs terrorists to CBP every time plaintiffs enter the country, whether at a land border or an airport. Amend. Compl. ¶¶ 282, 284. This is inherently stigmatizing (and dangerous), leading to (when at land borders) guns drawn on plaintiffs. And it fundamentally changes their rights and status. Watchlist placement is designed to place a status—known or suspected terrorist—onto plaintiffs. And, as a result, among other things, plaintiffs go from having the right to avoid "advanced screening" of electronic devices (and the substantial delays that go along with that screening) absent individualized reasonable suspicion of a border related crime. *See* § VI(B), below.

Second, the closing of bank accounts for qualify. Amend. Compl. ¶¶ 203,213 (Elhady, Abdukhamidov, Qashou). The right to a bank account is one protected under the law. *CFSA*

*of America v. FDIC*, 132 F. Supp. 3d 98, 124 (D.D.C. 2015). "Many people … would consider these to be rights more important than the right to purchase liquor." *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (citing *Wisconsin v. Constantineau*, 400 U.S. 433 (1971)). As to this point, the Government's argument is that it "does not ***mandate*** that private entities deny people such privileges." MTD at 15 n.6 (emphasis original). But, at this point in the case, that factual defense is unavailable to the Government. Although the Government refuses to disclose all of the consequences of watchlist placement, the allegations that the Government mandates the closure of these accounts are plausible. *See. e.g., Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842, 847 (2d Cir. 2021) (discussing various ways banks can be held liable for doing business with labeled terrorists). Likewise, the evidence may show that while the Government does not formally mandate closure, the costs to the bank of not closing may be substantial enough that it results in a "de facto" mandate to close. *Mead v. Indep. Ass'n*, 684 F.3d 226, 234 (1st Cir. 2012); *Kelley v. Mayhew*, 973 F. Supp. 2d 31, 43-45 (D. Me. 2013).

Third, Naveed Butt's legal inability to obtain a security clearance qualifies. Amend. Compl. ¶ 695. Ironically, Butt is an expert in counterterrorism, having previously taught counterterrorism to federal government employees. *Id.* ¶ 681. But he is unable to get a job in this field because his clearances have not been approved. *Id.* at ¶¶ 695-98. It is well established that an individual has a Due Process right in his security clearance when it is necessary for his employment and so, as a result "he was effectively barred from pursuit of many aspects of his profession." *Kelley*, 973 F. Supp. 2d at 46 n.13 (quoting *Greene v. McElroy*, 360 U.S. 474, 491 n.21 (1959) (cleaned up)). The Government's defense here is to suggest that Butt has yet proven that he cannot get a job in counterterrorism without a clearance, but again, the case

27

remains at the Motion to Dismiss stage. The Government also cites caselaw suggesting that Butt does not have a substantive right to the clearance, but that is a different question of whether he has a procedural right to not be denied a clearance under the stigma-plus test. Butt has also been denied for global entry. *See El Ali,* 473 F. Supp. 3d at 511 (allowing stigma plus claim to proceed based on such a denial).

Fourth, Khairullah's ***past*** watchlist status has made him ineligible to enter the White House. That, too, qualifies. *El Ali*, *id.* (inability to enter military bases grounds for stigma-plus claim).

Fifth, Amini and Abdukhamidov have been denied citizenship. The Government is wrong that Amini (who both hold Green Cards), 815, 855, do not have a right to citizenship. As green card holders, they are entitled to apply for citizenship, and to have that citizenship granted so long as they meet the applicable criteria. *United States v. Menasche*, 210 F.2d 809, 811 (1st Cir. 1954) ("a right to receive a certificate of naturalization arises once all the statutory requirements have been met and the requisite facts are established"), *aff'd*, 348 U.S. 528, 539 (1955); *see also Brown v. Holder*, 763 F.3d 1141, 1148 n.4 (9th Cir. 2014); *compare with DaCosta v. Gonzales*, 449 F.3d 45, 48 (1st Cir. 2006) (no due process right to an adjustment of status because of the discretionary nature of that relief). Likewise, although *Elhady* suggested that individuals do not have a right to a "speedy" adjudication of "visas and other immigration privileges," 993 F.3d at 227 n.5, the stigma plus test again (at least in this Circuit) covers "de facto" denials of rights, *Mead*, 684 F.3d at 234. At this stage in the litigation, Amini and Abdukhamidov have pled enough to show that their delay is a de facto denial of a right. *See*

Amend. Compl. ¶¶ 852 (Amini's 2019 application for citizenship not granted). ¶¶ 902-903

(Abdukhamidov's 2016 application for citizenship not granted).[7]

Finally, as to the No Fly List plaintiffs, to the extent that they do not have a due process

right already based on the denial of a liberty interest in traveling, the ability to board an aircraft

to, from, or over the United States is a plus factor. And there is no question that the Govern-

ment's prohibition is mandatory. *See Latif v. Lynch*, No. 3:10-CV-00750-BR, 2016 WL

1239925, at *8 (D. Or. Mar. 28, 2016).

**C. The process provided by DHS TRIP is inadequate.**

The Government asks the Court to dismiss the Due Process claims because enough

process is provided. Mot. to Dismiss at 21-23. As every court that has found a right in the first

place has held, this is wrong, *Elhady*, 391 F. Supp. 3d 562, particularly at the Motion to Dis-

miss stage, *Elhady*, 303 F. Supp. 3d at 465; *see also Kovac*, 363 F. Supp. 3d at 758; *Salloum v.

Kable*, No. 19-CV-13505, 2020 WL 7480549, at *11 (E.D. Mich. Dec. 18, 2020). As grounds

for dismissal, the Government unsuccessfully tries to perform the balancing test established

in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). But deciding the *Mathews* balancing test at

the motion to dismiss stage is rarely appropriate because "the determination of what process

is due requires a balancing of factors which in turn requires the type of factual record generally

not available upon a motion to dismiss." *Louise B. v. Coluatti*, 606 F.2d 392, 401 (3d Cir. 1979).

And, indeed, the Government's claims (at 27), that DHS TRIP provides rigorous process

subject to "several layers of review," including "regular TSC reviews and audits" and a "re-

dress" process "in which the Government conducts a review of available relevant

---

[7] According to the Department of State, the average processing time for citizenship is 5-7 months. https://www.state.gov/global-community-liaison-office/naturalization-of-foreign-born-spouses/guidelines-for-expeditious-naturalization/.

information" is based on findings made in 2016 at the summary judgment stage on a full record in a different case, *Latif v. Lynch*, No. 3:10-CV-00750-BR, 2016 WL 1239925, at *4 (D. Or. Mar. 28, 2016), which does not even support the factual claims.[8]

## IV.    The Government violated Migliore's and Ibrahim's Substantive Due Process Rights.

The right to substantive due process lies in the Fifth and Fourteenth Amendments of the Constitution and serves to protect citizens against government interference with fundamental rights. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

The Supreme Court has interpreted the word "liberty" in those amendments to include rights deeply rooted in US history--fundamental rights—which are "essential components of our Nation's concept of ordered liberty. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248 (2022). Substantive rights receive constitutional protection much greater than procedural rights. Indeed, substantive due process protects liberty from government action regardless of the "fairness of procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Therefore, state action which wrongfully deprives a person of life, liberty or property violates substantive due process in every instance unless the deprivation is "narrowly tailored to serve a compelling interest." Reno v. Flores, 507 U.S. 292, 302 (1993). Here, Migliore's and Ibrahim's substantive due process claims are about the wrongful deprivation of liberty—his right of movement.

---

[8] The factual claims are essentially the same made by the Government in the Motion to Dismiss in *Khalid v. Garland*, 21-cv-2307 (D.D.C. Aug. 10, 2023), Dkt. 43 at 27. There, it (inappropriately) relied on facts put forth in a declaration for these factual claims. In any event, Plaintiffs dispute these facts. *See Elhady*, 391 F. Supp. 562, 581-82 (E.D. Va. 2019), *rev'd on other grounds*, 993 F.3d 208 (4th Cir. 2021). Plaintiffs specifically object to the conversion of the Government's Motion into one for summary judgment and, before the Court does so, ask for an opportunity to respond under Rule 12(d), including by submitting a Rule 56(d) declaration.

**A.** **The freedom of movement is a fundamental right.**

The Government (at 27-28) relies on the "shocks the conscience" doctrine. This misunderstands Migliore's and Ibrahim's substantive due process claims. Substantive due process protects against more than just conscience-shocking behavior. It also protects fundamental rights. Substantive due process is the Constitution's "most comprehensive protection of liberties." *Rochin v. California*, 342 U.S. 165, 170 (1952). And those protections, as the Government's own brief acknowledges (at 30), include all rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987). The right of movement is among those rights.

Courts dealing with Substantive Due Process claims to look to "what the Fourteenth Amendment means by the term 'liberty." *Dobbs*, 142 S. Ct. at 2248. To answer that question, the Court must be "guided by the history and tradition that map the essential components of our Nation's concept of ordered liberty." *Id.* This inquiry requires "a careful analysis of the history of the right at issue." *Id.* at 2246; *see also Glucksberg*, 521 U.S. at 721 ("Our Nation's history, legal traditions, and practices thus provide the crucial guideposts."). Courts dealing with Substantive Due Process claims to look to "what the Fourteenth Amendment means by the term 'liberty." *Dobbs*, 142 S. Ct. at 2248. To answer that question, the Court must be "guided by the history and tradition that map the essential components of our Nation's concept of ordered liberty." *Id.* This inquiry requires "a careful analysis of the history of the right at issue." *Id.* at 2246; *see also Glucksberg*, 521 U.S. at 721 ("Our Nation's history, legal traditions, and practices thus provide the crucial guideposts.").

Our history—both ancient and contemporary—confirms that a right of movement is among the Constitution's unenumerated rights. In 1958, seemingly to answer the question posed by this case now, the Supreme Court described the right of movement— "across frontiers in either direction, and inside frontiers as well"—as a "part of our heritage." *Kent v. Dulles*, 357 U.S. 116, 126 (1958). And "the right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment." *Id.* at 129. Nor was *Kent* creating a new right. As the D.C. Circuit itself explained, at least one aspect of the right of movement, what it called a right of interstate travel, was "first recognized in *Crandall v. State of Nevada*"—a Supreme Court decision more than 150 years old. *State of Kan. v. United States*, 16 F.3d 436, 441 (D.C. Cir. 1994) (citing *Crandall v. State of Nevada*, 73 U.S. 35 (1867). Just after the Civil War's end, *Crandall* explained why the right of movement was central to our Constitution: "[The citizen] has the right to come to the seat of government … or to transact any business he may have with it…to seek its protection, to share its offices, to engage in administering its functions. [H]e has a right to free access to its seaports." *Id.* at 44. A violation of the right of movement, then, also interfered with all of these other rights, just as the No Fly List's flight ban does today to Migliore and Ibrahim. Courts have described the right of movement in various ways, leading the DC Circuit to observe that the constitutional right to "freedom of movement…[is] sometimes called the right to travel." *United States v. Matthews*, 419 F.2d 1177, 1193 (D.C. Cir. 1969). But the terminology is much more varied that just that. In 1900, the Supreme Court described Migliore's and Ibrahim's substantive due process right as the "right of locomotion" and the "right to remove from one place to another according to inclination." *Williams v. Fears*, 179 U.S. 270, 274 (1900). Four years later, the Supreme Court explained that "free movement" was among the "fundamental rights of citizens," offering Migliore and

Ibrahim protections for movement "out of, into, and settlement within, the confines of any state, district, or territory." *Pope v. Williams*, 193 U.S. 621, 624 (1904). Throughout the 20th century, the Supreme Court continued to churn out various ways of describing the right of movement and its necessary ingredients:

- a "freedom of movement" that includes travel "both internally and abroad," *Aptheker v. Sec'y of State*, 378 U.S. 500, 519 (1964) (Black, concurring);

- the right to travel "throughout the length and breadth of our land" *Shapiro*, 394 U.S. at 618;

- the "right of interstate travel" and the "right of international travel" *Haig v. Agee*, 453 U.S. 280, 307 (1981);

- the "freedom to travel abroad" *Califano v. Aznavorian*, 439 U.S. 170, 175 (1978).

Among the circuit courts, the nomenclature describing the right of movement has become even more fragmented:

- the "right of intrastate travel," which the Second Circuit deduced as a "correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971);

- the "right of localized intrastate movement." *Lutz v. City of York, Pa.*, 899 F.2d 255, 262 (3d Cir. 1990);

- the "right to travel locally through public spaces and roadways," including "free ingress to and egress from" various parts of a state. *Doe v. Miller*, 405 F.3d 700, 713 (8th Cir. 2005);

- the "right to freedom of movement," which includes a "right to localized travel" as well as "interstate and international travel components." *Johnson v. City of Cincinnati*, 310 F.3d 484, 495 (6th Cir. 2002);

- "the right of a citizen to re-enter the United States after lawfully traveling abroad is fundamental") *Hernandez v. Cremer*, 913 F.2d 230, 238 (5th Cir. 1990);

- Describing the international travel from abroad to the United States as a citizen's "fundamental right to have free ingress" to his country. *Worthy v. US*, 328 F.2d 386, 394 (5th Cir. 1964);

- Generally referring to the "fundamental right to free movement," *Hutchins by Owens v. D.C.*, 144 F.3d 798, 806 (D.C. Cir. 1999).

33

Regardless of its nomenclature, this movement-inclusive approach to identifying the contours of Migliore's and Ibrahim's substantive due process rights neither anticipates nor insulates something like the No Fly List--which excludes traveling citizens from the "usual and available means [of movement] in a modern society." *Mohamed v. Holder*, 2015 WL 4394958 at *6 (E.D. Va. 2015). And some aspects of the freedom of movement, such as the freedom to depart from and return to one's country, are neither fully international nor fully interstate. *See Mohamed v. Holder*, 266 F.Supp.3d 868, 878 (E.D. Va. 2017) ("interstate and international travel are increasingly seamless and we can no longer reasonably view interstate and international travel as discrete and separable activities.").[9] Indeed, the Magna Carta,[10] the Articles of Confederation,[11] the Universal Declaration on Human Rights,[12] and the International Covenant on Civil and Political Rights[13] all prove that the freedom to travel is a central feature of "our Nation's concept of ordered liberty." *Dobbs*, 142 S. Ct. at 2248.

---

[9] On April 12, after the Amended Complaint was filed, Mr. Ibrahim's mother passed away. Because of Ibrahim's status on the No Fly List, he was unable to see her before she died, or help with her burial, and will not be able to help settle her estate. Although Plaintiffs have not filed a Supplemental Complaint over these facts (in order to avoid further delay of the Motion to Dismiss in this case), Plaintiffs are willing to include them in a future Complaint should this Court decide them determinative of the Substantive Due Process or other claims. As a result, Plaintiffs respectfully request any dismissal of any claim to be with leave to amend.

[10] "All merchants may enter or leave England unharmed and without fear, and may stay or travel within it, by land or water, for purposes of trade, free from all illegal exactions, in accordance with ancient and lawful customs." Art. 41.

[11] [T]he people of each state shall have free ingress and regress to and from any other state." Art. IV.

[12] "Everyone has the right to freedom of movement and residence within the borders of each state" and "[e]veryone has the right to leave any country, including his own, and to return to his country." Art. 13.

[13] "Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence," "[e]veryone shall be free to leave any country, including his own, and "[n]o one shall be arbitrarily deprived of the right to enter his own country." Art. 12.

**B. The No Fly List interferes with Migliore's and Ibrahim's substantive rights, no matter how this Court decides to label them.**

Migliore's and Ibrahim's Substantive Due Process claims survive even if this Court splices their right of movement into separate rights regarding interstate and international travel. The right of domestic interstate travel is "virtually unqualified." *Haig*, 453 U.S. at 307 (citing United States v. Guest, 383 U.S. 745, 757-58 (1966)). As one Court assessing the No Fly List's impact on interstate travel put it, "The effect of the No Fly List on the fundamental right of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference." *Mohamed*, 266 F. Supp. 3d at 879–80.

The right of international travel, admittedly, has been subject to "reasonable government regulation" as circumstances have warranted. *Haig*, 453 U.S. at 306-07. But the No Fly List infringes on that right nevertheless. *Latif*, 28 F. Supp. 3d at 1149 (finding right implicated "even though [listees] may not have been completely banned from traveling"); *see also El Ali*, 473 F. Supp. 3d at 508 (that "less convenient means of transportation" remain technically available "does not change the analysis when considering, in many instances, the tremendous effort and time required to take such an alternative option.").

This Court need not decide the precise contours of Migliore's and Ibrahim's right of movement—or if the Court alternatively finds, their separate rights to international and interstate travel—at the motion to dismiss stage. "It is best to draw the constitutional line after we know the actual facts rather than to indulge in a long list of abstract opinions now." *Ibrahim v. DHS*, 06-00545, 2012 WL 6652362, at *8 (N.D. Cal. Dec. 20, 2012). At this stage, it is enough for the Court to find that their status on the No Fly List infringes on substantive due process rights they have to travel—domestically and internationally.

35

### C. No Fly List is not narrowly tailored.

Because the Government's decision to place Migliore and Ibrahim on the No Fly List interferes with their substantive due process right of movement it must "withstand strict scrutiny." *El Ali*, 473 F. Supp. 3d at 514. Strict scrutiny requires the Government to cease its interference with fundamental rights "unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721; *see also Mohamed*, 266 F. Supp. 3d at 879 (applying strict scrutiny to the No Fly List because it "significantly interferes with [a listee's] fundamental right to interstate travel…even though it only "limits their practical ability" to travel and "does not prevent designees from traveling domestically" completely). At the motion to dismiss stage, Migliore and Ibrahim limit their strict scrutiny argument to how poorly tailored the No Fly List is—as applied to them as well as facially.

And the No Fly List's flight ban is not narrowly tailored. The premise of the No Fly List is that certain people are too dangerous to fly. But that premise is betrayed by the Government's "one-time waiver" process. *See* MTD at 28; *see also, e.g., Latif*, 28 F. Supp. 3d at 1144; *Bosnic v. Wray*, No. 3:17-CV-826-J-32JBT, 2018 WL 3651382, at *2 (M.D. Fla. July 10, 2018); *Khalid v. Garland*, No. 1:21-CV-02307 (CRC), 2023 WL 2561943, at *2 (D.D.C. Mar. 16, 2023). If the Government can make a one-time waiver for people on the No Fly List, it can provide no reason why it cannot do so a second, or third, or fourth time, and so on. So the No Fly List and the one time waiver are self-evidently not the least restrictive means of enforcing any government interest. *See, e.g., Tandon v. Newsom*, 141 S. Ct. 1294, 1298 (2021) (existence of exceptions shows lack of narrow tailoring); *El Ali*, 473 F. Supp. 3d at 514 (The allegations "that the No Fly List, as an outgrowth of the TSDB, is both under and

overinclusive and so has been wholly ineffectual in furthering the government's legitimate security interests" are "plausible," making the narrow tailoring question "fact-dependent" and thus "inappropriate" to resolve at the Motion to Dismiss stage).

**V.    A watchlist targeting Muslims and people from Muslim-majority countries violates the Equal Protection clause.**

The Fourteenth Amendment's Equal Protection Clause prohibits a state from treating similarly situated persons differently because of their classification in a particular group. *See* U.S. Const. amend. XIV, § 1; *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004). The Fifth Amendment incorporates the same rule for the federal government. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 216 (1995). For an equal protection claim to survive a motion to dismiss, all a plaintiff must do is to "allege facts indicating that, compared with others similarly situated, [the plaintiff was] selectively treated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001) (cleaned up) (emphases omitted) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)).

**A. The watchlist targets Muslims and those from Muslim-majority countries.**

Plaintiffs have cleared this bar with space to spare. Plaintiffs—citing to the Government's own Watchlisting Guidance—allege that "Defendants consider constitutionally-protected traits like race, religion, ethnicity, national origin, and sex, as well as an individual's speech, political and social affiliations, family relationships, and other constitutionally-protected activity." Amend. Compl. ¶ 259. They also "consider origin from Muslim-majority countries, travel to Muslim-majority countries, attending mosques and Islamic events, zakat donations to Muslim charities, the wearing of typical Muslim dress, Muslim-sounding names,

37

the frequency of Muslim prayer, adherence to Islamic religious practices, Islamic religious study, the transfer money to individuals residing in Muslim-majority countries, affiliations with Muslim organizations, and associations with Muslims in the United States or abroad to be 'derogatory information' supporting a finding of reasonable suspicion." *Id.* at ¶ 260.

Hard data confirms the bias. "Based on a study of the leaked copies of the federal terrorist watchlist performed by statistical experts, using a 95% confidence level, over 98.3% Selectee portion of the leaked copy of the watchlist and over 99.6% of the No Fly portion of the leaked copy of the watchlist are Muslim. Overall, 98.3% of the records in the combined list were identified as Muslim by the statistical experts." Amend. Compl. ¶ 371. And the result is not only based on global patterns but translates to how the watchlist is used domestically, as well: "Dearborn, Michigan, a city of 96,000 people with the largest percentage of Arab-American residents in the United States, has the second-highest concentration of watchlisted individuals in the country. Dearborn is surpassed only by New York City, which has a population of nearly 8.5 million." *Id.* ¶ 366. This is despite the fact that "[n]o Muslim from Dearborn has ever committed acts of terrorism against the United States." *Id.*

Although the nomination of Muslims  to a list that specifically targets Muslims is enough on its own to make out an Equal Protection claim, the Complaint shows that the Government's use of the watchlist as a Muslim-targeting device is consistent with their own experiences. Several Plaintiffs on the watchlist were interrogated about their religious beliefs and practices, as part of the Government's attempts to interrogate Plaintiffs as to how much of a terrorist threat they actually are. Amend. Compl. ¶¶ 548 (El-Takach), 770, 798 (Cherri), 823-24, 838 (Amini), 1074 (Ibrahim). This questioning includes "what mosques they attend, how frequently they pray, whether their wives wear hijab, and whether they are Sunni or

Shia." Rashad was questioned over his role at his mosque. *Id.* ¶¶ 1014. 1178. Qashou and Ibrahim were also interrogated about their political beliefs. *Id.* ¶¶ 940, 1073

Plaintiffs have thus alleged that the Government's conduct has "had a discriminatory effect upon and ha[s] disparately impacted Muslim American travelers, and not travelers of other faiths." *Cherri v. Mueller*, 951 F. Supp. 2d 918, 937 (E.D. Mich. 2013). "Indeed, central to Plaintiffs' [Complaint] is that the policy, custom and practice is only applied against Muslims, and not travelers of other faiths." *Id.* And "Plaintiffs have sufficiently alleged that such policy, practice and custom targets a suspect class and has no rational basis." *Id.* "At this stage in the case, Plaintiffs' allegations are sufficient." *Id.*

### B.  Plaintiffs need not have a smoking gun proof of discrimination.

The Government states that an Equal Protection claim will not lie unless the Government admits that they intentionally target Muslims (or Arabs and South Asians, or some other protected class). MTD at 30. Statistical evidence is not enough. Nor are admissions or actions taken by officers based on the watchlist, even though they are acting according to the Government's own issued guidance. Even the Government's admission in its Watchlisting Guidance that relying on protected class status to place someone on the watchlist is only prohibited if that is the sole basis for placement. Amend. Compl. ¶ 232 & n.2. Only a true smoking gun, the Government contends, is enough.

This is not the law, particularly at the motion to dismiss stage. At this stage of the litigation, a plaintiff 'need not establish" that their harm was caused by discrimination. *Medina-Velazquez v. Hernandez-Gregorat*, 767 F.3d 103, 111 (1st Cir. 2014). "'Smoking gun' proof of discrimination" is not "necessary," as it is "rarely available." *Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012).

Indeed, "proof of discriminatory intent … can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bd. of Teamsters v. U.*S., 431 U.S. 324, 335 (1977). Thus, when "a clear pattern, unexplainable" through proper motives, "emerges," disparate treatment or impact suffices. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Likewise, to the extent the Government argues that these allegations should be discounted as somehow untrue, that, too, is belied by caselaw. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 14 (1st Cir. 2011).

But even if the extraordinary disparity shown by the hard data, the Plaintiffs' own experiences, and the Government's own Watchlisting Guidance were somehow not enough, the Congressional Research Service's own description of the watchlist points to the watchlist's focus on Muslims. *See* Richard F. Grimmett, 9/11 Commission Recommendations: Implementation Status Congressional Research Service (Dec. 4, 2006)12, at 1, 19, 21, and 31-33 (TSDB was a response to 9/11 Commission, which was aimed at "counter[ing] Islamic terrorism.").

In *El Ali*, a case with similar (though less pronounced, as there had not been a leak of the 2019 watchlist at the time) allegations, the Court found plaintiffs had properly pled an Equal Protection claim. The Court found the plaintiffs provided evidence of religious questioning similar to the ones faced by Plaintiffs here, which was enough to "infer plausibly that placement on the list was tied directly, and perhaps solely, to Plaintiffs' race, alienage, religion, and national origin." 473 F. Supp. 3d at 517. The Court separately found that Plaintiffs had plausibly alleged that "that similarly situated white or Christian individuals do not receive the same treatment as their Muslim counterparts," based on allegations repeated here almost

word for word. *Id.*; *see also* Amend. Compl. ¶ 368 (making same "social networks and known associates" allegation), 377 (making same allegations about "close families and friends of convicted white-nationalist domestic terrorists"); 378 (making same comparison to Christopher Hasson).

While not mentioning *El Ali's* holding at all, the Government cites a handful of other watchlist challenges where an equal protection claim was denied. But even if those decisions controlled, they turned on the specific allegations and arguments of those cases. For instance, at the time *Elhady* was decided, "[t]he publicly disclosed criteria used in connection with the Watch List [we]re facially neutral." 303 F. Supp. 3d at 467 (citation omitted). So, the plaintiffs there rested entirely on allegations of disparate impact. *Id.* As a result, Equal Protection claim was thus dismissed due to lack of sufficient allegations of intentional discrimination. *Id. Abdi v. Wray* is similar. 2018 WL 1940411 at *4 (D. Utah 2018). *Kadura v. Lynch* was decided based on the complaint's "threadbare recitals" of the elements without any supporting factual allegations. 2017 WL 914249 at *9 (E.D. Mich. 2017). Meanwhile, *Kovac* was decided on more narrow grounds, that "Defendants that Plaintiffs have not alleged a plausible comparison to similarly situated groups." 363 F. Supp. 3d at 760. Here, Plaintiffs specifically note that some criteria on which a determination may apply is not facially neutral. Amend. Compl. ¶¶ 387, 1130, 1150. Plaintiffs have met the burden the *Kovac* Court demanded by comparing the treatment of Muslims to even known terrorists when those terrorists are Christians engaged in white nationalist terrorism. *Id.* at ¶ 378; *see also id.* at ¶¶ 368, 376-77. And now Plaintiff has shown, using actual data, that the watchlist is almost exclusively Muslim. 371. Plaintiffs' Equal Protection claim survives.

VI.    **CBP's watchlist border search policy violates the Fourth Amendment.**[14]

Plaintiffs allege advanced searches of their electronic devices (in violation of the 4th Amendment) along with demands they provide passwords and biometric information to unlock their phones (in violation of the 5th Amendment). CBP's policy authorizes advanced searches of electronic devices for anyone on the watchlist even in the absence of any reasonable suspicion of any crime. *See, e.g.,* CBP Directive 3340-049A (Jan. 4, 2018), at § 5.1.4. Plaintiffs further allege that they are detained at the border for an unlawfully unreasonable time in relation to the legitimate bases of the detention, given that the Government has no right to do an advanced search of their phone, and they are all U.S. Citizens or lawful permanent residents with an absolute right of entry into the United States.

### A. Plaintiffs—all of whom are regularly subject to the policy—have standing to challenge it.

The Government suggests—incorrectly claiming that the statute of limitations runs from the first occurrence, *but see* § II(A)(3), above—that some (but not all) Plaintiffs' 4th and 5th Amendment claims fall outside of the statute of limitations period. But this is immaterial, because the Court can proceed on the clearly-programmatic relief that Plaintiffs seek even if only one Plaintiff has standing. *Dubois v. USDA*, 102 F.3d 1273, 1282 (1st Cir. 1996). (And, in any event, all Plaintiffs other than Khairullah are currently subject to the policy and thus will likely have their devices searched and seized the next time they trave abroad.)

The Government then shifts to the argument that nobody can have standing to challenge Fourth Amendment violations at the border. You see, past occurrences do not count. (Nor could they be brought as *Bivens* challenges, *see Egbert v. Boule*, 596 U.S. 482, 494 (2022);

---

[14] Plaintiffs' Fourth and Fifth Amendment claims are against CBP only.

*see also Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 887 (6th Cir. 2021) ("when it comes to the border, the Bivens issue is not difficult—it does not apply")). And even though Plaintiffs continue to be on a watchlist that places automatic consequences on them every time they cross the border, future injuries do not count either, because Fourth Amendment violations are not "continuing." Plaintiffs' ability to challenge the 4th Amendment violations the watchlist presents only during the hours-long duration they are detained without counsel at the border. *But see* Amend. Compl. ¶ 972 (CBD refusing Rashad access to a lawyer).

The Government provides no concrete support for this rule as it relates to border searches. It was rejected by this Court in *Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 152 (D. Mass. 2019) (plaintiffs history of travel plus the consistency of the Government's conduct sufficient to confer standing), *aff'd in part, vacated in part, rev'd in part* (all on other grounds) *sub nom. Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021). It was also rejected outside the 4th Amendment contexts in *El Ali v. Barr*, 473 F. Supp. 3d 479, 519 (D. Md. 2020); *Elhady*, 391 F. Supp. 3d; *Mohamed*, 266 F.Supp.3d at 875 ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing."); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1302 (D. Minn. 2018) (same); and *Cherri*, 951 F. Supp. 2d at 929 (similar).

To be fair to the Government, a version of this standing argument was accepted based on the narrowness of the facts alleged in *Jibril v. Wolf*, 2020 WL 2331870 (D.D.C. May 9, 2020). But that decision was reversed as to this issue on appeal. *Jibril v. Mayorkas*, 20 F.4th 804, 817 (D.C. Cir. 2021). As the D.C. Circuit explained, the reasonable inference that some Plaintiffs will travel in the future "combined with the reasonable inference that they remain on the" watchlist is enough to "adequately allege an imminent threat of future injury," which

is "plainly traceable to the Government's actions" and remediable by relief this Government could order (here, an instruction that watchlist placement by itself does not provide adequate reasons to perform an advanced search of people's phones). *Id.* at 817.

The Government separately—perhaps misreading the Complaint—suggests that advanced searches of electronic devices at the border are infrequent or inconsistent, rather than persistent, with few to no exceptions. Every single description of any entry by any plaintiff into the United States listed in the Complaint is, at minimum, consistent with the inference that the Government did an advanced electronic device search of the Plaintiff's phone, to the extent plaintiff had one. *See also* CBP Directive 3340-049A at § 5.1.6 (noting that such searches are not to take place in front of a watchlisted individual when there are national security issues). So yes, for instance, Abdukhamidov and Mohamed, who do not have any international travel described in the Complaint, do not allege any device searches. But the vast majority of Plaintiffs do. And, again, even if only one Plaintiff had standing, the challenge could still go forward. *Dubois*, 102 F.3d at 1282.

### B. CBP searches phones unlawfully without reasonable suspicion of border-related criminal activity.

The only information that CBP agents have when they perform these advanced searches of Plaintiffs' devices at the border is that they are on the watchlist. They have no reason to believe, much less reasonable suspicion, that Plaintiffs are in the process of committing any particular crime, much less one related to the border. Nor do they have reason to believe or reasonable suspicion that there is evidence of a crime on Plaintiffs' devices, or that Plaintiffs' devices or anything on Plaintiffs' devices are inadmissible to the United States. The searches are without reasonable suspicion. They are thus unconstitutional.

44

The Government only has two defenses to its illegal electronic search policy. One, which it makes only in a footnote, is that it is possible that a court might not consider the Government's "advanced" searches non-routine or requiring any sort of reasonable suspicion. The First Circuit has "repeatedly held that arguments raised only in a footnote or in a perfunctory manner are waived." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 60 n. 17 (1st Cir.1999); *see also Araujo v. UGL Unicco-Unicco Operations*, 53 F. Supp. 3d 371, 380 (D. Mass. 2014) (same). Even if it were not, the Government's entire argument—by its own concession—is dependent on the details of its advanced search. It is thus, at best, an argument that must be reserved for summary judgment.

The Government's second argument is that placement on the watchlist involves something with the words "reasonable suspicion" in its guidance, so it must satisfy the constitutional requirements for a border-related advanced search. But the Government's test is a modified and watered down "reasonable suspicion" test. Amend. Compl. ¶ 231. Their test determines whether there is "a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." *Id.* Yet conduct that can constitute being "related to" or "in aid" of terrorism sufficient to place an individual on the watchlist "is not necessarily related to any unlawful conduct," *Mohamed*, 995 F. Supp. 2d at 531, and the Government does not contend otherwise.

Border-related advanced searches of electronic devices do not require just "reasonable suspicion" of ***something***. Otherwise, the Government could perform them on all people at the border on the basis that the Government has a reasonable suspicion of engaging in international travel.

The First Circuit has not drilled down exactly what that something is, but in all previous cases, it was assumed to have been criminal in nature. *United States v. Robles*, 45 F.3d 1, 5 (1st Cir. 1995) (reasonable suspicion of unlawful narcotics); *United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (1st Cir. 1991) (same); *United States v. Wardlaw*, 576 F.2d 932, 935 (1st Cir. 1978) (same); *United States v. Braks*, 842 F.2d 509, 510 (1st Cir. 1988) (unlawful contraband). The Supreme Court, for its part, has been clear that "reasonable suspicion" implies suspicion of "criminal activity." *E.g., United States v. Cortez*, 449 U.S. 411, 417 (1981). Other courts have been clear that not only does "reasonable suspicion" require criminal activity, it must be criminal activity related to the border and the border search exception. *United States v. Cano*, 934 F.3d 1002, 1017 (9th Cir. 2019) ("border related crimes"); *U.S. v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018) (noting "the scope of a warrant exception should be defined by its justifications" and warning that a border warrant exception would not apply in a situation where "the government invokes the border exception on behalf of its generalized interest in law enforcement and combatting crime"); *United States v. McGinnis*, 247 F. App'x 589, 594 (6th Cir. 2007) ("The salient question is whether "reasonable suspicion" of criminal activity exists, paying special attention to whether the suspected criminal activity relates to a recent border crossing (e.g., smuggling as opposed to a murder charge) and whether the search occurred sufficiently close in time to the border crossing as to eliminate the risk that the individual obtained the contraband after the crossing.") (unpublished opinion). While a handful of other courts have expressly declined to decide whether to adopt a similar formulation, it is always in favor of a requirement that the reasonable suspicion be "of some type of criminal activity, border-related

or otherwise." *United States v. Bongiovanni*, 2022 WL 17481884, at \*13 (W.D.N.Y. Aug. 5, 2022), *report and recommendation adopted*, R, 2022 WL 17139489 (Nov. 22, 2022).[15]

So, the Government loses off the bat because their reasonable suspicion test is not of criminal activity, much less border-related criminal activity. But they lose again for a different reason: even if there was "reasonable suspicion" that plaintiffs engaged in some sort of unlawful terrorism, there's no reasonable suspicion that they did so on their phone. And what the First Circuit has articulated is that the agents must "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." *Uricoechea–Casallas*, 946 F.2d at 166. Even if the Government could win as to "the person," it loses on "the place." The Government has not and cannot explain the connection between a CBP officer knowing that someone is on the watchlist, and assuming for the second, that the individual is reasonably suspected of having some (not necessarily) illegal association with terrorism) and why that would give the CBP officer reasonable suspicion of any sort about the individual's electronic devices. Instead, searching the electronics of individuals suspected of having some relationship to terrorism is snooping or intelligence-gathering. *See Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018) (noting "the scope of a warrant exception should be defined by its justifications" and warning that a border warrant exception would not apply in a situation where "the government invokes the border exception on behalf of its generalized interest in law enforcement and combatting crime") (citations omitted).

---

[15] In prior litigation, the Government has pointed to language in *Kolsuz* that suggested reasonable suspicion could be that of "national security concerns." *Kolsuz*, 890 F.3d at 146. But in *Kolsuz*, the Fourth Circuit was merely citing favorably the Government's quasi-admission that heightened standards were necessary. *Id.* And so the District Court in that prior litigation rejected the Government's argument: "The TSDB cannot serve as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search." *El Ali*, 473 F. Supp. 3d at 521.

**C. CBP's hours-long detentions of people on the watchlist are not reasonably related to any permissible purpose.**

Once the Government loses on the electronic search policy (Count IV), it must necessarily lose on the unlawful seizure of person policy (Count VI). This is because the Supreme Court has made plain that the length of a detention at the border may only be justified to the extent it is "reasonably related in scope to the circumstances which justif[y]" the search. *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985). If the Government is not permitted to do an advanced search of the phone, they are not able to hold individuals with an absolute right to enter the country at the border for hours while they do. Nor are they allowed to detain these individuals for hours in order to interrogate them when that interrogation has nothing to do with their admissibility into the country. While they may ask voluntary questions of Plaintiffs, it must be in the context of them being reasonably aware that they are free to leave when they are done answering the questions, or if they decline to answer them.

Even if the Fourth Amendment electronic device claims fail, the Fourth Amendment unreasonable seizure claims still turn on the reasonable length of detention in light of the permissible grounds for holding them. In at least some of the detentions alleged, Plaintiffs were held for hours before any questioning of them was performed. *See, e.g.*, Amend. Compl. ¶¶ 944 (held in detention for two hours before questioning), 619 (four hours without interrogation). Other detentions took far longer than reasonably possible to perform an advanced search of electronic devices. *See, e.g.*, *id.* ¶¶ 1001-1003 (CBP held unlocked phone for six hours while Rashad was detained before allowing him to leave); 466 (Khairullah held incommunicado in a detention room for over five hours); 555 (three and a half hours interrogation); 571 (two-and-a-half detention even though the Government was not even returning El Takach's phone).

This violates the Fourth Amendment regardless of how the Government frames the justification. Maybe the Government was detaining them as retaliation for being on the watchlist. Maybe they were softening up the Plaintiffs as an interrogation tactic. Maybe the Government was waiting for a specialist in interrogating suspected terrorists to arrive. Regardless of the reasons, *Montoya de Hernandez* only permits the detention to the extent it is reasonably related to the reasons for the seizure. And because the Government has no reasonable suspicion that these individuals are inadmissible, they cannot detain them for hours in support of questioning beyond the limited questions normally asked at the border to ensure individuals and their property are not inadmissible. While an advanced search of a device can allow some delay at the border, it cannot justify the long detentions Plaintiffs routinely suffer.

The Government's rebuttal to this is to deny the plain truth of what is happening. It suggests (at 38-39) individuals are somehow not seized for Fourth Amendment purposes, even though they "are not free to leave," but the support for that proposition is inapposite cases about *Miranda* warnings. *United States v. Fernández-Ventura,* 85 F.3d 708, 711 (1st Cir. 1996); *United States v. Molina-Gomez*, 781 F.3d 13, 21 (1st Cir. 2015). Even then, *Molina-Gomez* found a *Miranda* violation when the plaintiff was detained at the border for two hours and the questioning was not routine, and "CBP officers were no longer probing whether or not to admit Molina into the country, as they had already reviewed Molina's travel documents and therefore confirmed his U.S. citizenship." *Id.* at 22-23. It suggests that the interrogations asked "routine" questions, but asking religious and other questions for hours goes well beyond "where [a traveler] was arriving from and with whom he was traveling" *United States v. Tajeddini*, 996 F.2d 1278, 1287–88 (1st Cir. 1993).[16]

---

[16] To be clear, Plaintiffs' claim here is against CBP seizures of person, not TSA.

The Government separately relies on a series of inapposite cases making different arguments or turning on specific facts. *Rahman v. Chertoff*, No. 05 C 3761, 2010 WL 1335434, at *4 (N.D. Ill. Mar. 31, 2010), assumed that placement on the watchlist rendered somebody arrestable, and then dealt with the Fourth Amendment claims of someone misidentified as being a person on the watchlist. *Id.* The Court found probable cause for arrest. Plaintiffs here claim—and the Government does not appear to dispute—that being on the watchlist is not grounds for arrest. Plaintiffs believe *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007), was wrongly decided, that case turned on specific evidence about a specific threat that the Court reviewed before making its determination, *id.* at 93 n.1. The Court found the search in *Tabbaa* routine only based on the narrow circumstances of that case. *See also Abidor v. Napolitano*, 990 F. Supp. 2d 260, 282-83 (E.D.N.Y. 2013) (permitting forensic search and extended seizure for such search after basic search showed images of terrorist groups on his device); *United States v. Saboonchi*, 990 F. Supp. 2d 536, 554-56 (D. Md. 2014) (disagreeing sharply with *Abidor*). Likewise, *United States v. Feiten*, No. 15-20631, 2016 WL 894452, at *3 (E.D. Mich. Mar. 9, 2016), simply held that whether a search is routine is dependent on the facts and bases for the search.

Here, Plaintiffs' 4th Amendment claim is that CBP is using watchlist status alone to justify hours-long detentions and interrogations of clearly-admissible United States citizens and permanent green card holders, even when there are no additional legal, unique reasons ns to justify these detentions. This claim is both plausible and legally sound under *Montoya de Hernandez*. The Government must stop using the border as an excuse to detain people for as long as it wants so it can take an opportunity to engage in the kinds of information gathering, interrogations, and retaliation, which would be plainly unlawful anywhere else.

50

## VII.  Requiring passwords or biometric information to unlock phones violates the Fifth Amendment.

### A. Plaintiffs Have Standing to Bring a Fifth Amendment Self-Incrimination Claim.

Plaintiffs have standing to bring their Fifth Amendment Claims for the same reason they have standing to bring their Fourth Amendment Claims.  *See* § VI(A), above. As that section explains in detail, Plaintiffs are consistently subject to CBP's illegal device search policy every time they cross the border, of which the Fifth Amendment violations are part. Their claims do not live, like delicate flowers, solely during the short instant they are at the border subject to the policy, or even just during the brief time a Plaintiff has booked specific travel to cross back into the United States on a specific date.

### B. Plaintiffs State a Fifth Amendment Self-Incrimination Claim

Plaintiffs allege that the Government forcing Plaintiffs to open electronic devices by providing passwords and biometric data "such as facial recognition or fingerprints" violates Plaintiffs' Fifth Amendment rights against self-incrimination.

#### 1. Plaintiffs have a reasonable fear that the Government will seek to use the information sought to criminally prosecute them.

The Government trots out the age-old trope that anyone with nothing to hide cannot stand behind the Fifth Amendment. MTD at 45-46. In the absence of alleging having committed a crime, and thus having incriminating information—as if civil plaintiffs would ever allege that—the Government claims, there can be no Fifth Amendment claim.

But the Supreme Court has "never held, as the Supreme Court of Ohio did, that the privilege is unavailable to those who claim innocence." *Ohio v. Reiner*, 532 U.S. 17, 21 (2001). "[O]ne of the Fifth Amendment's basic functions is to protect innocent men who otherwise might be ensnared by ambiguous circumstances." *Id.* (cleaned up) (emphasis original); *see also*

*Slochower v. Board of Education*, 350 U.S. 551, 557 (1956) ("a witness may have a reasonable fear of prosecution and yet be innocent of any wrongdoing").  And it is hardly speculative that the Government may go trolling through Plaintiffs devices to find supposedly-incriminating information to charge them with when (a) the Government already has labelled them "known or suspected terrorists," and (b) the Government was actively looking to coerce some of them into being an informant, and Plaintiffs' refusal to become informants have led to their placement or remaining on the watchlist, *see* ¶¶ 975 (Rashad), 1069 (Ibrahim).

### 2.  Plaintiffs have a right not to be punished for exercising their right to remain silent.

The Government also argues (at 43-45 and 46) that there is no actual Fifth Amendment right to remain silent, only a Fifth Amendment right not to have one's compelled speech used against them at trial. But the Fifth Amendment right to remain silent is just that, a right.

Sure, the remedy of exclusion is the proper remedy in the normal case where the Government compels testimony, an individual relents to the compulsion, and his only injury is that the Government now has information that it seeks to use against them at trial. There is, in that situation, no threat of future compulsion, and so any remedy must be limited to the harm suffered.

But here, Plaintiffs are asking the Court to force the Government to stop violating their rights in the future, whether or not that information is used against them in some future, hypothetical case. And so, they have standing to bring the case. And on the merits, the Fifth Amendment not only protects against the use of unlawfully-received evidence but also protects against the Government from violating the right in the first instance. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 804 (1977) (affirming injunction against policy violating Fifth

Amendment); *see also U.S. v. Kirschner*, 823 F.Supp.2d 665, 669 (E.D. Mi. 2010) (quashing of password-demanding subpoena).

It is impermissible for the Government to "make it 'costly' for [plaintiffs] to assert their Fifth Amendment rights." *Pentlarge v. Murphy*, 541 F. Supp. 2d 421, 427 (D. Mass. 2008) (incarceree class stated cause of action for declaratory and injunctive relief against program that punished them for refusing to waive Fifth Amendment rights by denying incarcerees treatment).

And even if Plaintiffs were not entitled to a declaratory judgment that the Government's actions violate the law and an injunction prohibiting them from forcing them to incriminate themselves, they are entitled to the Government's deletion of the wrongfully-obtained materials. All of the Government's cases to the contrary not only involve either Fourth Amendment claims or the equitable relief of expungement in general, but also involve claims to expunge arrest records, not the deletion of wrongfully obtained information.

## C. Giving biometric testimony is still testimony.

Finally, the Government claims (at 47) that "the provision of a biometric password" such as a fingerprint or facial recognition is not testimonial under the Fifth Amendment.

First, Plaintiffs' Fifth Amendment claims also include the Government's compelling Plaintiffs to provide actual passwords, or to type them into the device to unlock them, and this argument on its face does not apply to those claims. *See also United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. 2020) (finding demand that plaintiff unlock his phone in violation of the Fifth Amendment because "both situations would force defendant to 'disclose the contents of his own mind' and accordingly are testimonial acts violating the Fifth Amendment").

Second, there is a dispute between Courts about if and when the Government can ever compel the use of biometric data to unlock a phone. *See United States v. Warrant*, No. 19-MJ-71283-VKD-1, 2019 WL 4047615, at *2 (N.D. Cal. Aug. 26, 2019) ("The Court finds no meaningful distinction between unlocking a device with a password and unlocking a device with a biometric feature."); *see generally United States v. Payne*, No. 22-50262, 2024 WL 1647253, at *11 (9th Cir. Apr. 17, 2024) (describing split). It may well be, as *Payne* decided, that the question turns on precise facts and details of the case. 2024 WL 1647253, at *14 (9th Cir. Apr. 17, 2024). But so long as the Government's policy is that it may always compel biometric data of watchlisted individuals at the border, its policy is unlawful. And in any event, at the motion to dismiss stage, the idea that the case turns on particular facts not yet in evidence is grounds for denying dismissal.

### D. Even if not otherwise testimonia, demanding biometric data requires probable cause and a warrant, or at minimum, reasonable suspicion.

Even those few cases that have allowed compelled disclosure of biometric data have allowed it based on a warrant or subpoena, and the limits covered by that warrant or sub-poena. *See, e.g., In re Search Warrant No. 5165*, 470 F. Supp. 3d 715, 725 (E.D. Ky. 2020) (the United States may only compel individuals present during warrant execution to provide bio-metric markers to unlock electronic devices where the United States has reasonable suspicion that such an individual has committed a criminal act that is the subject matter of the warrant, and reasonable suspicion that the individual's biometrics will unlock the device"). *United States v. Warrant*, No. 19-MJ-71283-VKD-1, 2019 WL 4047615, at *4 (N.D. Cal. Aug. 26, 2019) ("the Court has authorized a search warrant that contains the direction it believes accurately describes the limited circumstances in which application of an individual's biometric feature can be compelled based on the facts presented in the government's application"). Here there

is no warrant or subpoena, raising new concerns that counsel against permission. The Court should not allow the erosion of the Fourth and Fifth Amendments to go that far in this novel assertion of Government power.

Finally, even if the Court rules that the Government can compel the unlocking of devices by biometric means, doing so opens the device to the sensitive information that is precisely the distinction between the manual searches that do not require reasonable suspicion at the border and the advanced searches that do. Thus, even when the Government does compel the use of biometric data at the border, and even when it does not thereafter use a computer to download the information, it should still nevertheless be held to the standards of reasonable suspicion, which it cannot meet for the reasons stated above.

## VIII. Religious questioning at the border violates RFRA.

Plaintiffs Amini and El-Takach have been subject to repeated religious questioning at the border. *See, e.g.*, Amend. Compl. ¶¶ 824, 825, 838, 542, 548, 550, 563, 631.[17] They have a sincere religious belief in being publicly Muslim. El-Takach, for instance, would like to go to his mosque regularly, but stopped for three years. *Id.* ¶ 1180.[18] But as a result of their religious practice, the Government has targeted them by not only placing them on the watchlist, but by subjecting them to religious questioning that leads to extended detentions every time they cross the border. Amini has also had his citizenship application delayed going on five years because of the Government's issues with Amini's religious practice. *Id.* ¶¶ 818, 852.

---

[17] So has Cherri, but because Cherri brought a substantially related challenge in the Eastern District of Michigan (though not under RFRA), Cherri is not bringing a RFRA religious-questioning related claim here.

[18] To the extent Amini and El-Takach need to provide more facts about their sincere religious beliefs, or how El-Takach has modified them in response to the Government's actions, Plaintiffs respectfully request the opportunity to amend.

This is a substantial burden. "Defendants' singling out of Plaintiffs and their persistent inquiry into Plaintiffs' religious beliefs and practices places pressure on Plaintiffs to modify or violate those beliefs or risk being subjected to the pattern of detentions and interrogations in connection with their travel." *El Ali,* 473 F. Supp. 3d at 526. And "trolling through a person's … religious beliefs" is "offensive." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000). This would necessarily put "substantial pressure" on Plaintiffs to "modify" their religious behavior. *Signs for Jesus v. Town of Pembroke, NH*, 977 F.3d 93, 111 (1st Cir. 2020).

*El Ali* found a viable RFRA violation pled based on essentially the same exact allegations.

Now, El-Takach did in fact succumb to this pressure (he stopped going to mosque, among other things) while Amini has not. But the question is not whether someone's sincere religious beliefs have been modified in response to the unlawful pressure, but whether they have been burdened in the first instance. *Cf. Barton v. Clancy,* 632 F.3d 9, 29 (1st Cir. 2011) (question as to whether an action rises to a First Amendment violation is whether it would "deter a reasonable hardy individual from exercising his constitutional right"). The Government provides no support for its suggestion (at 50) that unusual firmness in one's religious beliefs in response to unlawful pressure deprives an individual of their RFRA claim. If the Government were correct, then the federal Government would not violate an incarceree's religious beliefs by placing him in solitary confinement for nine months for refusing to shave his beard, despite the clear instructions of *Holt v. Hobbs*, 574 U.S. 352 (2015). Unfortunately, this is not a mere hypothetical. *See* Complaint, *Jackson v. Gilday*, 24-cv-01155, Dkt. 1 (D.S.C. Mar. 6, 2024).

It is not entirely clear whether the Government's argument is that there has been no "potential civil or criminal sanctions," MTD at 49-50, for Amini and El-Takach exercise of the religious belief or that there is no RFRA violation because Amini and El-Takach have not successfully been "forced to act contrary to their religious beliefs" as a result. Either way, the argument is at best a fact argument inappropriate for a motion to dismiss. Amini and El-Takach have both properly pled that they are subject to sanctions including remaining on the watchlist, additional lengthy detentions, and for Amini, denial of citizenship, as a result of their religious practice.

As to El-Takach, the Government suggests he might have modified his beliefs voluntarily for some other reasons, but that is just an inappropriate dispute of the alleged facts at this stage, and with no evidence in support. The Government separately claims that El-Takach has somehow lost his RFRA claim because, after three years of not attending mosque not making a difference, El-Takach has given up trying to modify his religious beliefs in that way in order to get the Government to stop punishing him for his religious beliefs. But, much like with Amini, the Government provides no support for why that would cost El-Takach his claim.

The Government moves on two caselaw, but its two cases in support do not get it the dismissal it seeks. *Cherri*—which involved the Free Exercise clause rather than RFRA—expressly did not deal with a situation where plaintiffs alleged that they were pressured to modify their religious beliefs. 951 F. Supp. 2d at 935.[19] The Court nevertheless allowed the same claim to go forward under the Equal Protection Clause. *Id.* at 937. *United States v. Mubayyid*, 476 F. Supp. 3d 46, 52 (D. Mass. 2007), is even further afield. It involves a defense to a

---

[19] The case remains at the summary judgment stage, so there has been no appeal.

criminal charge for lying on a tax exemption form "that an applicant for tax-exempt status 'submit a detailed statement of its proposed activities,' somehow places a substantial burden on the exercise of their religion." Of course the Court there summarily rejected that argument, without even bothering to explain why. That is quite different from placing El-Takach and Amini on a federal terrorism watchlist, detaining them for hours at a time to interrogate their religious beliefs, and denying Amini citizenship.

The Government then seeks refuge in the "exceptionally demanding" affirmative defense that the Government's actions were the least restrictive means of effectuating a compelling government interest. *Holt*, 574 U.S. at 364. The Government suggests (at 50) that its quizzing Muslim U.S. citizens and permanent residents at the border about their religion is necessary to prevent terrorism. But even assuming the Court could reach that affirmative defense at the motion to dismiss stage, *see Lowe v. Mills*, 68 F.4th 706, 718 (1st Cir. 2023), *Sabir v. Williams*, 52 F.4th 51, 61 (2d Cir. 2022), that defense is belied here by the fact that the religious questioning at the border is unrelated entirely to the question of El-Takach's Amini's admissibility, or the admissibility of any of their property. *See* § VI(C), above. Since it cannot compel questions to these answers in the first instance, it cannot claim that the interrogations and the punishments that attach to them either are a compelling government interest or that the Government has used the least restrictive means to impose them.

## IX. The watchlist is beyond the authority of the TSC, which has been given no powers by Congress.

### A. Congress has not clearly authorized the watchlist.

The Government laughs at Plaintiffs' claim that Congress has not authorized the watchlist even though the watchlist was initiated not by legislation but by an executive order in the wake of 9/11. In doing so, it makes no claim that the major questions doctrine would

apply to such a far-reaching, multi-agency practice that turns people's lives upside down even though all of its details are secret, even to Congress. *See* § 4012(c) of the Intelligence Reform and Terrorism Prevention Act of 2004, PL 108-458 (asking the Executive to provide "(A) the criteria for placing the name of an individual on the watch list, (B) the minimum standards for reliability and accuracy of identifying information, (C) the degree of information certainty and the range of threat levels that are to be identified for an individual; and (D) the range of applicable consequences that are to apply to an individual, if located"). It has thus forfeited the argument at this stage that this is not an "extraordinary case" where the major questions doctrine applies. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *Gonzalez Canton v. Mad Ruk Ent., Inc.*, No. CV 22-1458 (CVR), 2023 WL 4546545, at *9 (D.P.R. July 13, 2023) (argument not made in opening brief forfeited); *see also Kovac* (major questions doctrine applies to the watchlist).

When the major questions doctrine applies, the Government must identify "clear congressional authorization for the power it claims," *West Virginia*, 597 U.S. at 723 (citing *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Behind much bluster, the Government does not cite any authorization for creating the terrorist screening dataset, or the Terrorist Screening Center that administers it. Instead, the Government looks to broad congressional grants of authority for agencies to, for example, "prevent terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(B), and develop "policies, strategies, and plans for dealing with threats to transportation security," 49 U.S.C. § 114(f)(3). Like the statutes at issue in *West Virginia* and *NFIB v. DOL*, 595 U.S. 109 (2022), those vague pronouncements of agency power "ha[ve] a colorable textual basis" but fall far short of carrying the Government's burden to show clear congressional authorization to

create and maintain the watch list. *West Virginia*, 597 U.S. at 722-23; *see* 42 U.S.C. § 111(d) (authorizing regulation of certain pollutants from existing sources) (analyzed in *West Virginia);* 29 U.S.C. § 655(c)(1) (authorizing certain emergency occupational-health regulations) (analyzed in *NFIB*).

After all, "enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Midship Pipeline Co. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) (quoting *West Virginia*, 597 U.S. at 723) (cleaned up). Enabling legislation and general mission statements are a far cry from "clear congressional authorization" to collect identifying information about hundreds of thousands of people and then use that information to encroach upon their ability to access commercial flights, obtain visas, apply for municipal permits, purchase a firearm, and otherwise conduct their lives as law-abiding citizens. *See Utility Air*, 573 U.S. at 324.

Nor do Congress's more specific watch-list-adjacent directions provide the Government any help. In a few provisions of the U.S. Code, Congress provides instructions to TSA and other agencies about the use of "data on individuals identified on Federal agency databases who may pose a risk to transportation or national security." 49 U.S.C. 114(h)(1); *see also, e.g.*, 49 U.S.C. § 114(h)(3)(A) (requiring TSA to "establish policies and procedures requiring air carriers to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security"). Congress also directly ordered the creation of the DHS TRIP system. *See* 49 U.S.C. §§ 44903(j)(2)(C)(ii), 44903(j)(2)(C)(iii)(I), § 44903(j)(2)(G)(i); *see also* 49 U.S.C. § 44926(a). But those ancillary statutory directions—about how to use watch list data and address complaints about wrongful placements—are not adequate to show that Congress authorized the watch list's creation and

maintenance in the first place. Unless and until Congress expressly authorizes the Terrorist Screening Center and the terrorist watch list itself, the Government's actions in creating and maintaining them are "in excess of statutory jurisdiction, authority, or limitations" and must be held unlawful by this Court. 5 U.S.C. § 706(2)(C).

Unwilling to actually grapple with either step of the major question doctrine analysis (whether it applies and whether Congress has provided clear statutory authorization for the extraordinary assertion of power), the Government turns to a series of out-of-circuit district court cases that it characterizes as "rejecting" the contention that "Congress has [not] expressly authorized every step" of the watchlist. (Govt Reply and Response to MSJ) (citing *Salloum v. Kable*, 2020 WL 7480549, at *21 (E.D. Mich. Dec. 18, 2020); *Elhady v. Piehota*, 303 F. Supp. 3d 453, 467 (E.D. Va. 2017); *El Ali*, 473 F. Supp. 3d at 529; and *Mohamed*, 266 F. Supp. 3d at 883–84. These cases all involved the nondelegation doctrine, not the major questions doctrine. So none of them inquire whether Congress has actually, in clear language, authorized the watchlist itself, rather than tangential watchlist effects or consistent mission statements.

**B.  To the extent this Court finds Congress has authorized the watchlist, it did so only for the actual agencies authorized.**

To the extent Congress has authorized the TSA or the FBI to create and implement a federal terrorism watchlist, the TSA has impermissibly redelegated that authority to a different agency (TSC), and the FBI has impermissibly delegated its limited authority to a subagency (also TSC). They both have also impermissibly redelegated their authority to a multiagency advisory council (WLAC). Count XII. In other cases where the Supreme Court or Courts in this Circuit have permitted delegation from one agency to a different agency or subagency, permission for that delegation was provided by Congress. *Eagles v. U.S. ex rel.*

*Samuels*, 329 U.S. 304, 308 (1946) (statutory authority for redelegation); *INS v. Jong Ha Wang*, 450 U.S. 139, 140, (1981) (same); *Action for Bos. Cmty. Dev., Inc. v. Shalala*, 983 F. Supp. 222, 231 (D. Mass. 1997) (noting that if the challenged delegation was not authorized by Congress it would have been invalid, but separately finding that the delegating agency had ratified the conduct regardless).

The Government puts forth no argument that when Congress purportedly clearly authorized the watchlist, it authorized TSC to implement and run it, and the WLAC to decide by consensus all the rules and regulations that govern the watchlist. Nor does it put forth any argument that whatever authority Congress gave to TSA and FBI can simply be handed over to the TSC and WLAC. There are no grounds in the Motion to Dismiss for dismissing Count XII.

## X.    There is no textual basis for the watchlisting system's operations in violation of the nondelegation principle.

While it has been "some time" since the Supreme Court held that a "statute improperly delegated the legislative power to another branch," the Supreme Court has "hardly abandoned the business of policing improper legislative delegations." *Gundy v. United States*, 588 U.S. 128, 163 (2019) (Gorsuch, J., dissenting). That policing—sometimes done under the banner of the nondelegation doctrine but also via judicial efforts to "enforc[e] other sides of the separation-of-powers triangle between legislative, executive, and judiciary"—is of the utmost importance here, because for many aspects of the watchlisting system, there is no statutory grant of authority to interpret. *Id.* at 173.

There is no statutory language that authorizes the creation of the agency—TSC—at the center of this dispute. There is no statutory language authorizing the creation of a single, government-wide watchlist of any kind or for any purpose, let alone statutory authority for

the various kinds of lists made by the Government for the innumerable purposes those lists are now used. And as the Supreme Court recently observed, "it appears no statute or publicly promulgated regulation describes the standards the government employs when adding individuals to, or removing them from, the list." *Fikre*, 601 U.S. at 237. In short, the Government assumed a power to create the watchlisting system that Congress never delegated to it. *West Virginia,* 597 U.S. at 753 (Barrett, J., concurring) ("[T]he Constitution does not authorize agencies to use pen-and-phone regulations as substitutes for law passed by the people's representatives.")

The statutory language Defendants rely on—primarily, 49 U.S.C. § 114 and 49 U.S.C. § 44903—does not assign to the executive branch "only the responsibility to make factual findings," does not "set forth the facts that the executive must consider and the criteria against which to measure," and the Government's creation of the watchlisting system did not leave it to Congress to "make the policy judgments" about the basic facts of its existence. *Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting). Congress has not said anything about what lists it wants the Government to make and maintain, how it wants those lists to work, or who it wants on those lists.

This textual void complicates the application of the major questions doctrine, which depends on the presence of text to operate. But the major questions doctrine is not the only way this Court can address the separation of powers issues implicated by the expansive watchlisting authorities the Government claims for itself. The nondelegation doctrine offers another route that rests on a unanimous consensus in the Supreme Court. *West Virginia,* 597 U.S. at 750 (Barrett, J., concurring) ("But like Chief Justice Marshall, we all recognized that the constitution does impose limits on the delegation of legislative power.")

Indeed, it is the nature of the watchlisting powers claimed—to set up and staff a new agency, empower that agency to create a list of millions administered by secret processes and secret standards, and disseminate that list to tens of thousands of entities all over the world to the detriment of the people targeted—that makes the creation of the watchlisting system a legislative act within the exclusive constitutional authority of Congress. *Id.* at 737 ("the constitution's rule vesting federal legislative power in Congress is vital to the integrity and maintenance of the system of government ordained by the Constitution.").

With the Government's decision to create the watchlisting system, Defendants have found a novel way of violating the separation of power principles the nondelegation doctrine, and its differently-named doctrinal siblings, is intended to protect. *Gundy*, 588 U.S. at 167 (Gorsuch, J., dissenting) ("We still regularly rein in Congress's efforts to delegate legislative power; we just call what we're doing by different names."). For this reason, this Court should deny the Government's motion to dismiss Count IX.

## XI.    Plaintiffs' APA Claims Independently Survive.

### A. Plaintiffs' challenge to NCIC dissemination is a classic APA claim independent of any other claims.

Plaintiffs allege that sharing non-criminal watchlist information through the National Criminal Information Center is without any legal authorization, in violation of the APA. Complaint ¶¶ 1189-1193.

28 U.S.C. § 534(a)(1) allows the Attorney General to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records." That information may be shared for missing persons cases, id. at § (a)(3), and with the federal government for sentencing and penal purposes, id. at § (a)(4). Nothing in 28 U.S.C. § 534 permits the sharing of non-criminal information other than mere identification records. This is why information

may only be shared with certain "authorized" officials of the Federal Government, including the United States Sentencing Commission, the States, including State sentencing commissions, Indian tribes, cities, and penal and other institutions that "have arrest powers," *id.* at §§ (a)(4) and (e).  Civil information may not be shared just because it may serve another national security or law enforcement purposes. *See, e.g., U.S. v. Sweeney*, 914 F.2d 1260, 1263–64 (9th Cir. 1990) (28 U.S.C. § 534 authorizes Government "to collect criminal records data and make it available to law enforcement agencies throughout the country"); *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 467 (4th Cir. 2013) ("[w]e agree with the defendants that there is a good argument that Section 534(a)(1), which directs the Attorney General to 'acquire, collect, classify, and preserve identification, criminal identification, crime, and other records,' does not authorize inclusion of civil immigration records in the NCIC database").

In conformity with this plain reading of 28 U.S.C. § 534, 28 C.F.R. § 20.20(a) permits disseminating only certain "criminal history record information."  The watchlist is a civil, rather than criminal, record. So, the sharing of information through the NCIC is beyond statutory and regulatory authority.

The Government does not even argue to the contrary. So they have forfeited any challenge to Count IX at this time. *Gonzalez Canton,* 2023 WL 4546545, at *9(claim raised for first time in reply is waived).

## B.  Plaintiffs' APA Placement and Removal claim independently survives because the watchlist is arbitrary, capricious, and without statutory authorization.

Plaintiffs' other APA claim, challenging watchlist placement itself, is more closely intertwined with the other constitutional and statutory (e.g., Major Questions Doctrine and delegation-related) claims. Yet it is still independent in two ways.

First, even absent any constitutional deficiency, placement of people on the watchlist and failing to remove them (including by use of the policies used for placing and removing people on the watchlist) violates the APA to the extent these decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S. Code § 706(2)(a). The Government admits that this claim is independent of the constitutional ones.

The Government's argument is just that the standard is deferential so that there must be a rational basis for its actions. But whatever the standard is, without the administrative record, the Government cannot meet it. *Narragansett Indian Tribe by & Through Narragansett Indian Tribal Historic Pres. Off. v. Nason*, No. CV 20-576 (RC), 2020 WL 4201633, at *4 (D.D.C. July 22, 2020) ("Defendant's arguments about the highly deferential review of agency action under the APA, while correct, are premature given that the Court does not have the administrative record"); *Dist. Hosp. Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162, 171 (D.D.C. 2011) ("a review of the administrative record is necessary to a determination of whether the Secretary's methodology was arbitrary and capricious"). That claim must survive until the administrative record defending the Government's actions is produced. *See also Kovac v. Wray*, No. 3:18-CV-00110-X, 2020 WL 6545913, at *5 (N.D. Tex. Nov. 6, 2020) (refusing to dismiss APA watchlist challenge because "development of the factual record" is necessary to determine whether the Government's actions were arbitrary and capricious or not).

Second, Plaintiffs' placement and removal (and the processes used to place and remove Plaintiffs) should also be set aside to the extent it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(a). Notably, this provision applies even when the major question doctrine does not. But because the Government does not contest that the major question doctrine applies, Plaintiffs concede that this argument

66

is effectively duplicative of the second prong of the major questions doctrine analysis at this juncture.

TBD

## XII.  All Defendants are proper.

The Government suggests some Defendants should be dismissed because they have not injured Plaintiffs in any way. But all of them are part of the Watchlisting Advisory Council, or WLAC. As the Amended Complaint alleges, "The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures, which are formally adopted by Defendants when they are approved by the National Security Council ("NSC")." *E.g.*, Amend. Compl. ¶ 31. Because the WLAC, which operates by consent, *id.* ("agrees upon"),[20] each Defendant is responsible for formulating the inclusion standard for watchlist placement and dissemination practices that are part of the watchlisting guidance. *Id.* at ¶¶ 51, 230, 231, 244; *see also id.* at ¶ 337 (inclusion standard itself violates Due Process Clause). It is also responsible for how the watchlist is disseminated. As explained by *El Ali*: "The Court is centrally concerned that WLAC Agency Defendants' role in approving [the Watchlisting Guidance] changes as 'policy' is sufficient to confer standing. This is because, as averred, the WLG governs the TSDB and Watchlist inclusion criteria, as well as dissemination of the same." 473 F.Supp.3d at 502. All Defendants are proper.

Even putting aside the Defendants' role in WLAC, Defendant Cheatle (US Secret Service) denied Khairullah entry to the White House because of his prior watchlist placement. Amend. Compl. ¶¶ 60-62, 319, 470-72. Secretary Blinken (Department of State) has denied citizenship to Abdukhamidov and Amini and delayed it for over a decade to Mirzay. *Id.* ¶¶

---

[20] Plaintiff can further amend the Complaint to make this more explicit if necessary.

169, 660, 813, 902. The Department of the Treasury and Gacki (OFAC) have both forced banks to close accounts with Plaintiffs. ¶¶ 203,213. These Defendants are liable for the harm they have imposed on Plaintiffs for the reasons explained in this Opposition.

Finally, as the Government correctly notes in a footnote, Plaintiffs incorrectly named Pete Buttigieg instead of Janet Yellen when making its allegations against the Department of Treasury. *See* Amend. Compl. at ¶ 200 ("Defendant Pete Buttigieg is Secretary of the U.S. Department of Treasury."). While arguments in a footnote are waived, *NFTC*, 181 F.3d at 60 n. 17; *Araujo*, 53 F. Supp. 3d at 380, Plaintiffs agree that some cleanup is required (for one, it does not appear Janet Yellen, the actual current Secretary of Treasury, was served). But dismissal is not the proper remedy; instead, Plaintiffs should be allowed to Amend to correct. *See Rogers v. Miller, No.* 16-cv3610, 2017 WL 6542459, at *8 (E.D.N.Y. Dec. 21, 2017), ("Where a plaintiff mislabels the proper defendant in a caption but includes allegations of misconduct, courts generally will grant leave to correct the mistake under Rule 15."), *report and recommendation adopted*, 2018 WL 1136600 (Mar. 2, 2018) ("Where a plaintiff mislabels the proper defendant in a caption but includes allegations of misconduct, courts generally will grant leave to correct the mistake under Rule 15.").

Because this case has been delayed enough, Plaintiffs believe the best course of action is for the Court to decide the Motion to Dismiss, and then once it is decided, Plaintiffs can file a Rule 15 Motion to add Secretary Yellen back into the litigation.[21] At that point, the Government can reassert any Department-of-Treasury-specific defenses. But if the Court wants a Rule 15 Motion now, Plaintiffs can file one within seven days of being notified.

---

[21] The Government has refused to consent to such an approach, claiming prejudice from the mistake, even though they were plainly able to understand Plaintiffs' intent.

Plaintiffs make no claims against Pete Buttegieg or the Department of Transportation.

## CONCLUSION

The Court should deny the Motion to Dismiss.

Date: May 23, 2024                                    Respectfully Submitted,

                                                     **CAIR LEGAL DEFENSE FUND**
                                                     /S/ Lena Masri
                                                     Lena Masri*
                                                     Gadeir Abbas*^
                                                     Justin Sadowsky*
                                                     CAIR LEGAL DEFENSE FUND
                                                     Phone: (202) 742-6420
                                                     LDF@cair.com
                                                     453 New Jersey Avenue SE
                                                     Washington, DC 20003

                                                     Barbara J. Dougan (BBO 558392)
                                                     CAIR MASSACHUSETTS
                                                     800 Boylston Street
                                                     PO Box 990445
                                                     Boston, MA 02119

                                                     Amy V. Doukoure*
                                                     CAIR MICHIGAN
                                                     1905 Haggerty Road, Suite #5
                                                     Canton, Mi 48188

                                                     *Counsel for Plaintiffs*

                                                     *Admitted to practice before this Court Pro Hac Vice*
                                                     *^ Licensed in VA, not D.C. Practice limited to federal matters*

69

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non registered participants.

/s/ Lena Masri
Lena Masri